# EXHIBIT C




## STEP B DECISION

| | | |
|---|---|---|
| **STEP B TEAM:** | Decision: | **IMPASSED IN PART** |
| **Tennessee** | USPS Number: | C16N-4C-C 19079250 |
| | Grievant: | Class Action |
| Monica Lucas, USPS | Branch Grievance #: | 18-FCMK3-18 |
| Paul F Glavin, NALC | Branch: | 1999 |
| | Installation: | Kingsport |
| | Delivery Unit: | Post Office |
| | State: | Tennessee |
| District Grieving: | Incident Date: | Ongoing |
| **Tennessee** | Informal Step A Initiated: | 12/20/2018 |
| | Formal Step A Meeting Date: | 12/27/2018 |
| | Date Received at Step B: | 12/29/2018 |
| | Step B Decision Date: | 02/08/2019 |
| | Issue Code: | 15.3200 |
| | NALC Code: | 505011 |

**ISSUE:**

Did Management violate Article 15, Section 3A, and Article 19, via Postal Service Policy Letter (M-01517) via Article 19 of the National Agreement by failing to comply with the grievance resolution/settlements dated **11/27/2018** for Grievance **#18-FCMK2-18** in the **Main Kingsport Installation**? If so, what should the remedy be?

**DECISION:**

The Dispute Resolution Team (DRT) has decided to declare an **IMPASSE IN PART**. The DRT agrees Management violated Article 15, Section 3A, and Article 19, via Postal Service Policy Letter (M-01517) of the National Agreement by failing to comply with the grievance resolution/settlements dated 11/27/2018 for Grievance #18-FCMK2-18 in the Main Kingsport Installation. The Step B Team could not jointly agree on the appropriate contractual remedy for this case and therefore, the remedy is being impassed. All arguments and evidence in the case file pertaining to the remedy may be cited in the event of arbitration. The NALC National Business Agent may appeal this grievance to arbitration within fourteen (14) days after the receipt of this decision.

**UNION'S POSITION:**

The Union Formal A Representative effectively presented the Facts and Contentions. All of the arguments raised by the union at the Informal and Formal Step A meetings are brought forward to Step B and Arbitration. The Step B representative would like to add the following:

The Union and Management at the Step B Level have agreed it is undisputed Management violated Article 15, Section 3A, and Article 19, via Postal Service Policy Letter (M-01517) of the National Agreement by failing to comply with the grievance resolution/settlement dated 11/27/2018 for Grievance #18-FCMK2-18 in the Main Kingsport Installation.

1

On Page 5-1 of the JCAM both parties agree to the following:

> Article 5 prohibits management taking any unilateral action inconsistent with the terms of the existing agreement or with its obligations under law. Section 8(d) of the National Labor Relations Act prohibits an employer from making unilateral changes in wages, hours or working conditions during the term of a collective bargaining agreement.

National Arbitrator Aaron decision C-04085 dated January 25th, 1984 reads in relevant part as follows:

> It is now well settled that the parties to arbitration under a National Agreement between the Postal Service and a signatory Union are barred from introducing evidence or arguments not presented at preceding steps of the grievance procedure, and that this principle must be strictly observed.

Memorandum of Understanding (M-01648) reads in part as follows:

> Step B teams are not responsible for building the grievance file. It is the responsibility of the parties at Step A to exchange documentary evidence and place copies in the file...The primary responsibility of the Step B team is making timely decisions on the merits of disputes.

The Union contends there is simply no new argument or contention allowed past that Formal Step A Level. The Step B Team may add additional facts and contentions respectively, but **that language clearly notes "additional "meaning only to supplement a previous argument or contention rather than to create new evidence or argument into the record. Management in the Kingsport Installation failed to contest any of the specifics of the Union's Formal Step A contention or remedy as specifically required at the Formal Step A Level**. While the case moves forward in the procedure outlined in Article 15, the language is quite clear that a failure to present any contentions to the Unions arguments at Step A bars the Employer from creating any argument to a previous step A contention made by the Union in any future Step of that Article 15 Grievance-Arbitration Procedure, up to and including Arbitration. Management had every opportunity to interview witnesses, submit documentation, or present statements at the Formal Step A but chose not to in this instance.

Step 4 agreement M-01485 Step 4 August 29, 2002, E98N-4E-C-02096819 reads in relevant part as follows:

> The parties agree that Step B Teams have the authority to formulate a remedy when resolving disputes after finding a violation of the National Agreement...

Both parties agree to the following on Page 15-8 of the JCAM which reads in relevant part:

> **A Step B decision establishes precedent only in the installation from which the grievance arose.** For this purpose, precedent means that the decision is relied upon in dealing with subsequent similar cases to avoid the repetition of disputes on similar issues that have been previously decided in that installation.(Emphasis added)

The grievance file contains Step B Decision C16N-4C-C 18221124, dated June 06, 2018 which reads in relevant part as follows:

> **ISSUE:**
> Did Management violate Articles 3, 5, and 19 of the National Agreement via Sections 665.16, 665.44, and 661.2 of the ELM, the F-21 Time and Attendance Handbook, the M-32 Handbook, and The Joint Statement on Violence and Behavior in the Workplace (M-01242) when they manipulated and/or falsified clock rings in the Kingsport Installation? If so, what is the appropriate remedy?
>
> **DECISION:**

2

> The DRT has **RESOLVED** this grievance. **The DRT determines Management violated the National Agreement when they failed to ensure timekeeping procedures in the Kingsport Post Office were in compliance with the applicable handbooks and manuals. The Step B Team agrees Management will cease and desist this practice and that all Management in the Kingsport Post Office will be retrained on the use of TACS immediately upon receipt of this decision. A copy of the completed training will be provided to the Union immediately upon request.** The DRT also agrees the parties will jointly review the TACs reports included in the grievance file and will compensate any letter carrier who received a loss of pay incurred by the improper time keeping procedures in the Kingsport Post Office. Management will also immediately place all full time carriers in the Kingsport Installation on the appropriate assigned route in TACS and will ensure that operational changes in the Kingsport Post Office are done in compliance with the M-32 Handbook

The grievance file reveals Management was instructed in the decision rendered on 06/06/2018 as referenced above when they failed to ensure the time keeping procedures in the Kingsport Installation remained in compliance with the applicable handbooks and manuals. The Union contends to fraudulently alter time clock rings at any time is disingenuous; on the same level as theft, and negatively impacts the integrity of all postal operations. Management was given an opportunity to correct this behavior be being instructed to immediately take additional training and provide proof of this training to the Union immediately upon request, place all carriers on the appropriately assigned routes in TACS, and ensure all operational changes in the Kingsport Post Office are done in compliance with the M-32 Handbook.

The DRT provided additional instruction to Management in the explanation portion of the resolution which can be found on Page 4 in decision for Step B Decision C16N-4C-C 18221124, dated 06/06/2018. It reads as follows.

> The DRT instructs Management in the Kingsport to ensure employees who are required to move from one operational code to another clocks into the new operation him or herself when on office duties and/or when they return from their street duties, in an effort to avoid disputes of a similar nature.

The Union contends on Page 7 that recent TACS reports show that Supervisor Duane Allen and Phil Benton continue to place carriers on 782 (Training) function at their discretion even though they have been instructed to ensure Letter Carriers perform this function in an effort to avoid these types of disputes.

The Union has included Formal Step A Resolution for Local Grievance #18-FCMK1-18 dated 08/14/2018 which reads in relevant part as follows:

> The parties agree that Duane Allen, Lisa Fortner, Phil Benton will complete the TACS user training no later than August 31, 2018 and provide the Union certification of completion.

Management in the Kingsport Installation deliberately refused to comply with the decision rendered by the Step B Team on June 6th, 2018 which resulted in the Union filing a grievance which was resolved with the parties agreeing at the Formal Step A Level to the above resolution. The Union agreed Management would now have until August 31, 2018 to complete this training and provide the information to the Union. This did not happen. Once again the Union was forced to initiate a grievance at the Informal Step Level in an effort to ensure Management complied with the 2 above referenced grievance resolutions for the same issue. The parties met at the Formal Step A Level on 11/01/2018 and was received by the Step B Team on 11/13/2018.

The following decision for Grievance # 19019432 (18-FCMK2-18) was rendered on 11/27/2018. It reads as follows:

> The DRT agrees Management failed to comply with a Formal Step A settlement agreement as well as Step B Decision C16N-4C-C 18221124 when they failed to provide the Union documentation revealing Kingsport Management officials received TACS training. Management of the Kingsport Installation is issued a cease and desist in the failure to comply with grievance settlements. Management of the Kingsport Installation is

3

issued an additional cease and desist regarding the failure to provide information requested which is relevant to the investigation and processing of a possible grievance. Management will provide the Union with documentation relative to the required TACS training within seven (7) days of receipt of this decision. **Failure to comply with this subject resolution may result in the Union's request for escalating remedies to ensure compliance.**

The explanation portion of this grievance contains the following paragraph which can be found on Page 2 of the above referenced decision for grievance number # 19019432 (18-FCMK2-18)

The Union includes the following Steward's statement relevant to the above cited settlement:

During a meeting with Postmaster Susie Whittington we discussed Local Grievance 18-FCMK2-18 [sic] specifically the dates that supervisors completed their training; during this discussion the Postmaster told me that Supervisor Lisa Fortner was the last one to complete her TACS training and the date of completion was October 2, 2018. **The Postmaster said she would print out a completion paper with the dates on it that I never received.**

The grievance file reveals 5 months after the initial decision Management still stubbornly refused to provide the information of proof that Management had complied with the initial decision requiring them to take TACS Training as instructed by the DRT on June and agreed to at the Formal Step A Level on August 14, 2018. It should be duly noted the Step B Team recognized this when they rendered a decision with a note that failure to comply may result in escalating remedies to ensure compliance. This was not the first time Management was put on notice that escalating remedies may be applied to the remedy to ensure compliance for failing to provide information to the Union and/ or complying with Step B Decisions.

The Union contends the same Postmaster Susie Whittington in the above referenced paragraph was the Formal Step A Representative in the following Kingsport TN grievance decisioned by the Step B Team on 02/13/2018.

This decision will serve as an additional cease and desist to Management in failing to comply with Articles 15, 17 and 31 of the National Agreement as it relates to furnishing information requested by the Union in the investigation of a possible grievance and complying with Step B Decisions... **Management in the Kingsport Installation is put on notice that further violations of failing to provide time and information to the Union to investigate and process grievances may result in escalating monetary remedies.**

The grievance file contains Step B Decision for Grievance #C11N-4C-C17604804 dated 10/12/2017 which reads in relevant part as follows:

The DRT determines Management violated the National Agreement and Step 4 Decision (M-01517) when Management failed to comply with grievance settlements/resolutions for Union Grievance Number CA0082017 and CA0502017. Management will post Routes 6450 and 6008 on the next job bid posting from the date of this decision. **The DRT reminds Management compliance with arbitration awards and grievance settlements is not optional**.

The Union contends Management in the Kingsport Installation has been reminded, instructed and finally put on notice several times of the consequences in their continuing and deliberate failure and refusal to comply with DRT decisions to provide information as well as to actually comply with grievance resolutions. Postmaster Whittington and Supervisor Allen were certainly aware that deliberate failure to provide the Union with information and refusing to abide by Step B Team decisions may result in escalating remedies, yet the grievance was forwarded to the Step B Team yet again without providing the information they acknowledged existed. This action reveals the deliberate and intention decision Management has continually made not to provide the information to NALC Formal Step A Representative Stout and to ignore the instructions of the Step B Team.

The grievance file reveals Management at the Formal Step A provided no additional attachment as documentation to support this single paragraph which they submitted as their entire contention in this case file on 12/27/2018. It reads in its entirety as follows:

> **The Union did not receive the training certificates for the Supervisors by the deadline stated in the DRT decision. The certificates have been printed and given to the Union.** The city carriers in Kingsport did not suffer any monetary loss because the Union did not have training certificates. The Union's requested monetary remedy is certainly punitive rather than corrective in nature. The training was not able to be scheduled in time to meet the previous deadline.

Page 5 of Union contentions submitted by Formal Step A Representative Shawn Stout reads in relevant part as follows:

> First and foremost the Union would like to let the documents included show that the Step B Decision for Grievance #11-FDMK-4-18 clearly states that Management will be **RETRAINED** on the use of TACS however the information provided by the Union by Management shows Supervisor Duane Allen was trained on 11/18/1999 and that he did not in fact go to training again. Therefore this is still an ongoing failure to comply.(Bold and capitol as written).

The Union contends the documentation submitted by Management in their own contentions provides evidence Supervisor Allen as of the Formal Step A Meeting on 12/27/2018 had not even taken the instruction of the Step B Team to be retrained when the evidence in the file reveals he had the opportunity to do so as Supervisors Fortner and Watson had done. The date on Supervisor Allen's certificate shows his training date as last being completed on 11/18/1999. Once again, this is evidence of the deliberate and intentional refusal to comply with numerous instructions and grievance resolutions at the Formal Step A and Step B Levels.

The sheer volume of grievances cited by the Union in such a short amount of time regarding the very same issue and incident supports their case that Management in the Kingsport Installation has determined when it is not convenient to meet their responsibilities to comply with precedent setting decisions; they just may refuse to do so. They have provided no documentation in their contentions to make any explanation why they have not complied with the Step B Team decisions or their own Formal Step A Agreement despite having been instructed to do so with the warning that the remedies may be escalated to ensure compliance to these directives.

Memorandum of Understanding, USPS Letter (M-01517), reads in relevant part as follows:

> Compliance with arbitration awards and grievance settlements is not optional. No manager or supervisor has the authority to ignore or override an arbitrator's award or a signed grievance settlement. Steps to comply with arbitration awards and grievance settlements should be taken in a timely manner to avoid the perception of non-compliance, and those steps should be documented.

USPS-NALC Joint Statement of Expectations (M-01492) Joint Expectations dated July, 2003 reads in relevant part as follows:

> We will work together to prevent contract violations through communication, training, and good faith efforts to anticipate workplace problems and resolve disputes in a timely manner.
> • We are committed to eliminating abuses of our grievance-arbitration procedure, such as the filing of unwarranted grievances to clog the system or a refusal to resolve grievances even where there are no legitimate differences of opinion between the parties.
> • We are committed to mutual and joint efforts to improve the workplace environment and to improve the overall performance of the Postal Service. We will make every effort to resolve our disputes in a professional manner and to avoid any unnecessary escalation of disputes which may adversely impact adherence to the above principles or adversely influence union-management relationships at other levels of the organization.

Page 41-17 of the JCAM reads in relevant part as follows:

> In circumstances where the violation is egregious or deliberate or after local management has received previous instructional resolutions on the same issue and it appears that a "cease and desist" remedy is not sufficient to insure future contract compliance, the parties may wish to consider a further, appropriate compensatory remedy to the injured party to emphasize the commitment of the parties to contract compliance. In these circumstances, care should be exercised to insure that the remedy is corrective and not punitive, providing a full explanation of the basis of the remedy.

The above referenced Joint Statement of Expectations agreed to by the parties at the National Level reveals a commitment to eliminating abuse of the grievance system. The JCAM specifically expresses the joint, agreed-upon position of both NALC and the Postal Service in the above referenced language contained in the JCAM authorizes "compensatory" remedies beyond mere payment for lost hours and benefits in appropriate circumstances to **emphasize the commitment of the parties to contract compliance.**

National Arbitrator Mittenthal Decision (C-06238) rendered on June 9, 1986, H4N-NA-C 21 (4th Issue) which reads in relevant part as follows:

> One of the inherent powers of an arbitrator is to construct a remedy for a breach of a collective bargaining agreement. The U.S. Supreme Court recognized this reality in the Enterprise Wheel case:
> "...When an arbitrator is commissioned to interpret and apply the collective bargaining agreement he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency." United steelworkers of America v. Enterprise Wheel & Car Corp., 80 S. Ct. 1358, 1361 (1960).

National Arbitrator Gamser decision (C-03200) dated April 3, 1979, reads in relevant part as follows:

> However, to provide for an appropriate remedy for breaches of the terms of an agreement, even where no specific provision defining the nature of such a remedy is to be found in the agreement, certainly is found within the inherent powers of the arbitrator. No lengthy citations or discussion of the nature of the dispute resolution process which these parties have agreed to is necessary to support such a conclusion.

The National Labor Relations Act (NLRA) reads as follows in relevant part in 29 US Code 186 – Sec. 302. [§ 186.] (a)

> **(c) [Exceptions] The provisions of this section shall not be applicable** (1) in respect to any money or other thing of value payable by an employer to any of his employees whose established duties include acting openly for such employer in matters of labor relations or personnel administration or to any representative of his employees, or to any officer or employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer; **(2) with respect to the payment or delivery of any money or other thing of value in satisfaction of a judgment of any court or a decision or award of an arbitrator or impartial chairman or in compromise, adjustment, settlement, or release of any claim, complaint, grievance, or dispute in the absence of fraud or duress;**

Congress enacted the National Labor Relations Act ("NLRA") in 1935 to protect the rights of employees and employers, to encourage collective bargaining, and to curtail certain private sector labor and management practices, which can harm the general welfare of workers, businesses and the U.S. economy. This section provides the exclusions to restrictions on payments to employee representatives specifically to ensure the awards of arbitrators could include a monetary remedy.

The Step B Team has carefully constructed language and included the appropriate contractual provisions in each previous remedy and decision to remind the parties of their respective obligations to the provisions contained in the National Agreement. Each decision contains a cease and desist and an

6

explanation reminding or instructing Management of their responsibility to adhere to the previous precedent setting decisions. Management in the Kingsport Installation continually forces the Union to invest their resources and time into an issue which has repeatedly been determined by the Tennessee District Step B team as a violation of the National Agreement. These contractual violations are clearly flagrant and intentional; therefore this situation must be recognized when fashioning a remedy.

The Union contends the evidence reveals it is obvious the continuing violations have not and cannot be remedied by advancing each grievance to the Step B Level. Management continues to provide disingenuous contentions in an attempt to validate their position despite the decisions which remind them of their obligations in regards to scheduling of overtime in accordance with the provisions of the National Agreement. The concept of progressive payments advanced by the Union in this instance are reasonable and do not constitute punitive damages because of the deliberate and willful repeated violations despite the instruction of the Step B Team to cease and desist from doing so.

All carriers are harmed by the erosion of contractual rights and the relationship between the parties is harmed when Management willfully and intentionally fails to honor their contractual commitments as agreed to in the Collective Bargaining Agreement. It is evident as shown by the documentation in this grievance file the Union has been harmed by having to bear the expense of processing grievances and preparing for potential arbitration cases over and over again. It is particularly evident as shown by the repeated violations over a long period of time an additional cease and desist and the remedies awarded in the past resolutions are not sufficient to ensure Management's compliance with the Step B Team's decisions regarding this issue.

This is the third grievance filed by the Union on this single issue in an effort to get Management to comply to the resolution regarding the initial grievance. Management has repeatedly shown they have no regard for complying with these decisions. This shows they presently have no incentive to follow their own contractual obligations and will have no incentive to observe it in the future if the violation is allowed to occur without this additional penalty to ensure compliance. The Union asks all the remedies requested in Block 19 be awarded in their entirety to ensure future compliance.

**MANAGEMENT'S POSITION:**

Management effectively presented the facts and contentions of this grievance at the Formal A level. All of the arguments raised by Management at the Informal and Formal Step A meetings are brought forward to Step B and at Arbitration. The Step B representative would like to add the following:

Management refers to the following two National Arbitration decisions:

> **C-04085 National Arbitrator Aaron 25 January, 1984, NCE 11359**
> The principle that the parties **to an arbitration** are barred from introducing evidence or argument not presented at **preceding steps of the grievance procedure** must be strictly observed. The spirit of the rule, however, should not be diminished by excessively technical construction…The reason for the rule is obvious: **neither party should have to deal with evidence or argument presented for the first time in an arbitration hearing, which it has not previously considered and for which it has no time to prepare rebuttal evidence and argument.**
>
> **C-03206 National Arbitrator Mittenthal September 21, 1981, N8-W-0406**
> If the parties do not raise arguments at **Steps 2, 3 and 4** of the grievance procedure they **may not raise such arguments for the first time at arbitration**….**The Step B Team is required under Article 15, Section 2, Step B(b) "to ensure that the facts and contentions of grievances are fully developed and considered and resolve grievances jointly… That Step B language provides one last opportunity for the record to be developed**…As the US Supreme Court stated an arbitrator is not to dispense their own brand of industrial justice.

Management also submits the following Step 4's regarding the same as follows:

> **M-01309 Pre-arbitration Settlement May 6, 1998, Q94N-4Q-C 97008452**
> **There is no dispute between the parties that additional facts and contentions not previously set forth in the record as appealed from Step 2 may be presented for the first time at Step 3 as reflected in Article 15, Section 2, Step 3, (c) which provides that a Step 3 decision "shall state the reasons for the decision in detail and shall include a statement of any additional facts and contentions not previously set forth in the record of the grievance as appealed from Step 2."**
>
> **STEP B PROCESS M-01425 Step 4 H94N-4H-D 98099738, April 8, 1999**
> There is no dispute at this level that the Dispute Resolution Team has the responsibility to develop a joint report of the decision which **fully reflects the basis for the decision**, which includes:
> • Review of the USPS-NALC Joint Step A Grievance Form and grievance files to obtain a thorough understanding of the issues, facts, and contentions of the parties and research any remaining questions about the grievance.
> • **Share any additional relevant information.**
> • Conduct discussion of the grievance in a manner that is professional and will foster an atmosphere of good labor-management relations.
> • Make an objective decision based on the facts, consistent with the National Agreement and then resolve the grievance if possible.
> • Prepare a joint report of the decision which fully reflects the basis for the decision.
> • Communicate the decision to the necessary parties.

Management includes the following "additional facts and contentions not included in the Formal Step A appeal" in compliance with pages 15-8 through 15-9 of the JCAM as follows:

> The written Step B decision must state the reasons for the decision in detail **and include a statement of any additional facts or contentions not set forth in the grievance as appealed from Formal Step A.**
>
> **Impasse.** If the Dispute Resolution Team cannot resolve a grievance it issues a Step B decision called an "impasse." **A Step B impasse decision must state in detail the reasons for the impasse, and also must include a statement of any additional facts and contentions not included in the Formal Step A**

8

> **appeal.** The Dispute Resolution Team sends a Step B impasse decision to the NALC National Business Agent and to the union and management Formal Step A representatives.

The Union, at Step B, alleges as follows:

> The Union contends **there is simply no new argument or contention allowed past that Formal Step A Level**. The Step B Team may add additional facts and contentions respectively, but that language clearly notes "additional "meaning only to supplement a previous argument or contention rather than to create new evidence or argument into the record. While the case moves forward in the procedure outlined in Article 15, the language is quite clear that a failure to present any contentions to the Unions arguments at Step A bars the Employer from creating any argument to a previous step A contention made by the Union in any future Step of that Article 15 Grievance-Arbitration Procedure, **up to and including Arbitration**.

The Union's arguments directly contradicts the Step 4 decisions referred to by both parties. While the term additional can be defined as "supplementary to what is already present or available", it is also defined as "added or extra" according to www.Dictionary.com. The JCAM language specifically refers to "additional facts and contentions not included in the Formal Step A appeal." The arguments and information shared within this Impasse will not be heard for the first time at Arbitration as the Union at Step B has the option of rebutting or countering any information contained within, in compliance with Arbitrator Aaron's decision. Management makes no attempt to submit additional evidence or documentation, rather the contractually permitted additional facts and contentions. Hence, the Union has failed to support the allegation of new argument at Step B.

The Union framed the following issue statement for this grievance:

> Did Management violate article 15, Section 3.A, and the Postal Service Policy Letter (M-01517) via Article 19 of the National Agreement by failing to comply with the grievance resolution/settlements dated **11/27/2018** for Grievance **#18-FCMK2-18** in the **Main Kingsport Installation** and if so, what should the remedy be?

In accordance with the Union's own issue statement the review of this grievance is specifically limited to the specific date and settlement for grievance #18-FCMK2-18, as reemphasized via bold and underline by the Union. The Step B Decision for that grievance, C16N-4C-C 19019432, reads as follows:

> **DECISION:** The Dispute Resolution Team (DRT) has **RESOLVED** this grievance. The DRT agrees Management failed to comply with a Formal Step A settlement agreement as well as Step B Decision C16N-4C-C 18221124 **when they failed to provide the Union documentation revealing Kingsport Management officials received TACS training**. Management of the Kingsport Installation is issued a cease and desist in the failure to comply with grievance settlements. Management of the Kingsport Installation is issued an additional cease and desist regarding the failure to provide information requested which is relevant to the investigation and processing of a possible grievance. Management will provide the Union with documentation relative to the required TACS training within seven (7) days of receipt of this decision. Failure to comply with this subject resolution may result in the Union's request for escalating remedies to ensure compliance.

The Union bears the burden of requisite proof in this contract grievance. Management contends the Union has failed to evidence the remedies requested have any contractual basis or that they are warranted in this case. The Union has failed to evidence harm to individual carriers or to the Union Steward who requests monetary compensation for a delayed receipt of documentation.

The Step B decision, dated June 6, 2018, for Grievance number C16N-4C-C 18221124 provided that Management in the Kingsport Post Office were to be retrained on the use of TACS immediately upon receipt of the decision. The decision was improper and placed Management in a position where non-compliance was evident. Finance schedules training for TACS (Time and Attendance Control System) and the Step B team overstepped their boundaries by insisting the training occur immediately. The case

9

file contains no evidence of an immediately available class. Management also cannot conclude how the Step B team determined that operational code 743, Carrier Customer Service Activities, was to be "reserved for Address Management Service (AMS)" yet not for the updating of a route's edit book which IS Address Management Systems. The Step B Decision dated 11/27/2018 for C16N-4C-C 19019432, spoke only to the failure to comply with providing evidence of retraining.
The Union's request for remedy includes the following:

> 7. That Management in the Kingsport Installation place the carriers on the appropriate assignment in TACS.

The remedy request lies outside of the issue statement for this grievance. The Union's issue statement focuses solely on a failure to comply with the Step B decision dated 11/27/2018, which as previously stated does not address the Union's allegation that carriers were not assigned to the appropriate routes in TACS. The Union, at Step B, alleges that the Step B decision states failure to comply may result in escalating remedies to ensure compliance. However, the decision specifically states "Failure to comply with this subject resolution may result in the Union's request for escalating remedies to ensure compliance." There is a vast difference between the two.

The Step B decision for C16N-4C-C 18221124 dated June 6, 2018 instructed the local parties to jointly review the TACS reports and to compensate any letter carrier who received loss of pay (p. 5). There is nothing in this case file revealing any of the clock rings contained evidence of employee loss of pay due to an allegation of improper timekeeping procedures.

The Union submits the following contention:

> The non-compliance does not stop at the TACS training nor the falsified operational changes, management still has not placed carriers on the appropriate assignment in TACS which causes problem for the Union when it comes to filing grievances including TACS reports. A carrier being assigned to the inappropriate route or T-6 string hinders the ability of the Union to properly represent carriers in the grievance procedure and makes it almost impossible to determine if a[n] out of assignment violation has occurred. The TACS reports included in this case file will validate that there are still many carriers not placed on the appropriate assignment. The Union has also included an accurate and up to date list of carriers and their appropriate assignments.

Examination of the clock rings reveals multiple carriers being placed in 782 (training) for 0.42 hours on the same date. This type of entry would be proper if Management were conducting an expansive stand-up or safety talk which would be in excess of the Line 21 time credit provided during route inspection for a situation which is reoccurring. Exhibit 922.11 in the M-41 Handbook reveals Line 21a credit for a 5 minute weekly safety talk. Obviously, a 25 minute safety/stand-up talk would not occur on a weekly basis. In that case, the move to training would be proper. The Union submits a Pre-Arbitration settlement relative to overtime. Apparently there were no issues preparing an overtime argument, contradictory to the Union's contention.

The M-32 Handbook, Management Operating Data Systems (MODS), contains the following relative to stand-by time (Operation 354):

> **4-4.4.1 Definitions**
> Stand-by hours are hours recorded for which career bargaining unit employees are guaranteed work hours, as required by applicable national labor agreements, but for which there is insufficient work available. Normally, stand-by time is used for unplanned, low-work-volume periods on a particular day or days, or unplanned events such as equipment or communication breakdowns. Other examples include idle time as a result of storms, power failures, and lack of work. Stand-by hours do not include nonproductive time for temporary equipment breakdowns of 10 minutes or less.
>
> Stand-by operations are listed by operation numbers specifically provided for recording nonproductive hours in section 4-4.4.6.

The Handbook also details all of the operational codes utilized by city carriers. Training (782) and Carrier Customer Support Activities (743) are also explained. The Union submits 462 pages of clock rings with no statements revealing allegations of improper time credits or route assignments.

The Step B Decision, C16N-4C-C 18221124, contains the following in the explanation portion (p. 3):

> The Union provided contentions which included multiple interview sheets provided by letter carriers in the Kingsport Post Office to reveal they were unaware of the adjustments in the allocation of time being made to their assignments.

This instant case file contains no carrier statements or submitted interviews revealing any inappropriate clock ring moves or adjustments. As seen in the case file, the Union at the Kingsport office frequently files grievances whenever there are potential contractual violations. If discrepancies had been found upon further review by the parties' as stipulated, there is no doubt a subsequent grievance would have been filed. As evidenced by the top right hand corner of the included TACS Employee Everything Reports, the clock rings were provided to the Union no later than December 4, 2018, 16 days prior to the Informal Step A and 23 days prior to the Formal Step A meeting, ample time for the Union to gather information and/or statements from carriers or to conduct interviews upon review of the clock rings.

The June 20, 2018 Step B Decision contains the following Management contention:

> It is Management's responsibility to ensure all data and information in the TACS reports is entered correctly to ensure the routes are properly assigned and the payments to carriers are accurately disbursed. Carriers in the Kingsport Post Office do not always clock onto their assignments correctly, and therefore these rings must be manually adjusted and corrected. The documentation submitted in this file as evidence reveals there are many discrepancies in the Union's contentions regarding the allegations of improper timekeeping methods. There are also PS Forms 1260 and 3971 to show there has been no improper time adjustments made to the carriers in Kingsport, TN.

The Union states as follows:

> The TACS Reports will show that the Carriers included on the following list are not in the appropriate assignment.

The clock rings reveal the following carriers are reflected as being on the correct assignment:

| | | | | |
|---|---|---|---|---|
| R. Walls | W. Henderson | D. Price | N. Brown | R. Price |
| J. Honaker | N. Barco | R. Burton | J. Lifford | S. Wolfe |
| C. Sluss | S. Mays | W. Carroll | D. Harris | D. Arnold |
| J. Chapman | T. McCoy | M. Kinley | K. Barker | T. Grindstaff |
| R. Russell | G. Price | S. Minton | T. Smith | P. McKay |
| J. Salyer | M. Walters | M. Watkins | R. Taylor | M. Bennett |
| T. Hatcher | | | | |

There can be several reasons for employees' not identifying to the proper route in TACS. Nothing in the grievance file details whether bidding resulting from carrier vacancies or route adjustments from inspections occurred during the time period the clock rings were accessed. The few carriers showing as identifying to a route other than that listed by the Union are obviously sparse. The Union has failed to evidence which carriers' are assigned to incorrect routes in the TACS system. The Union, having the burden of proof, should stipulate which carriers appear to be assigned to the incorrect route rather than relying upon the Step B team or an Arbitrator to do the detective work through over 400 pages of documentation. The Union includes no documentation request for information from WEBcoins, Web complement information systems, to substantiate the claim of improper route assignments.

11

The Union's inclusion of the Pre-Arbitration Settlement(s) for C16N-4C-C 18472107 and C16N-4C-C 19023552 is improper as it specifically states "the settlement is reached on a non-precedent setting basis and is not to be cited or referenced by either party in future cases which may arise (except for enforcement of the settlement agreement terms)" as quoted in the Union's contentions.

The Union includes the following in their contentions (page 8):

> 16. Management provided the Union with information 23 days after the time limit given by the DRT for that the Union asks a separate remedy <u>in keeping with the $10 per day request for Steward Shawn Stout who was the investigating party.</u> The Union has taken all aspects of this grievance into consideration when asking for the below remedy requests that due to the egregious nature of these violations that the remedy be granted in its entirety.

The Union's remedy request includes the following:

> 3. That Union Representative Shawn Stout be awarded a one-time lump sum payment of $230 minus standard deductions for failing to provide documentation.

This remedy requests reveals the Union's expectation of a personal windfall to the Steward which is unwarranted and highly improper. The Union fails to evidence the harm to the Steward for the delay in receipt of the documentation. Steward activities are performed on the clock. Therefore, the Steward has already received payment for any and all investigation and processing performed for this grievance.

The National Labor Relations Act (NLRA) contains federal statutes prohibiting such in 29 US Code 186 – Restrictions on financial transactions, as follows:

> RESTRICTIONS ON PAYMENTS TO EMPLOYEE REPRESENTATIVES
> Sec. 302. [§ 186.] (a) [Payment or lending, etc., of money by employer or agent to employees, representatives, or labor organizations] It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value--
> (1) to any representative of any of his employees who are employed in an industry affecting commerce; or
> (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce;
> (3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or
> (4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.
> (b) [Request, demand, etc., for money or other thing of value]
> (1)It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) [of this section].

The Labor Management Relations Act, Taft-Hartley Act, enacted in 1947 made undesirable labor relations practices unlawful, including employers making payoffs to Unions or Unions demanding payment from employers. Additionally, employers and unions are to be kept at arms-length to avoid possible misconduct by either party. It is never appropriate, and can be considered as a violation of Federal Labor law, to award monetary compensation to a representative of a labor organization via grievance remedy. The Steward has failed to sufficiently evidence any harm which would be rectified via monetary payment. Management, despite the Union's cited exclusions, maintains payment is not

warranted to the Steward and any monetary award specifically to him when no harm has been evidenced is inappropriate.

Steward Stout also claims the following:

> Management was given 7 days to provide information to the union in order to process a grievance (18-FCMK3-18) they failed to provide the information in the timeframe given by the DRT, I initiated the grievance and management still failed to provide the Union with the information until the day of the Formal A meeting.

According to the PS Form 8190 the Union did not initiate a grievance until December 20, 2018 and the Formal A meeting occurring on December 27, 2018, exactly 7 days after the grievance was appealed. Given the Christmas holiday as well as the grievant observing his Non-scheduled day within that timeframe, Management does not consider the referenced 7 day delay as egregious. Management, on the other hand, questions why the Union would wait 23 days to file a grievance when Steward Stout would've been aware if he had or had not received the training certificates by December 4, if Management received the Step B decision the day it was dated, November 27, 2018.

Number 11 of the Union's contentions contains the following:

> 11. Management was instructed to provide the information needed within 7 days of receipt of Step B decision dated 11/27/2018 for grievance #18-FCMK2-18. **Management has provided the union with the information needed** however it was 23 days after the time limit provided by the DRT, therefore the violation still exists and a remedy needs to be formulated for the violation.

The cited contention contradicts the Union's previous argument because if Management provided the Union with the information 23 days after the time limit, it was received on December 20, 2018, the day of the Informal A meeting rather than the Formal A meeting. The Steward's statement as well as the contentions reveal receipt of the documentation, albeit after the 7 day timeframe. The Steward alleges Management was given 7 days to provide information to process 18-FCMK3-18, this instant grievance rather than the 7 days provided for in the Step B decision for 18-FCMK2-18.

The monetary remedy requests continue as follows:

> 4. That for Phil Benton's failure to comply ALL City Carriers to include CCA's and PTF's be paid a one-time lump sum payment of $120.
>
> 5. That for Lisa Fortner's failure to comply ALL City Carriers to include CCA's and PTF's be paid a one-time lump sum payment of $420.
>
> 6. That all city carriers to include CCA and PTF carriers in the Kingsport Installation be awarded $10 per day from August 31, 2018 until Duane Allen has been retrained on the use of TACS as per Step B settlement.
>
> 8. That as an incentive for future compliance of grievance settlements, all city carriers in the Kingsport Installation be awarded an additional $25 each or whatever remedy the Step B team or an Arbitrator deems appropriate.

The Union has failed to submit any documentation revealing harm to any of the carriers which would equate to monetary compensation. There is no explanation for the utilized calculation method. Simple math reveals the Union requests approximately $5 per day for the alleged 23 day delay in receiving Mr. Phillip Benton's training certificate. His training took place on September 12, 2018, a 13 day delay from the August 31, 2018 Formal Step A settlement date, the date referred to in the request relative to Duane Allen. From request number one to request number two somehow the subsequent request skyrockets to over $18 per day for the delay in receipt of Lisa Fortner's training certificate revealing she received the

13

training on October 12, 2018. While there was delay in receipt from the August 31, 2018 Formal Step A settlement date the information was received prior to the Step B decision which is being grieved. The Union then requests $10 per day for failure to receive a copy of Duane Allen's updated training certificate dating back to August 31, 2018. The inconsistency of the Union's argument and requests have made it impossible to settle this grievance at the lowest possible level as required by Article 15.3.A of the National Agreement which reads as follows:

> **15.3.A** The parties expect that good faith observance, by their respective representatives, of the principles and procedures set forth above will result in resolution of substantially all grievances initiated hereunder at the lowest possible step and recognize their obligation to achieve that end. At each step of the process the parties are required to jointly review the Joint Contract Administration Manual (JCAM).

H90K-6H-C 97130588 National Arbitrator Feigenbaum, in the award for grievance H90K-6H-C 97130588, frequently refers to National Arbitrator Mittenthal's reference to the status quo ante in the award for H1C-NA-C 97/123/124 as follows:

> ... the purpose of a remedy is to place employees (and Management) in the position they would have been in had there been no contract violation. The remedy serves to restore the status quo ante... Such a remedy would go far beyond the notion of a status quo ante...

Arbitrator Mittenthal then went on to say that when:

> ....determining how a contract violation should be remedied **[arbitrators]...can and should consider the nature of the wrong done, the damage (or lack thereof) to the employees, the practical impact of the remedy sought, the nature of the bargaining relationship, and other such matters.**

The essential principles I take from the Mittenthal Award are:

> a) **A remedy should be a remedy, not a windfall. The purpose of a remedy is to repair whatever damage the violation caused.**
> b) **There should be a rational and commensurate relationship between the harm caused and the relief to be granted.**
> c) **The facts and circumstances of the individual case determine what is an appropriate remedy.**

National Arbitrator Byars also refers to Mittenthal's status quo ante as well as the following in the remand decision for case number Q98C-4Q-C 00062970:

> As the cases cited by the parties also demonstrate, **punitive damages are generally unavailable as a remedy for a contract violation in arbitration.** The opinion that remedies should correspond to the harm suffered has been expressed in many arbitration decisions including one by Arbitrator Carlton J. Snow (Case No. W1C-5F-C 4734), cited by the Postal Service.

National Arbitrator Aaron in case number NC-E-11359 as well as National Arbitrator Mittenthal in case number H7C-NA-C 36 [Et Al] also declined to award monetary damages to the Union for contractual violations.

The Union selectively cites the following from page 41-17 of the JCAM:

> In circumstances where the violation is egregious or deliberate or after local management has received previous instructional resolutions on the same issue and it appears that a "cease and desist" remedy is not sufficient to insure future contract compliance, the parties may wish to consider a further, appropriate compensatory remedy to the injured party to emphasize the commitment of the parties to contract

compliance. In these circumstances, care should be exercised to insure that the remedy is corrective and not punitive, providing a full explanation of the basis of the remedy.

Management notes the above cited language specifically speaks to alleged "egregious or deliberate" violations of the National Agreement's opting provisions and is not a catch-all for any and all alleged violations of alternate Agreement Articles. If the parties had intended the language to be applied to the overtime provisions of the agreement, they would have memorialized such in writing. The Union failed to include Article 41 in the issue statement of this grievance. Therefore, the insertion of the above citation is misplaced and has been relied upon improperly. Even if Article 41 was relevant to this instant grievance, the language specifically cites "compensatory remedy."

www.merriam-webster.com defines compensatory damages as follows:

> Money awarded to a victim to make up for an injury, damage, etc.

The same definition website defines punitive damages as follows:

> Damages awarded in excess of compensation to the plaintiff to punish a defendant for a serious wrong

The Article 41 excerpt states "care should be exercised to insure that the remedy is corrective and not punitive." The above cited definition for punitive, rather than compensatory, is more in line with the Union's request in this instant case. No evidence was submitted to establish "the parties" ever intended to allow the awarding of punitive damages or to provide an arbitrator with the authority to award such. If the parties' wish to grant Arbitrators the authority to award monetary remedies for contract violations, the authority would be more suitably discussed during the negotiating process rather than via Arbitration.

Article 15.4.A.6 of the National Agreement includes the following in relevant part:

> **15.4.A.6** All decisions of an arbitrator will be final and binding. **All decisions of arbitrators shall be limited to the terms and provisions of this Agreement,** and in no event may the terms and provisions of this Agreement be altered, amended, or modified by an arbitrator.

The granting of the Union's request for additional punitive monetary award would exceed the Arbitrator's jurisdiction and would equate to a windfall for any and all carriers involved. Additionally, the remedy would be well in excess of the *status quo ante*. The Union has failed to show how hundreds of dollars in payment would result in the next available TACS training occurring sooner. It is for this reason that Management denies this grievance in its entirety and requests the Arbitrator do the same.

The Dispute Resolution Team (DRT) has decided to declare an **IMPASSE IN PART**. The DRT agrees Management violated Article 15, Section 3A, and Article 19, via Postal Service Policy Letter (M-01517) of the National Agreement by failing to comply with the grievance resolution/settlements dated 11/27/2018 for Grievance #18-FCMK2-18 in the Main Kingsport Installation. The Step B Team could not jointly agree on the appropriate contractual remedy for this case and therefore, the remedy is being impassed. All arguments and evidence in the case file pertaining to the remedy may be cited in the event of arbitration. The NALC National Business Agent may appeal this grievance to arbitration within fourteen (14) days after the receipt of this decision.

This grievance file contained the following documents:

(1) PS Form 8190
(2) Issue Statement
(3) Union Contentions (8 Pages)
(4) PS Form 8190 Page 3

15

(5)    Tie and Attendance Certificate
(6)    Steward Statement
(7)    Step B Decision C16N-4C-C19019432 (4 Pages)
(8)    PS Form 8190
(9)    Step B Decision C16N-4C-C18221124 (6 Pages)
(10)   (M-01517)
(11)   Pre-Arbitration Settlement
(12)   Step B Decision C16N-4C-C18072878 (4 Pages)
(13)   Step B Decision C16N-4C-C17605543 (3 Pages)
(14)   Step B Decision C11N-4C-C17604804 (4 Pages)
(15)   Steward Statement
(16)   List Of Carrier Assignments (2 Pages)
(17)   Employee Everything Report (472 Pages)
(18)   Management Contentions
(19)   Time and Attendance Certificate
(20)   Email Transmission
(21)   Time and Attendance Certificates (2 Pages)

In reaching the above decision, the DRT carefully reviewed each of the documents and placed the appropriate value to each as it applied to the issue in this grievance.

*Monica Lucas*  
Monica Lucas  
USPS Step B Representative

Paul F Glavin  
NALC Step B Representative

USPS Number: C16N-4C-C 19079250

Cc:   Steve Lassan, NALC NBA, Region 8
      Jill Miniard, Eastern Area Labor Relations Manager
      Michael Kulikowski, Eastern Area Labor Relations Representative
      Duane Allen, Management Formal A Representative
      Shawn Stout, NALC Formal A Representative
      Christopher Alexander, District Manager
      Barbara Kirchner, District Human Resources Manager
      Nita Fournier, District Labor Relations Manager