# EXHIBIT D

## In Re:

*BRANCH GRIEVANCE NO. 18-FCMK3-18*
*CASE NO. C16C-4C-C 19079250*

*ARBITRATION*
*June 14, 2019*

*Gibson Court Reporting*
*606 West Main Street*
*Suite 350*
*Knoxville, TN 37902*



Gibson COURT REPORTING

Min-U-Script®

ARBITRATION BETWEEN THE

U.S. POSTAL SERVICE AND THE

NATIONAL ASSOCIATION OF LETTER CARRIERS

IN RE BRANCH GRIEVANCE NO. 18-FCMK3-18

CASE NO. C16C-4C-C 19079250

HEARING

BEFORE ARBITRATOR LAWRENCE ROBERTS

June 14, 2019
9:00 a.m.

Kingsport Post Office
1001 North Eastman Road
Kingsport, Tennessee

APPEARANCES:

For the Union:

Corey C. Walton,
Local Business Agent
Arbitration Advocate

Shawn Stout, Union Steward

For Management:

Derek Truman, Labor Advocate

Eric W. Conklin,
Labor Relations Specialist, Eastern Area

1                          I N D E X

2                                               Page

3    Opening Statement of the Union                    3

4    Opening Statement of Management                   8

5    Closing Statement of the Union                   95

6                  E X A M I N A T I O N S

7    SHAWN LEE STOUT                                Page

8    Direct Examination by Mr. Walton                30
     Cross-Examination by Mr. Truman                 49
9    Redirect Examination by Mr. Walton              59
     Recross-Examination by Mr. Truman               63
10   Examination by Arbitrator Roberts               65
     Further Recross-Examination by Mr. Truman       67
11
     SUSIE WHITTINGTON
12
     Direct Examination by Mr. Truman                69
13   Cross-Examination by Mr. Walton                 76
     Redirect Examination by Mr. Truman              78
14   Recross-Examination by Mr. Walton               79
     Examination by Arbitrator Roberts               80
15   Further Recross-Examination by Mr. Walton       86

16
                       E X H I B I T S
17   No.                  Description                Page

18     J1   Wage Agreement                            3

19     J2   Moving Papers                             3

20     J3   Status Quo Ante                           3

21     M1   Training Completion Certificates         86

22

23        (All Exhibits Retained by Arbitrator Roberts.)

24

25

```
 1              (Be it remembered, the following
 2      proceedings were held before Arbitrator Lawrence
 3      Roberts at the United States Post Office at 1001
 4      North Eastman Road, Kingsport, Tennessee, on June
 5      14, 2019, commencing at 9:05 a.m., as follows.)
 6              ARBITRATOR ROBERTS:   The wage agreement
 7      will be marked as J1, and the moving papers will
 8      be marked as J2.
 9              And we have a contract case, so the union
10      has the burden.  Do you have anything else to
11      offer as a joint?
12              MR. WALTON:  No, sir; I don't.
13              ARBITRATOR ROBERTS:  Does the Postal
14      Service have anything to offer?
15              MR. TRUMAN:  No, sir.
16              MR. CONKLIN:  Okay.  Would you agree to
17      offer that as a joint?
18              MR. WALTON:  Sure.  What is it?
19              MR. CONKLIN:  Status quo ante.
20              MR. TRUMAN:  Status quo ante.
21              ARBITRATOR ROBERTS:  It will be marked as
22      J3.  A joint?
23              MR. WALTON:  It doesn't matter.  That's
24      fine.
25              ARBITRATOR ROBERTS:  J3.
```

```
 1                    Okay.  Now we're ready.  You're on,
 2          Mr. Walton.
 3                    OPENING STATEMENT OF THE UNION
 4                    MR. WALTON:  Mr. Arbitrator, the case
 5          that we're hearing today is a remedy-only case.
 6          On Page 2 of the case file is the decision from
 7          the Dispute Resolution Team, or DRT, which reads
 8          in relevant part as follows:
 9                    "The dispute resolution, DRT, has decided
10                    to declare an impasse in part.  The DRT
11                    agrees management violated Article 15,
12                    Section 3A, and Article 19, via Postal
13                    Service Policy Letter 1517 of the National
14                    Agreement, by failing to comply with the
15                    Agreement Resolution Settlement dated
16                    11/27/18 for Agreement 18-FCMK2-18, in the
17                    Main Kingsport Installation.
18                    "The Step B Team could not jointly agree on
19                    the appropriate contractual remedy for this
20                    case; and therefore, the remedy is being
21                    impassed."
22                    The evidence will show that the grievance
23          before you today is the fourth grievance filed by
24          the union which initially involved management
25          falsifying clock rings in the Main Kingsport
```

1          Installation.

2                    The last three grievances were filed due

3          to management's noncompliance of the initial

4          settlement.

5                    On June 6, 2018, the DRT issued their

6          decision for Grievance 11-MDMK4-18, which was the

7          initial grievance, and wrote in part:

8                    "The Step B Team agrees management will

9                    cease and desist this practice and that all

10                   management in the Kingsport Post Office

11                   will be retrained on the use of TACS

12                   immediately upon receipt of this decision."

13                   On August 7th of 2018, the local Formal A

14         parties, NALC representative Shawn Stout and USPS

15         representative Duane Allen, agreed to the

16         following remedy:

17                   "The parties agree that Duane Allen, Lisa

18                   Fortner, and Phil Benton will complete the

19                   TACS user training no later than 8/31/18

20                   and provide the union certification of

21                   completion."

22                   On November 22nd, 2018, the DRT issued

23         their decision for Grievance 18-FCMK2-18, which

24         reads as follows:

25                   "The Dispute Resolution Team, DRT, has

| | |
|---|---|
| 1 | resolved this grievance.  The DRT agrees |
| 2 | management failed to comply with a Formal A |
| 3 | settlement agreement, as well as Step B |
| 4 | decision, when they failed to provide the |
| 5 | union documentation revealing Kingsport |
| 6 | management officials received TACS |
| 7 | training.  Management of the Kingsport |
| 8 | installation has issued a cease and desist |
| 9 | in the failure to comply with grievance |
| 10 | settlements. |
| 11 | "Management of the Kingsport Installation |
| 12 | issued -- is issued an additional cease and |
| 13 | desist regarding the failure to provide |
| 14 | information requested which is relevant to |
| 15 | the investigation and processing of a |
| 16 | possible grievance. |
| 17 | "Management will provide the union with |
| 18 | documentation relative to the required TACS |
| 19 | training within seven days of the receipt |
| 20 | of this decision.  Failure to comply with |
| 21 | this subject resolution may result in the |
| 22 | union's request for escalating remedies to |
| 23 | ensure compliance." |
| 24 | Finally, on February 2nd, 2019, the DRT |
| 25 | issued the decision for Grievance 18-FCMK3-18, |

1     which reads in relevant part as follows:

2               "The Dispute Resolution Team has decided to

3               declare an impasse in part.  The DRT agrees

4               management violated Article 15, Section 3A,

5               and Article 18, via Postal Service Policy

6               Letter 1517 of the National Agreement by

7               failing to comply with the grievance

8               resolution settlement dated November 27,

9               2018, for Grievance 18-FCMK2-18 in the Main

10              Kingsport Installation."

11              The union will show you today that from

12    the initial decision dated June 6 of 2018 until

13    this last decision dated February 2, 2019, there

14    have been 247 days for management to simply comply

15    with the initial decision; yet, they failed to do

16    so.

17              Today, you will meet Shawn Stout.  He is

18    the Formal Step A representative for this case,

19    and he will go over his contentions in great

20    detail.

21              He will also go over his requested

22    remedy, which can be found on Page 27 of the case

23    file.

24              Unfortunately, he will tell that as of

25    today -- which may have changed -- it has been 379

1     days from his initial grievance, and management
2     has still not complied with the initial DRT
3     decision.
4              Mr. Arbitrator, at the end of this
5     hearing, the union will have clearly and
6     convincingly shown that their requested remedy is
7     not only proper but justified.  It will be for
8     these reasons that the union will ask that you
9     sustain its grievance in its entirety and grant
10    the unit its requested remedy, which again can be
11    found on Page 27 of this case file.
12              Thank you, sir.
13              ARBITRATOR ROBERTS:  Your turn.
14              OPENING STATEMENT OF MANAGEMENT
15              MR. TRUMAN:  All right.  Good morning,
16    Mr. Arbitrator.  Let me start off by saying that
17    we are here today to discuss remedy only.  It is
18    true, that's the reason that we're here.
19              The union framed the issue as such:  Did
20    management violate Article 15, Section 3A, and
21    Article 19 via the Postal Service Policy Letter
22    via Article 19 of the National Agreement by
23    failing to comply with the grievance resolution
24    settlement date of 11/27/2018 for Grievance
25    18-CMK2-18 in the Main Kingsport Installation?

1          That's the issue statement here today.

2     Not a grievance a year ago, 379 days ago, 247.

3          The issue statement is:  Did management

4     violate by failure to comply with the 11/27/2018

5     date?

6          The union states that this is the fourth

7     grievance that has been filed based on management

8     falsifying clock rings.  There is no such proof or

9     wording in the file of falsification of clock

10    rings.

11         If you would go through the union's

12    opening and say -- and listen to all the

13    grievances that were filed before that, there were

14    three grievances, including one Formal A -- which

15    is not precedent setting, not citable -- that were

16    all resolved.  They are not the issue that we're

17    here to discuss today.

18         The informal grievance was initiated on

19    December 20th, 2018, followed by a Formal Step A

20    heard on December 27, 2018, in this case.  This

21    case is based specifically on failing to comply

22    with the resolution settlement dated 11/27/2018.

23         The Step B stated that the management

24    failed to provide documentation showing the

25    Kingsport management officials received TACS

1    training.  The grievance is about failing to
2    provide proof of TACS training.  That is it.
3    Again, none of the previous grievances are in
4    question in this instant case.
5            The union would like you to believe that
6    this is ongoing; however, it's clear what the
7    union's intent was whenever they issued the issue
8    statement and whenever they made their arguments
9    in the grievance file.
10           Did it take management longer than
11   expected or longer than the union would have liked
12   in order to get the correct training certificates?
13   Yes, it did.  But did management ultimately
14   comply?  Yes, it did.
15           Did management provide copies of training
16   records?  Yes, it did.  Management complied with
17   Formal A by providing the training documents.
18           Remember, the Grievance 18-FCMK2-18,
19   which is why we're here today, the union cites
20   that management would provide documentation
21   relevant to the TACS training.  That is it,
22   provide the documents relative to the TACS
23   training.  Nothing else; not provide training, not
24   go back and do anything.  It's specific to this
25   case today.

 1          All the grievances that were resolved
 2     previously were resolved.  No remedy due, no
 3     additional monetary compensation.
 4          In the cases that we're here today, they
 5     were already issued a cease and desist.  If the
 6     parties had intended to award a remedy, then a
 7     resolution would have awarded a remedy.
 8          No. 11 of the union's contentions in the
 9     grievance file states:  "Management was instructed
10     to provide the information needed within seven
11     days of the Step B decision on 11/27/2018."
12          Management has provided the union with
13     the information needed; however, it was 23 days
14     after the time limit provided by the DRT.
15     Therefore, the violation still exists, and a
16     remedy needs to be formulated.
17          Those are the union's contentions,
18     Mr. Arbitrator.  The union says management has
19     provided the union the information needed in the
20     case file.
21          The Step B decision also states that
22     "Failure to comply with the subject resolution may
23     result in the union's request for an escalated
24     remedy."  That's why we're here today.  The union
25     is requesting an astronomical amount of money.

1        The key word is "may." The union has not

2    shown and cannot prove that there is any carrier

3    that is due any monetary remedy for a supervisor

4    failing to receive required TACS training. How

5    can any carriers be due any monies for a TACS

6    training class that must be retrained by

7    management?

8        The language that is included in these

9    settlements is a tactic that the union uses when

10   management is trying to resolve a grievance. The

11   union says, "Yeah, we'll settle, but we want this

12   language. If not, then no go; we're not going to

13   settle, not going forward, not going to do

14   anything." How is that bargaining in good faith?

15       The union has asked for this absurd

16   amount of money, which makes no sense. Generally,

17   in a breach of contract action the injured party

18   is entitled to a compensatory remedy that replaces

19   what is lost. Nothing more.

20       A punitive remedy are those that go

21   beyond replacing what is lost and are intended to

22   punish the party at fault and deter future

23   misconduct.

24       In a Postal Service grievance arbitration

25   setting, requests for punitive remedies most often

```
 1        take the form of a direct payment to an individual
 2        or a union, and for the Postal Service's alleged
 3        failure to respond to information, oppose a bid,
 4        meet with the union.  Those are typical -- those
 5        are possibilities.
 6                But requests for punitive remedies also
 7        include the requests that go far beyond what's
 8        already provided for in the National Agreement.
 9                Remember, as submitted as J3, the
10        national-level Arbitrator Mittenthal stated:
11                    "The purpose of a remedy is to place
12                    employees and management in the position
13                    they would have been in had there been no
14                    violation.  The remedy serves to restore
15                    the status quo ante."
16                In the case today, such a remedy would go
17        far beyond the notion of status quo ante.
18                Arbitrator Mittenthal also went on to
19        say:
20                    "In determining how a contract violation
21                    should be remedied" -- "remedied, an
22                    arbitrator can and should consider the
23                    nature of the wrong done, the damage or
24                    lack thereof to the employee, and the
25                    practical impact of the remedies sought and
```

```
 1                    the nature of the bargaining relationship
 2                    and other such matters, taking those into
 3                    consideration."
 4              So there're three principles that you can
 5         take from this award. The first is a remedy
 6         should be a remedy. That's it. Not a windfall.
 7              The purpose of a remedy is to repair
 8         whatever damage the violation caused. There
 9         should be a rational and commensurate relationship
10         between the harm caused and the relief to be
11         granted, and the facts and circumstances of the
12         individual case will be what would determine the
13         appropriate remedy.
14              Now, the union sees this as a cash cow,
15         okay? They're looking at this as a cash cow for a
16         new revenue stream to file as many cases as
17         possible and undermine the process, rather than a
18         means to resolve disputes, and an opportunity to
19         milk the Post Office for additional monies that it
20         can't get in the contract.
21              The union didn't bargain for these
22         remedies. There is nothing in the contract that
23         states that. Remedies should be corrective, not
24         punitive.
25              There has -- this has to stop, okay, here
```

1       and now.  The Service must take a stand to protect
2       the interests, and the financial climate and
3       position that we are in is not so stable as to
4       where you just throw money out the window or light
5       it on fire.
6               And that's what the union is asking us.
7       That is absurd.  That's what the union is asking
8       for; just light your money on fire, throw it out
9       the window.
10              The union is going to -- has tried
11      arguing and made some arguments in the file which
12      I'm sure you'll hear today, some selective texts
13      from the JCAM cited on Page 4117.
14              JCAM 4117 -- the JCAM is very specific.
15      Article 41 is where it's found, and it's very
16      specific, okay?  The JCAM preface also -- also
17      puts it into perspective, okay?
18                  "The JCAM is self-explanatory and speaks
19                  for itself.  It's not intended to, nor does
20                  it, increase or decrease the rights and
21                  responsibilities or benefits under the
22                  parties.  JCAM is limited to the disputes
23                  concerning the application of the
24                  agreement."  Okay?
25              It's very, very important to understand

1      that the JCAM does not increase or decrease the
2      rights, responsibilities, or benefits under
3      collective bargaining. It neither adds nor
4      modifies in any respect to the current collective
5      bargaining agreement. As noted, a punitive remedy
6      is disfavored in labor arbitration and will not be
7      inferred from general contract language.

8              Nothing in the agreement provides for an
9      award of a punitive remedy. Consequently, nothing
10     in the JCAM can add to the availability of that
11     remedy to the contract, nor can this agreement be
12     altered, amended, or modified by an arbitrator,
13     which you'll hear me talk about several times
14     today -- Article 15.4.A.6.

15             Third, the language the union is trying
16     to argue applies only to those sections of Article
17     41 dealing with an opting by a letter carrier for
18     a bid assignment. Nothing in the JCAM implies or
19     suggests that the comments cited are intended to
20     apply either to a dispute between the parties.

21             The union will try to convince you that
22     an escalating remedy is appropriate because of
23     this article. However, at the time that this
24     article was introduced in the JCAM and put into
25     the contract language, it was for opting.

1        And it was a very specific remedy

2   because, you know, we were pulling people off

3   their routes, and it was -- we were showing, you

4   know, just abuse of it. So they put it as a

5   possibility to where it may be in that one

6   specific situation.

7        However, you will not find that language

8   anywhere in Article 15, 17, 31. And if the

9   parties had intended this to be a remedy in the

10  process, or in those articles, then it would be

11  so. And if it's not there, then it doesn't exist

12  in the grievance arbitration process.

13       The language in the JCAM specifies that

14  any agreed-upon remedy must be compensatory in

15  nature and directed to the parties injured by a

16  violation of the opt-in provisions. Remember,

17  specific to that one circumstance. That's it.

18  The union is going to try to make you believe

19  something different, Mr. Arbitrator.

20       Now, we're going to hear from the steward

21  today. He's going to testify on his remedy on

22  Page 27, as the union stated in their opening.

23  Part of the union's recommended remedy is that we

24  pay the steward -- how is that -- for his time.

25  He's already been compensated for his time. He's

| 1 | already been paid for his time in investigating |
| 2 | and handling the grievance. |
| 3 | You know, we can consider it |
| 4 | double-dipping. How is he put out? There's no |
| 5 | remedy. There's no reason why he should receive |
| 6 | anything, which goes to prove that the remedy is |
| 7 | punitive. |
| 8 | Everything else that happened before the |
| 9 | Step B decision and the violation the union is |
| 10 | alleged occurred on 11/27 is just noise. Okay? |
| 11 | Yes, the earlier decision said "Train by a certain |
| 12 | date." Yes, they said "Provide this." However, |
| 13 | they were all resolved. |
| 14 | And the issue in this instant grievance |
| 15 | that we're dealing with today is, did management |
| 16 | comply with the 11/27/2018? |
| 17 | Now, speaking of punitive remedies, if |
| 18 | the Service came in front of you today and we were |
| 19 | presenting a removal, and we were trying to |
| 20 | convince you that an employee was a problem for |
| 21 | the last five years, yet we never addressed it, |
| 22 | you would say "It doesn't count. You can't go |
| 23 | back five years. You can't use any of that stuff. |
| 24 | You didn't worry about it, so you can't do it |
| 25 | now." |

1          That's equivalent to what we're dealing

2     with here today.

3          You know, a payment for the union or any

4     of their representatives for a punitive remedy is

5     prohibited, Mr. Arbitrator.  You simply cannot do

6     what the union is wanting you to do today.

7     National Arbitrator Mittenthal said it, National

8     Arbitrator Beyers said it, National Arbitrator

9     Snow said it, National Arbitrator Aaron said it.

10         All of these arbitrators agree, status

11    quo ante must bring the employee and the employer

12    back to where they would have been, had it not

13    been for the violation.

14         These arbitrators agree punitive damages

15    are generally unavailable as a remedy for a

16    contract violation in arbitration.

17         So to quote Arbitrator Beyers, she said:

18    "Punitive damages are generally unavailable as a

19    remedy for a contract violation in arbitration."

20         The opinion that remedies should

21    correspond to the harm suffered has been expressed

22    in many arbitration decisions, including one by

23    arbitrator Carlton Snow.

24         In fashioning remedies, however,

25    arbitrators generally have adhered to the

1        principle that damages should correspond to the

2        harm suffered.  A deeply rooted principle of

3        measuring concert damages is such it must be based

4        on the injured party's expectation.

5                It is recognized that some arbitrators

6        have awarded punitive remedies when a party's

7        violation of an agreement has been constant and

8        repeated and malicious, willful and wanton.

9                That approach is not consistent with

10       common law that has been taught; that no matter

11       how reprehensible a breach, punitive damages which

12       are in excess of the injured party's loss

13       expectation generally have not been awarded for a

14       breach of contract.

15               Courts have vacated arbitral decisions

16       imposing punitive remedies or penalties for

17       breaches of labor agreements, where the collective

18       bargaining agreements did not explicitly provide

19       for punitive awards and the employer did not

20       engage in wanton and willful misconduct.

21               Punitive damages are not recoverable in

22       Labor and Management Relations Act 301 actions.

23       Section 303 of the Labor Management Relations Act

24       indicates that Section 301 does contemplate the

25       imposition of punitive awards.  It is the general

1     policy of the federal labor laws to which the
2     federal courts are to look for guidance in Section
3     301 actions.
4                Now, Article 15.4.A.6 states that:
5                "All decisions of an arbitrator are final
6                and binding.  All decisions of an
7                arbitrator shall be limited to the terms
8                and provisions of this agreement, and in no
9                event may the terms and provisions of this
10               agreement be altered, amended, or modified
11               by an arbitrator."
12               This is similar language to that which is
13    in the preface to the JCAM that I mentioned
14    earlier, as well as violating the status quo ante
15    of the national arbitrators which I discussed.
16               This would equate to a windfall to the
17    union and its representatives.  How can a union
18    show that any amount of money to these carriers
19    would be justified as an appropriate remedy for
20    failure to provide a training certificate?
21               Mr. Arbitrator, I just don't get it.
22    Training certificates do not run an office.  They
23    don't help carry -- they don't help carry on a
24    route.  They don't take overtime work for the
25    carrier.  They don't run a route.  There's no harm

1        to the carrier or the union in any way.

2              The carrier is paid, yet they don't get

3        their paycheck stub in the mail, should they be

4        paid additional compensation because they didn't

5        get their stub in the mail?  No.  They still got

6        paid, they just didn't get a piece of paper to

7        show when they got paid.

8              You know, it's similar here.  The

9        supervisors have been trained and they have been

10       retrained, and the documents have been provided.

11       In the union's own contentions, they say they got

12       them.

13             It is well established and is a general

14       rule of law that punitive damages are not

15       available as a remedy for a contract breach.  The

16       Postal Service's national agreements are with its

17       unions, and in particular punitive damages are

18       disfavored.  An award of punitive damages against

19       the Service is barred by the principle of

20       sovereign immunity, which precludes suits and

21       remedies against the government without its

22       consent.

23             Recognizing that punitive damages are

24       exceedingly rare and generally disfavored in labor

25       arbitrations, a number of Postal arbitrators have

1        held that punitive damages are improper.

2                So the Supreme Court specifically held

3        that:

4                "Punitive damages may not be imposed upon

5                unions for a breach of the duty of their

6                representation" -- it's the International

7                Brotherhood of Electrical Workers v. Faust

8                award -- "because general labor policy

9                disfavors punishment, and the adverse

10               consequences of punitive damages awards

11               could be substantial.  We hold that damages

12               may not be assessed against a union that

13               breaches its duty of fair representation by

14               failing properly to pursue agreements."

15               Now, post Faust, the majority of

16       subsequent lower court decisions have held that

17       "Punitive damages are never available against a

18       union in an action for a breach of the collective

19       bargaining agreement brought under Section 301" --

20       which I mentioned earlier -- "of the Labor

21       Management Relations Act."

22               Some Circuits -- including the Third, the

23       Ninth, the Tenth -- have extended Faust to hold

24       that punitive damages are never available for a

25       breach of a labor agreement under 185, regardless

1       of the identity of the defendant in the case.

2               Punitive damages are, of course, far more

3       common in a tort case than in a contract case.

4       The breach of duty, a clear representation is a

5       form of fiduciary duty, and therefore it is a

6       tort.

7               Partly an explanation of Faust, related

8       to the point that was just made, federal policy

9       aims to promote harmonious labor relations, and

10      this is one of the justifications for the mildness

11      of the National Labor Relations Board's remedial

12      powers.  This aims that -- that aim would be

13      deflected if a punitive damage was available.

14              The possibility of one side recovering

15      and the other side having to pay a potentially

16      astronomical amount of money in damages would

17      place a cloud over labor negotiations, and it

18      would be endangering the formality and suspicion

19      and it would damage the harmonious resolutions of

20      the labor disputes.

21              Now, all these reasons I just spoke of in

22      Faust are independent of whether or not the

23      defendant is a union or an employer.  It applies

24      in both circumstances.

25              And I am convinced that the Supreme Court

1       would not allow punitive damages to be awarded

2       against employers for violating a collective

3       bargaining agreement.

4              The award of punitive damage against the

5       Service is barred by the principles of sovereign

6       immunity, as I spoke of earlier, because the costs

7       are simply passed on to ratepayers.  Punitive

8       awards against a government instrumentality fail

9       to advance the public interest in deterring its

10      conduct, unless that sovereign immunity has been

11      weighed by Congress.

12             Courts have held that principles of

13      sovereign immunity bar recovery of punitive

14      damages against the Service -- the Postal Service

15      -- which is an independent establishment of the

16      executive branch of the government.

17             In Bowen v. The Postal Service, the Court

18      set aside a jury verdict awarding the plaintiff

19      punitive remedies against the union, holding that

20      since sovereign immunity barred the employee's

21      recovery of punitive damages against the employer,

22      the Postal Service, for his wrongful discharge, it

23      was not fair to impose a punitive damage against

24      the union for its arbitrary and perfunctory

25      handling of the plaintiff's meritorious grievance.

1     Now, the most common theory supporting a
2     punitive damage award would be punishment and
3     deterrence, okay? Those are not fulfilled when
4     punitive damages are permitted against the
5     government.

6     Postal ratepayers are innocent of any
7     wrongdoing committed by the Service, but they
8     would ultimately bear the burden of paying for
9     punitive damage awards.

10    Furthermore, the purpose of punishment of
11    an offender is to benefit the members of society.
12    However, with awards against the Postal Service,
13    ratepayers themselves would be shouldering the
14    cost of the benefit. Do we raise stamps every
15    time the union wants a punitive award of hundreds
16    of thousands of dollars?

17    There is nothing in this case file that
18    can convince the Service, convince you, convince
19    me today, Mr. Arbitrator, that training
20    certificates to be given in the Kingsport
21    Installation in Tennessee is worth $170-, $270-,
22    hundreds of thousands of dollars.

23    There's nothing that can convince me of
24    that. There's nothing in this file. There's
25    nothing that the union can say, show, or prove

```
1        that would equate that amount of money.
2                Now, "All decisions of arbitrators" --
3        management has inserted a sentence in Article
4        15.4.A.6 that reads:  "All decisions of
5        arbitrators shall be limited, and that in no event
6        may the terms and conditions of this agreement be
7        altered, amended, or modified by an arbitrator."
8                Now, this should be interpreted as
9        preventing an arbitrator from issuing a punitive
10       damage because the National Agreement does not
11       address or provide for such an award.
12               As eloquently stated by Arbitrator
13       Richard Mittenthal in the national case, which is
14       J3:
15               "It is generally accepted in labor
16               arbitration that a damage award arising
17               from a violation of the collective
18               bargaining agreement should be limited to
19               the amount necessary to make the injured
20               employees whole."
21               Those that are deprived of a contractual
22       benefit are made whole for their loss.  They
23       receive compensatory damages to the extent
24       required, no more, no less.  That's it.
25               Now, while serving on a regular
```

1    arbitration panel, future National Arbitrator

2    Carlton Snow thought that, in fashioning remedies,

3    arbitrators generally have adhered to the

4    principle that damages should correspond to the

5    harm suffered.

6              After careful review of relevant case law

7    and everything we are dealing with today, I have

8    concluded that punitive damages should only be

9    awarded, if at all -- if at all -- should only be

10   award in an extremely narrow instance where the

11   employer's conduct is willful, malicious, in bad

12   faith, wanton.

13             And in this present case, the union did

14   not seek as a remedy to have any individual

15   employee compensated for lost wages due to the

16   failure to provide a training certificate at all.

17   They didn't ask for any individual to be paid.

18             Management's action was in the form of

19   unintentional administrative error, scheduling

20   conflicts, poor communication; and in no way,

21   shape, or form was it intentional, willful, or

22   malicious by many means.

23             Furthermore, there is no evidence that

24   this error caused the union or its members to

25   suffer any sort of financial loss.

1              The evidence in the record does not

2    support the union's demand for punitive damage,

3    and it doesn't support -- nor does the record

4    support even a cease and desist. The union's

5    already been issued and been awarded two cease and

6    desists in the file in the grievance we're hearing

7    today.

8              With all due respect, Mr. Arbitrator, the

9    union is asking you to do something you simply

10    cannot do, all right? That is to go beyond the

11    four corners of the contract and award punitive

12    damage. As I stated earlier, the union is asking

13    you to change the terms and conditions of the

14    National Agreement with the CVA.

15              Article 15.4.A.6 states that:

16              "The reach of an arbitrator and what he has

17              in arbitration is that all decisions must

18              be limited to the terms and provisions of

19              this agreement, and in no event may the

20              terms and conditions of this agreement be

21              altered, amended, or modified by an

22              arbitrator."

23              If a punitive award is granted in this

24    instant case, there's no proof of malice -- proof

25    of malice or wanton and willful misconduct on

```
1          management's part, or any harm to the union or its
2          members, that is exactly what you will be doing.
3          You will be altering, amending, and modifying the
4          National Agreement.
5                    It is for all these reasons that I've
6          stated before you today, Mr. Arbitrator, that I
7          respectfully request that you deny this grievance
8          in its entirety.
9                    ARBITRATOR ROBERTS:   Thank you.
10                   Call your first witness.
11                   MR. WALTON:   All right.
12                   (Shawn Stout enters the proceedings.)
13                   ARBITRATOR ROBERTS:   I need you to raise
14         your right hand and be sworn, please.
15                   THE WITNESS:   Yes, sir.
16                        SHAWN LEE STOUT,
17    having been first duly sworn, testified as follows:
18                   ARBITRATOR ROBERTS:   Thank you.  Answer
19         the questions, please.
20                        DIRECT EXAMINATION
21    BY MR. WALTON:
22         Q.    Please state your name for the record.
23         A.    Shawn Lee Stout.
24         Q.    Mr. Stout, how long have you been
25    employed with the Postal Service?
```

```
1          A.      Six years.
2          Q.      Six years?
3          A.      Yes, sir.
4          Q.      Do you currently hold any position with
5   the union?
6          A.      Yes, sir.  I'm the branch president.  I'm
7   the Formal A steward and the Informal A steward.
8          Q.      I want you to turn to Page 520.
9                  On Page 520, is this management's
10  contentions for this grievance?
11         A.      Yes, sir; it is.
12         Q.      And who met with you at the Formal A?
13         A.      Mr. Duane Allen did.
14         Q.      Okay.  Is this the only contention that
15  he submitted?
16         A.      In writing?
17         Q.      Typed?
18         A.      Yes.  Yes, sir; it is.
19         Q.      And it was five pages total?
20         A.      Yes.
21         Q.      Okay.  And that's 520 to 524; is that
22  correct?
23         A.      Yes, sir.
24         Q.      So these are the only contentions that
25  management handed you at the Formal Step A?
```

```
 1         A.      Yes, sir; they are.
 2         Q.      Let's go to Page 18.  On Page 18 is the
 3   8190.  Did you meet at both the Informal and Formal
 4   Step A?
 5         A.      Yes, sir; I did.
 6         Q.      All right.  Who did you meet with at the
 7   Informal Step A?
 8         A.      Mr. Phillip Benton.
 9         Q.      And who is he?
10         A.      He is the supervisor on the 64 side, and
11   he's the one that handles the Informal A grievances.
12         Q.      And who did you meet with at the Formal
13   Step A down here on 21a?
14         A.      Mr. Duane Allen.
15         Q.      Okay.  Let's go to Page 19.  Is this your
16   issue statement?
17         A.      Yes, sir; it is.
18         Q.      Okay.  I'm not going to read it.  We've
19   already read it, okay?
20                 So let's go to Page 20.  Are these your
21   contentions for the case today?
22         A.      Page 20?
23         Q.      Yes.
24         A.      These are my undisputed facts.
25         Q.      Okay.  Pages 20 through 27, are those the
```

1   undisputed contentions that you provided for the case,

2   your written contentions?

3          A.     Yes, sir.

4          Q.     We're not going to go through all of

5   that.  But I want you to tell the arbitrator exactly

6   how this started from the very beginning, okay?

7          A.     I had been going through TACS reports,

8   looking at mandated overtime, an Article 8 violation.

9   And when I was going through, looking at those, I had

10  noticed some discrepancies.  There was a lot of ring

11  deletions.  There was a lot of carriers being placed on

12  inappropriate functions, taking time away from the

13  routes that they were assigned to.

14                So I started investigating that at that

15  point.  And I pulled clock rings for an entire year, and

16  I found an astronomical amount of alterations and

17  manipulations.

18                We grieved that in June of 2018, and the

19  settlement came back from the DRT finding that management

20  did in fact violate the contract in the ways that I had

21  accused them of and instructed them to be retrained on

22  TACS and to place the carriers in the appropriate route

23  on TACS.

24          Q.     Okay.  Is that on -- let's go to Page 50.

25  On Page 50, is this the initial grievance that you

```
 1    filed, or the B Team's decision on that agreement?
 2         A.      Yes, sir; it is.
 3         Q.      All right.  And what's the date of that
 4    decision?
 5         A.      The Step B decision date is June 6, 2018.
 6         Q.      All right.  I want to turn to Page 51.
 7    On Page 51, the second from the bottom.  Go up two, I
 8    guess we'll call them paragraphs, where it says "The
 9    grievance file also contains."  Do you see that?
10         A.      Yes, sir.
11         Q.      Okay.  Read that for the arbitrator.
12         A.      "In 2017, TACS reports show the
13    following:  1,112 moves to 782, training time; 349
14    moves to 354, weighing time; 1,859 moves to 743,
15    carrier customer support activities; 821 moves to 731,
16    collections; 47 moves to 739, carrier drivers-street;
17    1,153 moves to 632, meeting time; 8,648 ring deletions
18    at" --
19         Q.      Hang on right there.  How big of a period
20    of time are we talking about here?
21         A.      Over the course of a year.
22         Q.      There was 8,648 ring deletions in the
23    course of a year?
24         A.      Yes, sir.
25         Q.      All right.  Go ahead.  Just finish out
```

```
 1   that.
 2         A.      And seven cases of time disallowed.
 3         Q.      Okay.  So that's what started all of
 4   this?
 5         A.      Yes, sir; it is.
 6         Q.      All right.  Back on Page 50, on the
 7   decision a couple, three sentences down.  "The Step B
 8   Team agrees."  What do they state there?
 9         A.      "The Step B Team agrees management will
10   cease and desist this practice and that all management
11   in the Kingsport Post Office will be retrained on the
12   use of TACS immediately upon receipt of this decision."
13         Q.      Okay.  Let's go back to Page 20.
14                 So you got the decision back that they'll
15   be retrained.  What happened then?
16         A.      I had requested the training certificates
17   for that decision, and management could not provide
18   them to me because they said they had not been
19   retrained.
20                 So then I grieved it as a failure to
21   comply grievance for the first time.
22         Q.      All right.  Let's go to Page 49.  On Page
23   49, what are we looking at here?
24         A.      This is the 8190 that we used for this
25   grievance where Duane Allen and myself agreed to settle
```

```
 1   at the Formal Step A.
 2          Q.      Okay.  Is this the same Duane Allen that
 3   met with you --
 4          A.      Yes, sir.
 5          Q.      -- on this one?
 6                  All right.  And what did you all agree to
 7   on 19a?
 8          A.      We agreed:  "The parties agree that Duane
 9   Allen, Lisa Fortner, and Phil Benton will complete the
10   TACS user training no later than 8/31" -- or August
11   31st -- "of 2018 and provide the union a certificate of
12   completion."
13          Q.      Who wrote that?
14          A.      Duane Allen did.
15          Q.      So Duane Allen wrote that resolution in
16   there?
17          A.      Yes, sir; he did.
18          Q.      Okay.
19          A.      He came up with the August 31st date,
20   also.
21                  MR. TRUMAN:  I'm going to object.  It's a
22          Formal A, it's not precedent setting.
23                  MR. WALTON:  It doesn't matter.  It's in
24          the case file.
25                  MR. TRUMAN:  Please note my objection.
```

```
1                    ARBITRATOR ROBERTS:   Objection is noted.

2          It is in the case file.

3    BY MR. WALTON:

4          Q.     So what did -- what was the resolution of

5    the Formal Step A resolution between you two?

6          A.     We agreed the three supervisors would

7    have their training no later than August 31, 2018.

8          Q.     So back on Page 20, what happened then?

9          A.     At that point they did not comply with

10   the settlement that we agreed on locally, and I filed

11   another failure to comply grievance.

12         Q.     So management did not comply with the

13   8/31?

14         A.     No, sir; they did not.

15         Q.     All right.  So you filed another

16   grievance?

17         A.     Yes, sir.

18         Q.     All right.  Let's go to Page 45.  Is this

19   the one that you're talking about?

20         A.     Yes, sir; it is.

21         Q.     And what's the date of the Step B

22   decision on this one?

23         A.     November 27, 2018.

24         Q.     On the decision, on Page 45, about

25   halfway down, it says "Management of the Kingsport
```

1  Installation." Do you see that?

2      A.    Yes, sir.

3      Q.    Read that for me.

4      A.    "Management of the Kingsport Installation

5  is issued an additional cease and desist regarding the

6  failure to provide information requested which is

7  relevant to the investigating" -- "investigation and

8  processing of a possible grievance."

9      Q.    Okay. And so an additional cease and

10 desist, is that because that they've issued one already

11 in their previous decision?

12     A.    Yes, sir; they have.

13     Q.    And what do they go on to state?

14     A.    They go on to state: "Management will

15 provide the union with documentation relative to the

16 required TACS training within seven days of receipt of

17 this decision."

18     Q.    Then what do they state?

19     A.    "Failure to comply with this subject

20 resolution may result in the union's request for

21 escalating remedies to assure compliance."

22     Q.    Who is the B Team members on this one

23 here at the time?

24     A.    It is Monica Lucas for the Postal Service

25 and Paul Glavin for NALC.

```
 1          Q.      And so they both agreed that if they
 2    don't comply with this it may be reason for an
 3    escalated remedy?
 4          A.      Yes, sir; they did.
 5          Q.      So what happened then?
 6          A.      They failed to comply again, and I filed
 7    another grievance.
 8          Q.      And is that the one we're meeting on here
 9    today?
10          A.      Yes, sir; it is.
11          Q.      Okay.  Did you ever receive the
12    certificates from the three people in management?
13          A.      Management never provided me the
14    information to fulfill an information request.  The
15    training certificates that I received were during the
16    Formal A for this grievance, and management did not
17    provide those to me to fulfill the request for
18    information.
19                  Management used them in their contentions
20    without me having seen them prior.  That's how I
21    accessed them, was when management gave me their
22    contentions.
23                  They argued that at the Formal A meeting,
24    that when they provided me with the paperwork I was
25    allowed to make copies of it to use.
```

```
 1         Q.      And that was the Formal A meeting for
 2  this grievance?
 3         A.      Yes.
 4         Q.      Okay.  Now, you're supposed to receive
 5  three, correct?
 6         A.      Yes.
 7         Q.      How many at that time had been retrained
 8  in accordance with the B Team decision and in
 9  accordance with your Formal A decision?
10         A.      Two of the three.
11         Q.      Two of the three?
12         A.      Yes.
13         Q.      So management still is not in compliance?
14         A.      No, sir.
15         Q.      Turn to Page 29.  On Page 29, is this the
16  one that you received at the Formal Step A meeting?
17         A.      Yes, sir; it is.
18         Q.      And this is whose?
19         A.      This is Mr. Duane Allen's.
20         Q.      And at the bottom of that, what does it
21  show the date of that being?
22         A.      It shows November 18, 1999.
23         Q.      So 11/18/1999 is what -- is the one he
24  gave you at the Formal Step A?
25         A.      Yes, sir; it is.
```

```
 1        Q.       And when was this grievance filed?
 2        A.       In November of 2018.
 3        Q.       So is it possible that he was retrained
 4   in 1999 for this grievance?
 5        A.       No, sir.
 6        Q.       Did you ever receive anything prior to
 7   yesterday showing that Mr. Allen had been retrained, as
 8   the B Team had told him to do?
 9        A.       No, sir.  I had not received anything
10   until yesterday at 5:49, I believe.
11        Q.       Okay.  Let's go to Page 25.  These are
12   still your contentions for this case.
13                 No. 11, talk to the arbitrator what
14   you're talking about in No. 11.
15        A.       Okay.  The Step B decision had came back,
16   instructing management to provide me with the
17   information within seven days of that receipt.
18   Mr. Duane Allen is courtesy copied on all those emails;
19   the Step B decisions that I receive, he receives them
20   at the same time.
21                 Management had failed to provide the
22   information to me within the seven days instructed by
23   the Step B Team.  By the time we got around to get to
24   the Formal A meeting for this grievance 23 days had
25   passed, and at that point is when Mr. Allen had the
```

```
 1   information that I needed in his contentions.
 2              So I just assumed that I received them on
 3   that 23rd day, because I told him I needed to make copies
 4   of it.  But it was never given to me as compliance to
 5   fulfill the request for information.
 6        Q.    Talk to him about the TACS training,
 7   about halfway down.  Go there to the end.
 8        A.    Do you want me to read it?
 9        Q.    Uh-huh.
10        A.    "Furthermore, if they have completed TACS
11   training the question remains of why are there still
12   discrepancies with operational changes.  The union has
13   included recent TACS reports that show management,
14   Duane Allen, EIN 02190405, and Phil Benton, EIN
15   03651357, still placing carriers on 7982, training
16   function, at their discretion.  Will appropriate
17   training resolve this issue, or should some other
18   remedy be sought after?"
19        Q.    So after all of this, they're still
20   falsifying clock rings as of the date of this meeting?
21        A.    Yes, sir; they are.
22        Q.    Let's go back to Page 50.  On Page 50,
23   did the B Team tell them to cease and desist the
24   practice of falsifying clock rings?
25        A.    Yes, sir; they did.
```

```
1          Q.      And you're stating that the clock rings
2    that you have in this file show that as of the date
3    some three months later they're still falsifying clock
4    rings?
5          A.      Yes, sir.
6          Q.      Did Mr. Duane Allen address that at all
7    in his contentions?
8          A.      No, sir; he did not.
9          Q.      Did he rebut that at all?
10         A.      No, sir; he did not.
11         Q.      Let's go to your remedy on Page 27.
12                 What is Duane Allen's title here?  What
13   does he do here at this installation?
14         A.      At the moment, he is not in this
15   installation.  He has been OICing in another office.
16         Q.      What was he during this time?
17         A.      The supervisor, customer service.
18         Q.      Okay.  Was he an a.m. or p.m.?
19         A.      a.m.
20         Q.      Okay.  Let's go to your remedy on Page
21   27.  I just want you to walk down this remedy and tell
22   the arbitrator what you're asking for and why.  Okay?
23         A.      Okay.
24         Q.      Just start at No. 1.
25         A.      No. 1:  "That management immediately
```

1  comply with the grievance resolution/settlement
2  associated with this case."
3            Compliance is the biggest thing that we
4  have. We fought very hard to get our contract, and
5  management has agreed to the terms of our contract.
6  That's how it came to be. So compliance of that should
7  not be a question.
8       Q.    And how many grievances have been going
9  on because of this one issue of management not
10 providing you with these training certificates?
11      A.    I honestly can't give you a number.
12 Several.
13      Q.    Is this the fourth?
14      A.    Yes, that sounds right.
15      Q.    Okay. No. 2?
16      A.    No. 2: "That management cease and desist
17 from future violations of Article 15, Section 3.A, and
18 the Postal Service Policy Memorandum 01517 via Article
19 19 of the National Agreement, in the Main Kingsport
20 Installation."
21      Q.    Do you also have a pre-arb where
22 management has been told to abide by Article 15?
23      A.    Yes, sir; we do.
24      Q.    Is that on Page 57?
25      A.    Yes, sir; it is.

```
 1        Q.        On Page 57, what does No. 2 state?
 2        A.        No. 2 states that:  "Management shall
 3   comply with Article 15 of the National Agreement to
 4   include grievance settlements in Step A decisions."
 5        Q.        Let's go back to Page 27.  No. 3.
 6        A.        No. 3 states that:  "Union Representative
 7   Shawn Stout shall be awarded a one-time, lump-sum
 8   payment of $230, minus standard deductions, for failing
 9   to provide documentation."
10        Q.        Why did they include you in that?
11        A.        Because I was the investigating steward
12   at informal and formal.  I was the one that handled
13   this whole case, from beginning to end.
14        Q.        Okay.  Did you do that at work?
15        A.        Yes, sir.
16        Q.        Okay.  So you were already paid to do
17   that work, correct?
18        A.        Yes, sir.
19        Q.        So why would you want an additional $230?
20        A.        Because it seems like cease and desists
21   aren't enough.  We've had several cease and desists.
22   They don't care about the cease and desists.  I thought
23   that $230 would maybe get their attention and let them
24   know that compliance is not optional.
25        Q.        Okay.  Why $230?
```

1      A.      For the Article 15 violation, for the
2  entire thing, I was asking $10 per day. It took 23
3  days for me to get the information that I needed when
4  we met at the Formal Step A. So $10 for 23 days came
5  out to be $20.

6      Q.     Okay.  No. 4?

7      A.      No. 4: "That Phil Benton's failure to
8  comply, all city carriers to include CCAs and PTFs to
9  be paid a one-time, lump-sum payment of $120."

10     Q.     Why $120?

11     A.      Same thing.  For Article 15 violations, I
12 was asking $10 per day. It took Phil Benton 12 days
13 past August 31 to get his TACS training.

14     Q.      And that's going solely off the Formal
15 Step A resolution on 8/31 that Mr. Allen agreed to?

16     A.      Yes, sir; it is.

17     Q.      Okay.  No. 5?

18     A.      No. 5: "That for Lisa Fortner's failure
19 to comply, all city carriers to include CCAs and PTFs
20 to be paid a one-time, lump-sum payment of $420."

21     Q.      And why $420?

22     A.      $10 per day.  It took her 42 days to get
23 her TACS training.

24     Q.      Okay.  Keep going.

25     A.      No. 6: "That all city carriers, to

1    include CCA and PTF carriers in the Kingsport

2    Installation, be awarded $10 per day from August 31,

3    2018, until Duane Allen has been retrained on the use

4    of TACS, as per the Step B settlement."

5         Q.    Keep going.

6         A.    No. 7:  "That management in the Kingsport

7    Installation place carriers on the appropriate

8    assignment in TACS."

9                No. 8:  "That as an incentive for future

10   compliance of grievance settlement, all city carriers

11   in the Kingsport Installation be awarded an additional

12   $25 each, or whatever remedy the Step B Team or an

13   arbitrator deems appropriate."

14        Q.    Okay.  Why that?

15        A.    Why the $25?

16        Q.    Uh-huh.

17        A.    Because I've asked for the $10 and we've

18   asked for cease and desist, and this was escalating.

19   It's a very small amount, $25, as a flat rate.

20        Q.    Okay.

21        A.    No. 9:  "Any other remedy the Step B Team

22   or an arbitrator deems appropriate."

23        Q.    All right.  So back to No. 6.  The August

24   31st, that's from the Formal A settlement that's on

25   Page 49, correct?

```
1          A.       Yes, sir; it is.
2          Q.       And so all of this hinges off of the
3    agreed settlement, that Formal A settlement?
4          A.       Yes, sir; it does.
5          Q.       Okay.  Let's go to Page 56.  Put your
6    finger on 56 and go to Page 2.  On Page 2, the
7    decision.  Do you see that, the decision?
8          A.       Yes.
9          Q.       Go past the impasse part.  What do both
10   parties agree to in this?
11         A.       "The DRT agrees management violated
12   Article 15, Section 3A, and Article 19, via Postal
13   Service Policy Letter Memorandum 01517."
14         Q.       By what?
15         A.       "Of the National Agreement, by failing to
16   comply with the grievance resolution or settlement
17   dated 11/27/2018."
18         Q.       Okay.  So they've agreed that violated
19   the Postal Service Policy Letter 1517?
20         A.       Yes, sir.
21         Q.       All right.  On Page 56 is 1517.  The
22   second paragraph, what does Patrick Donahoe say there?
23         A.       "Compliance with arbitration awards and
24   grievance settlements is not optional.  No manager or
25   supervisor has the authority to ignore or override an
```

```
 1   arbitrator's award or a signed agreement settlement."
 2          Q.     Is the Formal Step A Resolution on Page
 3   49 a signed agreement, settlement?
 4          A.     Yes, sir; it is.
 5                 MR. WALTON:  Okay.  That's all I have,
 6          Mr. Arbitrator.
 7                 ARBITRATOR ROBERTS:  Cross-exam.
 8                      CROSS-EXAMINATION
 9   BY MR. TRUMAN:
10          Q.     All right.  Good morning.  My name is
11   Derek Truman.  I'm the labor advocate assigned to this
12   case.  I just have a few questions.
13                 One, you testified earlier that you met
14   with Duane Allen.  And you started to say something; he
15   was in writing at the Formal A when you were -- you were
16   asked if these were his contentions, and you said "in
17   writing."
18          A.     Yes.
19          Q.     Does that mean that there was other
20   contentions that were not in writing?
21          A.     No, I was -- the question threw me off.
22   I didn't know if he was talking about in words or if he
23   was including the certificates also.
24          Q.     Did you all discuss the case in the
25   agreements, or did you just hand him the papers?
```

```
1          A.       At Formal A?

2          Q.       Yes.

3          A.       Briefly.

4          Q.       How brief?

5          A.       Maybe five minutes.  We sat down at

6   Formal A, and Duane told me that the supervisors had

7   been trained.  And that's when he showed me the

8   certificates, was at that meeting.  And I told him that

9   the training dates for Lisa and Phil's did not meet the

10  date that we had agreed upon.

11                  And I had spoke with the postmaster

12  prior, and she told me that they had got their training

13  done but she didn't give me the information.

14         Q.       So the dates that you received, you said

15  they didn't meet the requirements for Lisa and Phil?

16         A.       Yes, by August 31st.

17         Q.       Okay.

18         A.       Their dates were past August 31st.

19         Q.       But you did receive all the training

20  certificates?  Albeit late, you did receive them?

21         A.       I had to make copies of management's

22  contentions.  That information was not provided to me

23  to fulfill the information request.

24         Q.       So yes or no, did you receive the

25  training certificates?
```

```
 1          A.      I mean, yes.
 2          Q.      Okay.  Now, real quick, I want to turn to
 3    Page 19.
 4                  MR. TRUMAN:  Corey, help me out if I'm
 5          off, because my pages are off from yours.  I don't
 6          know why.
 7    BY MR. TRUMAN:
 8          Q.      But 19 should be your Issue Statement?
 9          A.      Yes.
10          Q.      And will you read your Issue Statement?
11          A.      "Did management violate Article 15,
12    Section 3A, and Postal Service Policy Letter Memorandum
13    01517 via Article 19 of the National Agreement by
14    failing to comply with the grievance
15    resolution/settlement dated 11/27/2018 for Grievance
16    No. 18-FCMK2-18 in the Main Kingsport Installation?"
17          Q.      That's fine.  Now, I'm just curious.
18    This seems awful specific.  Does this mention anything
19    about any previous grievances?
20          A.      The settlement.
21          Q.      Does this statement mention anything
22    about any previous grievances?
23          A.      This statement mentions Grievance No.
24    18-FCMK2-18 --
25          Q.      Okay.
```

```
1            A.       -- where previous settlements were
2    mentioned.
3            Q.       But you filed this grievance on the
4    noncompliance for the settlement dated November 27,
5    2018; is that correct?
6            A.       Yes.
7            Q.       Now, I believe it's Page 50.  It's a Step
8    B Decision dated 6/6/2018 that you testified?
9            A.       Yes.
10           Q.       Okay.  You testified that this was the
11   Step B decision that -- you claimed falsification?
12           A.       Yes.
13           Q.       Okay.  In the decision under the "Issue,"
14   is there anything that says there's a falsification of
15   clock rings?
16                    You can take your time and read through
17   it.
18           A.       Those specific words?
19           Q.       Yes.
20                    (Witness reviews document.)
21                    THE WITNESS:  No.
22   BY MR. TRUMAN:
23           Q.       Okay.  Now, on Page 51, what you
24   testified to and what you read to, the paragraph that
25   says "The grievance also contains the information."
```

```
 1            A.      Yes.
 2            Q.      Is this the union's contentions of the
 3    Step B filing?
 4            A.      That included these, this small
 5    paragraph?
 6            Q.      Yes.   Is this the union's contentions?
 7            A.      Yes.
 8            Q.      Okay.   In the paragraph that you read,
 9    you said "In 2017, the TACS reports showed the
10    following in moves."  Does that say whether those were
11    natural moves or whether or not those were anything
12    like that?   Just -- this is the union's argument,
13    correct?
14            A.      In this case, I argued much more than
15    that.  But this is the particular part that they chose
16    to put in the Step B decision, yes.  This is the
17    union's argument.
18            Q.      Okay.  So in the decision, nothing like
19    that is mentioned?
20            A.      No.
21            Q.      Okay.  Now, you said -- you testified
22    that you received two of the three certificates on
23    12/27/2018?
24            A.      No.
25            Q.      Did you receive all of the certificates?
```

```
 1          A.      Yes.

 2          Q.      All right.

 3          A.      Only two of the three had completed the

 4    training.

 5          Q.      But you did receive all of them?

 6          A.      I made copies of management's

 7    contentions.

 8          Q.      Yes, okay.  Now, on Page 27, I found it

 9    interesting.  You testified that you received pay for

10    union time and work to process a grievance.  Is that

11    correct?

12          A.      Yes.

13          Q.      And you also -- you just testified that

14    No. 3 of your remedy is being requested as punitive?

15          A.      I did not testify to that.

16          Q.      Did you testify that there is really no

17    reason as to why, other than to make management comply?

18          A.      That's not at all what I said.

19          Q.      Was it -- did you testify -- would you

20    consider it an escalating remedy?

21          A.      The $230?  No.

22          Q.      Then what would you consider it?

23          A.      I would consider that a remedy for a

24    violation that occurred, trying to prevent me as the

25    investigating steward from investigating this case.
```

```
 1        Q.      Okay.  But you testified that there was
 2   really no reason as to just make sure that management
 3   complied.  That was your testimony.
 4        A.      I said in order to make management
 5   comply, yes.
 6        Q.      So in order to make management comply, is
 7   that not punishing management?
 8        A.      Not at all.
 9        Q.      Is there any basis behind why we would
10   award $230?
11        A.      Management failed to comply with the Step
12   B settlement.  That is not optional.
13                Management failed to provide me the
14   information in order to investigate the process.  By
15   doing so, it hindered my investigation up until the
16   Formal A meeting, where we actually got to sit down and
17   talk.
18        Q.      Now, did -- were you harmed in any way to
19   justify that $230?
20        A.      Compliance.  Noncompliance of the
21   national contract is a lot of harm.
22        Q.      That's not the question.  That's not the
23   question.
24                Did you suffer any sort of financial harm
25   or loss because of not receiving your certificates?
```

```
1   You?
2           A.      No, I did not.
3           Q.      Okay.  Now, you testified that -- well,
4   oh, $10 per day.  You were asking for $10 per day.  How
5   many carriers are here?
6           A.      64.
7           Q.      So you're wanting -- you're asking for
8   $10 a day for 64 carriers?
9           A.      Yes, sir.
10          Q.      All right.  So your No. 4, was there any
11  carrier, including CCAs and PTFs, that were financially
12  harmed due to Phil Benton's failure to comply, that
13  lost any money out there on the floor?
14          A.      No, sir.
15          Q.      Were there any carriers out there who
16  lost any money out there due to Lisa Fortner's?
17          A.      No, sir.
18          Q.      Or due to Duane Allen's?
19          A.      No, sir.
20          Q.      Okay.  So there is -- Page 5.  All right.
21                  So I want to read down where it says the
22  union includes the following steward's statement
23  relevant to the above cited, because this is a
24  noncompliance grievance on 18-FCMK2-18.
25                  Can you read that under there?
```

1        A.        "During a meeting with Postmaster Susie
2   Whittington, we discussed Local Agreement 18-FCMK2-18,
3   specifically the dates that supervisors completed their
4   training.  During this discussion, the postmaster told
5   me that supervisor Lisa Fortner was the last one to
6   complete her TACS training and the date of completion
7   was October 2, 2018.  The postmaster said she would
8   print out a completion paper with the dates on it that
9   I never received."
10        Q.        So did you discuss it with Susie
11   Whittington?
12        A.        Did I discuss the case?  No.
13        Q.        You didn't have a meeting with Susie to
14   discuss the local grievance number?
15        A.        I had a meeting with Susie to discuss the
16   information that was with this grievance.  The only
17   thing that she cared to talk about during that meeting
18   was that the training had been completed by Lisa
19   Fortner and Phil Benton.
20        Q.        Do you remember when that meeting took
21   place?
22        A.        I do not.
23        Q.        Do you know a roundabout date?
24        A.        No.
25        Q.        All right.  So the union includes your

```
1    statement.  You're testifying that you did not discuss
2    the local grievance with Susie?
3         A.      I discussed the request for information
4    that went along with this grievance.
5         Q.      Okay.
6         A.      But we did not get into the specifics of
7    the grievance, no.
8         Q.      Do you have a good relationship with
9    Susie?
10        A.      I like to think so, yes.
11        Q.      Do you work well with her?
12        A.      Yes.
13        Q.      Now, if you were to go to her to address
14   your issues, is she responsive to you?  Does she
15   address your concerns usually?
16        A.      Sometimes.
17        Q.      Does she have like an open-door policy
18   with you?
19        A.      I don't really know what "an open-door
20   policy" means, to be honest with you.
21        Q.      When you go to her, does she usually
22   handle or address your issues or make you feel like
23   she's going to work on it?
24        A.      Yeah.  Most of the time, we'll talk about
25   stuff if she's not busy.  But sometimes it goes
```

```
 1   further, sometimes it doesn't.
 2              MR. TRUMAN:  Okay.  I'm good.  That's all
 3      for now.
 4              ARBITRATOR ROBERTS:  Anything further?
 5              MR. WALTON:  Sure.
 6                  REDIRECT EXAMINATION
 7   BY MR. WALTON:
 8       Q.    Back on Page 5, the B Team decision, it
 9   talks about Susie Whittington.  Is that in your
10   contentions, this here?  Is this taken out of your
11   contentions in this case?
12       A.    Yes.
13       Q.    Did Ms. Susie Whittington rebut that at
14   any time, or did she add anything to the case file?
15       A.    Nothing at all.
16       Q.    No statement in the case file from Susie
17   Whittington?
18       A.    No, sir.
19       Q.    Did she contribute anything at all on the
20   case file?
21       A.    No, sir.
22       Q.    Did Mr. Duane Allen reach out to her
23   during the Formal Step A to ask her about anything?
24       A.    Not that I'm aware of.
25       Q.    So you all didn't mutually talk to Susie
```

```
1  Whittington in the Formal Step A?
2          A.       No, sir; we did not.
3          Q.       Okay.  One of the questions that
4  Mr. Truman asked is if you got the three certificates
5  at the Formal Step A meeting, and you said "Yes."  Were
6  those three in compliance with the B Team decision?
7          A.       No, they were not.
8          Q.       Whose was not?
9          A.       Duane Allen's.
10         Q.       When did you get his certificate?
11         A.       What is today?  The 14th.  I received his
12 certificate June 13, 2019.
13         Q.       So when you say you got the three
14 certificates, you got three certificates but one of
15 them was not in compliance?
16         A.       Correct.
17         Q.       Okay.  He also asked you about when you
18 testified about your remedy where you would be paid,
19 you said it was to make them -- it was to make them
20 comply because they didn't comply.  Correct?
21         A.       Correct.
22         Q.       Let's go back to Page 45.  On Page 45 of
23 the decision, you read this already but I want you to
24 read it again.  This is both parties.  Who is the Step
25 B Team that wrote it at the top?
```

```
 1         A.      Monica Lucas for the United States Postal
 2   Service, and Paul Glavin for the NALC.
 3         Q.      Okay.  Under "Decision," the very last
 4   sentence, what do they state?  The first three words.
 5         A.      "Failure to comply."
 6         Q.      Is that not what you just stated, the
 7   reason that you put that it there?
 8         A.      Yes, sir; it is.
 9         Q.      Okay.  What did they state?
10         A.      "Failure to comply with this subject
11   resolution may result in the union's request for
12   escalating remedies to ensure compliance."
13         Q.      Did they say that's the union's punitive
14   remedy?
15         A.      Not at all.
16         Q.      Okay.  What'd they state?
17         A.      They stated "the union's escalating
18   remedies to ensure compliance."
19         Q.      To ensure compliance?
20         A.      Yes, sir.
21         Q.      Is that what your remedy is for, to try
22   to get some kind of compliance?
23         A.      Yes, sir; absolutely.
24         Q.      Let's go back.  Another thing is that
25   Mr. Truman asked you about a B Team decision, where he
```

1    says "Does it state anything about falsification?"  I
2    want you to turn to Page 53.  This is that initial B
3    Team decision.  From the very bottom, do you see "The
4    DRT directs?"
5              A.      Yes.
6              Q.      Above that, "The DRT notes?"
7              A.      Yes.
8              Q.      Read that right there.
9              A.      "The DRT notes the allegations made by
10   the union in this grievance file are of a serious
11   nature and instructs management to strictly comply with
12   the applicable handbooks and manuals to ensure the
13   accurate and prompt reporting of time in the Kingsport
14   Post Office."
15             Q.      All right.  Turn the page.  The top.
16             A.      "The DRT instructs management in the
17   Kingsport to ensure employees who are required to move
18   from one operational code to another clocks into the
19   new operation him or herself when on office duties
20   and/or when they return from street duties in an effort
21   to avoid disputes of a similar nature."
22             Q.      Is that what the grievance was about, is
23   management falsifying the clock rings, moving people
24   that weren't supposed to be moved and putting carriers
25   on different routes who weren't on routes?

```
 1         A.        Yes, sir; it is.
 2                   MR. TRUMAN:  That's all I have,
 3         Mr. Arbitrator.
 4                   ARBITRATOR ROBERTS:  Recross.
 5                   MR. TRUMAN:  Real quick.
 6                   RECROSS-EXAMINATION
 7    BY MR. TRUMAN:
 8         Q.        To touch on that, what you just read on
 9    Page 53, please read the first nine -- the first nine
10    words.
11         A.        I'm sorry, on which one?
12         Q.        On Page 53, the paragraph that you just
13    read.
14         A.        The one that I just read?
15         Q.        Yeah.
16         A.        "The DRT notes the allegations made by
17    the union" --
18         Q.        Okay.  That's it.  So these are
19    allegations made by the union?
20         A.        Yes.
21         Q.        Now, on Page 45, this is the DRT decision
22    in question for the noncompliance.  Please read the
23    second sentence that says "Management will provide."
24         A.        "Management will provide the union with
25    documentation relative to the required TACS training
```

```
 1    within seven days of the receipt of this decision."
 2         Q.     Okay.  That's what this grievance is
 3    about, is providing the documents of the TACS training;
 4    is that correct?
 5         A.     No.
 6         Q.     Is that what you just read?
 7         A.     Yes.
 8         Q.     Okay.  What's the last sentence say?
 9    "Failure" -- is the word "may" and "union's request" in
10    the last sentence of that?
11         A.     Yes.
12         Q.     It does not say "will" or "shall?"
13         A.     It says "may result in the union's
14    request for escalating remedies to ensure compliance."
15                MR. TRUMAN:  I want to hand him this.
16    BY MR. TRUMAN:
17         Q.     All right.  So did you -- have you
18    received all the training certificates?
19         A.     As of June 13th of 2019, yes.
20         Q.     So you have?
21         A.     Yes.
22         Q.     And is there any monetary compensation
23    due to any carrier on the floor now that you have all
24    the certifications?
25         A.     Yes.
```

```
1          Q.      Due to any harm to them?
2          A.      Yes.
3          Q.      Has there been any harm to any of the
4    carriers on the floor now that you've received all the
5    training certificates?
6          A.      Yes.
7          Q.      Financial harm?
8          A.      No.
9          Q.      Okay.  No monetary loss by any carrier on
10   the floor?
11         A.      No.
12                 MR. TRUMAN:  Okay.  Sorry for the
13         rephrase.  That's it.
14                 MR. WALTON:  We rest.
15                 ARBITRATOR ROBERTS:  I have a question.
16                 THE WITNESS:  Yes, sir.
17                         EXAMINATION
18   BY ARBITRATOR ROBERTS:
19         Q.      Falsification of time records is pretty
20   serious.
21         A.      Yes, sir.
22         Q.      But in your words, how does that affect
23   the employees?
24         A.      Several ways.  When our routes are
25   evaluated, for one, if the timekeeping is not done
```

1  properly the routes will show that they are shorter
2  than what they really are, because they never give us
3  to make them longer.

4  So the time gets manipulated. And in
5  this case especially I found this several times, that a
6  carrier would come back and clock back to the office,
7  and the p.m. supervisor would delete that clock ring
8  and change it back 30 minutes to an hour to show that
9  he actually clocked back to the office while the
10 carrier was still on the street.

11 So when we have a route inspection come
12 in and they see those times and they -- you're looking
13 at a seven-hour, on-the-street route that's really
14 showing six hours on the street, so then they come in
15 and they add to that route.

16 As a case in point, that's what happened
17 to us as a direct result of this. And, you know, we
18 spent almost a good year carrying routes that were very
19 overburdened before we could get everything
20 straightened out.

21 There was a few instances of people's
22 beginning tours being changed, but when I went back and
23 looked at it again, it wasn't for monetary loss.  They
24 had deleted them and moved them around.  It causes a
25 big issue with the union.

```
1                    When I go through the TACS rings, I had a
2    hard time understanding what's going on, why there are
3    so many deletions and stuff. And I can't read them
4    very well to figure out what's going on sometimes,
5    because management has deleted so many clock rings and
6    moved somebody from one route to another.
7                    Or they put them on training time while
8    they're casing the route to take away from office time.
9                    There was a carrier that I found, Mike
10   Sumpter, who was assigned to City 1, and they had
11   placed him on collections after he had been on the
12   street for an hour and left him on collections all day.
13   So he's only showing an hour of street time on that
14   route, when he carried City 1 until almost 6:00 at
15   night.
16                    So there's -- there's a lot of stuff that
17   comes out of this.
18        Q.    But everyone was paid for their time,
19   though, right?
20        A.    Yes, they were all paid for their time.
21              ARBITRATOR ROBERTS: Okay. Anything
22        else?
23              MR. WALTON: No, sir.
24              MR. TRUMAN: Yes, I'll respond.
25              FURTHER RECROSS-EXAMINATION
```

```
1   BY MR. TRUMAN:
2        Q.   You said it affects route adjustments.
3   Were all those errors corrected?
4        A.   No.
5        Q.   Did they do any route adjustments?
6        A.   Here?  Yes.
7        Q.   And did it affect anybody's route?
8        A.   Yes.
9        Q.   Are all the routes correct now?
10       A.   A year after it happened, yes.
11       Q.   So now, with this, they're correct?
12       A.   The routes are, the clock rings are not.
13            MR. TRUMAN:  Okay.  That's good.  That's
14       all.  I just clarified.
15            ARBITRATOR ROBERTS:  Thank you.  You're
16       excused.  I think Mr. Walton wants you to assist
17       him as his technical advisor.
18            MR. WALTON:  And that's it for me.  I
19       rest, Mr. Arbitrator.
20            Do you want to take five?
21            ARBITRATOR ROBERTS:  Let's take five.
22            (Recess at 10:31 a.m. to 10:43 a.m.)
23            ARBITRATOR ROBERTS:  Okay.  Call your
24       first witness.
25            MR. TRUMAN:  Susie Whittington.
```

| | |
|---|---|
| 1 | MR. WALTON: I'm going to object to this |
| 2 | witness, Mr. Arbitrator, because she has nothing |
| 3 | in the file. She has -- her testimony is that she |
| 4 | didn't participate in this hearing -- or in this |
| 5 | case file. She has no statement. She has nothing |
| 6 | to management's contentions. They have five pages |
| 7 | of contentions, one written page from Duane Allen. |
| 8 | She's contributed nothing, so anything she's |
| 9 | fixing to testify to is new argument. |
| 10 | ARBITRATOR ROBERTS: If it's new |
| 11 | argument, it won't be permissible. But your |
| 12 | witness did talk about Ms. Whittington, so she's |
| 13 | going to be allowed to testify. But no new |
| 14 | argument. |
| 15 | (Susie Whittington enters the |
| 16 | proceedings.) |
| 17 | ARBITRATOR ROBERTS: I need you to raise |
| 18 | your right hand to be sworn, please. |
| 19 | SUSIE WHITTINGTON, |
| 20 | having been first duly sworn, testified as follows: |
| 21 | ARBITRATOR ROBERTS: Thank you. Answer |
| 22 | the questions, please. |
| 23 | DIRECT EXAMINATION |
| 24 | BY MR. TRUMAN: |
| 25 | Q. All right. Good morning, Susie. |

```
 1        A.       Good morning.
 2        Q.       Will you please state your name slowly
 3   for the record?
 4        A.       Okay.  Susie Whittington.
 5        Q.       All right.  And what is your position
 6   here?
 7        A.       I am the postmaster here at Kingsport.
 8        Q.       How many years have you worked for the
 9   Postal Service?
10        A.       25.
11        Q.       And how many routes do you have?  How big
12   is your office?
13        A.       We have 75 routes in this building, and
14   46 are city and 25 rural.
15        Q.       So you have a lot of employees?
16        A.       Yes.
17        Q.       I'm going to take you right to it.  On
18   Page 5, you have a grievance file in front of you.
19        A.       Okay.
20        Q.       If you would turn to Page 5.
21        A.       Sure.
22        Q.       There's like the second paragraph down,
23   it says:  "During a meeting with the postmaster, Susie
24   Whittington."  Can you read that for me?
25        A.       "During a meeting with Postmaster Susie
```

1   Whittington we discussed local Grievance 18-FCMK2-18,
2   specifically the dates that supervisors completed their
3   training.  And during this discussion, the postmaster
4   told me that supervisor Lisa Fortner was the last one
5   to complete her TACS training, and the day of
6   completion was October 2, 2018.  The postmaster said
7   she would print out a completion paper with the dates
8   on it that I never received."

9           Q.      Can you just explain what that is, what
10  that means, what you were saying with Lisa being the
11  last one and everything?

12          A.      Well, when we started researching who
13  needed the training and who had had the training, Lisa
14  and Phil had not completed TACS training, so I wanted
15  to make sure that I got them in.  And I did that.

16                  I thought Lisa was the last one.  I had
17  checked on everybody.  I took the training.  I had not
18  had it.  And I checked on Duane Allen and talked to the
19  person who is the manager of TACS, and she told me that
20  Duane had already had the training.

21                  And I just -- that was -- that was what my
22  thought process was on that.  And I didn't think anything
23  further.

24          Q.      Okay.  So you just -- you thought -- you
25  thought Lisa was it at that time?

| 1 | A. | Yes, absolutely. |

```
1       A.      Yes, absolutely.
2       Q.      In the back of the file, so if you would
3  turn to like 523. You can just move all the big ones
4  over. This is the date, or this is -- is this training
5  certificate for Lisa Fortner?
6       A.      Yes, it is.
7       Q.      And what's it dated?
8       A.      October 12, 2018.
9       Q.      And on 522, the page before this.
10      A.      Okay.
11      Q.      Is this the record of training for Phil
12 Benton?
13      A.      It is.
14      Q.      And what's his date?
15      A.      September 12th, 2018.
16      Q.      So why are they spaced out?
17      A.      Well, I got them in as soon as I could,
18 you know. The classes are few and far between. I
19 don't remember a lot of TACS training since I've been
20 with the Post Office, and I was able to get them into
21 the classes I was able to get them in.
22              I couldn't send them both at the same
23 time. We have 130-some employees in three stations,
24 and I had to schedule them when I could schedule them.
25 I couldn't -- I couldn't send everybody at the same
```

```
 1   time.  These supervisors have specific
 2   responsibilities, and they don't have backups if
 3   they're not here.
 4        Q.      Now, whose responsibility is this office?
 5        A.      Me.
 6        Q.      Yours?
 7        A.      Yes.
 8        Q.      And you're aware of this grievance,
 9   correct?
10        A.      Yes.
11        Q.      Okay.  Being the installation head and in
12   charge of this, was it your intent to just defy this
13   order?
14        A.      Absolutely not.  You know, I've been
15   around a long time, and I don't -- I wouldn't be here
16   if I disobeyed my instructions of my boss, you know.
17   And, you know, we all know that the DRT decision is the
18   DRT decision.
19               And there was no malicious intent here,
20   not at all.  I -- that's just not me, Derek.
21        Q.      Now -- now, this case has substantial
22   liability; I mean, over $100,000.  I mean, is there
23   anything that you would like to say to that?
24        A.      Well --
25               MR. WALTON:  I'm going to object.  This
```

1       is exactly what I'm talking about.  Her entire
2       testimony is new argument.  All of it, everything
3       that she said after her name, is new argument.
4                   ARBITRATOR ROBERTS:  Well, I haven't
5       heard any argument yet, but if you start talking
6       about that, that's going to be an argument as far
7       as the monetary award.
8                   MR. WALTON:  Well, she's talking about
9       procedures and policies.  That's what I'm talking
10      about.  Article 15 states that this case file must
11      be set when it goes forward.  If they wanted this
12      lady to participate so much, then why was she not
13      in the case file?
14                  ARBITRATOR ROBERTS:  Well, she was in the
15      case file.  Your witness opened that up, and she
16      was explaining that particular paragraph that he
17      read.  So to that point, she's fine.  But I don't
18      think she needs to go into the remedy part of it.
19                  MR. TRUMAN:  With the amount of the
20      remedy and this being her installation, I just
21      wanted her to get it out and say, because she --
22      she admitted there was nothing malicious.  She was
23      falling on the sword; "Look, yeah, this happened.
24      However" --
25                  ARBITRATOR ROBERTS:  And that's for me to

| | |
|---|---|
| 1 | decide. All right. Go ahead. |
| 2 | THE WITNESS: I really appreciate it. |
| 3 | You know, first off, I want to apologize. Last |
| 4 | year was probably one of my worst in the Post |
| 5 | Office. We were short, so shorthanded clerks that |
| 6 | I was coming in sometimes at 2:30 in the morning |
| 7 | and working until 5:00, 6:00 p.m. at night, |
| 8 | sometimes staying at night throwing packages. |
| 9 | We had -- it wasn't that we didn't keep |
| 10 | up with the staffing or we didn't hire. We had |
| 11 | people on AWOL, people on annual, people who had |
| 12 | retired just like that (indicating). We had -- we |
| 13 | were down seven clerks at one point, and so that's |
| 14 | half of our staff. |
| 15 | And so I was doing so many things that I |
| 16 | probably shouldn't have been doing to keep the |
| 17 | mail going, to keep the mail to the carriers, that |
| 18 | I probably just didn't do my job. Okay? |
| 19 | But I -- I assure you, nothing -- |
| 20 | nothing -- malicious. |
| 21 | On top of dealing with all that, I had -- |
| 22 | my father was very sick down in South Carolina. I |
| 23 | was out of the office a lot with him. He ended up |
| 24 | being very sick. I was with him in November, in |
| 25 | December, in January, in March. And then in March |

```
1          he went into the hospital, and I -- he -- he
2          passed away. This was just -- it was just a blur
3          for me. It was awful.
4                    And not a reflection of the kind of -- of
5          work that I do. I am very conscientious, very
6          passionate about my job. And I have been proud to
7          work for the Postal Service and be a postmaster
8          for 20 -- probably 22 years as a postmaster.
9                    And I've been promoted, and that would
10         not have happened if -- if I do this kind of work.
11                   And this is -- this is on me. I am
12         responsible. And I am -- I am deeply sorry if I
13         have done anything egregious to someone. It's
14         just -- it was not intentional. It was not.
15                   And I made that effort to get those
16         people trained that I thought needed the training.
17         And it just -- and then peak, and when we rounded
18         the corner of the new year, I just -- I couldn't
19         get him in a class. And I finally got him in a
20         class, but....
21                   MR. TRUMAN: Thank you, Susie.
22                   ARBITRATOR ROBERTS: Cross-exam?
23                        CROSS-EXAMINATION
24    BY MR. WALTON:
25         Q.    When did you finally give Mr. Stout
```

```
1   Mr. Allen's completion of his training?
2        A.      I don't recall giving him that.  I
3   received a certificate on him and emailed it to him
4   last night, but --
5        Q.      So you emailed him the completion of
6   Mr. Allen's training last night?
7        A.      I did, yes.
8        Q.      Were you aware of all these decisions?
9        A.      I was, yes.
10       Q.      How were you made aware of that?
11       A.      Initially, I did not get any of the
12  decisions because I'm not included --
13       Q.      Right.
14       A.      -- on the emails.  And so the first
15  decision, I guess the one dated maybe June or something
16  like that --
17       Q.      Uh-huh, right.
18       A.      -- came from Duane Allen.  And Shawn
19  actually forwarded it to me, as well.
20       Q.      When?  Do you remember?
21       A.      Right after -- right after it came out,
22  the one in June, yes.
23       Q.      So the first one came out last June,
24  correct?
25       A.      Yes.
```

```
 1          Q.      And so a year later, you're finally
 2    giving him Mr. Allen's completion of his training?
 3          A.      Yes.  I had reached --
 4                  MR. WALTON:  Thank you.  That's all I've
 5      got.
 6                        REDIRECT EXAMINATION
 7    BY MR. TRUMAN:
 8          Q.      What was it you were getting ready to
 9    say?
10          A.      I had reached out to Michelle Costa
11    multiple times for training certificates.  We have
12    emailed back and forth, and I have those emails from
13    her where I was trying to get those records in one of
14    my emails to her.  And Michelle is the TACS trainer.
15    In one of my emails to her I said "Michelle, I need
16    this for a DRT decision."
17                  And with everything else going on and,
18    you know, just the -- I don't mean to sound sarcastic,
19    but it seems like the 8,000 things that I have going on
20    all the time, I just -- I reached out the minute I
21    knew.
22                  And even Shawn and I, you know, we talked
23    about it in my office.  And I wanted to get that for
24    him, and I may have even typed one of those emails
25    right while he was sitting with me.  I don't remember.
```

```
1   But I just didn't get it to him.
2        Q.      So over the last year, has the -- you're
3   trying to get the certificate, right?  You just said
4   that.
5               Did the Postal Service migrate from
6   what's called LMS to a new program called HERO?
7        A.      Yes.  Absolutely, yes.
8        Q.      That was probably part of the issue?
9        A.      Yes.
10       Q.      Okay.
11       A.      And that happens all the time.  We find
12  ourselves scrambling to figure out how to do our job.
13  Yes, that was a huge issue.  That's why I couldn't just
14  go in there and get it.  I had to reach out for help.
15              MR. TRUMAN:  Okay.  That's it.
16              ARBITRATOR ROBERTS:  Anything else,
17       Mr. Walton?
18              MR. WALTON:  Yeah, I do.
19                    RECROSS-EXAMINATION
20  BY MR. WALTON:
21       Q.      Mr. Allen stated that -- do you feel that
22  he's aware of all these issues that you're having, the
23  shortage of staff and all these problems that you have?
24  Was he here?
25       A.      He was here, yes.
```

```
1          Q.      So you're stating that's the main reason
2    you're having so many issues, because you're coming in
3    at 2:00 and all of that.  Was he aware of that?
4          A.      He was here, yes.
5          Q.      Do you have any idea why he would
6    obligate himself to do training by 8/31 if he knew you
7    were having all these issues?
8          A.      I can't answer for him.  I just know that
9    our intention has always been to do the right thing,
10   and we didn't.  We -- we messed that up, and I
11   apologize.
12         Q.      And so this gentleman who's not
13   testifying today obligated -- you're saying it's your
14   responsibility, correct?
15         A.      Yes.
16         Q.      Obligated you to do something by 8/31.
17   Did you have an issue with that?
18         A.      Well, absolutely.
19                 MR. WALTON:  Okay.  That's all I have.
20                         EXAMINATION
21   BY ARBITRATOR ROBERTS:
22         Q.      Are you familiar with the ELM, Section
23   66544?
24         A.      Specifically?
25         Q.      It talks about falsification of records.
```

```
 1        A.       Absolutely.  Yes, sir.  Yes, sir.
 2        Q.       Okay.  Are you aware that you had two
 3    cease-and-desist orders that weren't complied with?
 4        A.       In regards to?
 5        Q.       Changing the TACS?
 6                 MR. TRUMAN:  The cease and desists were
 7        on the failure to provide the information, not on
 8        TACS issues.
 9                 MR. WALTON:  There was the one on that.
10        One on the falsifying clock rings, two on the not
11        providing the TACS training.
12    BY ARBITRATOR ROBERTS:
13        Q.       Yes, but it all had to do -- it started
14    with the TACS records?
15        A.       It did, yes.  Yes.
16        Q.       And I do not -- there's no evidence here,
17    and it's not really part of this case, but --
18        A.       I don't mind answering.
19        Q.       -- there's evidence, but there's still
20    problems going on with the TACS report.  Are you aware
21    of that?
22        A.       Yes, and I don't mind answering that
23    question.
24        Q.       I wish you would.
25        A.       Since I've been the installation head
```

1 here, at any office where I've been the installation
2 head, my supervisors are aware of the seriousness of
3 that type of action.

4 That is absurd. We in our history at the
5 Postal Service have seen supervisors lose their job
6 over falsifying clock rings, and we don't allow it.

7 However, and unfortunately, we are
8 required to -- and I know you're probably going to kick
9 me for saying this. But we are required to keep that
10 -- that those rings cleaned -- laundered, so to speak.
11 That's not a good word, but that would be the carriers
12 clocking to the correct route or making the correct
13 move so that we can allocate the time, where it is
14 supposed to go. Not where we want it to go, but where
15 clearly the carrier worked.

16 And so, unfortunately, we still have to
17 change the rings and move the carriers. And the
18 alternative to that -- and this is what I've tried to
19 explain to everybody. The alternative to that is to --
20 to talk to the carrier, explain to them, show them in
21 their handbook where they're required to make those
22 correct moves; and when they don't, take disciplinary
23 action against them.

24 And, you know, that's not my first --
25 that's just not -- that's just not my management style.

1   My management style is to teach them and to help them,
2   and if they make the incorrect ring to correct the ring.
3                 And -- and now, you know, when we do that
4   it makes it look like we're falsifying time. And we are
5   not. No one has lost pay. You know, no clock rings were
6   deleted, no end tours were deleted.
7                 You know, we don't -- we don't move time.
8   It's just we allocate -- it has to be allocated to the
9   appropriate route. It has to be -- we, you know, if they
10  are doing a collection, we have to charge it to
11  collection. If we are doing a training, you know, we
12  have to charge it to a training.
13                 I -- I want the carriers to clock
14  correctly, and they don't always do that.
15       Q.    Well, I don't know if you have seen this
16  file before, but if this file indicates there were
17  thousands of changes to the TACS reports --
18                 MR. TRUMAN:  That was the file before
19       this, not this file.
20                 MR. WALTON:  It's in this file.
21                 ARBITRATOR ROBERTS:  It's in this file.
22                 MR. TRUMAN:  The decision is in the file.
23                 MR. WALTON:  Yeah.
24                 MR. TRUMAN:  But the actual -- these
25       rings are not the ones where there's thousands.

```
1              MR. WALTON:  He said it's in the file.
2              ARBITRATOR ROBERTS:  No, no, no; I was
3    indicating to the postmaster.  This doesn't
4    really -- this doesn't really apply to my decision
5    or this case.  But her testimony is very credible,
6    and she seems like she's very concerned.
7              But you have a major -- you had a major
8    problem here.  There was testimony it continues to
9    exist.  I don't know if it does or not; again,
10   that's not part of my decision.  But if it still
11   exists, I think you need to take care of that.
12             THE WITNESS:  Yes, sir.
13             ARBITRATOR ROBERTS:  You had two
14   cease-and-desist orders.  It's in this file.  We
15   still have a problem.  I don't know -- I've
16   looked, and I don't even know what the problem is.
17   There was testimony that it continues to exist.
18             Going back to 66544, it is very serious.
19             THE WITNESS:  Absolutely.
20             ARBITRATOR ROBERTS:  That's
21   falsification.
22             THE WITNESS:  Absolutely.
23             ARBITRATOR ROBERTS:  That's why people
24   lose their jobs.
25             THE WITNESS:  Yes, sir.
```

```
1              ARBITRATOR ROBERTS:  People can go to
2       jail based on that particular section.  Are you
3       aware of that?
4              THE WITNESS:  Yes, sir.
5              ARBITRATOR ROBERTS:  So it's very
6       serious.  It needs to be resolved somehow.  I
7       don't know what the answer is but just thought I
8       would ask for your viewpoint on what's happening.
9       Again, that has nothing to do, because that's not
10      argument or anything.
11             THE WITNESS:  Yes, sir.
12             ARBITRATOR ROBERTS:  It's just
13      information to discuss.
14             MR. TRUMAN:  Okay.
15             ARBITRATOR ROBERTS:  Do you have anything
16      else?
17             MR. TRUMAN:  I would like to introduce
18      the training certificate that was just testified
19      to that was emailed yesterday that you asked
20      about.  Is that okay?
21             MR. WALTON:  Yeah, because I'm going
22      to --
23             ARBITRATOR ROBERTS:  The steward
24      testified that they got the certificates.  They
25      were late coming, but he said you could file the
```

```
1          certificates.
2                    MR. TRUMAN:   I would move that as M1.
3                    ARBITRATOR ROBERTS:   M1, yes.
4                    MR. TRUMAN:   And it has the date on the
5          bottom of the completion.
6                    ARBITRATOR ROBERTS:   I'll ask you one
7          more thing before you go.
8                    THE WITNESS:   Yes.
9                    ARBITRATOR ROBERTS:   Does anyone else
10         have anything of this witness?
11                   FURTHER RECROSS-EXAMINATION
12    BY MR. WALTON:
13         Q.    How many years did you say you were at
14    this installation?
15         A.    July 28th, it will be four years.
16         Q.    Four years?
17         A.    Yes.
18                   MR. WALTON:   That's fine.
19                   ARBITRATOR ROBERTS:   Let me make one
20         comment again.   It has nothing to do with this
21         case -- maybe it does.   You mention -- no, it
22         doesn't have anything to do with this
23         particular -- my decision.
24                   But you put the emphasis on the carriers
25         as far as making sure that TACS reports are right.
```

```
1      But if a carrier comes off the street at a certain
2      time, he clocks in. It should show that that's
3      the time he clocked in.
4                THE WITNESS: Yes.
5                ARBITRATOR ROBERTS: Not clocked in an
6      hour later.
7                THE WITNESS: That's right. That's
8      exactly right.
9                ARBITRATOR ROBERTS: But it's not always
10     the carrier. It seems to me, from what I've seen
11     so far, is it's management that's changing TACS
12     reports, it's not the carriers.
13               THE WITNESS: That's correct.
14               ARBITRATOR ROBERTS: And you say you're
15     making them correct?
16               THE WITNESS: Yes. Because if a carrier
17     clocked in and they clock into, let's say, Route
18     16, and he clocks into the office and he makes a
19     move to the street, and then he returns to the
20     office and then he ends his day, that may not be
21     all he's that done that day.
22               He may have gone and done a collection
23     for us where he went around and picked up 20 blue
24     boxes. He may have -- he may have carried a piece
25     of another route. He may have carried -- on the
```

```
 1        other side of the building he may have carried an
 2        hour, an hour and a half.
 3               And we are required to allocate
 4        everything he did.  From the time he clocked in at
 5        7:30 in the morning under the time he clocked out
 6        at 6:00 at night, we are required to allocate that
 7        properly in TACS.
 8               And honestly, the Post Office way is if
 9        he doesn't then I am to, you know, bring him in,
10        show him in the handbook where he is required.
11        And then if this happens again, you know, give him
12        an official discussion.  And if it happens again,
13        take corrective action on the employee.
14               And we've just been too lenient on that.
15        We have not -- we've not done that.  We just -- we
16        did all the work for them, and -- and shame on us.
17        It shouldn't have happened.
18               ARBITRATOR ROBERTS:  Okay.  That's all.
19        Thank you very much.
20               THE WITNESS:  Thank you.
21               ARBITRATOR ROBERTS:  Have a nice day.
22               THE WITNESS:  Okay.  Thank you.
23               (Susie Whittington exits the
24        proceedings.)
25               MR. TRUMAN:  The Service is going to
```

```
1          brief, so we request a brief.
2               ARBITRATOR ROBERTS:  Okay.
3               MR. WALTON:  I will not brief, but I
4          would like to ask permission to file a reply brief
5          in accordance with Article 15, Mr. Arbitrator, if
6          you don't mind.
7               ARBITRATOR ROBERTS:  Reply brief?
8               MR. WALTON:  Whereas if management wants
9          to do a brief and I'm going to do an oral closing,
10         you can't kick them out, but I can ask permission
11         from you to do a reply brief.
12              So once they submit their brief, I would
13         like to ask an additional ten days after their
14         brief to submit it so that I can do a reply brief
15         in case there are new arguments or anything
16         addressed that was not addressed in this hearing.
17              And I would have to ask that permission
18         from you, sir.  And this is straight out of
19         Article 15.
20              So if he's going to do his a month from
21         now, I would ask for ten days from the date I
22         receive his brief that I can file a reply brief.
23              ARBITRATOR ROBERTS:  This is something
24         new.  What is this telling me?
25              MR. WALTON:  And this 1315 is in article
```

```
 1        15.  It talks about briefs.  And that's where you
 2        can get this from.  It is in Article 15.
 3                MR. TRUMAN:  You mentioned the
 4        arbitrator.  Before you make a decision, I have
 5        the JCAM, which is after this decision, which --
 6        here you go, Corey -- does not -- it specifically
 7        states that you have to choose either/or.  "If one
 8        party's representative decides to close orally,
 9        the other party's representative will not be
10        excluded from the hearing during closing
11        arguments."
12                ARBITRATOR ROBERTS:  Yes, I think that
13        this says that.
14                MR. WALTON:  See here in Article 15 where
15        it talks about post-hearing briefs, 1315.  And
16        that's what this is, is 1315.  It talks about the
17        brief.  That document is the one that I handed you
18        there, so I'd like to ask for time from you for
19        permission to file a reply brief.
20                MR. TRUMAN:  I'm still going to object.
21        Because if we're closing orally, he doesn't get --
22        it's a contract case, so I'll go and then he'll
23        go.
24                MR. WALTON:  I'll go and you'll go.
25                MR. TRUMAN:  Yeah, and then I'll go.
```

ase 1:19-cv-03685-TSC   Document 2-4   Filed 12/10/19   Page 93 of 121

ARBITRATION                                    91

```
1            But he doesn't get a chance to come back
2     and rebut anything that I just went over.
3            MR. WALTON:  If it's new argument, I can,
4     absolutely.
5            ARBITRATOR ROBERTS:  If it's new
6     argument.
7            MR. TRUMAN:  But other than that, no.
8     What I'm saying is, with a brief, it's the same
9     way.  If I request a brief, he doesn't get a
10    chance to respond to my brief.
11           MR. WALTON:  Yes, that's what he says.
12           ARBITRATOR ROBERTS:  From what I see, I
13    will allow you the ten days.
14           MR. TRUMAN:  It says he can ask.  It
15    doesn't say that you can.
16           MR. WALTON:  And I asked.
17           ARBITRATOR ROBERTS:  But I will allow it,
18    in the event -- in the event there's new argument.
19    That's it.  That's the only thing he can do.
20           MR. WALTON:  I can address new argument,
21    new evidence.
22           ARBITRATOR ROBERTS:  If there's new
23    argument, he can send a post-hearing brief.
24           MR. CONKLIN:  So if there's no new
25    argument, there's no response?
```

son Court Reporting

1              ARBITRATOR ROBERTS:  Pardon?
2              MR. CONKLIN:  So if there's no new
3     argument, there's no response?
4              ARBITRATOR ROBERTS:  No new argument, no
5     response.  He can't dispute it.
6              MR. TRUMAN:  So if my brief has no new
7     argument in it, he cannot send a response to you?
8              ARBITRATOR ROBERTS:  No.
9              MR. TRUMAN:  I can agree to that.
10             MR. WALTON:  Well, it's up to him.
11             ARBITRATOR ROBERTS:  Otherwise, your
12    ten-day request is granted.
13             MR. TRUMAN:  If he would like a chance to
14    respond, I would like a chance to review.
15             MR. WALTON:  It doesn't work that way.
16             MR. TRUMAN:  Well, I can ask, the same as
17    you can.
18             MR. WALTON:  It doesn't say that.  It
19    doesn't say it's going to keep on going.
20             MR. TRUMAN:  It doesn't say it's
21    approved, either.
22             MR. WALTON:  He just approved it.
23             ARBITRATOR ROBERTS:  You'll have ten
24    days, if there's new argument.  If he feels
25    there's not new argument, I will allow you to

```
 1            respond and I'll give you ten days.
 2                     MR. WALTON:  Okay.
 3                     MR. TRUMAN:  And will I be copied on the
 4            reply brief?
 5                     MR. WALTON:  Of course.
 6                     ARBITRATOR ROBERTS:  There's no way for
 7            you to reply if you don't see it.
 8                     MR. TRUMAN:  Exactly.  I just wanted to
 9            be sure.
10                     ARBITRATOR ROBERTS:  If you feel there's
11            a new argument, just let me know.
12                     When will the transcript be ready?
13                     THE COURT REPORTER:  Monday.
14                     ARBITRATOR ROBERTS:  It will be ready on
15            Monday.  So on Monday, then do you need 30 days
16            from Monday?
17                     MR. TRUMAN:  That would be preferable.
18                     MR. WALTON:  You've got the 17th, so the
19            22nd of July?  Or the 15th?
20                     MR. TRUMAN:  The 19th.
21                     MR. WALTON:  The 19th, okay.
22                     MR. TRUMAN:  I'll just mark July 19th, by
23            closing, just sometime.
24                     MR. WALTON:  And then can I have 15 days,
25            because I'm on a cruise from the 21st to the 27th.
```

```
 1              ARBITRATOR ROBERTS:  15 days will be
 2       fine.
 3              MR. WALTON:  That way, if I get it on the
 4       19th I won't be back until the 27th.
 5              ARBITRATOR ROBERTS:  July 27th.
 6              MR. WALTON:  So mine will be --
 7              MR. TRUMAN:  If I have new argument.
 8              MR. WALTON:  Brother, this ain't my first
 9       time, man.  You don't have to tell me.  I know
10       what I'm doing.
11              So what date do you need mine in?
12              ARBITRATOR ROBERTS:  I thought you said
13       July 27th?
14              MR. WALTON:  That's when I get back from
15       my cruise.
16              ARBITRATOR ROBERTS:  Okay.
17              MR. WALTON:  15 days from the 19th.
18       That's Friday, the 2nd.  Is that right?
19              MR. CONKLIN:  That's the last business
20       day.
21              MR. WALTON:  Okay.  Friday, the 2nd of
22       August.  Okay.  I'll mail you both a copy, if
23       there's no new argument.
24              ARBITRATOR ROBERTS:  And you will send
25       him a copy of your brief?  Okay.
```

```
 1                    All right, Mr. Walton.
 2               MR. WALTON:  May I have about ten
 3        minutes?
 4               MR. TRUMAN:  I will also include my
 5        citations to that, as well.
 6               ARBITRATOR ROBERTS:  All right.  Let's
 7        take a break.
 8               MR. WALTON:  Thank you.
 9               (Recess at 11:14 a.m. to 11:29 a.m.)
10               ARBITRATOR ROBERTS:  All right.  We're
11        going to go back on the record.
12               CLOSING STATEMENT OF THE UNION
13               MR. WALTON:  First off, Mr. Arbitrator, I
14        want to talk about management's J3, the Mittenthal
15        award.  They always use this award when they talk
16        about punitive damages.  They say punitive
17        remedies, or whatever.
18               I've got a decision here from Arbitrator
19        Maier, and he worked at the Postal headquarters
20        for 25 years.  He wrote this on Page 10, talking
21        about management's trying to include the
22        Arbitrator Mittenthal award in everything, and
23        this is what he said.  "Management" -- and this is
24        on Page 10.
25               "Management quoted National Arbitrator
```

1    Richard Mittenthal in its opening statement, as

2    follows," and he talked all about the language

3    that they always want to use. This is what he

4    said:

5         "These arguments fly in the face of the

6         evidence of record. The Mittenthal

7         decision is not on point with the issue in

8         this case. Arbitrator Mittenthal rendered

9         a decision in a case regarding a

10        management-initiated program on attendance

11        control. The program resulted in numerous

12        disciplinary actions.

13        "The union grieved the program, seeking to

14        eliminate it. They initially sought to

15        expunge the discipline issue resulting from

16        the implementation of the program.

17        "Arbitrator Mittenthal determined it was

18        the employees' misconduct that led to the

19        discipline and not the implementation of

20        the program. The program did not diminish

21        the existence of the misconduct. The

22        employees would be waiting a judgment on

23        the alleged misconduct, regardless of

24        whether or not the program existed.

25        "He reasoned that eliminating the program

1          and expunging the discipline would go far

2          beyond the notion of a status quo ante.  It

3          would reward employees from management's

4          procedural error by freeing them of any

5          responsibility from their alleged

6          misconduct."

7          He goes on to state:  "There is no

8          correlation with the case at bar.  The Item

9          14 provision in this matter was jointly

10         negotiated.  The jointly developed penalty

11         for violating the provision began as a

12         cease and desist and, after repeated

13         violations, evolved into an escalating

14         remedy.  I give considerable weight to the

15         fact that the escalating remedy was

16         mutually developed by the parties and is

17         consistent with the language regarding

18         remedies found at Page 4117 of the JCAM."

19         The very thing that Mr. Truman was trying

20    to shoot down in his opening, 41, the arbitrator

21    acknowledges that.  So the Mittenthal decision has

22    nothing to do with what we're talking about when

23    it talks about status quo ante.  Arbitrator Maier

24    discussed that at length.

25         So when you consider that, it has nothing

| | |
|---|---|
| 1 | to do with what we're talking about here. But |
| 2 | they always want to use that, you always see |
| 3 | they'll try to attempt to use this decision |
| 4 | whenever it talks about remedies. |
| 5 | I want to talk about management's opening |
| 6 | for a second. There are a few things that I |
| 7 | wanted to touch on. |
| 8 | One of the things, and I think that this |
| 9 | it is the problem that we're having and the reason |
| 10 | we're here today, is that he minimized the |
| 11 | training certificates. He even said "Just a |
| 12 | training certificate. "What harm is that? It's |
| 13 | just a training certificate." |
| 14 | Well, did the B Team tell them to supply |
| 15 | us with the training certificates? Yes, they did. |
| 16 | Did both parties at the Formal Step A tell them to |
| 17 | provide us with the training certificates? Yes, |
| 18 | they did. |
| 19 | So you cannot minimize that it's just a |
| 20 | training certificate. I don't care if it's a roll |
| 21 | of toilet paper. If you've been told to give it |
| 22 | to me by the B Team or by a Formal Step A |
| 23 | settlement, give it to me. You cannot minimize |
| 24 | that. |
| 25 | It's the integrity of the grievance |

1    resolution progress that's on -- process that's

2    on -- at arbitration here today.  It's the

3    integrity of the process.  Article 15 covers it.

4    It's the integrity of a B Team decision.  It's the

5    integrity of the Formal Step A process.  That's

6    what on arbitration here today.

7              You cannot minimize it by saying it's

8    just a certificate.  You're told to give it to me

9    by a certain time.  You didn't do it.  You're told

10   to give it to me on three different occasions.

11   You didn't do it.  That's why we're here.

12             He goes on to state in his opening, "Hey,

13   all the grievances were resolved.  We're only here

14   for this one grievance.  All the previous ones

15   were resolved."

16             That's true.  They were resolved as what?

17   That you would do something, that you'll give me

18   something.  That you'll give me these training

19   records.  Every single one of them was resolved,

20   he's right, that you will do something that they

21   did not do.

22             That's the reason that we have four

23   grievances, rather than one.  If you complied with

24   the first one, we wouldn't be here.  But you

25   didn't.

1    So when he says, "Hey, they're all
2    resolved," he's right, partially. But they're
3    resolved telling you to do something that you
4    didn't do.

5    His entire opening, he talked about
6    punitive damages. There's no such thing as
7    punitive damages. On Page 45 of the case file,
8    both parties agreed that if you don't comply it
9    may result in escalating remedy. That's what it
10   is. If you don't comply, that's the only avenue
11   we've got is the grievance procedure. That's the
12   only avenue we have to make you comply.

13   What would they suggest he do after the
14   first grievance, when they said "Don't" -- you
15   know, "You have to comply, you have to give these
16   training records?" Just never get them? "Oh,
17   well, we didn't get them."

18   What now? Nothing? We just don't get
19   them? No, we have a grievance procedure. That's
20   how we hold management accountable, because we
21   can't make them do anything. This is how we make
22   them do something.

23   He can't go in and say "Give it to me,"
24   because they can do exactly what they did. It's
25   not given. This is the only avenue we have, is

1      the grievance procedure, to make management do

2      something.  And it's taken us four times.

3             You know when they finally abided by the

4      initial decision?  Yesterday, the day before this

5      arbitration.  That's odd, isn't it?  They finally

6      abided by a decision of 6/6 of last year

7      yesterday.  They finally abided by a Formal Step A

8      resolution from 8/31 yesterday.

9             They said, "You'll give it to us by

10     8/31/31" -- that's last year -- "yesterday."

11            It's just a certificate?  That's absurd.

12            Go to management's witness, Ms. Susie

13     Whittington.  I kind of took offense, too, that

14     she stated that, after all of this, it was the

15     carriers' fault.  They're not doing things.

16     8,000 -- 8,000 deleted rings, and it's our fault?

17            Let me -- I wish I could tell her

18     something.  You don't get a cease and desist for

19     something that's my fault.  The B Team is not

20     going to give management a cease and desist for

21     something that's the carriers' fault.

22            You know who got a cease and desist for

23     falsifying clock rings?  They did.  Not me.  They

24     did.  You don't get a cease and desist for

25     something you didn't do.  It doesn't work that

```
1    way.
2              So she can try to come in here and put
3    blame on whoever she wants to.  It's her fault.
4    It's management's fault.  It's the supervisors'
5    fault.  They got caught.  You know what else?
6    They're still doing it.
7              On Page 25, Mr. Stout said, "Hey, what
8    good are the certificate, anyway, because you're
9    still falsifying clock rings?"
10             I've got evidentiary proof right there.
11   These clock rings.  This is from '11.  All was
12   when they were told to do the training.  They
13   said, "Hey, we got them."  This was from '11, '15,
14   '16.  They're still doing it.  I've got
15   evidentiary proof in this case file that
16   management is still falsifying clock rings.
17             He stated in his contention they're still
18   falsifying clock rings.  You know what management
19   said about that?  Nothing.  Zero.  Not a thing.
20   That's crazy.
21             This all started because of that.  He
22   shows them, "Hey, you're still doing it.  I've got
23   proof, evidentiary proof, right here."  What did
24   they say?  Nothing.  "Your remedy is punitive."
25             What the hell are you talking about?  I'm
```

1      telling you, it's still going on.

2              Here is the first decision on Page 50.

3      This is from 6/6. It tells them that they're

4      going to stop, cease and desist the practice of

5      that. That's talking about falsification of clock

6      rings.

7              You're going to get retrained -- not

8      trained, retrained -- on the use of TACS.

9              Go to Page 55. Who is included on that?

10     Duane Allen. Duane Allen, the Formal Step A

11     representative on this one. He was included on

12     that.

13             I told you about Page 25, that was --

14     Page 520, he never addressed that. So we want you

15     to consider that when you're formulating your

16     decision on the remedy. We do want you to

17     consider that. It's part of this case file. It

18     was addressed in the case file. The union does

19     want you to consider that.

20             Here's this decision on Page 2. They

21     agreed, after all of this, the Dispute Resolution

22     Team, DRT, has decided to declare a impasse in

23     part. They agree management violated Article 15,

24     Section 38, Article 19 via Postal Service Policy

25     Letter 1517.

```
1               We went over that Postal Service Policy

2     Letter with you.  Here it is.  This is 1517.  This

3     is what they said they violated:  "Compliance with

4     arbitration awards and grievance settlement is not

5     optional."  It doesn't say "unless you're in the

6     Kingsport Installation."

7               "No manager or supervisor has the

8     authority to ignore or override an arbitrator's

9     award or a signed grievance settlement."  That's

10    what we have.  We've got a Formal Step A

11    settlement.  It's signed.  That's what he's

12    talking about.

13              So they can say that formal Step A's

14    don't matter, they're not precedent setting.  Yes,

15    if you sign an agreement you can be held

16    accountable for that agreement.  1517 states that.

17              From August 31st to yesterday, that's 251

18    days.  I think it states in here that they will be

19    settled in a timely manner.

20              "Steps to comply with arbitration awards

21              and grievance settlements shall be taken in

22              a timely manner to avoid the perception of

23              noncompliance, and those steps should be

24              documented."

25              251 days.  Do you think that that's a
```

1      timely manner, Mr. Arbitrator? Because you're the
2      only one that matters in here. Do you think that
3      that's doing it in a timely manner, 251 days?
4              What do you consider excessive? What
5      would be excessive for a grievance settlement; 20
6      days, 30 days, 50 days, 100 days, 200 days? How
7      about 300 days? That's what we're talking about
8      here.
9              How about this? Next time management
10     tells me when I call in sick, they say, "Corey,
11     we're going to need you to bring in medical
12     documentation to support your absence." What if I
13     wait 300 days to bring that documentation, what do
14     you think they'll say to that?
15             If they say "Why not?" "I was busy. I
16     got home, I got kids, I was busy. I was" -- "I
17     haven't been able to do it." You think they're
18     going to go for that?
19             Why should we? Why should we go for
20     that? Almost 300 days. That's asinine, to sit
21     there and tell us, "Oh, well, you finally did it."
22     I think they even asked him, "Well, did he finally
23     do it?"
24             Well, God, it's been a year later.
25     "Yeah, they did it." "Oh, well, let's just go

| | |
|---|---|
| 1 | home, then. Why are we here?" That's absolutely |
| 2 | ridiculous that you say, "Hey, we finally did it, |
| 3 | so what's the harm?" |
| 4 | I even think that he stated in his |
| 5 | opening, let's see if I can get it right. I put |
| 6 | it in my closing. We'll get to that in a second. |
| 7 | I want to touch on your decision, |
| 8 | Arbitrator Roberts. On Page 12 and 13, this goes |
| 9 | back to the initial point I made. When management |
| 10 | continues -- he -- Mr. Truman went down the list |
| 11 | of things on the remedy; "Did this person get |
| 12 | financially harmed? Did this person get |
| 13 | financially harmed?" |
| 14 | It's not about that. We're not here for |
| 15 | that. |
| 16 | On Page 12 of your decision, you cited |
| 17 | Arbitrator Clark. This is what he says: |
| 18 | "The union did establish that Ms. Mertz |
| 19 | changed hundreds of clock rings" -- here, |
| 20 | we are talking about 8,000 -- "to |
| 21 | inaccurately reflect what functions the |
| 22 | carriers were actually performing at that |
| 23 | time. Even though the impacted carriers |
| 24 | were not financially affected by |
| 25 | Ms. Mertz's actions, the integrity of the |

```
 1                employee-employer relationship was severely
 2                damaged.  Employers are held to various
 3                provisions of the National Agreement,
 4                including handbooks and manuals, to engage
 5                in ethical behavior so as to reflect
 6                favorably upon its employees."
 7                He could have been here on this hearing.
 8                They say that, "Hey, nobody was harmed
 9         here." It's the relationship that's harmed.  It's
10         the process that's harmed.
11                You go on to state this:
12                "I cite the above because I find the
13                language of Arbitrator Clark applicable to
14                any case of this nature.  To fraudulently
15                alter any time rings is disingenuous.  It's
16                an act, in my view, as the same level of
17                theft.  But paramount is the fact the
18                impact of such action will be extensive and
19                the effects negatively impact the very
20                integrity of all Postal operations."
21                You heard very credible testimony from
22         Mr. Stout that told you exactly what happened
23         because of management's falsification of clock
24         rings in this unit.
25                "While the pattern did not indicate a
```

1       repetitive history of time record

2       alterations" -- which this one does -- "the

3       seriousness of such an event certainly

4       warrants a cease-and-desist order.  A

5       single occurrence is far too many.

6       "Fraudulent time record alterations for any

7       reason are disingenuous and cannot be

8       tolerated.

9       "I don't believe that either party to this

10      arbitration endorses, supports, or condones

11      any activity of this sort.  The

12      authenticity and accuracy of such time

13      records must never be compromised, and any

14      fraudulent act to that end must be

15      considered heinous and dealt with

16      accordingly."

17      But I show you that and state this.  6/6

18      was the first decision.  They were told not to do

19      it anymore.  As of 11, as of November, still doing

20      it.  Unrebutted.  That's in the file.

21      How about decisions, when we're talking

22      about excessive?  How many decisions should it

23      take for compliance?  I say one.  I say it should

24      take one.  If certificates were such a nonmatter,

25      why didn't I get them?

```
1            One decision is all it should take, one
2       decision from a B Team that sets precedent.  One
3       decision.
4            How about two?  Two decisions to finally
5       get what I want?
6            How about three?  No?
7            Four?  Four decisions on the same thing?
8            I want to touch on Arbitrator Wolitz's
9       decision.  She talks a little bit about it.  This
10      is what she says on Page 19:
11           "The decisions by DRT teams,
12      pre-arbitration settlement negotiators, and
13      arbitrators are made to be read, studied,
14      understood, and complied with.  Yet, in the case
15      before us, Lake Charles management has once again
16      acted as though those decisions had never been
17      rendered."
18           Hello?  That's this case.
19           If you look at a previous decision,
20      Mr. Allen, who was in the initial one, he states
21      this simply.  "We didn't do it."  Yup, "We didn't
22      do it."  That's his contention, "We didn't do it."
23           What does he state on Page 520?  "The
24      union didn't receive the training certificates."
25           Does he understand what these are for?
```

Case 1:19-cv-03685-TSC   Document 2-4   Filed 12/10/19   Page 112 of 121

| | |
|---|---|
| 1 | They're meant to be read, studied, complied with. |
| 2 | Why does he keep saying, "It's only a contention. |
| 3 | We didn't do it."  Somebody needs to educate that |
| 4 | man on what these things mean. |
| 5 | Somebody from higher up should have come |
| 6 | down and said, "Hey, Mr. Allen, you don't get" -- |
| 7 | "this is not how it works.  You are going to cost |
| 8 | us."  Obviously, that wasn't done. |
| 9 | She states on Page 20:  "Management can |
| 10 | prevent such an award simply by living up to its |
| 11 | responsibilities under the collective bargaining |
| 12 | agreement."  And I'm going to get to that in just |
| 13 | a minute. |
| 14 | How about a cease and desist?  How many |
| 15 | of those should it take for compliance?  How many |
| 16 | cease and desists should we have?  What does |
| 17 | "cease and desist" mean?  "Stop, and don't do it |
| 18 | anymore."  That's what "cease and desist" means. |
| 19 | "Cease.  Stop.  Desist.  Don't do it anymore." |
| 20 | How many of those should we get to stop? |
| 21 | If management tells me to stop something, you know |
| 22 | what?  I've got to stop it.  Are they immune from |
| 23 | that?  Because we've got two. |
| 24 | And what did Mr. Truman say in his |
| 25 | opening?  "It doesn't even warrant a cease and |

```
 1        desist."  Are you serious?  "It doesn't even
 2        warrant a cease and desist."  You've already
 3        gotten two.  What?
 4              How about the remedy?  On Page 520 is
 5        management's contention.  He states that this
 6        remedy is not corrective, it's punitive.  You've
 7        got three decisions.  That's correcting you,
 8        that's correcting your behavior.
 9              The initial decision on 6/6, that should
10        have corrected you.  That's what that was for.
11              The second one that you signed off on
12        stating that on August 31st they should get
13        something, that was us correcting you.  That was
14        you agreed to be corrected.  That's what that was
15        for.
16              The third decision, the cease and desist,
17        the additional cease and desist, that's correcting
18        you.  That's what that is.  That's being
19        corrected.
20              But now you want to say, "But you asked
21        for an escalated remedy.  You're being punitive on
22        me."
23              Somebody's not paying attention.
24        Somebody's not listening.  Somebody's not reading.
25        It's Mr. Allen.
```

```
1              I wish he had been in here today.  I'd
2      want to ask him, "What would have been corrective
3      on this?  What would you have considered
4      corrective action to you for the fourth grievance,
5      the fourth settlement?  What would that have
6      been?"
7              Management will talk about it's a
8      punitive -- spent the entire opening, "It's a
9      punitive remedy."  How about this?  Comply with
10     the first one.  You know how much the union would
11     have made if they would have complied with the
12     first one?  Nothing.  Zero.
13             "Oh, it's so much money.  Oh, it's a
14     fortune."  Comply with the first one.  That's up
15     to them.  That's not up to us.  We're going to do
16     things to make you stop.
17             "You can't pay this person, you can't pay
18     this person."  Do this:  Comply.  Comply with the
19     initial decision.  Then you don't have to worry
20     about that.
21             "It's a cash cow," is what he was saying.
22     "It's a cash cow."  Comply with the initial
23     decision.  You don't ever have to worry about a
24     monetary award if you comply with the initial
25     decision.
```

```
 1              "We're going to have to raise the price
 2      of stamps."  Well, why don't do you this; why
 3      don't you comply with the decision of a B Team?
 4      Why don't you comply with the decision you wrote
 5      out in Formal Step A?  You wouldn't have to pay a
 6      penny.
 7              Page 45, the B Team agrees with this
 8      remedy.  They want to say "may," but this is the
 9      reason I believe this was written.  On Page 45,
10      last sentence:  "Failure to comply with this
11      subject matter or this subject resolution may
12      result in the union's request for escalating
13      remedies to ensure compliance."
14              Now, I'm sure Monica Lucas from USPS
15      thought, "Surely to God, I won't have to see this
16      again.  Surely, that will do it.  I won't have to
17      see this ever again."
18              Guess what?  Here we are.  Here we are
19      again.
20              So what does she state, now that she got
21      caught, on Page 13 and 14 of her contentions?
22      "The union's requested remedy is improper.  It's a
23      windfall."
24              She goes on to state:  "The union has
25      failed to submit any documentation detailing harm
```

```
1      to any of the carriers which would equate to
2      monetary compensation."  This is the same person
3      who wrote the other one.
4             "There's no explanation for the utilized
5      calculation method."
6             This is the same person who stated that
7      it may warrant an escalated remedy.  Now, she's
8      saying, "Oh, now that they didn't comply, I back
9      up off of that.  It's improper."  It's not
10     improper.
11            I'm going to go back to Arbitrator
12     Maier's decision I handed you.  On this one, on
13     Page 12, this is who they paid:
14            "Management will pay shop steward, Eddie
15            Pratt, a lump sum of $1,100.  This sum is
16            $50 a day for each day that the OT recap
17            was late, 22 days."
18            Very similar to what we are doing here,
19     very similar to the remedy that Mr. Stout asked
20     for here.
21            Every day you're late giving me that, I'm
22     going to ask for an amount.  Who did they pay?
23     Eddie Pratt.  So there's precedent right there.
24            Arbitrator Wolitz, this one here,
25     Mr. Arbitrator, on Page 18.  That's a new one.  On
```

```
1        Page 18, who does she pay?
2              "For management's violation of a January
3    28 no-contest agreement, an Article 15, Carl
4    Jenkins, Formal A rep."  Then she goes on to pay
5    Marvin Green, the Informal A rep.  Another one,
6    Marvin Green, the Informal A rep.
7              You know what management argued in that
8    one?  "It's not proper.  You can't pay them."
9              Arbitrators can pay whoever they want to.
10             Here's another one from Arbitrator
11   McGowan.  It's just that very front page.  This
12   one, the Postal Service had the same argument:
13   "You can't do that, it's improper."  All those
14   things.
15             Here is what Arbitrator McGowan did:  "In
16   the final settlement of this case, the employer is
17   directed to pay the union $3,199,898.  The
18   employer is further directed to contribute
19   $1,209,760 to the Postal Employees Relief Fund."
20             There's nothing in any contract,
21   handbook, or provision that states he can do that,
22   other than whatever an arbitrator deems
23   appropriate.
24             Management raised Cain about that.  You
25   know what the arbitrator said?  "You're going to
```

1    do it.  You know why?  Because you don't listen to
2    anybody.  That's why."
3            So, yes, sir, you can pay the shop
4    steward.  You can pay whoever you want to.
5    There's nothing in any handbook or manual that
6    says you can't.  They want to talk about a
7    National Labor Relations thing.  That doesn't
8    apply here.
9            Management's sole argument on Page 520,
10   first off, they state that they did it -- "Yeah,
11   we still haven't done what we were supposed to
12   do" -- is that it's punitive.  To me, that's
13   absurd.
14           You know what else is absurd?  That the
15   union is having to come out of their pocket today
16   to defend this mess.  That's another thing that's
17   absurd.  This should have been taken care of a
18   year ago.  But now we're having to come out of our
19   pocket to come here to say, "Somebody do something
20   other than management, because they're not going
21   to.  Somebody help us here, because they're not
22   going to do it."
23           Page 27 is the remedy.  And this is going
24   to be it.
25           Page 27 is the remedy.  And No. 6 is the

```
 1        most important, because it tells you the date.
 2        And that's from the Formal Step A settlement on
 3        Page 49:
 4                    "That all city carriers, including CCA and
 5                    PTF carriers, in the Kingsport Installation
 6                    be awarded $10 per day from August 31st
 7                    until Duane Allen has been retrained on the
 8                    use of TACS, as per the Step B settlement."
 9                He got this yesterday, showing that Duane
10        Allen had been trained -- retrained.  Yesterday,
11        he got this.  Can you imagine that?  All of this
12        going on, and you hand him something the day
13        before the arbitration that shows that he was
14        retrained on May the 9th, I believe it was.
15                Why wasn't he given that on May 9th?  Why
16        wasn't he given that on May 9th?  Because that's
17        what he says you're going to do.  It says, "You're
18        going to give it to me."  It's not saying he has
19        to do it.  It says, "You're are going to give it
20        to me, give me a copy of it."
21                You didn't give it to me on May 9th.  You
22        wait for -- for it to go to arbitration, and the
23        day before it goes to arbitration you want to hand
24        him -- email him something last night, saying "Oh,
25        here it is, by the way."
```

```
 1              That's what you're dealing with here.
 2              Management's argument that this is
 3      punitive is absurd.  They can cry all they want to
 4      about "Don't pay this and that."  That ship has
 5      sailed long ago.  You don't want to pay nothing?
 6      Get in somebody's butt about complying with the
 7      decision.  Then you don't have to pay nothing.
 8              But we're here now.  The union's here
 9      now.  We're the only avenue we have, arbitration,
10      to get things done.
11              We're going to ask that you grant that
12      requested remedy on Page 27 in its entirety, from
13      1 to the bottom.  Somebody needs to understand
14      that B Team decisions are meant to be complied
15      with, not a year later.
16              We ask that you sustain this grievance in
17      its entirety, Mr. Arbitrator, and grant the union
18      the requested remedy.  Thank you, sir.
19              MR. TRUMAN:  I'm briefing.
20              ARBITRATOR ROBERTS:  I didn't think --
21      she's taking notes for you.  Okay.
22              Everything having been submitted and
23      there being nothing else, the hearing is closed.
24          (Proceedings concluded at 11:58 a.m.)
25
```

```
1                    C E R T I F I C A T E
2    STATE OF TENNESSEE
3    COUNTY OF KNOX
4
5           I, Rhonda S. Sansom, RPR, CRR, CRC, Licensed
6    Court Reporter, do hereby certify that I reported in
7    machine shorthand the above proceedings; that the
8    foregoing pages were transcribed under my personal
9    supervision and constitute a true and accurate record
10   of the proceedings.
11          I further certify that I am not an attorney or
12   counsel of any of the parties, nor an employee or
13   relative of any attorney or counsel connected with the
14   action, nor financially interested in the action.
15          Witness my hand and seal this the 16th day of
16   June, 2019.
17
18
19
20                         Rhonda S. Sansom
21
                           Rhonda S. Sansom, RPR, CRR, CRC
22                         Tennessee LCR# 0685
                           Expiration Date:  6/30/20
23   rhondasansom@gibsonreporters.c
                           Illinois Licensed Certified
24   Signer:               Shorthand Reporter
     Erikaldesasion@gibsonreporters.com
                           No. 084.004823
25                         Expiration Date:  5/31/21
```

**Gibson Court Reporting**