# EXHIBIT E

RECEIVED

SEP 1 1 2019

HQ LR SYSTEMS

**REGULAR ARBITRATION PANEL**

---------------------------------

In the Matter of the Arbitration *

between:                          *      Grievant:  Class Action

United States Postal Service      *      Post Office: Kingsport, TN

         and                      *      USPS Case No: C16N-4C-C 19079250

National Association of           *      NALC Case No: 18-FCMK3-18
Letter Carriers, AFL,CIO          *

---------------------------------

BEFORE:                    Lawrence Roberts, Arbitrator

APPEARANCES:

        For the U.S. Postal Service:      Derek Truman

        For the Union:                    Corey Walton

Place of Hearing:           Postal Facility, Kingsport, TN

Date of Hearing:            June 14, 2019

Date of Award:              August 30, 2019

Relevant Contract Provision:   Article 15-19

Contract Year:              2016

Type of Grievance:          Contract

Award Summary:

        The issue in this case is one of non-compliance of a previous
grievance settlement. The Union contended the Employer failed to
satisfy the language of a prior settlement. The Service asserted the
Union's requested settlement offer was unreasonable. The evidence
proves the Employer failed to comply with the settlement agreement,
defying a cease and desist order, and for that reasoning, the Union's
requested remedy is granted.

Lawrence Roberts, Panel Arbitrator

**SUBMISSION:**

This matter came to be arbitrated pursuant to the terms of the Wage Agreement between United States Postal Service and the National Association of Letter Carriers Union, AFL-CIO, the Parties having failed to resolve this matter prior to the arbitral proceedings.  The hearing in this cause was conducted on 14 June 2019 at the postal facility located in Kingsport, TN. Testimony and evidence was received from both parties. The hearing was transcribed by Rhonda S. Sansom, RPR, CRR, CRC, Licensed Court Reporter.  The Arbitrator also made a record of the hearing by use of a digital recorder and personal notes. The Arbitrator is assigned to the Regular Regional Arbitration Panel in accordance with the Wage Agreement.

**OPINION**

**BACKGROUND AND FACTS:**

This is a class action grievance filed on behalf of Letter Carriers working Branch 1999 of the Kingsport TN Post Office. The issue in this matter has been reduced to one of remedy.

This matter was resolved, in part, whereby the Parties agreed that a violation occurred however, was unable to agree upon an appropriate remedy. The Step B **"DECISION,"** labeled **C16N-4C-C 19079250,** and dated 8 February 2019 reads as follows:

> **"The Dispute Resolution Team (DRT) has decided to declare an IMPASSE IN PART. The DRT agrees Management violated Article 15, Section 3A, and Article 19, via Postal Service Policy Letter (M-01517) of the National Agreement by failing to comply with the grievance resolution/settlements dated 11/27/2018 for Grievance #18-FCMK2-18 in the Main Kingsport Installation." The Step B Team could not jointly agree on the appropriate contractual**

remedy for this case and therefore, the remedy is being impassed. All arguments and evidence in the case file pertaining to the remedy may be cited in the event of arbitration. The NALC National Business Agent may appeal this grievance to arbitration within fourteen (14) days after the receipt of this decision.

And that **"18-FCMK2-18"** referenced above, dated 27 November 2018, reads as follows:

**"The Dispute Resolution Team (DRT) has RESOLVED this grievance. The DRT agrees Management failed to comply with a Formal Step A settlement agreement as well as Step B Decision C16N-4C-C 18221124 when they failed to provide the Union documentation revealing Kingsport Management officials received TACS training. Management of the Kingsport Installation is issued a cease and desist in the failure to comply with grievance settlements. Management of the Kingsport Installation is issued an additional cease and desist regarding the failure to provide information requested which is relevant to the investigation and processing of a possible grievance. Management will provide the Union with documentation relative to the required TACS training within seven (7) days of receipt of this decision. Failure to comply with this subject resolution may result in the Union's request for escalating remedies to ensure compliance."**

The Union maintains that Management failed to comply with the above settlement. It is the position of the Postal Service the Union's requested settlement is unreasonable.

The Step B Team reached an impasse on 8 February 2019. Therefore, the matter is now before the undersigned for final

determination.

At the hearing, the Parties were afforded a fair and full opportunity to present evidence, examine and cross examine witnesses.  The record was closed following the receipt of a closing brief by the Employer Advocate on 6 August 2019.

## JOINT EXHIBITS:

1. Agreement between the National Association of
   Letter Carriers Union, AFL-CIO and
   the US Postal Service.

2. Grievance Package

3. Status Quo Ante

4. Training Completion Certificates

## UNION'S POSITION:

It is the contention of the Union that the evidence will show this grievance is the fourth grievance filed by the Union which initially involved Management falsifying clock rings in the Main Kingsport Installation.

According to the Union the last three grievances were filed due to Management's non-compliance of the initial settlement.

The Union mentions that on June 6, 2018, the Dispute Resolution Team issued their decision for Grievance 11-MDMK4-18, which was the initial grievance, and wrote in part that "The Step B Team agrees Management will cease and desist this practice and that all Management in the Kingsport Post Office will be retrained on the use of TACS immediately upon receipt of this decision."

On August 7th of 2018, the Union submits the local Formal A Parties, NALC Representative Shawn Stout and USPS Representative Duane Allen, agreed to the following remedy: "The Parties agree that Duane Allen, Lisa Fortner, and Phil Benton will complete the TACS user training no later than 8/31/18 and provide the Union certification of completion."

And then on November 22nd, 2018, the Union mentions the Dispute Resolution Team issued their decision for Grievance 18-FCMK2-18, which reads as follows: "The Dispute Resolution Team, DRT, has resolved this grievance. The DRT agrees Management failed to comply with a Formal A settlement agreement, as well as Step B Decision, when they failed to provide the Union documentation revealing Kingsport Management Officials received TACS training.  Management of the Kingsport Installation has issued a cease and desist in the failure to comply with grievance settlements. Management of the Kingsport Installation issued -- is issued an additional cease and desist regarding the failure to provide information requested which is relevant to the investigation and processing of a possible grievance. Management will provide the Union with documentation relative to the required TACS training within seven days of the receipt of this decision.  Failure to comply with this subject resolution may result in the Union's request for escalating remedies to ensure compliance."

And the Union mentions that, finally, on February 2nd, 2019, the Dispute Resolution Team issued the decision for Grievance 18-FCMK3-18, which reads in relevant part as follows: "The Dispute Resolution Team has decided to declare an impasse in part.  The DRT agrees Management violated Article 15, Section 3A, and Article 18, via Postal Service Policy Letter 1517 of the National Agreement by failing to comply with the grievance resolution settlement dated November 27, 2018, for Grievance 18-FCMK2-18 in the Main Kingsport Installation."

The Union asserts they will show that from the initial decision dated June 6 of 2018 until this last decision dated February 2, 2019, there have been 247 days for Management to simply comply with the initial decision; yet, they failed to do so.

The Union forecasts the Union Representative will testify about their contentions in great detail. According to the Union, that same Representative will also go over his requested remedy, which can be found on Page 27 of the case file.

Unfortunately, the Union also foresees the Union Representative will tell that as of today -- which may have changed -- it has been 379 days from his initial grievance, and Management has still not complied with the initial DRT decision.

At the end of this hearing, the Union predicts the evidence will have clearly and convincingly shown that their requested remedy is not only proper but justified.

It will be for these reasons that the Union will ask its grievance be sustained in its entirety and the requested remedy be granted which again can be found on Page 27 of this case file.

**COMPANY'S POSITION:**

The Employer initializes there position by stating the purpose of this hearing is to discuss remedy only.  Management again reiterates it is true, that's the reason that we're here.

Management recited the issue insisting that's the issue statement here today, not a grievance a year ago, 379 days ago.

The Service insists the Union states that this is the fourth grievance that has been filed based on Management falsifying clock rings.  However, according the Agency, there is no such proof or wording in the file of falsification of clock rings.

The Employer insists that if this Arbitrator would go through the Union's opening and say -- and listen to all the grievances that were filed before that, there were three grievances, including one Formal A - which is not precedent setting, not citable -- that were all resolved.

Management insists they are not the issue that we're here to discuss today. According to the Agency, the informal grievance was initiated on December 20th, 2018, followed by a Formal Step A heard on December 27, 2018, in this case.

In the opinion of the Service, this case is based specifically on failing to comply with the resolution settlement dated 11/27/2018. The Employer notes the Step B stated that the Management failed to provide documentation showing the Kingsport Management Officials received TACS training.

It is Management's perspective the grievance is about failing to provide proof of TACS training that is it. The Employer repeats that again, none of the previous grievances are in question in this instant case.

The Employer claims the Union would like this Arbitrator to believe that this is ongoing; however, it's clear what the Union's intent was whenever they issued the issue statement and whenever they made their arguments in the grievance file.

As queried by the Agency, did it take Management longer than expected or longer than the Union would have liked in order to get the correct training certificates?

The Service answered its own question by stating, "Yes, it did." Again, the Agency queried as to whether or not Management ultimately complied and again answered its own query by stating "Yes, it did."

The Agency again asks whether or not Management provided copies of training records, reciting again, "Yes, it did." Management claims to have complied with Formal A by providing the training documents.

It is the argument of the Employer the Grievance 18-FCMK2-18, which is why we're here today, the Union cites that Management would provide documentation relevant to the TACS training. Management insists, that is it, being, to provide the documents relative to the TACS training, nothing else; not provide training, not go back and do anything. The Service believes it's specific to this case today.

Management believes that all the grievances that were resolved previously were resolved with no remedy due, no additional monetary compensation.

In the cases that are here today, the Employer argues they were already issued a cease and desist. In the opinion of the Agency, if the Parties had intended to award a remedy, then a resolution would have awarded a remedy.

The Agency cites the Union's contentions in the grievance file stating: "Management was instructed to provide the information needed within seven days of the Step B decision on 11/27/2018."

In their view, Management has provided the Union with the information needed; however, it was 23 days after the time limit provided by the DRT. The Agency concedes the violation still exists, and a remedy needs to be formulated.

In the interpretation of the Service, the Union says Management has provided the Union the information needed in the case file. The Employer's recaps the Step B decision emphasizing that "Failure to comply with the subject resolution may result in the Union's request for an escalated remedy" and that's why we're here today. In the Agency's opinion, the Union is requesting an astronomical amount of money.

And according to the Service, the key word is "may." Management believes the Union has not shown and cannot prove that there is any Carrier that is due any monetary remedy for a

supervisor failing to receive required TACS training.  The
Employer queries as to how can any carriers be due any monies
for a TACS training class that must be retrained by Management?

The Agency insists the language that is included in these
settlements is a tactic that the Union uses when Management is
trying to resolve a grievance. It is the speculation of the
Service that Union says, "Yeah, we'll settle, but we want this
language and if not, then no go; we're not going to settle, not
going forward, not going to do anything."  How is that
bargaining in good faith?

It is Management's view that the Union has asked for this
absurd amount of money, which makes no sense.  The Employer
asserts that generally, in a breach of contract action, the
injured party is entitled to a compensatory remedy that replaces
what is lost and nothing more. It is the opinion of the Service
that a punitive remedy are those that go beyond replacing what
is lost and are intended to punish the party at fault and deter
future misconduct.

As explained by the Employer, in a Postal Service grievance
arbitration setting, requests for punitive remedies most often
take the form of a direct payment to an individual or a Union,
and for the Postal Service's alleged failure to respond to
information, oppose a bid, meet with the union; those are
typical — those are possibilities.

The Agency insists that requests for punitive remedies also
include the requests that go far beyond what's already provided
for in the National Agreement. The Employer references a
National Award by Arbitrator Richard Mittenthal in support of
their position.

As argued by the Agency in the case today, such a remedy
would go far beyond the notion of status quo ante. The Employer
again references that Mittenthal Award.

Management speculates that now, the Union sees this as a
cash cow and they're looking at this as a cash cow for a new
revenue stream to file as many cases as possible and undermine
the process, rather than a means to resolve disputes, and an
opportunity to milk the Post Office for additional monies that
it can't get in the contract. The Agency adds the Union didn't
bargain for these remedies, there is nothing in the contract
that states that and Remedies should be corrective, not
punitive.

In the words of the Employer Advocate, there has -- this

has to stop, okay, here and now.  And continuing, the Employer
Advocate added the Service must take a stand to protect the
interests, and the financial climate and position that we are in
is not so stable as to where you just throw money out the window
or light it on fire. The Employer Advocate goes on to state
that's what the Union is asking us and that is absurd.  In the
opinion of the Employer Advocate, that's what the Union is
asking for; just light your money on fire, throw it out the
window.

The Agency predicts the Union is going to -- has tried
arguing and made some arguments in the file which I'm sure
you'll hear today, some selective texts from the JCAM.
Management notes the JCAM is very specific.

In the opinion of the Employer, Article 41 is where it's
found, and it's very specific and the JCAM preface also -- also
puts it into perspective. The Agency asserts the JCAM is self-
explanatory and speaks for itself and it's not intended to, nor
does it, increase or decrease the rights and responsibilities or
benefits under the Parties.

Management believes the JCAM is limited to the disputes
concerning the application of the agreement and it's very, very
important to understand that the JCAM does not increase or
decrease the rights, responsibilities, or benefits under
collective bargaining.  The Employer goes on to argue it neither
adds nor modifies in any respect to the current collective
bargaining agreement.

The Employer also notes a punitive remedy is disfavored in
labor arbitration and will not be inferred from general contract
language. The Agency asserts that nothing in the Agreement
provides for an award of a punitive remedy.  And consequently,
according to the Service, nothing in the JCAM can add to the
availability of that remedy to the contract, nor can this
agreement be altered, amended, or modified by an arbitrator,
which you'll hear me talk about several times today -- Article
15.4.A.6.

The Agency insists the language the Union is trying
to argue applies only to those sections of Article 41 dealing
with an opting by a letter carrier for a bid assignment, nothing
in the JCAM implies or suggests that the comments cited are
intended to apply either to a dispute between the Parties.

Management thinks the Union will try to convince the
arbitrator that an escalating remedy is appropriate because of

this Article.  However, at the time that this Article was
introduced in the JCAM and put into the contract language, the
Service insists it was for opting.

In the viewpoint of the Employer, it was a very specific
remedy because, you know, we were pulling people off their
routes, and it was -- we were showing, you know, just abuse of
it.  So, Management speculates they put it as a possibility to
where it may be in that one specific situation, however, you
will not find that language anywhere in Article 15, 17, 31.

And the Agency suggests if the Parties had intended this to
be a remedy in the process, or in those Articles, then it would
be so.  And if it's not there, the Service argues it doesn't
exist in the grievance arbitration process.

It is the interpretation of the Agency that the language in
the JCAM specifies that any agreed-upon remedy must be
compensatory in nature and directed to the Parties injured by a
violation of the opt-in provisions.  Remember, as explained by
the Employer, specific to that one circumstance and that's it.

Management speculates the Union is going to try to make the
arbitrator believe something different. It is the prediction of
the Employer Advocate that we're going to hear from the steward
today and he's going to testify on his remedy on Page 27, as the
Union stated in their opening.

Management notes that part of the Union's recommended
remedy is that we pay the steward -- how is that -- for his time
and he's already been compensated for his time.  The Service
believes he's already been paid for his time in investigating
and handling the grievance.

According to the phraseology of the Employer we can
consider it double-dipping asking how is he put out?  There's no
Remedy according to the Employer and there's no reason why he
should receive anything, which goes to prove that the remedy is
punitive.

It is the argument of the Agency that everything else that
happened before the Step B decision and the violation the Union
is alleged occurred on 11/27 is just noise, okay? The Employer
Advocate answers his own question by stating yes, the earlier
decision said "Train by a certain date" and yes, they said
"Provide this."  However, it is the Agency's assertion they were
all resolved and the issue in this instant grievance that we're
dealing with today is, did Management comply with the
11/27/2018?

Now, speaking of punitive remedies, Management insists if the Service came in front of this arbitrator today and we were presenting a removal, and we were trying to convince you that an employee was a problem for the last five years, yet we never addressed it, you would say "It doesn't count. You can't go back five years.  You can't use any of that stuff. You didn't worry about it, so you can't do it now" and that's equivalent to what we're dealing with here today.

You know, advises the Employer Advocate, a payment for the Union or any of their Representatives for a punitive remedy is prohibited, Mr. Arbitrator and you simply cannot do what the Union is wanting you to do today.

According to the Employer's argument, National Arbitrator Mittenthal said it, National Arbitrator Beyers said it, National Arbitrator Snow said it, National Arbitrator Aaron said it and all of these Arbitrators agree, status quo ante must bring the Employee and the Employer back to where they would have been, had it not been for the violation.

The Agency believes these Arbitrators agree punitive damages are generally unavailable as a remedy for a contract violation in arbitration and to quote Arbitrator Beyers, she said: "Punitive damages are generally unavailable as a remedy for a contract violation in arbitration."

Management adds, the opinion that remedies should correspond to the harm suffered has been expressed in many arbitration decisions, including one by Arbitrator Carlton Snow.

In the opinion of the Employer, arbitrators generally have adhered to the principle that damages should correspond to the harm suffered and a deeply rooted principle of measuring concert damages is such it must be based on the injured party's expectation.

Management also suggests it is recognized that some arbitrators have awarded punitive remedies when a party's violation of an agreement has been constant and repeated and malicious, willful and wanton.

According to the Employer Advocate, that approach is not consistent with common law that has been taught; that no matter how reprehensible a breach, punitive damages which are in excess of the injured party's loss expectation generally have not been awarded for a breach of contract.

Management also advises this arbitrator that courts have vacated arbitral decisions imposing punitive remedies or penalties for breaches of labor agreements, where the collective bargaining agreements did not explicitly provide for punitive awards and the Employer did not engage in wanton and willful misconduct.

The Agency also believes that punitive damages are not recoverable in Labor and Management Relations Act 301 actions. The Service insists Section 303 of the Labor Management Relations Act indicates that Section 301 does contemplate the imposition of punitive awards.  The Employer interjects it is the general policy of the federal labor laws to which the federal courts are to look for guidance in Section 301 actions.

The Service also reminds the arbitrator that Article 15.4.A.6 states that: "All decisions of an arbitrator are final and binding.  All decisions of an arbitrator shall be limited to the terms and provisions of this agreement, and in no event may the terms and provisions of this agreement be altered, amended, or modified by an arbitrator."

The Employer Advocate again reiterates this is similar language to that which is in the preface to the JCAM that I mentioned earlier, as well as violating the status quo ante of the National Arbitrators which I discussed.

The Agency argues this would equate to a windfall to the Union and its Representatives and asks how can a Union show that any amount of money to these Carriers would be justified as an appropriate remedy for failure to provide a training certificate?

The Employer Advocate once again proclaims that he just doesn't get it and that training certificates do not run an office, they don't help carry -- they don't help carry on a route, they don't take overtime work for the Carrier, they don't run a route and there's no harm to the Carrier or the Union in any way.

Management adds the Carrier is paid, yet they don't get their paycheck stub in the mail, should they be paid additional compensation because they didn't get their stub in the mail? No, according to the Employer Advocate as they still got paid, they just didn't get a piece of paper to show when they got paid.

It's similar here, according to the Agency.  The Service indicates Supervisors have been trained and they have been

retrained, and the documents have been provided. It is the Employer's argument, in the Union's own contentions, they say they got them.

The Agency's Advocate once again repeats that it is well established and is a general rule of law that punitive damages are not available as a remedy for a contract breach.

Management describes the Postal Service's National Agreements are with its Unions, and in particular punitive damages are disfavored. Another replication by the Employer Advocate once again mentions that an award of punitive damages against the Service is barred by the principle of sovereign immunity, which precludes suits and remedies against the government without its consent.

It is the view of the Employer, recognizing that punitive damages are exceedingly rare and generally disfavored in labor arbitrations, a number of Postal Arbitrators have held that punitive damages are improper, so the Supreme Court specifically held that: "Punitive damages may not be imposed upon Unions for a breach of the duty of their representation" -- it's the International Brotherhood of Electrical Workers v. Faust Award - - "because general labor policy disfavors punishment, and the adverse consequences of punitive damages awards could be substantial. We hold that damages may not be assessed against a Union that breaches its duty of fair representation by failing properly to pursue agreements."

Now, post Faust, as argued by the Employer, the majority of subsequent lower court decisions have held that "Punitive damages are never available against a Union in an action for a breach of the collective bargaining agreement brought under Section 301" -- which the Employer Advocate mentioned earlier -- "of the Labor Management Relations Act."

Management also mentions that some Circuits -- including the Third, the Ninth, the Tenth -- have extended Faust to hold that punitive damages are never available for a breach of a labor agreement under 185, regardless of the identity of the defendant in the case.

The Employer Advocate scholarly suggests that punitive damages are, of course, far more common in a tort case than in a contract case, the breach of duty, a clear representation is a form of fiduciary duty, and therefore it is a tort.

As extrapolated by the Service partly an explanation of Faust, related to the point that was just made, federal policy

aims to promote harmonious labor relations, and this is one of
the justifications for the mildness of the National Labor
Relations Board's remedial powers.

The Agency believes that aim would be deflected if a
punitive damage was available.

Management believes the possibility of one side recovering
and the other side having to pay a potentially astronomical
amount of money in damages would place a cloud over labor
negotiations, and it would be endangering the formality and
suspicion and it would damage the harmonious resolutions of
the labor disputes.

Now, all these reasons referenced by the Employer Advocate
in Faust are independent of whether or not the defendant is a
Union or an Employer as it applies in both circumstances.

And the Employer Advocate is convinced that the Supreme
Court would not allow punitive damages to be awarded against
employers for violating a collective.

The award of punitive damage against the Service is barred
by the principles of sovereign immunity, as the Employer
Advocate once again, repetitively reasserts, is because the
costs are simply passed on to ratepayers.

It is Management's observation that punitive awards against
a government instrumentality fail to advance the public interest
in deterring its conduct, unless that sovereign immunity has
been weighed by Congress.

According to the Employer, Courts have held that principles
of sovereign immunity bar recovery of punitive damages against
the Service -- the Postal Service -- which is an independent
establishment of the executive branch of the government.

As referenced by the Service, in Bowen v. The Postal
Service, the Court set aside a jury verdict awarding the
plaintiff punitive remedies against the Union, holding that
since sovereign immunity barred the employee's recovery of
punitive damages against the employer, the Postal Service, for
his wrongful discharge, it was not fair to impose a punitive
damage against the Union for its arbitrary and perfunctory
handling of the plaintiff's meritorious grievance.

The Employer Advocate states that now, the most common
theory supporting a punitive damage award would be punishment
and deterrence, then asks, okay?  Those are not fulfilled when

punitive damages are permitted against the government, according to the Agency.

It is Management's opinion that Postal ratepayers are innocent of any wrongdoing committed by the Service, but they would ultimately bear the burden of paying for punitive damage awards. Furthermore, the Employer believes the purpose of punishment of an offender is to benefit the members of society.

However, it is the Agency's view that with awards against the Postal Service, ratepayers themselves would be shouldering the cost of the benefit.  The Employer Advocate queries do we raise stamps every time the Union wants a punitive award of hundreds of thousands of dollars?

Management also adds that there is nothing in this case file that can convince the Service, convince this Arbitrator or convince me today that training certificates to be given in the Kingsport Installation in Tennessee is worth $170-, $270-, hundreds of thousands of dollars.

As repeated by the Employer Advocate, there's nothing that can convince me of that, there's nothing in this file, there's nothing that the Union can say, show, or prove that would equate that amount of money.

Now again, the Employer Advocate repeats that "All decisions of arbitrators" -- Management has inserted a sentence in Article 15.4.A.6 that reads:  "All decisions of arbitrators shall be limited, and that in no event may the terms and conditions of this agreement be altered, amended, or modified by an arbitrator."

Now, in the Employer Advocate's opinion, this should be interpreted as preventing an arbitrator from issuing a punitive damage because the National Agreement does not address or provide for such an award. The Employer once again points to the Mittenthal National Award.

The Employer Advocate once again repeats that those that are deprived of a contractual benefit are made whole for their loss, they receive compensatory damages to the extent required, no more, no less, that's it.

Management also mentions that while serving on a regular arbitration panel, future National Arbitrator Carlton Snow thought that, in fashioning remedies, arbitrators generally have adhered to the principle that damages should correspond to the harm suffered.

The Employer Advocate stated that after careful review of relevant case law and everything we are dealing with today, I have concluded that punitive damages should only be awarded, if at all -- if at all -- should only be award in an extremely narrow instance where the employer's conduct is willful, malicious, in bad faith, wanton.

The Employer adds that, in this present case, the Union did not seek as a remedy to have any individual employee compensated for lost wages due to the failure to provide a training certificate at all, they didn't ask for any individual to be paid.

It is the belief of the Employer that Management's action was in the form of unintentional administrative error, scheduling conflicts, poor communication; and in no way, shape, or form was it intentional, willful, or malicious by many means.

Furthermore, the Agency argues, there is no evidence that this error caused the Union or its Members to suffer any sort of financial loss.

According to the Service, the evidence in the record does not support the Union's demand for punitive damage, and it doesn't support -- nor does the record support even a cease and desist.  The Employer notes the Union has already been issued and been awarded two cease and desists in the file in the grievance we're hearing today.

Management interjects the Union is asking the Arbitrator to do something you simply cannot do, all right?  According to the Agency, that is to go beyond the four corners of the contract and award punitive damage.  The Service argues the Union is asking the Arbitrator to change the terms and conditions of the National Agreement.

The Employer mentions Article 15.4.A.6 states that: "The reach of an arbitrator and what he has in arbitration is that all decisions must be limited to the terms and provisions of this agreement, and in no event may the terms and conditions of this Agreement be altered, amended, or modified by an arbitrator."

In the Employer's opinion, if a punitive award is granted in this instant case, there's no proof of malice - proof of malice or wanton and willful misconduct on Management's part, or any harm to the Union or its Members, that is exactly what you will be doing, you will be altering, amending, and modifying the

National Agreement.

It is for all these reasons that I've stated before you today, Mr. Arbitrator, that Management respectfully requests that you deny this grievance in its entirety.

**THE ISSUE:**

Did Management violate Article 15 3A and Article 19, via the Postal Service Policy Letter (M-1517) via Article 19 of the National Agreement by failing to comply with the grievance resolution/settlements dated 11/27/2018 for Grievance #18-FCMK2-18 in the Main Kingsport Installation? If so, what should the remedy be?

**PERTINENT CONTRACT PROVISIONS:**

ARTICLE 15
GRIEVANCE-ARBITRATION PROCEDURE

ARTICLE 19
HANDBOOKS AND MANUALS

**DISCUSSION AND FINDINGS:**

Initially, I would like to point out that compliance with previous settlements, whether it is an arbitrator's decision, a Step B Decision, a Pre-Arbitration settlement or a grievance settlement is not optional. I believe that is well understood by both Parties.

As mentioned by the Employer in their opening statement, **Arbitrator Richard Mittenthal** in a National Award, styled

**H7C-NA-C36,** and a part of Joint Exhibit 3, states that:

> **"It is generally accepted in labor arbitration that
> a damage award arising from a violation of the
> collective bargaining agreement should be limited to
> the amount necessary to make the injured employees
> whole." (emphasis added)**

I agree with Arbitrator Mittenthal that a remedy serves to
restore the status quo ante. Arbitrator Mittenthal stops short
of making that "status quo ante" mandatory by the use of wording
such as "generally accepted" and "should be limited." Such
mandatory dialogue indicates the intent of Arbitrator Mittenthal
was not to eliminate the use of punitive awards in certain
situations.  And in my view, this is certainly one of those
cases.

In his opening statement, it was the Employer Advocate's
opinion this particular case did not represent any conduct which
was "willful, malicious, in bad faith, wanton." I disagree.

With respect to the various arguments made by the Agency
regarding punitive awards, one significant point was clearly
overlooked, that of the pre-existing cease and desist order. It
was the local Parties, not another arbitrator or third party,
that issued the cease and desist order relevant to this
particular case. Cease and desist means cease and desist. It

means to stop, end, abstain and discontinue, period. It's straightforward and should not require interpretation. But paramount is the fact that a cease and desist order cannot be simply ignored, as it was in this case.

Management argued the cease and desist order only involved supervisor training and really had absolutely no impact on any Letter Carrier, their Craft or the Postal Service for that matter.  And that may all be so. But the fact of the matter is, Management agreed to and signed a binding settlement. And that settlement included a cease and desist order that was clearly ignored and violated by the Employer and cannot be explained away at a later date by legal jargon, which, quite frankly, is totally irrelevant to the specific dynamics of this case. As previously stated, compliance is not an optional amenity found in the Parties 2016-2019 Agreement.

In fact, the Employer even mentioned in their opening statement that **"the Union has already been issued and been awarded two cease and desists in the file in the grievance we're hearing today."**  Simply ignoring such an order is clearly willful and malicious and clearly represents bad faith bargaining. And as clarified by the Employer, there were not one, but two cease and desist orders that were ignored and

totally disregarded by Management.

I am of the considered opinion the Employer failed in complying with a very clear mandate of a settlement which states that **"management will provide the Union with documentation relative to the required TACS training within seven (7) days of receipt of this decision. Failure to comply with this subject resolution may result in the Union's request for escalating remedies to ensure compliance."** The Employer's disregard for that settlement language was quite obvious. The documentation was not provided within that seven day window of opportunity.

The Agency insisted the documentation relative to the required TACS training was really insignificant. Maybe so. But paramount is the fact the Agency disregarded the sanctity of compliance with a grievance settlement in which they agreed to and signed. For that reasoning, the Union's requested remedy is hereby granted to the extent provided herein:

**1. That Management comply with the settlement outlined above in "18-FCMK2-18", dated 27 November 2018.**

**2. That Management *immediately* cease and desist from future violations of Article 15, Section 3.A and Postal Service Policy**

Letter (M-01517) via Article 19 of the National Agreement in the Main Kingsport Installation.

3. That Union Representative Shawn Stout be awarded a one-time lump sum payment of $230 minus standard deductions for failing to provide documentation.

4. That for Phil Benton's failure to comply ALL City Carriers to include CCA's and PTF's be paid a one-time lump-sum payment of $420.

5. That for Lisa Fortner's failure to comply ALL City Carriers to include CCA's and PTF's be paid a one-time lump-sum payment of $420.

6. That all City Carriers to include CCA and PTF Carriers in the Kingsport Installation be awarded $10 per calendar day from August 31, 2018 until Duane Allen has been retrained on the use of TACS as per Step B settlement.

7. That Management in the Kingsport Installation place the Carriers on the appropriate assignment in TACS.

8. That as an incentive for future compliance of grievance settlements, all City Carriers in the Kingsport Installation be

**awarded an additional \$25.**

It is so ordered.

AWARD

The instant grievance is resolved in accord with the above.

Dated: August 30, 2019
Fayette County PA