# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

- ---------------------------------------------------------------- x

UNITED STATES POSTAL SERVICE,　　　　　　:

　　　　　　　　　　　　:

　　　　　　　　　*Plaintiff,*　　　　:

　　　　　　　　　　　　:　　　Case No. 19-3685-TSC

　　　- v. -　　　　　　　　:

　　　　　　　　　　　　:

NATIONAL ASSOCIATION OF LETTER　:

CARRIERS, AFL-CIO,　　　　　:

　　　　　　　　　　　　:

　　　　　　　　*Defendant.*　　:

- ---------------------------------------------------------------- x

## MOTION OF DEFENDANT AND COUNTERCLAIM PLAINTIFF
## NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO
## TO CONFIRM ARBITRATION AWARD

Defendant and Counterclaim Plaintiff National Association of Letter Carriers, AFL-CIO respectfully moves this Court for an order confirming and enforcing the August 30, 2019 award of Arbitrator Lawrence Roberts in NALC Case No. 18-FCMK3-18 and providing such other and further relief as the Court deems appropriate.

Dated: February 14, 2020

Respectfully submitted,

/s/ *Peter D. DeChiara*

Peter D. DeChiara (admitted *pro hac vice*)
Judd E. Cohen (admitted *pro hac vice*)
COHEN, WEISS AND SIMON LLP
900 Third Avenue
New York, New York 10022-4869
(212) 563-4100

/s/ *Lucas R. Aubrey*

Victoria L. Bor (D.C. Bar. No. 288852)
Lucas R. Aubrey (D.C. Bar No. 982849)
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C.  20001
(202) 785-9300

*Attorneys for National Association of Letter Carriers, AFL-CIO*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------------------x

UNITED STATES POSTAL SERVICE,

                 *Plaintiff,*

    - v. -

NATIONAL ASSOCIATION OF LETTER
CARRIERS, AFL-CIO,

               *Defendant.*

---------------------------------------------------------------x

Case No. 19-3685-TSC

**MEMORANDUM OF POINTS AND AUTHORITIES OF
DEFENDANT AND COUNTERCLAIM PLAINTIFF NATIONAL ASSOCIATION OF
LETTER CARRIERS, AFL-CIO
IN SUPPORT OF ITS MOTION TO CONFIRM ARBITRATION AWARD AND
IN OPPOSITION TO PLAINTIFF'S MOTION TO VACATE IT**

Peter D. DeChiara (admitted *pro hac vice*)
Judd E. Cohen (admitted *pro hac vice*)
COHEN, WEISS AND SIMON LLP
900 Third Avenue
New York, New York 10022-4869
(212) 563-4100

Victoria L. Bor (D.C. Bar. No. 288852)
Lucas R. Aubrey (D.C. Bar. No. 982849)
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C.  20001
(202) 785-9300

*Attorneys for National Association
of Letter Carriers, AFL-CIO*

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ........................................................................................................................ 3

    USPS .................................................................................................................................. 3

    NALC ................................................................................................................................ 4

    CBA Grievance Procedure ................................................................................................ 5

    National-Level Arbitral Precedent for Imposing Penalties on USPS ................................ 6

    Regular-Panel Awards Granting Penalties for USPS's Non-Compliance ......................... 7

    Step B Decisions Granting Penalties for USPS's Non-Compliance ................................. 9

    Kingsport Management's Repeated Violations of Grievance Resolutions ........................ 9

    USPS's Time and Attendance Collection System ........................................................... 10

    USPS's Repeated Failure to Comply with Grievance Resolutions Regarding
        TACS Violations ...................................................................................................... 12

    The Grievance Leading to the Roberts Award ............................................................... 13

    The Arbitration ................................................................................................................ 14

    The Roberts Award ......................................................................................................... 15

    USPS's Lawsuit and Motion to Vacate ......................................................................... 16

ARGUMENT ............................................................................................................................ 16

I.     JUDICIAL REVIEW OF LABOR ARBITRATION AWARDS IS
       EXTRAORDINARILY DEFERENTIAL ......................................................................... 16

II.    ARBITRATOR ROBERTS DID NOT EXCEED HIS AUTHORITY ............................. 20

    A.     The Roberts Award Draws Its Essence from the CBA ......................................... 20

    B.     Penalty Remedies Do Not Require Express Contract Language ........................... 22

    C.     Arbitrator Roberts' Factfinding is Not Subject to Challenge .............................. 26

    D.     Arbitrator Roberts Did Not Dispense His Own Brand of Industrial Justice ......... 27

i

　　　E.　　Arbitrator Roberts Was Free to Consider the Entirety of the Circumstances ....... 27

III.　　THE ROBERTS AWARD DID NOT VIOLATE PUBLIC POLICY ............................ 29

CONCLUSION ............................................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Postal Workers Union, AFL-CIO v. USPS,*
    789 F.2d 1 (D.C. Cir. 1986) ...................................................................19, 25, 29, 30

*Amanda Bent Bolt Co. v. UAW,*
    451 F.2d 1277 (6th Cir. 1971) ...............................................................................24

*Coast Trading Co., Inc. v. Pacific Molasses Co.,*
    681 F.2d 1195 (9th Cir. 1982) .........................................................................23, 24

*Dolan v. USPS,*
    546 U.S. 481 (2006) ........................................................................................30, 33

*Eastern Associated Coal Corp. v. United Mine Workers of Am., Dist. 17,*
    531 U.S. 57 (2000) ....................................................................................19, 29, 30

*Franchise Tax Bd. v. USPS,*
    467 U.S. 512 (1984) ................................................................................... *passim*

*Howard Univ. v. Metro. Campus Police Officers' Union,*
    512 F.3d 716 (D.C. Cir. 2008) .........................................................................19, 25

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Northwest Airlines, Inc.,*
    858 F.2d 427 (8th Cir. 1988) ...........................................................................23, 28

*Local 689, Amalgamated Transit Union v. Washington Metro. Area Transit Auth.,*
    249 F.Supp.3d 427 (D.D.C. 2017) .....................................................17, 19, 29, 30

*Loeffler v. Frank,*
    486 U.S. 549 (1988) ........................................................................30, 31, 32, 33

*Madison Hotel v. Hotel and Restaurant Employees, Local 25, AFL-CIO,*
    144 F.3d 855 (D.C. Cir. 1998) .................................................................................18

*Major League Baseball Players Ass'n v. Garvey,*
    532 U.S. 504 (2001) ....................................................................................17, 19, 27

*Nat'l Postal Mail Handlers Union v Am. Postal Workers Union,*
    589 F.3d 437 (D.C. Cir. 2009) ...................................................................16, 17, 19

*Nat'l Rural Letter Carriers' Ass'n v. USPS*,
    637 F. Supp. 1041 (D.D.C. 1986) ........................................................................29

*Newport v. Fact Concerts, Inc.*,
    453 U.S. 247 (1981) ..........................................................................................33

*Oakstone v. Postmaster Gen.*,
    397 F.Supp.2d 48 (D. Me. 2005) ........................................................................32

*Pan Am. Airways Corp. v. Air Line Pilots Ass'n, Int'l*,
    206 F.Supp.2d 12 (D.D.C. 2002), *aff'd*, 62 F. Appx. 356 (D.C. Cir. 2003) ...............17, 21, 23

*Steelworkers v. Enterprise Wheel & Car Corp.*,
    363 U.S. 593 (1960) .................................................................................... *passim*

*UNITE Here Local 23 v. I.L. Creations of Maryland Inc.*,
    148 F. Supp. 3d 12 (D.D.C. 2015) .....................................................................18

*United Paperworkers Int'l Union AFL-CIO v. Misco, Inc.*,
    484 U.S. 29 (1987) .................................................................................... *passim*

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
    363 U.S. 574 (1960) .................................................................................... *passim*

*USPS v. Am. Postal Workers Union*,
    553 F.3d 686 (D.C. Cir. 2009) .....................................................................19, 22

*USPS v. Flamingo Indus. (USA) Ltd.*,
    540 U.S. 736 (2004) ..................................................................................30, 31

*USPS v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
    789 F.2d 18 (D.C. Cir. 1986) ...........................................................................29

*USPS v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
    810 F.2d 1239 (D.C. Cir. 1987) .........................................................................29

**Statutes**

29 U.S.C. §152(2) ....................................................................................................4

29 U.S.C. §185(a) ....................................................................................................4

39 U.S.C. §401(1) ...........................................................................................4, 30, 31

39 U.S.C. §1206 ......................................................................................................4

39 U.S.C. §1208(b) ...............................................................................................4, 31

39 U.S.C. §1209(a) ..................................................................................................4

39 U.S.C. §3622(b)(5) .................................................................................................................4

Defendant and Counterclaim Plaintiff National Association of Letter Carriers, AFL-CIO ("NALC") submits this memorandum of points and authorities in support of its motion to confirm the August 30, 2019 arbitration award issued by Arbitrator Lawrence Roberts ("Roberts Award") and in opposition to the motion of Plaintiff United States Postal Service ("USPS") [Docket Entry #2] to vacate the Roberts Award. For the following reasons, NALC's motion should be granted and USPS's denied.

## INTRODUCTION

In recent years, USPS management has been found to have engaged in a widespread and unlawful practice of manipulating records of letter carriers' work time. USPS has also frequently breached the terms of settlements it has entered into with NALC resolving union grievances. In this case, there is no dispute that USPS management engaged in extensive and improper alterations of letter carrier time records at its facility in Kingsport, Tennessee. After NALC grieved the violations, the parties reached a settlement, but USPS failed to abide by the terms of the settlement, even after a joint labor-management board ordered it to do so. It was in this context that Arbitrator Lawrence Roberts issued an award requiring USPS to make penalty payments for its non-compliance.

The Roberts Award is fully consistent with a longstanding and widespread practice by arbitrators who decide cases under the collective bargaining agreement ("CBA") between USPS and NALC to require USPS to make penalty payments -- either to the union, union representatives or employees -- as a remedy for USPS's failure to comply with prior grievance settlements. In just the last two years, arbitrators have issued over a dozen such awards, none of which USPS has challenged -- until now. Remarkably, USPS now claims that by imposing penalties on it, the Roberts Award exceeded the arbitrator's authority and violated public policy, and so should be vacated.

1

The D.C. Circuit has held that judicial review of labor arbitration awards is "extraordinarily deferential."  Because the parties to a labor contract choose the arbitrator and agree in advance to abide by his or her decision, the Supreme Court has repeatedly made clear that courts must uphold a labor arbitrator's award, so long as the award at least arguably "draws its essence" from either the text of the contract or established practices under it.  That is so even if the arbitrator misconstrued the contract or the applicable facts or made a mistake of law.  In particular, the Supreme Court has made clear that labor arbitrators have exceedingly broad discretion to formulate remedies for contract violations.

The Roberts Award easily passes muster under this extraordinarily deferential standard of review.  In determining that USPS should pay for its non-compliance, Roberts -- a seasoned arbitrator with nearly three decades' experience deciding cases under the CBA -- noted the absence in the CBA of anything that would excuse USPS from complying with a grievance settlement.  He also based his award on another arbitrator's decision under the CBA, a decision that Arbitrator Roberts read as permitting penalty payments where appropriate.  Moreover, the Roberts Award is consistent with the ample body of arbitral precedent under the CBA imposing penalties for USPS's non-compliance with settlement resolutions.  Like these prior awards, the Roberts Award makes clear to USPS that non-compliance has consequences and that postal management may not just ignore its obligations.

USPS makes the baseless claim that the Roberts Award infringes USPS's purported sovereign immunity and thus contravenes public policy.  The D.C. Circuit has described as "extremely narrow" the public policy exception to the general rule that courts should sustain labor arbitration awards.  Here, since the award itself was not illegal and did not require USPS to take any unlawful action, it did not fall within this extremely narrow public policy exception.

In any event, there is no definite and well-established public policy against arbitration awards that impose penalty payment remedies on USPS.  USPS cites *no* decision -- and we know of none -- holding that USPS has immunity from such remedies in a labor arbitration award.  In other contexts, the Supreme Court has repeatedly rejected USPS's claims to sovereign immunity, holding that because Congress made USPS liable to suit and set it up to operate as a business, a presumption exists that USPS lacks sovereign immunity.  USPS cannot overcome that presumption here.  Indeed, the well-established practice of arbitrators under the CBA requiring USPS to make penalty payments for its non-compliance with grievance resolutions undermines any claim by USPS to immunity from the Roberts Award.

Vacating the Roberts Award would contravene decades of Supreme Court and D.C. Circuit case law requiring extraordinary deference to labor arbitration awards.  It would also encourage USPS to seek judicial intervention whenever it felt aggrieved by an arbitration decision.  Since USPS and the unions that represent postal employees arbitrate many hundreds of cases each year, this Court's docket could soon become laden with demands by USPS that the Court second-guess arbitrators' decisions.  Arbitration is designed to be an expeditious and inexpensive means of resolving labor disputes.  Giving USPS a green light to seek judicial review would make arbitration just the first step in a prolonged and costly process of resolving labor disputes by litigation.

For these reasons, as explained further below, NALC's motion to confirm should be granted and USPS's denied.

## **BACKGROUND**

### USPS

When Congress created USPS in the 1970 Postal Reorganization Act ("PRA"), Pub. L. No. 91-375 (Aug. 12, 1970), it wanted USPS "to be run more like a business than had its

predecessor, the Post Office Department." *Franchise Tax Bd. v. USPS*, 467 U.S. 512, 519-20 (1984). To that end, it made USPS subject to suit. *See* 39 U.S.C. §401(1). Congress also designed USPS to be self-sustaining. *See* H.R. Rep. 91-1104, 1970 U.S.C.C.A.N. 3649, 3659 (May 19, 1970); *see also* 39 U.S.C. §3622(b)(5) (establishing a "modern system" for regulating postage rates that, among other things, assures USPS "adequate revenues"). As USPS has explained, "[w]e pay for our operations entirely through the sale of postal products and services and do not receive tax revenue to support our business." USPS's *FY2018 Annual Report to Congress* ("USPS Annual Report"), at 3.[1]

In its relations with its workforce, USPS operates much like a private company. The National Labor Relations Act, which regulates labor relations in the private sector, *see* 29 U.S.C. §152(2), also governs USPS labor relations. *See* 39 U.S.C. §1209(a); *see also* H.R. Rep. 91-1104, at 3658. The PRA provides for collective bargaining between USPS and its employees. *See* 39 U.S.C. §1206. Like private employers, *see* 29 U.S.C. §185(a), USPS is subject to suit in federal courts if it violates a union contract. *See* 39 U.S.C. §1208(b). The PRA allows USPS, like a private employer, to opt to resolve its labor disputes through binding arbitration, rather than through litigation. *See id.* §1206(b).

NALC

NALC is a national labor union that serves as the collective bargaining representative of city letter carriers employed by USPS. *See* February 4, 2020 Declaration of Brian Renfroe ("Refroe Dec."), filed herewith, at ¶2. NALC Branch 1999 is a local labor union affiliated with

---

[1] Available at https://about.usps.com/who-we-are/financials/annual-reports/fy2018.pdf.

NALC that represents the approximately 64 city letter carriers employed at USPS's Kingsport, Tennessee facility.  *See id*.; *see also* Docket Entry #2-4, at 58. [2]

CBA Grievance Procedure

At all relevant times, USPS and NALC have been parties to the CBA, which governs the terms of employment of city letter carriers.  *See* Renfroe Dec. ¶3 & Exhibit A.  Every few years, after the term of the current CBA expires, the parties enter into a new CBA.  *See id.* ¶3.

Article 15 of the CBA contains a procedure for the resolution of grievances, including claims that USPS failed to comply with the CBA.  *See* Renfroe Dec., Exhibit A at 64-77.  The grievance procedure begins at Step A.  *See id.*, at 65-67 (Art. 15, §2, at Informal Step A, Formal Step A).  The parties have authority to settle a grievance at Step A.  *See id.* at 65-66 (Art. 15, §2, Informal Step A, §(b); Art. 15, §2, Formal Step A, §(c)).  If the parties fail to settle the grievance at Step A, the union can appeal to Step B.  *See id*. at 67 (Art. 15, §2, Formal Step A, §(f); Art. 15, §2, Step B(a)).  At Step B, a two-person team, composed of a NALC representative and a USPS representative, has the authority to resolve the grievance.  *See id.* at 67 (Art. 15, §2, Step B, §(b)), 198.  If this team  -- referred to as the Step B team or the Dispute Resolution Team ("DRT") -- cannot agree on a resolution, it may declare an impasse.  *See id*. at 67 (Art. 15, §2, Step B, §(b)).

Although the PRA does not require arbitration, USPS has agreed in the CBA that NALC may appeal Step B impasses to arbitration.  *See* Renfroe Dec., Exhibit A at 68 (Art. 15, §2, Step B, §(d)).  USPS and NALC jointly select all arbitrators.  *See* Renfroe Dec. ¶9 & Exhibit A, at 73

---

[2] Page citations to docket entries are to the ECF pagination, not the pagination of the original document.

(Art. 15, §4(A)(8)).  USPS has agreed in the CBA that "[a]ll decisions of an arbitrator will be

final and binding."  Renfroe Dec., Exhibit A, at 72 (Art. 15, §4(A)(6)).

USPS and NALC arbitrate hundreds of disputes each year.  *See* Renfroe Dec. ¶7.  For

example, from December 2018 to December 2019, arbitrators issued 626 awards under the CBA.

*See id.*

Most grievances are heard by arbitrators on the "regular panel," who decide cases on a

local level, but NALC may submit grievances over the interpretation of the CBA to an arbitrator

on the "national" level.  *See id.* ¶11 & Exhibit A, at 70 (Art. 15, §3(F)).  National-level

arbitration awards are deemed to be authoritative interpretations of the CBA.  *See id.*  ¶11.

<u>National-Level Arbitral Precedent for Imposing Penalties on USPS</u>

Awards issued under the CBA provide ample precedent for an arbitrator to make USPS

pay a penalty for its violations.  For example, in a 1979 national-level arbitration, Arbitrator

Howard Gamser held that even though the CBA did not provide for a monetary remedy for

USPS's breach of its contractual obligation to distribute overtime opportunities equitably, such a

monetary remedy would be permitted in certain circumstances.  *See* Renfroe Dec., Exhibit B, at

10.  Arbitrator Gamser explained that a "general consensus" existed that when USPS engaged in

a "flagrant disregard or defiance of the contractual obligation," a monetary penalty "would

provide the deterrent effect which is plainly warranted."  Renfroe Dec., Exhibit B, at 10.

In 1986, Richard Mittenthal, another national-level arbitrator, held that even though the

CBA already required USPS to pay double wages to employees required to work hours beyond

the contractual maximum, an arbitrator has authority, in formulating a remedy for such a work

hours violation, to require USPS to pay an additional penalty amount.  *See* Renfroe Dec., Exhibit

C, at 8.  The goal of such an additional monetary remedy, Arbitrator Mittenthal explained, is to

"enforce" the contractual prohibition on working employees beyond the maximum hours

allowed.  *See* Renfroe Dec., Exhibit C, at 7.  That the CBA provided for no such extra pay penalty, beyond the required double compensation to the employees, Arbitrator Mittenthal wrote, "does not mean that I am without power to fashion an appropriate remedy.  One of the inherent powers of an arbitrator is to construct a remedy for a breach."  Renfroe Dec., Exhibit C, at 5.

These two national-level awards, establishing that an arbitrator may impose monetary penalties aimed at deterring CBA violations, constitute authoritative readings of the CBA.  *See* Renfroe Dec. ¶11.

Regular-Panel Awards Granting Penalties for USPS's Non-Compliance

Under the CBA, regular-panel arbitrators have long had a practice of imposing monetary penalties on USPS for its non-compliance with grievance resolutions.  *See, e.g.,* Renfroe Dec., Exhibit S (2004 award by Arbitrator Sergent awarding penalty of $1,000 against USPS for failure to comply with prior DRT decision); *id.*, Exhibit T (2005 award by Arbitrator Nixon awarding penalty of $2,500 against USPS for failure to comply with prior DRT decision); *id.*, Exhibit U (2011 award by Arbitrator Wolitz awarding penalty of $275 against USPS for failure to comply with prior grievance resolutions); *id.*, Exhibit V (2011 award by Arbitrator Wolitz awarding penalty of $200 against USPS for failure to comply with a local memorandum of understanding); *id.*, Exhibit W (2011 award by Arbitrator Dorshaw awarding penalty against USPS for failure to comply with prior grievance settlements); *id.*, Exhibit X (2012 award by Arbitrator Monat awarding penalty of $200 against USPS for failure to comply with prior grievance settlements); *id.*, Exhibit Y (2013 award by Arbitrator Smith awarding penalty against USPS for failure to comply with prior DRT decisions and grievance settlements); *id.*, Exhibit Z (2013 award by Arbitrator Ames awarding penalty against USPS for failure to comply with prior grievance settlements); *id.*, Exhibit AA (2013 award by Arbitrator Monat awarding penalty against USPS for failure to comply with prior settlement agreements); *id.*, Exhibit BB (2014

award by Arbitrator Roberts awarding penalty against USPS); *id.*, Exhibit CC (2016 award by Arbitrator Jordan awarding penalty of $500 against USPS for failure to comply with prior Step B decisions); *id.*, Exhibit DD (2017 award by Arbitrator Roberts awarding penalty of $1,500 against USPS for failure to comply with prior Step A resolution); *id.*, Exhibit EE (2018 award by Arbitrator Durham awarding penalty of $3,500 against USPS for failure to comply with prior Step B decisions); *id.*, Exhibit FF (2018 award by Arbitrator Miles awarding penalty of $1,200 against USPS for failure to comply with prior grievance settlement); *id.*, Exhibit GG (2018 award by Arbitrator Levak awarding penalty of $500 against USPS for failure to comply with prior grievance settlements); *id.*, Exhibit HH (2018 award by Arbitrator DiLauro awarding penalty of $4,875 against USPS for failure to comply with prior grievance settlements); *id.*, Exhibit II (2018 award by Arbitrator Roberts awarding penalty against USPS for failure to comply with prior arbitration award); *id.*, Exhibit JJ (2018 award by Arbitrator Jordan awarding penalty against USPS for failure to comply with prior grievance decisions); *id.*, Exhibit KK (2018 award by Arbitrator August awarding penalty against USPS for failure to comply with prior DRT decision); *id.*, Exhibit LL (2018 award by Arbitrator Braverman awarding penalty of $500 against USPS for failure to comply with Formal Step A grievance resolution); *id.*, Exhibit MM (2018 award by Arbitrator Vonhof awarding penalty of $200 per carrier against USPS for failure to comply with prior grievance settlement); *id.*, Exhibit NN (2019 award by Arbitrator Braverman awarding penalty of $55 against USPS for failure to comply with settlement of prior grievance); *id.*, Exhibit OO (2019 award by Arbitrator Miles awarding prospective penalty against USPS if USPS failed to comply with arbitration award); *id.*, Exhibit PP (2019 award by Arbitrator Vonhof awarding penalty of $300 per bargaining unit member against USPS for failure to comply with settlement of prior grievance); *id.*, Exhibit QQ (2019 award by Arbitrator

Barrett awarding penalty against USPS for failure to comply with prior grievance settlements); *id.*, Exhibit RR (2019 award by Arbitrator Nixon awarding penalty against USPS for failure to comply with prior arbitration award).

Just since 2018, arbitrators have issued fourteen such penalty awards (not including the Roberts Award).  *See* Renfroe Dec. ¶29.  As far as NALC is aware, USPS has challenged *none* of them.  *See id.*  Indeed, three prior awards imposing penalties against USPS were issued by Arbitrator Roberts.  *See id.*, Exhibits BB, DD, II.  USPS did not challenge them.  *See id.* ¶29.

Step B Decisions Granting Penalties for USPS's Non-Compliance

It is not only arbitrators who have repeatedly endorsed penalty payments as an appropriate response to USPS's non-compliance with grievance resolutions.  Step B teams have too.  We submit into the record several recent examples of such decisions.  *See, e.g.*, Renfroe Dec., Exhibit SS.

For the DRT team to reach a resolution, both members of the team must concur.  *See* Renfroe Dec. ¶5.  So in each case in which the Step B team imposed a penalty payment remedy, USPS's representative concurred in the decision.

Kingsport Management's Repeated Violations of Grievance Resolutions

USPS has a long history of failing to comply with grievance resolutions.  In 2002, the Postmaster General felt compelled to issue a memo reminding USPS management that they were obligated to comply with grievance settlements:  "While all managers are aware that settlements reached in any stage of the grievance/arbitration procedures are final and binding, I want to reiterate our policy on this subject … Compliance with arbitration and grievance settlements is not optional."  Renfroe Dec., Exhibit D**.**

It seems that USPS management in Kingsport, Tennessee did not get the memo.  For example, on October 12, 2017, a Step B team determined that Kingsport management had "failed

to comply with grievance settlements/resolutions" regarding job postings.  Renfroe Dec., Exhibit E, at 1.  In its decision, the Step B team reminded Kingsport management that "compliance with arbitration awards and grievance settlements is not optional."  *Id.*

On another recent occasion, Branch 1999 claimed that Kingsport management had failed to comply with a Step B decision requiring it to provide the union with requested information. Finding that USPS had failed to comply with the earlier grievance resolution, the DRT, on February 13, 2018, issued "an additional cease and desist to Management."  Renfroe Dec., Exhibit F, at 1.  The DRT put Kingsport management "on notice that further violations of failing to provide time and information to the Union to investigate and process grievances may result in *escalating monetary remedies*."  *Id.* (emphasis added).  In addition to providing another example of Kingsport management failing to comply with prior grievance resolutions, this unanimous February 13, 2018 Step B decision demonstrated how routine it was under the CBA to consider penalty payments as a remedy for such non-compliance.

USPS's Time and Attendance Collection System

USPS uses a system called the Time and Attendance Collection System ("TACS") to track and record employee workhours.  *See* Renfroe Dec., Exhibit G, at 1.  Employees record their time performing various tasks by swiping an electronic timecard.  *See id.*  A TACS time record is called a "clock ring."  *See id.*

If a supervisor makes any modification to an employee's TACS record, the supervisor must properly document the modification on certain designated forms.  *See id.*  Often, however, USPS supervisors change the records without complying with required procedure.  For example, the USPS Inspector General conducted an audit in the Boston area for a period from 2015 to 2017, reviewing a sample of instances in which USPS management "disallowed" employee time records.  *See id.*  The Inspector General found that management altered employee time records

10

without completing or maintaining required documentation in 89% of the instances sampled.  *See id.*  At one facility, supervisors deleted 30 employee clock rings and extended 20 employee lunch times without any supporting documentation to justify the adjustment.  *See id.*

In his report, the Inspector General concluded that "[t]hese issues occurred because supervisors were not sufficiently trained in proper procedures for disallowing time, deleting clock rings, and extending lunch times; and district and facility management did not adequately oversee facility supervisors to ensure that they performed these actions properly."  Renfroe Dec., Exhibit G, at 1.

In its handbook entitled *Time and Attendance*, USPS explains that it is "extremely important" that supervisors strictly follow procedures regarding the maintenance of employee time records:

> The payroll system has been designed with the necessary controls to ensure that all employees are properly paid.  Payment is in compliance with the requirements of the Fair Labor Standards Act (FLSA).  The integrity of the system depends upon the degree to which timekeepers and supervisors comply with these procedures. Therefore, it is *extremely important that supervisors, timekeepers, and other personnel strictly follow these instructions and procedures.*

Renfroe Dec., Exhibit H (emphasis added).  Unauthorized manipulation of an employee's timecard can subject a supervisor to discipline or discharge.  As USPS explains in its *Employee and Labor Relations Manual*, "[r]ecording the time for another employee constitutes falsification of a report" and "[a]ny employee knowingly involved in such a procedure is subject to removal or other discipline."  Renfroe Dec., Exhibit I, at §665.44.

USPS's violation of timekeeping rules constitutes an extensive and critical problem.  One 2019 arbitration award (which USPS did not challenge in court) concluded that the evidence

from that case "reflects a widespread practice by management of willfully and repetitively deleting and altering time records of Letter Carriers."  Renfroe Dec., Exhibit R, at 21.

<u>USPS's Repeated Failure to Comply with Grievance Resolutions Regarding TACS Violations</u>

As at many other locations, USPS management at Kingsport has had an ongoing practice of improperly altering clock rings.  On June 6, 2018, a Step B team issued a unanimous decision finding that USPS "failed to ensure that timekeeping procedures in the Kingsport Post Office were in compliance with the applicable handbooks and manuals."  Renfroe Dec., Exhibit J, at 21. As a remedy, it ordered that "all Management in the Kingsport Post Office will be retrained on the use of TACS immediately upon receipt of this decision" and a copy of proof of the training will be given to the union upon request.  *See id*.

On August 7, 2018, Branch 1999 President Shawn Stout initiated another grievance over TACS violations, and on August 14, 2018, USPS supervisor Duane Allen agreed to settle the grievance.  *See* Renfroe Dec., Exhibit K.  The settlement read as follows:  "The parties agree that Duane Allen, Lisa Fortner, Phil Benton will complete TACS use training *no later than 8/31/18* and provide the union certification of completion."  *Id*. (emphasis added).

On November 27, 2018, a Step B team found that management had failed to comply with either the June 6, 2018 Step B decision or the August 14, 2018 grievance settlement "when they failed to provide the Union documentation revealing Kingsport Management officials received TACS training."  Renfroe Dec., Exhibit L, at 1.  The November 27, 2018 decision gave management seven days to provide the union proof that it had trained all the supervisors, or face demands for escalating remedies:

> Management of Kingsport is issued a cease and desist in the failure to comply with grievance settlements.  Management of the Kingsport installation is issued an additional cease and desist regarding the failure to provide information requested which is relevant to the investigation and processing of a possible

> grievance.  Management will provide the Union with documents
> relative to the required TACS training within seven (7) days of
> receipt of this decision.  *Failure to comply with this subject
> resolution may result in the Union's request for escalating
> remedies to ensure compliance.*

*Id.* (emphasis added).

The Grievance Leading to the Roberts Award

On December 20, 2018, Branch 1999 President Stout initiated a grievance claiming that

USPS had violated the November 27, 2018 Step B decision.  *See* Renfroe Dec., Exhibit N.

Training certificates showed that Benton had received TACS training on September 12, 2018 and

Fortner on October 12, 2018.  *See* Renfroe Dec., Exhibit M; *see also* Docket Entry #2-4, at 74.

The grievance noted that Benton had received the mandated TACS training 12 days after the

August 31, 2018 deadline and Fortner 42 days past the deadline, and that Allen still had not been

trained.  *See* Renfroe Dec., Exhibit N, at 8. It also noted that USPS gave the union the

information it had requested 23 days after the deadline.  *See id*.

As a remedy for USPS's violations of the grievance settlement and Step B decision, the

grievance requested, among other things, $120 for each Kingsport letter carrier (representing $10

for each day that USPS was in violation by failing to train Benton); plus another $420 for each

letter carrier (representing $10 for each day that USPS was in violation by failing to train

Fortner); plus $10 for each letter carrier for each day after the August 31, 2018 deadline that

USPS was in violation for its continuing failure to train Allen; plus $230 for Stout (representing

$10 for each day USPS was in violation by failing to provide the union requested information).

*See id*. at 8-9.

After the parties failed to settle the grievance at Step A, a Step B team, on February 8,

2019, issued a decision finding that USPS had failed to comply with the November 27, 2018

Step B decision.  *See* Renfroe Dec., Exhibit O.  However, the management member of the DRT

did not agree to grant the remedy the union requested, causing the Step B team to impasse on the

remedy question.  *See* Renfroe Dec, Exhibit O, at 1.  NALC then appealed the remedy issue to

arbitration.

The Arbitration

At the June 14, 2019 arbitration hearing before Arbitrator Roberts, Branch 1999 President

Stout explained that the union sought the monetary remedy to "get some kind of compliance"

from USPS.  Docket Entry #2-4, at 63.  He testified that USPS managers "don't care about the

cease and desists," and that he thought a monetary claim "would maybe get their attention and let

them know that compliance is not optional."  *Id.* at 47.  In his closing argument, NALC's

advocate rhetorically asked what the alternative could have been to a monetary penalty:

"Nothing?  We just don't get them?  No, we have a grievance procedure.  That's how we hold

management accountable.  This is how we make them do something."  *Id*. at 102.

At the hearing, Stout testified that his investigation had yielded an "astronomical amount

of alterations and manipulations" by Kingsport management of letter carrier clock rings.  *Id.* at

35.  Specifically, he found 8,648 ring deletions over the course of a year.  *See id*. at 36.  In her

testimony, Kingsport Postmaster Susan Whittington admitted that management had "laundered"

clock rings.  *Id*. at 84.  "I am responsible," she admitted, "And … I am deeply sorry if I have

done anything egregious to someone."  *Id*. at 78.  Despite her expression of regret for her past

misconduct, Whittington conceded that USPS management was continuing to alter letter carrier

time records, stating that "unfortunately, we still have to change the rings."  *Id*. at 84.

Stout testified, and Whittington confirmed, that Whittington did not provide Stout with

the last training certificate -- the one for supervisor Allen -- until June 13, 2019, the day before

the hearing.  *See* Docket Entry #2-4, at 66, 79.  Whittington also admitted that she had received

the initial June 6, 2018 grievance resolution requiring the training of all supervisors, *see id.* 79-80, but took a year to fully comply, *see id*. at 80.

The Roberts Award

Arbitrator Roberts is a seasoned labor relations professional.  He has served as an arbitrator for NALC and USPS since 1992, and over the course of those nearly three decades has issued 570 arbitration awards.  *See* Renfroe Dec. ¶10.  Based on his experience under the CBA and the record before him in this case, he decided, in his August 30, 2019 award, to grant the remedy that the union sought.  *See* Renfroe Dec., Exhibit P, at 1**.**

In making his decision, Arbitrator Roberts concluded that "compliance is not an optional amenity found in the Parties 2016-2019 Agreement."  *Id*. at 19.  In considering whether the CBA permitted "punitive awards," he also quoted a 1994 award by national-level arbitrator Mittenthal, in Case No. H7C-NA-C36, which stated that it is "generally accepted" that the remedy for a CBA violation "should be limited" to the amount needed to make an employee whole.  *Id.* at 18 (quoting the award).  Arbitrator Roberts read the Mittenthal award as meaning that while "generally" awards "should" compensate employees for loss, the CBA did not "eliminate the use of punitive awards in certain situations."  *Id.*

Arbitrator Roberts found that by "[s]imply ignoring" prior cease and desist orders, USPS had acted in a manner that was "clearly willful and malicious."  *Id*. at 19.  He explained:

> It was the local Parties, not another arbitrator or third party, that issued the cease and desist order relevant to this particular case. Cease and desist means cease and desist.  It means to stop, end, abstain and discontinue, period.  It's straightforward and should not require interpretation.  But paramount is the fact that a cease and desist order cannot be simply ignored, as it was in this case.

*Id*. at 18-19.  In particular, the arbitrator noted that the November 27, 2018 Step B decision contained a "very clear mandate" that USPS provide proof of the supervisors' training within

seven days of the decision, and also stated that failure to comply could result in the union's request "for escalating remedies to ensure compliance." *Id.* at 20.  Arbitrator Roberts explained that he granted the union's requested remedy because USPS "disregarded the sanctity of compliance with a grievance settlement in which they agreed to and signed." *Id.*

The Roberts Award required USPS, among other things, to make a payment to letter carriers for USPS's failure to train supervisors Benton, Fortner and Allen by the deadline, and to make another payment for its failure to provide requested documentation to the union by the deadline.  *See id.* at 21.  However, contrary to USPS's allegation, *see* Docket Entry #1, at 5 (¶20), nothing in the award said that USPS was directed to pay $230,640.

USPS's Lawsuit and Motion to Vacate

In its complaint in this action, USPS asks the Court to vacate the Roberts Award.  *See* Docket Entry #1, at ¶1.  USPS does not dispute that it "impermissibly altered clock rings." *Id.* at 3 n.1.  It also admits that it failed to train the supervisors by the August 31, 2018 deadline that it had agreed to in the August 14, 2018 settlement.  *See id.* ¶15.  Nonetheless, USPS claims that Arbitrator Roberts exceeded his authority and violated public policy by imposing "punitive damages." *Id.* ¶¶27, 37, 41.

On the same day USPS filed its complaint, it filed a motion to vacate the Roberts award. *See* Docket Entry #2.  For the reasons explained below, USPS's motion should be denied and NALC's motion to confirm, filed herewith, should be granted.

## **ARGUMENT**

## I.    **JUDICIAL REVIEW OF LABOR ARBITRATION AWARDS IS EXTRAORDINARILY DEFERENTIAL**

As the D.C. Circuit has noted, judicial review of labor arbitration awards is "extraordinarily deferential." *Nat'l Postal Mail Handlers Union v Am. Postal Workers Union*,

589 F.3d 437, 440-41 (D.C. Cir. 2009); *see also Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (review of labor arbitration awards "very limited"); *Local 689, Amalgamated Transit Union v. Washington Metro. Area Transit Auth.*, 249 F.Supp.3d 427, 431 (D.D.C. 2017) ("'extremely limited'" review) (citation omitted).

The "foundational" case on judicial review of labor arbitration awards, *Nat'l Postal Mail Handlers Union*, 589 F.3d at 441, is the Supreme Court's decision in *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960).  There, the Court ruled that a court must uphold a labor arbitration award so long as it "draws its essence from the collective bargaining agreement."  *Id.* at 597; *accord United Paperworkers Int'l Union AFL-CIO v. Misco, Inc.*, 484 U.S. 29 (1987).  An award draws its essence from a collective bargaining agreement when the arbitrator was "*even arguably* construing or applying the contract and acting within the scope of his authority." *Misco*, 484 U.S. at 38 (emphasis added); *accord Major League Baseball Players Ass'n*, 532 U.S. at 509; *Nat'l Postal Mail Handlers*, 589 F.3d at 441; *Local 689*, 249 F.Supp.3d at 432.

An arbitrator need not base his or her award on the text of the collective bargaining agreement.  As the Supreme Court explained, "[t]he labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law -- the practices of the industry and the shop -- is equally a part of the collective bargaining agreement although not expressed in it."  *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581-82 (1960); *see also Pan Am. Airways Corp. v. Air Line Pilots Ass'n, Int'l*, 206 F.Supp.2d 12, 21 (D.D.C. 2002) (arbitrators "have long had authority to look beyond vague provisions to determine the custom, common law, and practice within an industry in order to better inform their interpretations and constructions of agreements."), *aff'd*, 62 F. Appx. 356

(D.C. Cir. 2003).  The "industrial common law" that is "equally a part of the collective

bargaining agreement although not expressed in it" includes the practices of arbitrators who

resolve disputes through the grievance procedure.  *See Warrior & Gulf*, 363 U.S. at 581 ("The

processing of disputes through the grievance machinery is actually a vehicle by which meaning

and content are given to the collective bargaining agreement.")

In particular, in fashioning a remedy, the arbitrator is not confined to the contract's

language but can consider, among other things, the practice of the parties.  *See Madison Hotel v.*

*Hotel and Restaurant Employees, Local 25, AFL-CIO*, 144 F.3d 855, 859 (D.C. Cir. 1998) ("The

parties' past practice, the 'industrial common law' of the hotel business, the structure of the

contract as a whole—all of these matters could be properly considered by the arbitrator in

interpreting the contract and formulating the award.").  Indeed, the Supreme Court has noted that

labor arbitrators have an especially wide range of authority when it comes to fashioning a

remedy:

> When an arbitrator is commissioned to interpret and apply the
> collective bargaining agreement, he is to bring his informed
> judgment to bear in order to reach a fair solution of a problem. *This*
> *is especially true when it comes to formulating remedies. There the*
> *need is for flexibility in meeting a wide variety of situations.* The
> draftsmen may never have thought of what specific remedy should
> be awarded to meet a particular contingency.

*Enterprise Wheel*, 363 U.S. at 597 (emphasis added); *Misco*, 484 U.S. at 38 ("where it is

contemplated that the arbitrator will determine remedies for contract violations that he finds,

courts have no authority to disagree with his honest judgment in that respect."); *accord UNITE*

*Here Local 23 v. I.L. Creations of Maryland Inc.*, 148 F. Supp. 3d 12, 20 (D.D.C. 2015).  The

leading treatise on labor arbitration explains that "most collective bargaining agreements leave a

'gaping void' on the topic of arbitral remedies, and, in the absence of language limiting the scope

of a remedy in the agreement itself, arbitrators generally have been considered to possess broad

discretion to fashion an appropriate remedy."  ELKOURI & ELKOURI: HOW ARBITRATION WORKS 18-8 (8th ed. 2016).

An ambiguity in a labor arbitration award that permits the inference that the arbitrator may have exceeded her authority is not grounds for vacating it.  *See Enterprise Wheel*, 363 U.S. at 598.  Nor may a court vacate a labor arbitration award "even if convinced that the arbitrator committed serious error."  *Misco*, 484 U.S. at 38; *accord Major League Baseball Players Ass'n*, 589 U.S. at 509; *Nat'l Postal Mail Handlers*, 589 F.3d at 441; *Local 689*, 249 F.Supp.3d at 431-32.  Errors of fact or of law, or misreadings of the contract, provide no ground for relief from an arbitration award.  *See Misco*, 484 U.S. at 38 (courts "do not sit to hear claims of factual or legal error by an arbitrator"); *Nat'l Postal Mail Handlers,* 589 F.3d at 441; *Howard Univ. v. Metro. Campus Police Officers' Union*, 512 F.3d 716, 720 (D.C. Cir. 2008) ("That the arbitrator may have made a 'mistake of law' does not affect the standard of review."); *Am. Postal Workers Union, AFL-CIO v. USPS*, 789 F.2d 1, 6 (D.C. Cir. 1986) (an arbitrator's purported mistake of law not grounds to vacate award).

This extremely deferential standard of review of labor arbitration awards preserves both the parties' bargain and the finality of the arbitration process.  As the Supreme Court explained, "[i]t is the arbitrator's construction which was bargained for," not the court's.  *Enterprise Wheel*, 363 U.S. at 599; *accord Eastern Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000); *see also USPS v. Am. Postal Workers Union*, 553 F.3d 686, 695 (D.C. Cir. 2009) (rejecting USPS's challenge to arbitration award, as "[t]he parties bargained for [the arbitrator] to be the reader of their CBA").  Moreover, plenary judicial review of labor arbitration awards would only encourage the losing party to sue.  It "would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final."

*Enterprise Wheel*, 363 U.S. at 599; *see also Misco*, 484 U.S. 38 (if courts intervened, "the speedy resolution of grievances by private mechanisms would be greatly undermined").

Both concerns apply here.  USPS agreed to employ Lawrence Roberts as an arbitrator, *see* Renfroe Dec. ¶9 -- and did so for decades, *see id*. ¶10 -- and agreed to abide by his decisions as "final and binding."  *Id.* ¶6, Exhibit A, at 72 (Art. 15, §4(A)(6)).  Having so agreed, USPS should not be permitted to evade his ruling here.  Moreover, USPS and NALC arbitrate several hundred disputes a year, *see id*. ¶7, and NALC is just one of the unions with which USPS has a collective bargaining agreement, *see id*. ¶8.  A ruling vacating a labor arbitration award here would encourage USPS to seek review of other awards it does not like.  That could clog the Court's docket with postal labor disputes and impose substantial delays in obtaining their final resolution.

## II.     ARBITRATOR ROBERTS DID NOT EXCEED HIS AUTHORITY

### A.     The Roberts Award Draws Its Essence from the CBA

The Court should confirm the Roberts Award since it draws its essence from the CBA.  The February 8, 2019 Step B decision found that USPS had failed to comply with the November 27, 2018 Step B decision.  *See* Renfroe Dec., Exhibit O.  Arbitrator Roberts' task was to determine what remedy, if any, to impose for USPS's non-compliance.  In choosing the remedy he chose, Arbitrator Roberts relied on the CBA, particularly the CBA's lack of any excuses or exemptions for compliance with a grievance resolution.  He concluded that "compliance is not an optional amenity found in the Parties 2016-2019 Agreement."  Renfroe Dec., Exhibit P, at 19.  Because Arbitrator Roberts relied on the CBA for his award, the award draws its essence from the CBA.

Arbitrator Roberts also relied on the 1994 national-level award by Arbitrator Mittenthal, *see* Renfroe Dec., Exhibit P, at 18, Exhibit Q.  Arbitration awards issued under a CBA constitute

part of the "industrial common law" that is "a part of the collective bargaining agreement but not expressed in it." *Warrior & Gulf*, 363 U.S. at 581-82; *see also id*. at 578 ("…arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself").  Arbitrator Roberts read the 1994 Mittenthal Award as establishing that the CBA allowed "punitive awards in certain situations."  Renfroe Dec., Exhibit P, at 18.  Whether Arbitrator Roberts' reading of the 1994 Mittenthal award was correct or not is irrelevant.  *See Misco*, 484 U.S. at 38.  All that matters is that he based his decision on his understanding of the "industrial common law" under the CBA.  His award thus draws its essence from the CBA.

In any event, Arbitrator Roberts did not misread the CBA when he issued a remedy requiring USPS to pay a penalty for its non-compliance.  An extensive body of arbitration cases -- indeed, fourteen awards in just the last two years, *see* Renfroe Dec., Exhibits EE to RR -- establishes a practice under the CBA of requiring USPS to pay a penalty for its non-compliance with grievance resolutions.  *See* Renfroe Dec., Exhibits S to RR.  These awards, including prior unchallenged awards by Arbitrator Roberts himself, *see id*., Exhibits BB, DD, II, are part of the "industrial common law" which, in addition to the CBA's text, constitute the terms of the CBA. *See Warrior & Gulf*, 363 U.S. at 581-82 ("industrial common law" of parties' practices "is equally a part of the collective bargaining agreement"); *see Pan Am.*, 206 F.Supp.2d at 21; *see also Warrior & Gulf*, 363 U.S. at 581 ("The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.")  In addition, at least two national-level awards, the 1979 Gamser award and the 1986 Mittenthal award, constitute authoritative interpretations of the CBA permitting monetary remedies aimed not at compensating employees for financial loss but at deterring

USPS violations.  *See USPS*, 553 F.3d at 691 (USPS recognizing that national-level award constitutes "controlling arbitral precedent").

The frequent Step B decisions requiring USPS to pay a penalty for its noncompliance, *see* Renfroe Dec., Exhibit SS -- decisions in which the USPS representatives on the Step B team concurred, *see id.* ¶5 -- also form part of the "industrial common law" under the CBA.  In one recent case, the Step B team awarded a remedy of a fixed dollar amount per day for each day of USPS's failure to comply with a prior grievance resolution, *see* Renfroe Dec., Exhibit SS, at 1-3, precisely the type of remedy Arbitrator Roberts granted.  *See id.*, Exhibit P, at 21.

Even if the Court finds the Roberts Award to be ambiguous, and has some doubt as to whether the award draws it essence from the CBA, it must nonetheless resolve such doubts in favor of upholding the award.  *See Misco*, 484 U.S. at 38 (award draws its essence from contract when the arbitrator is "even arguably" construing or applying it); *Enterprise Wheel*, 363 U.S. at 598 (ambiguity in award not grounds for vacating it).

For all these reasons, the Roberts Award draws its essence from the CBA and so should be confirmed.

### B.      Penalty Remedies Do Not Require Express Contract Language

USPS argues that Arbitrator Roberts exceeded his authority because his chosen remedy was not "explicitly set forth in the contractual language."  Docket Entry #2, at 10.  This argument fails.  Like most collective bargaining agreements, *see* ELKOURI & ELKOURI, at 18-8, the CBA contains no language either prescribing or proscribing the remedy for the employer's non-compliance with prior grievance settlements.  This silence in the CBA's language meant that Arbitrator Roberts could not have based his decision on a particular provision of the CBA.  To fulfill his charge, and formulate a remedy for USPS's breach, he had no choice but to look beyond the text of the CBA and do what the Supreme Court said he should do:  "bring his

informed judgment to bear in order to reach a fair solution of a problem." *Enterprise Wheel*, 363 U.S. at 597.

Although the well-established case law shows that an arbitrator need not base a decision on express contract language, *see Warrior & Gulf*, 363 U.S. at 581-82; *Pan Am.*, 206 F.Supp.2d at 21, USPS urges that an exception should nonetheless be made for awards requiring the employer to pay a penalty for its violation.  *See* Docket Entry #2, at 10.  But USPS cites *no* case holding that such an exception exists.

Indeed, the case law does not support such an exception.  In *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Northwest Airlines, Inc.*, 858 F.2d 427 (8th Cir. 1988), for example, the arbitrator ordered the employer to make a "penalty payment" to the union even though "the collective bargaining agreement did not specifically authorize punitive damages." *Id*. at 429.  The court held that the award nonetheless drew its essence from the collective bargaining agreement because "industry practice has been to award punitive damages."  *Id*. at 432.  The court also noted that the award made sense, since it provided "an incentive for [the employer], which had ignored its responsibilities for more than a year, to comply."  *Id*.  Here, as in *Machinists*, the practice has been to require payment of a penalty amount, as a sensible way to provide the employer an incentive to comply with its contractual obligations.

To try to support the exception it urges, USPS cites just two cases, both from outside this Circuit, both decades old, and one not even involving a labor arbitration.  Neither case concerns penalty remedies nor supports the proposition that only express contractual language will support such a remedy.  In *Coast Trading Co., Inc. v. Pacific Molasses Co.*, 681 F.2d 1195 (9th Cir. 1982) (cited at Docket Entry #2, at 14), a court vacated an arbitration award based on a commercial contract because the contract incorporated a set of rules that specified the remedies

available if the seller defaulted, but the arbitration panel granted a remedy different from and "contrary to" those prescribed remedies. *Id.* at 1198. Similarly, in *Amanda Bent Bolt Co. v. UAW*, 451 F.2d 1277, (6th Cir. 1971) (miscited by USPS at Docket Entry #2, at 14 as appearing at 466 F.2d 1277), the arbitrator's award was "contrary to the terms of the collective bargaining contract." *Id.* at 1280. Here, in contrast to the two cases USPS relies on, the Roberts Awards is not contrary to any contractual language.

Unable to cite any case for its claim that an award requiring penalty payments must rest on express CBA language, USPS falls back on the general rule of contracts, asserting that "punitive" remedies "are not available as a remedy for a breach of contract." Docket Entry #2, at 10 (citing the Second Restatement of Contracts); *see also id*. at 14 (citing *Barnes v. Gorman*, 536 U.S. 181, 187-88 (2002) ("punitive damages … are generally not available for breach of contract"). Whether the general law of contracts permits punitive remedies or not has no bearing on whether Arbitrator Roberts exceeded his authority. First, the law of commercial contracts cannot be grafted onto collective bargaining law. *See Warrior & Gulf*, 383 U.S. at 578 ("arbitration of labor disputes has quite different functions from arbitration under an ordinary commercial agreement"). As explained below, labor arbitrators do issue penalty remedies under certain circumstances. More importantly, whatever the "law" says about punitive remedies has no bearing here because Arbitrator Roberts' job was to apply the CBA, not external law, and ample arbitral precedent, as well as numerous Step B decisions, show that penalty payments are permitted under the CBA. *See* Renfroe Dec., Exhibits S to SS.

In any event, even if Arbitrator Roberts had issued his award in the mistaken belief that the general law of contracts allowed punitive remedies, such a mistake of law would not justify vacating his award. *See Misco*, 484 U.S. at 38 ("legal error by an arbitrator" not grounds to set

aside award); *Howard Univ.*, 512 F.3d at 720 (mistake of law by arbitrator not grounds to vacate award).  As the D.C. Circuit has explained, the parties to a collective bargaining agreement are bound by the arbitrator's interpretation of the law:

> When construction of the contract implicitly or directly requires an application of "external law," *i.e.*, statutory or decisional law, *the parties have necessarily bargained for the arbitrator's interpretation of the law and are bound by it.* Since the arbitrator is the "contract reader," his interpretation of the law becomes part of the contract and thereby part of the private law governing the relationship between the parties to the contract. *Thus, the parties may not seek relief from the courts for an alleged mistake of law by the arbitrator.*

*Am. Postal Workers Union*, 789 F.2d at 6 (emphasis added).

USPS also tries to justify its position that penalty payment remedies require express contract language by asserting that punitive remedies are "foreign to the labor relations landscape."  Docket Entry #2, at 10.  While penalty payment remedies are not routine in labor relations, arbitrators do award them when the circumstances warrant.  *See* ELKOURI & ELKOURI at 18-30 ("Some arbitrators have felt justified in awarding punitive damages on a showing that the contractual violation was knowing and repeated, willful and flagrant, in bad faith or intended for the purpose of delay, or otherwise 'egregiously wrongful.'") (citations omitted); FAIRWEATHER'S PRACTICE AND PROCEDURE IN ARBITRATION 471 (4th ed. 1999) (penalty awards made on occasion even in the absence of financial injury to employee, when employer's violation was either knowing or repeated).  More importantly here, penalty payment remedies are not foreign *to the CBA*.  The extensive body of arbitration cases under the CBA requiring USPS to pay a penalty for its non-compliance, plus the numerous Step B decisions requiring the same, *see* Renfroe Dec., Exhibits S to SS, make that clear.

USPS asserts that it "has not consented to the imposition of punitive remedies."  Docket Entry #2, at 14.  But an employer need not consent to an arbitrator's remedy to be bound by it.

An employer need only have consented to arbitration of the dispute and to the arbitrator.  Here, USPS consented to Arbitrator Roberts, *see* Renfroe Dec. ¶¶9, 10, and agreed to abide by his decisions as "final and binding."  *Id.*, Exhibit A, at 72 (Art. 15, §4(A)(6)).  Moreover, USPS has at least implicitly consented to the imposition of penalty payment remedies in arbitration by never -- until now -- challenging the practice under the CBA of arbitrators issuing such remedies for USPS's non-compliance with grievance resolutions.  *See* Renfroe Dec., Exhibits S to RR.  USPS's implicit consent can also be found in the numerous Step B decisions requiring USPS to pay a penalty for its non-compliance, *see* Renfroe Dec., Exhibit SS, decisions in which USPS's representatives concurred.  *See id.* ¶5.

## C.     Arbitrator Roberts' Factfinding is Not Subject to Challenge

In addition to arguing that punitive remedies are unauthorized under the CBA because no express contract language permits them, USPS argues, in the alternative, that a penalty payment remedy was inappropriate here because there was no "proof of wanton or willful misconduct."  Docket Entry #2, at 12.  This argument fails first because Arbitrator Roberts could have issued a penalty payment remedy even absent a finding that USPS acted willfully.  Under what circumstances such a remedy is warranted under the CBA was a decision entrusted entirely to the arbitrator.  *See Enterprise Wheel*, 363 U.S. at 599 ( "[i]t is the arbitrator's construction [of the contract] which was bargained for").

In any event, USPS's argument fails because Arbitrator Roberts found that USPS *did* engage in willful misconduct, and that finding of fact by the arbitrator is not subject to court review.  USPS argued at the arbitration hearing that its violation was not willful and Arbitrator Roberts rejected that contention, stating "I disagree."  Renfroe Dec., Exhibit P, at 18.  He found that USPS's "ignoring" prior grievance resolutions was "*clearly willful* and malicious."  *Id.* at 19 (emphasis added).  That finding is not now subject to challenge.  As the Supreme Court has

explained, courts "do not sit to hear claims of *factual* or legal error by an arbitrator," *Misco*, 484 U.S. at 38 (emphasis added), and "improvident, even silly, factfinding" is insufficient reason to vacate an award. *Id.* at 39; *accord Major League Baseball Players Ass'n*, 532 U.S. at 509.

Even if the Court had license to review the arbitrator's factfinding, it would find nothing improvident or silly about his determination that USPS acted willfully. USPS repeatedly committed itself to take action by a certain date and then failed to do so. As Arbitrator Roberts noted, it was "not another arbitrator or third party" that bound USPS to train the supervisors by a certain date, but USPS itself that agreed to do so. Renfroe Dec., Exhibit P at 18.

D.     **Arbitrator Roberts Did Not Dispense His Own Brand of Industrial Justice**

Next, USPS argues that Arbitrator Roberts issued the penalty payment remedy out of his personal frustration and ire towards USPS's non-compliance and thus impermissibly dispensed his "own brand of industrial justice." Docket Entry #2 at 8-9, 13. This argument, too, is meritless. USPS cites no case for the proposition -- and we know of none -- holding that a court may look beyond an arbitrator's award, to the arbitrator's subjective feelings, to determine whether the award passes muster. What matters is not what the arbitrator *feels*, but what he or she *does*. What Arbitrator Roberts did here, as discussed above, was issue an award that draws its essence from the CBA.

E.     **Arbitrator Roberts Was Free to Consider the Entirety of the Circumstances**

USPS also takes issue, *see* Docket Entry #2, at 8-9, with Arbitrator Roberts looking beyond USPS's non-compliance with the November 27, 2018 Step B decision, and considering as well its non-compliance with the June 6, 2018 Step B decision, its non-compliance with the August 14, 2018 settlement, and its admission that it continued to manipulate employee time records. USPS in effect contends that the arbitrator should have taken a blinkered view of the case, shutting out the fact that USPS's non-compliance was repeated and its contract violations

27

ongoing.  However, the Supreme Court teaches that a labor arbitrator should not take such a

cabined approach to deciding cases, but should base his judgment on a wide array of facts:

> The labor arbitrator is usually chosen because of the parties'
> confidence in his knowledge of the common law of the shop and
> their trust in his personal judgment to bring to bear considerations
> which are not expressed in the contract as criteria for judgment.
> The parties expect that his judgment of a particular grievance will
> reflect not only what the contract says but, insofar as the collective
> bargaining agreement permits, such factors as the effect upon
> productivity of a particular result, its consequence to the morale of
> the shop, his judgment whether tensions will be heightened or
> diminished.

*Warrior & Gulf*, 363 U.S. at 582.

That the arbitrator take account of all relevant facts is particularly important when

deciding whether to impose a penalty payment remedy.  Here, the problem was not simply that

USPS was failing, repeatedly, to comply with commitments it had made to the union and the

employees.  It was continuing to commit the same violations that triggered the grievances in the

first place.  *See* Docket Entry #2-4, at 63.  Under those circumstances, the arbitrator exercised

appropriate judgment in issuing a penalty payment remedy.  Indeed, had he failed to do so, it

would have sent USPS the wrong message, namely, that non-compliance, and ongoing

violations, would be tolerated.  *See Machinists*, 858 F.2d at 432 (upholding penalty payment

remedy because it "was an incentive for [the employer], which had ignored its responsibilities

for more than a year, to comply …")

Because Arbitrator Roberts properly exercised his authority under the CBA, his award

should be confirmed.

## III.   THE ROBERTS AWARD DID NOT VIOLATE PUBLIC POLICY

USPS also argues that the Roberts Award "conflicts with USPS's sovereign immunity," Docket Entry #2, at 14, and thus contravenes a "clear, dominant public policy," *id.* at 10.  This argument fails.

Courts may in rare circumstances vacate awards that violate public policy but, as the D.C. Circuit has held, this public policy exception is "*extremely narrow*."  *Am. Postal Workers Union*, 789 F.2d at 8 (emphasis in original); *accord USPS v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 810 F.2d 1239, 1241 (D.C. Cir. 1987); *Local 689*, 249 F.Supp.3d at 435; *see also Eastern Associated Coal*, 531 U.S. at 63; *USPS v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 789 F.2d 18, 20-21 (D.C. Cir. 1986) (rejecting USPS's public policy challenge to arbitration award).  The Court of Appeals has explained that "the exception is designed to be narrow so as to limit potentially intrusive judicial review of arbitration awards under the guise of 'public policy.'" *Am. Postal Workers Union*, 789 F.2d at 8.

In this Circuit, a court may only refuse to confirm an award under the public policy exception "if the award itself violates established law or seeks to compel some unlawful action." *Am. Postal Workers Union*, 789 F.2d at 8; *accord Local 689*, 249 F.Supp.3d at 435; *Nat'l Rural Letter Carriers' Ass'n v. USPS*, 637 F. Supp. 1041, 1044 (D.D.C. 1986).  Here, USPS points to no statute, court decision or other established legal authority that prohibits a labor arbitration award from requiring USPS to pay a penalty for its non-compliance.  Nor does USPS argue that it would be unlawful for it to make the payments that Arbitrator Roberts ordered.  Accordingly, the Roberts Award does not fall within the "extremely narrow" scope of the public policy exception.

USPS asserts that punitive remedies are "virtually unheard of," Docket Entry #2, at 11, but, as discussed above, an entire body of arbitration awards already exists under the CBA

imposing penalty payment remedies on USPS.  *See* Renfroe Dec., Exhibits S to RR.  That USPS never previously challenged these awards defeats USPS's public policy argument.  *See Nat'l Rural Letter Carriers' Ass'n*, 637 F.Supp. at 1044 (rejecting USPS's public policy claim when USPS had not challenged similar arbitration awards).

In any event, to support a public policy argument challenging a labor arbitration award, an employer must establish that the purported public policy is "'well defined and dominant,'" and "'ascertained by reference to laws and legal precedents.'"  *Eastern Associated Coal*, 531 U.S. at 62 (citation omitted); *accord Am. Postal Workers Union*, 789 F.2d at 8; *Local 689*, 249 F.Supp.3d at 436.  No "well defined and dominant" public policy exists supporting USPS's claim to sovereign immunity in general, let alone sovereign immunity from labor arbitration awards.  To the contrary, the Supreme Court has recognized that when it enacted the PRA, Congress "'cast off the cloak of sovereignty" and USPS "'assumed the status of a private commercial enterprise.'"  *Loeffler v. Frank*, 486 U.S. 549, 565 (1988) (citation omitted).  Moreover, when, as in the PRA, *see* 39 U.S.C. §§401(1), Congress has allowed a governmental agency to be sued, that waiver of sovereign immunity "should be given a liberal -- that is to say, expansive -- construction."  *USPS v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 741 (2004); *see also Franchise Tax Bd.*, 467 U.S. at 517.  Accordingly, a presumption exists that USPS has waived its sovereign immunity, and it is only the exceptional circumstances, such as those that would "pose a threat of 'grave interference' with [USPS's] operation," that can overcome this presumption.  *See Loeffler*, 486 U.S. at 556-57.

Applying this presumption, the Supreme Court has repeatedly denied USPS's claims to sovereign immunity.  *See, e.g.. Dolan v. USPS*, 546 U.S. 481, 483 (2006) (denying USPS's claim to sovereign immunity from tort claim brought under Federal Tort Claims Act); *Loeffler*, 486

U.S. 549 (USPS has no sovereign immunity from prejudgment interest under Title VII of Civil Rights Act); *Franchise Tax Bd*, 467 U.S. 512 (USPS has no immunity from state tax board's order requiring withholdings from postal employees' wages).  Here, the presumption against sovereign immunity applies with extra force because Congress not only made USPS subject to suit in general, *see* 39 U.S.C. §401(1), but, in particular, made it subject to suit by a union representing its employees.  *See* 39 U.S.C. §1208(b).  The wavier of immunity in the collective bargaining context is thus particularly clear.

USPS argues that its waiver of sovereign immunity has never been recognized to extend to punitive remedies.  *See* Docket Entry #2, at 15.  But that argument turns the inquiry on its head.  *See Loeffler*, 486 U.S. at 565 (with respect to USPS's status, "the search for an express waiver of immunity … is unnecessary").  Given the presumption against USPS's sovereign immunity, the question is whether any statute or any court decision has ever recognized that USPS enjoys immunity from penalty payment remedies in a labor arbitration award.  USPS cites none.  Indeed, the absence of any language in the PRA making USPS immune to penalty payment remedies in labor arbitration awards shows that Congress intended no such immunity. *See Loeffler*, 486 U.S. at 557 ("… [S]ince Congress expressly included several narrow and specific limitations on the operation of the sue-and-be-sued clause [in the PRA], none of which is applicable here, the natural inference is that it did not intend other limitations to be implied.")

*Flamingo Industries*, 540 U.S. 736, on which USPS relies, *see* Docket Entry #2, at 15, says nothing about whether USPS is immune from penalty payment remedies in labor arbitration. There, the Supreme Court held that USPS could not be sued under the Sherman Antitrust Act, not because of sovereign immunity, but because the statute, by its terms, does not apply to federal governmental entities.  *See Flamingo Industries*, 540 U.S. at 745.

To support its plea for immunity, USPS argues that punitive remedies would be "potentially catastrophic." Docket Entry #2, at 11. This is hyperbole. USPS is a behemoth that last year had over $70 billion in revenue. *See* USPS Annual Report, at 8. It reports its financial status in figures rounded to the nearest million. The liability imposed by the Roberts Award -- even if it were the $230,640 that USPS claims, *see* Entry #1, at 5 (¶20) -- is simply not material to USPS's financial standing. Because the Roberts Award and similar arbitration decisions do not threaten "grave interference" with USPS's ability to function, sovereign immunity does not apply. *Franchise Tax Bd.*, 467 U.S. at 517 (denying immunity to USPS when immunity not "necessary to avoid grave interference" with its functioning); *accord Loeffler*, 486 U.S. at 557.

USPS warns of the risk of "punitive damages," Docket Entry #2, at 10, but penalty payment remedies in labor arbitration are not comparable to punitive damages imposed by a jury. Whether punitive damages are available under a given statute depends on the terms of the applicable statute. *See, e.g.*, *Oakstone v. Postmaster Gen.*, 397 F.Supp.2d 48, 61 (D. Me. 2005) (disallowing punitive damages against USPS under Title VII since "Title VII expressly disallows punitive damages"). Arbitration, by contrast, is a creature of contract. By negotiating a CBA that nowhere prohibits penalty payment remedies, and also by not objecting (until now) to an extensive arbitral practice of imposing such remedies, USPS consented to such remedies.

Moreover, the risks of penalty payment remedies in arbitration are nothing like the risks of punitive damages in a jury trial. Unlike lay jurors, who walk in off the street, labor arbitrators who decide cases under the CBA are seasoned professionals, carefully chosen by both sides for their experience, skill and temperament, and their ability to render fair decisions. *See* Renfroe Dec. ¶9. Moreover, unlike jurors, empaneled for a single case, arbitrators under the CBA decide case after case. *See id.* Arbitrator Roberts, for example, has decided cases under the CBA for

nearly thirty years and has issued 570 arbitration awards. *See id.* ¶10. In addition, because either party, upon expiration of the CBA, has the right to strike from the arbitration panel any arbitrator with whom the party is dissatisfied, arbitrators who want to keep their job have a keen interest in avoiding extreme or outlandish rulings. *See id.* at ¶9. All these features of the arbitration system safeguard against unwarranted or excessive penalty payment remedies.

Because arbitral remedies differ from jury awards, USPS's reliance on *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) (cited at Docket Entry #2, at 16), is unavailing. There, the Court held that a municipality could not be subject to a jury's imposition of punitive damages under a federal civil rights statute. *See Newport*, 453 U.S. at 271. *Newport* is also distinguishable because USPS is not a municipality, but an entity for which Congress has "cast off the cloak of sovereignty." *Loeffler*, 486 U.S. at 565. Moreover, *Newport* rested to a large extent on the Court's reasoning that punitive damages against a municipality "'punishes' only the taxpayers." *Newport*, 453 U.S. at 267. Because USPS does not rely on taxpayer support, *see* USPS Annual Report at 3, that rationale has no application here.

To grant USPS immunity from certain types of labor arbitration awards would be to give it a protection not enjoyed by other businesses that, like USPS, engage in collective bargaining under the NLRA. In other contexts, the Supreme Court has denied USPS's claims to sovereign immunity precisely to avoid giving USPS special treatment not enjoyed by other businesses. *See Dolan*, 546 U.S. at 491 (denying USPS immunity from slip-and-fall tort claim since such claims are "a risk shared by any business that makes home deliveries"); *Franchise Tax Bd.*, 467 U.S. at 520 (denying USPS immunity from state tax board's withholding order when the order "has precisely the same effect on its ability to operate efficiently as it does on that of any other employer"). The Court should not grant USPS special treatment here.

For all of these reasons, USPS's public policy argument fails.

## CONCLUSION

The Court should grant NALC's motion to confirm the Roberts Award and deny USPS's

motion to vacate it.

Dated: February 14, 2020

Respectfully submitted,

/s/ *Peter D. DeChiara*

Peter D. DeChiara (admitted *pro hac vice*)
Judd E. Cohen (admitted *pro hac vice*)
COHEN, WEISS AND SIMON LLP
900 Third Avenue
New York, New York 10022-4869
(212) 563-4100

/s/ *Lucas R. Aubrey*

Victoria L. Bor (D.C. Bar. No. 288852)
Lucas R. Aubrey (D.C. Bar No. 982849)
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C.  20001
(202) 785-9300

*Attorneys for National Association of Letter Carriers,*
*AFL-CIO*