## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES POSTAL SERVICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:19-3685 (TSC) |
| | ) | |
| NATIONAL ASSOCIATION OF LETTER | ) | |
| CARRIERS, AFL-CIO | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF RICHARD ACKER

I, Richard Acker, make the following Declaration in lieu of affidavit in accordance with the provisions of 28 U.S.C. § 1746. I understand that my Declaration is to be filed in the above-captioned civil action in the United States Court District Court for the District of Columbia and that it is the equivalent to a statement under oath.

1.      I am over the age of 18 and am competent to testify. The statements made herein are based upon my personal knowledge, upon information made available to me in my official capacity and upon conclusions and determinations reached and made therewith.

2.      I am employed by the United States Postal Service as Manager, Contract Compliance, a position I have held since March 01, 2019.

3.      Prior to assuming my current position, I worked in various positions within the Labor Relations Department at Postal Service Headquarters in Washington, DC, as well as in various Area and field offices.  As the Manager, Contract Compliance I am responsible for the creation and administration of all National Labor Relations training.  The functional units of Strategic Complement, Contract Compliance and (Field) Labor Relations also report to me.  As such, my

staff and I have the obligation of investigating and insuring that we are in compliance with our

national contract agreements, should compliance not be finalized and thereafter brought to our

attention.  We provide labor relations support to all field units in the United States as well as to

Headquarters.

4.      I am aware that the defendants in the above-captioned action have filed a Motion to

Confirm postal arbitration 18-FCMK3-18 (the "Award"), issued by Arbitrator Lawrence Roberts,

awarding punitive damages to postal employees at the Kingsport, Tennessee Main Installation.

5.      Paragraphs 1 through 8 of pages 20-22 of the Award detail the various penalties assessed

against the Postal Service by Arbitrator Roberts for failing to provide the defendant with

documentation of supervisor training at the Kingsport Installation.

6.      The total penalty assessed by Arbitrator Roberts was $230,410.00, calculated as follows:

| Source of Penalty (¶¶ 1-8 of the Award) | Penalty Amount | Total |
|---|---|---|
| Payment to union Steward Shawn Stout for "failing to provide documentation" (¶3) | $230 | $230 |
| Failure to train manager Phil Benton within specified time limit (¶4) | $420 per carrier (68 carriers) | $28,560 |
| Failure to train manager Lisa Fortner within specified time limit ((¶5) | $420 per carrier (68 carriers) | $28,560 |
| Failure to train manager Duane Allen within specified time limit (¶6) | $10 per carrier (68 carriers) for 252 days | $171,360 |
| Additional "incentive" for future compliance (¶8) | $25 per carrier (68 carriers) | $1,700 |
| **Grand Total** | | **$230,410** |

7.      Together, the penalties outlined in Arbitrator Roberts' award amount to $3,385 per carrier

– i.e., $230,410.00, minus $230 paid to the union, divided by 68 carriers.

8.      If the Award had been rendered at a larger installation, the cost to the Postal Service

would be even higher. For example, at the San Francisco, Napoleon Street Annex, the Postal

Service currently employs approximately 230 carriers. If an arbitrator ordered a penalty payment

of $3,385 per carrier at that installation, the total award amount would be $778,550. There are several other postal installations with 150+ carriers.

9.      In recent years, the Postal Service has seen a number of punitive awards issued at the regional level. In most cases, these awards involve smaller, one-time payments to union stewards or grievants.

10.     Seizing upon these examples, NALC local officials have increasingly sought punitive damages for minor violations of the contract and/or formal and informal cease and desist agreements.  As a result, grievances which may have otherwise settled promptly and informally are now being forced to arbitration by the Union because the parties deadlocked over requests for punitive sanctions.

11.     The Postal Service arbitrates thousands of cases each year, and relatively few of them have involved punitive sanctions.  Of those, some regional arbitrators have awarded punitive damages, while others have confined their awards to make-whole relief. *See e.g.*, Case No. K16N-4K-C 17664487 from Arbitrator David A. Stanton (2018) (Exhibit A) ("The Union's request for money to be paid to the labor organization as part of the grievance settlement is asking for a purely punitive remedy. There is no harm to [the union] in this matter – either monetary or non-monetary. Arbitration precedent for decades has established that purely punitive damages are rarely awarded in arbitration."); Case No. W1C-5F-C 4734 from Arbitrator Carlton Snow (1987) (Exhibit B) ("In fashioning remedies . . . arbitrators generally have adhered to the principle that damages should correspond to the harm suffered. A deeply rooted principle of measuring contract damages is that such damages must be based on the injured party's expectation . . . . It is recognized that some arbitrators have awarded punitive damages when a violation of an agreement has been constant and repeated or malicious. That approach, however,

has not been consistent with the common law which has taught that, no matter how reprehensible a breach, punitive damages which were in excess of an injured party's lost expectation generally have not been awarded for a breach of contract."); Case No. A98C1AC99211670-9964 from Arbitrator Irene Thomas (2000) (Exhibit C) (finding "no connection between the remedy sought and the alleged contract violation" and concluding as a result that the requested remedy was punitive and therefore, impermissible); Case No. G11N-4G-C 15003323 from Arbitrator Paul Chapdelaine (2015) (Exhibit D) (Denying union's demand that the Postal Service pay carriers $10 per each day that management failed to implement Step B team's agreed-upon territory adjustments and concluding "[t]o award the Union's requested monetary remedy in the instant case would be improper under the specific terms of the National Agreement and would exceed this Arbitrator's authority. If the parties wish to establish monetary penalties for specific contract infractions, such penalties must be established through the negotiating process and not through arbitration . . . . Although the Union contended that the failure to implement the Step B Decision was malicious and willful, no such determination was found by the Step B Team."); Case No. K16N 4K C 18442097 from Arbitrator Jacquelin F. Drucker (2019) (Exhibit E) (in case deadlocked solely over remedy, arbitrator denied Union request for punitive monetary sanctions noting that "in the absence of specific contractual terms or repeated or egregious failure to comply, the remedy for breaches such as this is limited to traditional contract relief.")..

12.    There have been no national-level arbitration awards providing for punitive damages.

13.    Regional awards are subordinate to national awards, and national awards constitute binding precedent for regional arbitrators. Indeed, numerous regional arbitrators have recognized the primacy of national-level awards. *See, e.g.,* Case No. H1N-1J-C 23247 from Arbitrator Neil Bernstein (1987) (Exhibit F) ("The whole purpose of the national arbitration scheme is to

establish a level of definitive rulings on contract interpretation questions of general applicability. National decisions bind the regional arbitrators, and not the reverse."); Case No. Q11N-4Q-C 14032224 from Arbitrator Dennis Nolan (2015) (Exhibit G) ("The difficulty with relying on regional awards in a national level interpretive case like this is that regional level arbitrators lack authority to interpret the national Agreement and manuals. While regional arbitrators do not always restrain themselves from doing so, the limitation on their powers means at least that their interpretations carry less weight."); Case No. E95R-4E-D 01027978 from Arbitrator Dana Edward Eischen (2002) (Exhibit H) ("National Arbitration under the [CBA] represents a ruling by the Parties' designated "Supreme Court".)

14.     The NALC has recognized the primacy of national awards and has advanced arguments at the national level embracing the supremacy of national awards. *See* consolidated Case Nos. H7V-1K-C 31669, H7V-3S-C 40533, H7V-1K-C 37022, HOV-3E-C 3100, H7V-1N-C 33344 from Arbitrator Carlton Snow (1994) (Exhibit I) ("Because regional arbitration awards are not binding at the national level and national level arbitration awards are binding at the regional level, the National Association of Letter Carriers argues that the present dispute is a legitimate, undecided conflict involving the meaning of specific language in the agreement.").

15.     Regional awards are not precedential but may be cited for purposes of persuasion.

16.     Pre-arbitral Step B decisions are not precedential outside the installation from which the grievance arose. *See* Exhibit J, USPS/NALC Joint Contract Administration Manual.

17.     The Step B process is intended to resolve grievances before they are scheduled for arbitration, conserving resources of both parties and promoting management-union harmony. As such, the parties routinely settle disputes for relatively nominal amounts, even where the merits of the claims are disputed.

18.     Since July 10, 2018, the parties have agreed that Step B teams are prohibited from

citing/quoting regional awards in any Step B decision, unless the award is from the installation

where the grievance arose and is relevant to the subject matter at issue. *See* Exhibit K,

Memorandum of Understanding Re: Article 15 – Dispute Resolution Procedure Task Force.

        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing

Declaration is true and correct.  Executed in Powell, Ohio 43065.


_March 06, 2020_
Date

_Richard Acker_
Richard Acker

# EXHIBIT A

**REGULAR ARBITRATION**

|  |  |  |
|---|---|---|
| In the Matter of Arbitration | * | |
| | * | |
| | ● | Letica Thomas |
| Between | * | |
| | * | |
| United States Postal Service | * | Stewart Station |
| | * | |
| And | * | USPS Case No. K16N-4K-C 17664487 |
| | * | |
| National Association of Letter | * | NALC Case No.  DRT# 13-422918 |
| Carriers, AFL-CIO | * | |
| | * | |

RECEIVED SEP 2 7 2018 HQ LR SYSTEMS

APPEARANCES:

Postal Service Advocate:        Yvette Johnson

NALC Advocate:                Walter Brummage

Technical Assistant:            Jeannine Gasper

Place of Hearing:  Richmond P & DC

Date of Hearing:  July 25, 2018

## AWARD SUMMARY

The grievance is partially sustained and partially denied.  The Grievant shall receive a lump sum payment of $2,700 for the 9 - month delay implementing her route adjustment and 8 hours pay at the straight time rate for representational activities performed off-the-clock. The Union's request for a $100 payment to be made to Branch 496 is denied.

Date of Award: 9/25/2018

David A. Stanton, Arbitrator

## INTRODUCTION

This grievance arose under the 2016 National Agreement between the United States Postal Service (USPS or Postal Service) and the National Association of Letter Carriers, AFL-CIO (NALC or Union). Specifically, NALC Branch 496 filed Grievance Number: K16N-4K-C 17664487 (DRT 13-422918) alleging Management violated Articles 15, 17, 19, and 31 of the National Agreement by failing to implement a route adjustment for Letica Thomas and failing to provide steward time or respond to Union information requests. The grievance, not being resolved at the earlier steps of the grievance procedure, was presented to the Arbitrator at 9:00 a.m. on July 25, 2018, at the Richmond P&DC, 1801 Brook Road, Richmond, VA 23232. The parties had a full and fair opportunity to present argument and evidence; to engage in the examination and cross-examination of witnesses; and to present any and all arguments in support of their respective positions. The Union gave an oral closing statement while the Postal Service chose to file a post-hearing brief. The post-hearing brief was timely received on August 24, 2018, and the record was closed at that time.

## ISSUE

The parties agreed to adopt the issue statement as presented in the Step B decision dated February 22, 2018.

Did Management violate including but not limited to Article 19 (via M-39 Chapter 2, M-41 Chapter 9) of the National Agreement when management failed to provide the grievant permanent relief assigned to route 21006 in accordance with route adjustment? And if so, what is the appropriate remedy?

Did Management violate including but not limited to Article 17 and 31 when they failed to provide the Union with requested information and paid steward time on the clock to process this grievance? And if so, what is the appropriate remedy?

## EXHIBITS INTRODUCED

Joint 1:      2016 - 2019 National Agreement – NALC and USPS

Joint 2:      JCAM

2

Joint 3      Moving Papers

U-1      USPS/NALC DRP Joint Q & As

U-2      Arbitration decision Case No. N8-W-0406, Mittenthal, September 21,1981

U-3      JCAM excerpt (July 2014) p. 15-5

U-4      Arbitration decision Case No.K11N-4K-C 17310015, Roberts, May 13, 2017

U-5      Arbitration decision Case No. K11N-4K-C 13374003, Roberts, June 29, 2014

M-1      TACS records Letica Thomas


## APPLICABLE NATIONAL AGREEMENT PROVISIONS

### Article 15.2.   Grievance Procedure – Steps

#### Informal Step A

(a) Any employee who feels aggrieved must discuss the grievance with the employee's immediate supervisor within fourteen (14) days of the date on which the employee or the Union first learned or may reasonably have been expected to have learned of its cause.  This constitutes the Informal Step A filing date.

(c) If no resolution is reached as a result of such discussion, the Union shall be entitled to file a written appeal to Formal Step A of the grievance procedure within seven (7) days of the date of the discussion……….

#### Formal Step A

(c ) The Installation head or designee will meet with the steward or a union representative as expeditiously as possible, but no later than seven (7) days following receipt of the Joint Step A Grievance Form unless the parties agree upon a later date.

(d) At the meeting the Union representative shall make a full and detailed statement of facts relied upon, contractual provisions involved, and remedy sought.  The Union representative may also furnish written statements from witnesses or other individuals.  The Employer representative shall also make a full and detailed statement of facts and contractual provisions relied upon.  The parties' representatives shall cooperate fully in the effort to develop all necessary facts, including the exchange of copies of all relevant papers or documents in accordance with Articles 17 and 31………

### Article 15.3.  Grievance Procedure - General

(A). The parties expect that good faith observance, by their respective representatives, of the principles and procedures set forth above will result in resolution of substantially all grievances initiated hereunder at the lowest possible step and recognize their obligation to achieve that end.  At each step of the process the parties are required to jointly review the Joint Contract Administration Manual (JCAM).

## Article 17    Section 3. Rights of Stewards

When it is necessary for a steward to leave his/her work area to investigate and adjust grievances or to investigate a specific problem to determine whether to file a grievance, the steward shall request permission from the immediate supervisor and such request shall not be unreasonably denied.

## Article 31    Section 3. Information

The Employer will make available for inspection by the Union all relevant information necessary for collective bargaining or the enforcement, administration or interpretation of this Agreement, including information necessary to determine whether to file or to continue the processing of a grievance under this Agreement.......

## M-39    243.21 Routes of More than 8 Hours

If, after correcting improper practices, a route still shows a total daily time consistently in excess of 8 hours on most days of the week, plan to provide permanent relief by transferring the workload or providing temporary relief on heavy days, as follows:

- a. Temporary relief must be provided in the most efficient and economical manner, either by using auxiliary assistance in the office or on the street or by authorizing necessary overtime.
- b. Permanent relief may be provided by reducing carrier office or street time.  Consider items such as additional segmentations, use of routers, hand-offs, relocating vehicle parking, withdrawal of mail by clerks or mail handlers, providing a cart system for accountable times, etc....

   If a hand-off is the method selected for providing relief on the street, the time value associated with the delivery of the hand-off must be deducted from the route getting relief and transferred to the gaining route.

## BACKGROUND

Letica Thomas is a Letter Carrier at Richmond's Stewart Station and has been employed by the Postal Service for seven years.  Ms. Thomas carries Route 21006 at the Stewart Station. Thomas asserted that her route consistently required more than 8 hours to complete and requested a special route inspection. The route was assessed from June 13, 2017 to June 20, 2017.  The assessment established that Ms. Thomas' route was in fact overburdened by 1 hour and 4 minutes.  The corrective action chosen by Management was to hand off 1 hour and 4 minutes of street delivery to West End Auxiliary Route 2016.  The adjustment was to take place on August 5, 2017.

Ms. Thomas also serves as the Union steward at the Stewart Station.  Ms. Thomas filed a grievance on August 8, 2017, protesting that the route adjustment was not being implemented.

4

Thomas initiated an information request for 7 information items related to the grievance on August 9, 2017. The information request was annotated "refused to sign" and "failed to provide information." Jt. 3, p.35.

The Grievant also submitted requests for Union time to allow her to process the grievance on:

8/9/2018    8 hours
8/10/2018   8 hours
8/14/2018   6 hours
8/15/2018   6 hours
8/16/2018   6 hours
8/17/2018   6 hours
8/25/208    8 hours

Jt. 3, pp. 37 – 43

None of the requests were signed or acknowledged by a management representative.


In this grievance Ms. Thomas alleges three specific violations of the National Agreement by the Employer. All of the allegations are personal to Ms. Thomas. One complaint concerns her work as a Letter Carrier while two others involve her representational activities as a Union steward. Specifically, Ms. Thomas complains of:

1. Failure to timely implement the findings of a special route inspection.
2. Failure to respond to Union information requests.
3. Failure to grant steward time on the clock to undertake representational activities.

Ms. Thomas further testified that her route remained out-of-adjustment until April 2018. Between August 2017 and April 2018 Ms. Thomas regularly worked overtime even though she was not on the overtime desired list. Ms. Thomas was not on the overtime desired list because she did not want to work overtime.

Ms. Thomas further asserts that her requests for steward time were regularly denied and this required her to work at home off-the-clock to carry out her representational activities. In addition, Ms. Thomas testified that requests for information were routinely ignored which made her job as steward even more difficult. Finally, Ms. Thomas argued that a dual standard exists in the office. Letter Carriers were always expected to obey every rule while Management could ignore them whenever they liked and without any repercussions.

## POSITION OF THE UNION

The Union relies upon two primary theories in support of its position in this matter.  One line of argument is that Management's failure to participate in the Informal A and Formal A steps of the grievance process require that the grievance be sustained without consideration of the merits. Alternatively, the Union argues that Management's violation of Articles 17 and 31 of the National Agreement result in fatal due process errors that require the grievance to be sustained in its entirety.

Thelma Hunt, President Branch 496, was the Union's Formal Step A representative in this matter.  Hunt testified that she met with Postal Service representative Lewis Hackett on October 31, 2017.  She stated that Hackett provided no contentions and simply said "send it up." The Union argues that the grievance must be sustained without consideration of the merits because Management did not raise any contentions at Informal A or Formal A.

The Union further argues that any contentions by Management in the Step B decision in this case should be ignored, because no contentions were made at Informal A or Formal A.  In support of this position, the Union relies upon a variety of sources:

1. USPS/NALC Dispute Resolution Process Joint Questions and Answers.[1]  Specifically, the Union points to questions 31 and 32 on the document which provide:

   31.  Should the DRT make a decision based on the case file as received, or should they remand if information is missing:  The Step B team is not responsible for building the file and are not to go into the field for that purpose.  If a file lack proper documentation, the grievance should be remanded to the local level, or the parties should jointly call the local parties, with instructions concerning needed documentation and a timeframe for response.

   32.  Can new evidence/arguments be presented at a later step?  The contract language in this area has not changed.

2. The Union further asserts that a National Level Award by Arbitrator Richard Mittenthal supports its position.[2]  In the decision Mittenthal stated:

   Article XV describes in great detail what is expected of the parties in the grievance procedure. The Postal Service's Step 2 decision must make a "full statement of its "understanding of…the contractual provisions involved."  Its Step 3 decision must include "a statement of any additional…..contentions not previously set forth…"  Its Step 4 decision must contain "an adequate explanation of the reasons therefor."

---

[1] Union Exhibit 1.

[2] Case No. H8-W-0406, Mittenthal, September 21, 1981.

3. The Union relies upon two decisions by Arbitrator Lawrence Roberts. In one case Roberts stated:

The Union introduced a requested remedy at the Formal Step A and it became part of the record. There was no objection raised by the Employer at the Formal Step A. In fact, the Employer failed to make any statement of facts or contractual provisions relied upon. It was the Employer's choice to do so, however, failure to raise any arguments at Formal Step A bars the introduction of any objection or argument beyond that point. And with that said, the Employer waived their right to raise an objection to any argument presented by the Union at arbitration.[3]

The second cited Roberts decision supports the Union's argument even more forcefully.

The language of Article 15.3.b. simply moves the grievance forward should the Employer fail to participate in any of the Steps, including Formal Step A. However, the failure by the Employer to participate in that Formal Step A also bars them from presenting any future argument or contention in that Article 15 process. And to some degree, I would hope this would encourage Employer participation. I have yet to experience a matter wherein the Employer failed to present Formal Step A arguments and contentions yet remained successful n the final outcome of that particular case.

And in this matter, the Employer's failure to present a Formal Step A argument or contention mutes any argument made by same at arbitration.[4]

4. The Union also provided a series of Step B decisions, all from the Stewart Station in support of its position in this matter. The five decisions are listed below in chronological order. Failure to adhere to the requirements of Article 17 and 31 was the subject matter of the August 30, 2016, Stewart Station, Step B decision. The Union requested a $50 monetary payment for failing to provide the information, but the DRT determined the "request would amount to unjust enrichment" and issued a cease and desist instruction.

In Case No. K11N-4K-C 17091721, the Union alleged Management violated Article 8.5 by forcing non-ODL carriers to work overtime before all available ODL carriers were maximized. In addition, the Union asserted that Management violated Article 15 by failing to meet with the Union at Step A and did not adhere to the requirements of Article 17 and 31.The Union asked for $50 for the Article 8 violation, $50 for the Article 17 and 31 violation and $50 for the Article 15 violation. The December 22, 2016, Step B decision awarded a one-time lump sum payment of $25 and directed Management to meet at all levels of the grievance procedure and to adhere to the provisions of Article 31.

[3] Case No. K11N-4K-C 13374003, Roberts, June 29, 2014.
[4] Case No. K11N-4K-C 17310015, Roberts, May 13, 2017.

7

The Step B decision in Case No. K11N-4K-C 11286501, dated February 8, 2017, addressed, among other things, alleged violations of Article 17 and 31.  The decision found those Article were violated and directed Management to adhere to the provisions.

In Case No. K11N-4K-C 1691562, the Union alleged that Management failed to meet at Informal Step A, failed to utilize all ODL list carriers before mandating non-ODL carriers to work, and failed to respond to information requests, The Union asked for a cease and desist order and for a $100 payment to the Union.  The February 8, 2017, decision resolved the matter by making a one-time $25 payment to the grievant.

Finally, in Case No. K11N-4K-D 17356937 addressed the issue of whether Management violated Articles 15, 16, 17 and 31 by issuing three Letters of Warning and failing to meet at Informal Step A and failing to respond to the Union's properly submitted Request for Information.  The April 12, 2017 decision required Management to set up a Labor Management meeting within 14 days to discuss  to violations and review relevant portions of the JCAM.

The Union argues that staffing problems are not the Union's problem and they don't give Management the right to violate the National Agreement.  The Grievant was entitled to Union time and entitled to information.  "I can't give it to you is not an answer."  The Step B decisions that were introduced demonstrate that Management regularly violates the National Agreement.  As remedy for Management's violations the Union asks the arbitrator for three remedies:

1. A lump sum payment of $2,700 to the Grievant.  The payment is $10 a day for the 9 months Grievant was forced to work overtime on her route because Management failed to implement her 1.04 per day route reduction.
2. 15 hours of pay to the Grievant at the overtime rate for steward work performed off-the-clock because Management wouldn't release her from Letter Carrier duties.
3. Branch 496 compensated $100.

## POSITION OF THE POSTAL SERVICE

Management acknowledges that Route 21006 in the Stewart Station and Routes 3001, 3003, and 3007 in the West End Zone which each determined to be longer than 8 hours.  In addition, the Grievant testified that the comparator routes 3001, 3003, and 3007 were given relief while she was consistently forced to carry her overage.  Mr. Eddie Smith, Supervisor Customer

8

Service, testified that the Grievant was not singled out and that each of the comparator routes, as well as routes throughout the city, were working many additional hours due to inadequate staffing. According to Smith: "No one went home at the end of their eight (8) hour day; it was incumbent on each body to share the load and all did so." Smith elaborated that due to the dire circumstances, there was no relief available across the entire city of Richmond and <u>all</u> (emphasis added) routes were on the street until between 9 p.m. and midnight on a regular basis. Smith acknowledged that the understaffing continued for months. Smith testified that he constantly made requests for additional carriers to assist his unit but there was no help available. Smith also asserted that Grievant was given relief on occasion as circumstances allowed.

Management also argues that complaints by the Union regarding violations of Article 17 and 31 have not been proved by a preponderance of evidence. The Postal Service concedes the Union has presented many documents as part of Joint Exhibit 2, but some are duplicate and many lack date stamps or supervisor signatures to establish their authenticity. Mr. Smith testified that it is his practice to sign and date all information requests that are submitted to him. If there is no signature on the form, he didn't receive it.

Management also questions whether Grievant's steward time requests were actually submitted to Management. The requests were not signed, or date stamped by Supervisors as would be the normal practice. It was also noted the management representative at Step B questioned the validity of steward time requests. In addition, Management questions how the Grievant could work a 12- hour day, commute home, and then work on grievances for 8 hours, and do so with significant regularity. Moreover, why would so many hours be needed to perform the necessary work? Each of these inconsistencies cast a pall in the integrity of the documents in this grievance. The Union has fallen short of meeting its burden of proving by a preponderance of evidence that Articles 15, 17, 19 or 31 have been violated.

## DISCUSSION

The Union preliminarily argues that Management's lack of participation at Informal Step A and Formal Step A forecloses them from making any arguments in this grievance. According to the Union, because there were no Management arguments at Informal A or Formal A there was no entitlement to raise any issues at Step B. Moreover, by not providing any contrary evidence, the Union has already met its burden of proof in this case and the Union's position must be

9

accepted as true.  In fact, the Union asserts, the Step B decision in this case should be ignored.  In support of it position the Union cites a Mittenthal national level arbitration case and two Regular arbitration decisions by Arbitrator Lawrence Roberts.

The previously discussed Mittenthal decision sheds little light on the instant matter.  The case stands for the proposition that new arguments cannot be raised for the first time at arbitration.  Union Ex. 1.  I am unaware of any arguments being raised for the first at the arbitration hearing in this matter.  The decisions by Arbitrator Roberts do support the Union's position in this case, but I struggle to embrace Robert's interpretation of the parties' grievance procedure.  I also note that no other arbitration decisions were introduced to support the interpretation.

Step B is an integral part of the grievance procedure and the Step B representatives have authority to add to or revise the record developed at Informal A and Formal A.  Article 15.2 Step B (c) of the National Agreement provides in part:

> **Review.**  The Step B representatives work together in pairs and attempt to resolve grievances jointly.  Both Step B representatives are responsible for ensuring that the facts and contentions of grievances are fully developed.  The Step B representatives may restate or change a grievance's issue statement as appropriate.  The Step B teams must give priority to considering and deciding removal cases.
>
> **Impasse.**  If the Dispute Resolution Team cannot resolve a grievance it issues a Step B decision called an "impasse."  A Step B impasse decision must state in detail the reasons for the impasse, and must also include a statement of any additional facts and contentions not included in the Formal Step A appeal.

This language clearly evidences the Step B Team is an active participant in the development of the case file and not exclusively confined to what might have happened at an earlier Step of the grievance procedure.  The Step B representatives often have more extensive labor relations training and experience than the parties meeting at Informal A or Formal A.  It makes no contractual or practical sense to completely exclude any input of the Step B team based on what did, or did not, happened at the Informal or Formal Step A process.

The subject matter of this grievance is remedies.  Specifically, what remedy is to be provided, if any, for:

1. The delayed implementation of a route adjustment.
2. The denial of multiple requests for steward time.
3. Whether a local union should be provided with a payment for the inconvenience of having to pursue a grievance.

The third remedy request may be the easiest one to deal with in this case. The Union's request for money to be paid to the labor organization as part of the grievance settlement is asking for a purely punitive remedy. There is no harm to Local 496 in this matter – either monetary or non-monetary. Arbitration precedent for decades has established that purely punitive damages are rarely awarded in arbitration. Awarding punitive damages to a Local Union as opposed to an employee overlays a problem on top of a problem. The Labor Management Relations Act was enacted in 1947. The purpose of the Act was to make unlawful undesirable labor relations practices including employers making payoffs to Unions or Unions demanding payments from employers. Section 302 of the Act makes it unlawful for an employer to "pay, lend, or deliver" money or any "other thing of value" to a labor union or official, or for a union to "request, demand, receive or accept" the same from an employer.[5] Financially, employers and unions are to be kept at arms-length to avoid the possibility of misconduct by either party. The law is poorly defined and the exact extent of its reach unknown. Even if such payments to a union are not unlawful, it still represents the kind of activity the law seeks to prevent and are therefore undesirable.

The Union asks for Steward Thomas to be paid 15 hours at the overtime rate for representational work she performed off-the-clock. This request faces both evidentiary and contractual problems. The grievance in this case was filed on August 8, 2017. Eight hours of steward time was requested on August 9 and 10, followed by 6 hours of steward time requested for August 14, 15, 16, and 17 and then another 8 hours on August 25, 2018. The seven requests seek a total of 48 hours of steward time to process a grievance that was not complex. Moreover, the 8 hours of steward duty were performed at home after working and commuting for up to 12 hours, and the steward work continued for almost a week straight. It would be an incredible act of endurance to undertake such a feat. None of the requests for steward time was signed by a supervisor to either acknowledge receipt of the request or denial. Given the staffing circumstances in the office, I have no doubt a properly made request for steward time would have been denied.

The steward time requests in this case were excessive. At the same time, it's obvious some amount of time was required to prepare the grievance. It's also clear to me that local management viewed its labor relations obligations as an optional event to be observed only when business conditions allow. I am generally loath to award steward pay for time worked off-

---

[5] 29 U.S.C. Section 141 – 147.

11

the-clock because to do so contradicts Article 17.4 of the National Agreement. This is the rare case when I reluctantly do so.

There is uncontroverted testimony that Grievant's route remained overburdened from early August until April. The Employer's response was that the office was terribly short-staffed, everyone was working overtime, the primary responsibility of the office was to deliver the mail daily, and the Grievant was compensated for working overtime. I accept all of those statements as being true, but do not accept them as being adequate excuses for failing provide the Grievant with relief for almost 9 months. The Union has requested a $2,700 lump sum payment for grievant which represented $10 a day for the 9 - month delay. The request is modest, is supported by arbitration precedent, and Management's delay was egregious.

### AWARD

The grievance is partially sustained and partially denied. The Grievant shall receive a lump sum payment of $2,700 for the 9 - month delay implementing her route adjustment and 8 hours pay at the straight time rate for representational activities performed off-the-clock. The Union's request for a $100 payment to be made to Branch 496 is denied.

Date of Award: September 25, 2018

David A. Stanton, Arbitrator

12

# EXHIBIT B

USPS 815168

IN THE MATTER OF ARBITRATION )
                              )
        BETWEEN               )
                              )           ANALYSIS AND AWARD
AMERICAN POSTAL WORKERS UNION )
                              )             CARLTON J. SNOW
        AND                   )               Arbitrator
                              )
UNITED STATES POSTAL SERVICE  )
   (Case No. W1C-5F-C 4734)   )
     (Local Grievance         )

**RECEIVED**

SEP 1 1 1987

Grievance and Arbit...
  Labor Relations Department

I.   INTRODUCTION

        This matter came for hearing pursuant to a collective
bargaining agreement between the parties effective dur-
ing 1982.   A hearing occurred on June 2, 1987 at the
postal facility located on 1135 Broadway Northeast in
Albuquerque, New Mexico.   Mr. Leo Gutierrez, Manager of
Labor Relations, represented the United States Postal
Service.   Mr. Leon E. Garcia, Executive Vice-president,
represented the American Postal Workers Union.

        The parties had scheduled nine cases to be heard by
the arbitrator.   Four cases actually went to hearing and
have been decided by the arbitrator.   These were Case No.
W1C-5F-C 4734, Case No. W1C-5F-C 7466, Case No. W4C-5S-C 31665
(Turner Grievance), and Case No. W4C-5S-C 36083.   The par-
ties reached a settlement prior to the hearing with regard
to Case No. W4C-5F-C 4081.   The parties were in dispute
at this hearing with regard to whether a second case, Case
No. W1C-5F-C 8194, had been settled, and the arbitrator

did not hear the case.  At this hearing, the Union withdrew
Case No. W4C-5S-C 35406 without prejudice.  The arbitrator
did not hear Case No. W4C-5S-C 36472 nor Case No.
W4C-5S-C 36843.

The hearing proceeded in an orderly manner.  There
was a full opportunity for the parties to submit evidence,
to examine and cross-examine witnesses, and to argue the
matter.  All witnesses testified under oath as administered
by the arbitrator.  The arbitrator tape-recorded the pro-
ceeding as an extension of his personal notes.  The advocates
fully and fairly represented their respective parties.

There were no challenges to the substantive or proced-
ural arbitrability of the dispute, and the parties stipulated
that this case properly had been submitted to arbitration.
The parties authorized the arbitrator to retain jurisdiction
in the matter for ninety days after issuance of a report.
The parties submitted the matter on the basis of evidence
presented at the hearing and oral closing arguments.

II.   STATEMENT OF THE ISSUE

The issue before the arbitrator is as follows:

Did the Employer violate the parties' National Agreement by not notifying the Union fourteen days prior to implementing a permanent change in the reporting time of an entire section?  If so, what is an appropriate remedy?

III.   RELEVANT CONTRACTUAL PROVISIONS

3

ARTICLE 19 - HANDBOOKS AND MANUALS

Those parts of all handbooks, manuals and published
regulations of the Postal Service, that directly
relate to wages, hours or working conditions, as
they apply to employees covered by this Agreement,
shall contain nothing tghat conflicts with this Agree-
ment, and shall be continued in effect except that
the Employer shall have the right to make changes
that are not inconsistent with this Agreement and
that are fair, reasonable, and equitable.  This
includes, but is not limited to, the Postal SWervice
Manual and the F-21 Timekeeper's Instructions.

ARTICLE 30 - LOCAL IMPLEMENTATION

    A.  Presently effective local memoranda of
understanding not inconsistent or in conflict with
the **1981** National Agreement shall remain in effect
during the term of this Agreement unless changed by
mmutual agreement pursuant to the local implementa-
tion procedure set forth below.

    B.  There shall be a 30-day period of local
implementation to commence October 1, <u>1981</u> on the
22 specific items enumerated below, provided that
no local memorandum of understanding may be incon-
sistent with or vary the terms of the <u>1981</u> National
Agreement:
        . . . .
    21.  Those other items which are subject to
         local negotiations as provided in the
         craft provisions of this Agreement.

ARTICLE 37 - CLERK CRAFT

Section 3.  <u>Posting and Bidding</u>

A.  Newly established and vacant clerk craft duty
assignments shall be posted as follows:

    5.  The determination of what constitutes a
        sufficient change in starting time of a
        duty assignment to cause the assignment
        to be reposted is negotiable at the local
        level, provided:

        a.  No assignment will be reposted when
            the change in starting time is one
            hour or less;

4

IV.  STATEMENT OF FACTS

In this case, the Union has challenged the Employer's failure to give the Union fourteen days of advance notice about an impending change in the reporting time of an entire section of employes.  Events giving rise to this grievance occurred in 1982 or earlier.  Consequently, documentary evidence about the matter has been scant.  There were some facts, however, about which the parties were not in dispute.

On April 17, 1982, the Employer made a permanent change in the reporting time of approximately 158 employes in the Clerk craft.  Their "reporting hours were changed from 2300 to 2200."  (See, Joint Exhibit No. 2(C).  The Employer gave the Albuquerque local no more than three days of notice about the impending change.  Whether this was the only instance of this type of occurrence has been disputed by the parties.

The Employee and Labor Relations Manual, in Section 434.6, provides for an "out of schedule premium" to be paid to eligible full-time bargaining unit members who work outside and instead of their regularly scheduled work days or work weeks.  An employe is paid an out-of-schedule premium when  notice of the temporary schedule change is given to the employee by Wednesday of the preceding service week.   (See, Joint Exhibit No. 3).  The parties did not submit evidence regarding how many of the 150 employees affected by management's change in reporting time on April 17, 1982, held the status of full-time regular employes.  It is also unclear how many, if any, of the affected employes failed to receive timely notification

5

of the change in their reporting times.  The parties agreed
that the Employer had violated the collective bargaining
agreement, but they were unable to agree on an appropriate
remedy for the violation.  When they were unable to resolve
their differences, the matter proceeded to arbitration.


V.   POSITION OF THE PARTIES:

   A.   The Union:

   The Union contends that the Employer violated the Local
Memorandum of Understanding when it failed to give the Union
fourteen days of notice about an impending change in the
reporting time of an entire section of employes to take effect
on April 17, 1982.  The Union argues that the appropriate
remedy for this violation is to require the Employer to pay
one hour of out-of-schedule premium to all employes affected
by management's change in their reporting time on April 17,
1982, from that date until the grievance is resolved.  It is
the belief of the Union that this is an appropriate remedy
for several reasons.

   First, the Union contends that a violation of the Union's
rights constitutes a violation of the rights of all employes.
The Union notes that Section 434.6 of the Employee and Labor
Relations Manual provides for an out-of-schedule premium to
be paid employes who are required to work hours outside of
and instead of their regular shift.  Accordingly, the Union

6

maintains that it is logical to treat the Employer's failure to notify the Union as an effective failure to allow employes to work their regular schedules.

Moreover, the Union suggests that, in some cases, the Employer has failed to give individual employes timely notification of an impending change in their reporting time. Under those circumstances, the Union argues that the collective bargaining agreement between the parties mandates payment of out-of-schedule pay.

Even if the parties' agreement does not require this remedy, the Union maintains that the arbitrator has authority to fashion any remedy which is appropriate.  In this case, the Union argues that the Employer has violated Article VIII, Section 2.c.a of the Local Memorandum of Understanding and has done so on a continual basis.  Consequently, the Union contends that requiring the Employer to pay out-of-schedule pay to all affected employes would be an appropriate means for being certain that the Employer adheres to terms of the collective bargaining agreement.

7

B.    The Employer:

The Employer concedes that it failed to give the Union fourteen days of notice of an impending change in an entire section's reporting time on April 17, 1982.  The Employer contends, however, that paying all affected employes an out-of-schedule premium is an inappropriate remedy for this contractual violation.

It is the position of the Employer that it violated only the contractual rights of the Union.  Management denies that any individual employes failed to receive timely notification of the impending schedule change.  Section 434.6 of the Employee and Labor Relations Manual allegedly cannot be used to remedy the Union's harm because, according to the Employer, it only provides an entitlement to employes for the inconvenience they incur as a result of a temporary schedule change. That provision does not entitle employes to a premium for management's failure to notify the Union of upcoming schedule changes, according to the Employer.  Even if Section 434.6 of the Employee and Labor Relations Manual were applicable, the Employer maintains that the remedy requested by the Union fails to differentiate between full-time regular employes (who are eligible for out-of-schedule pay), and part-time flexible employes (who are not).

8

VI.   ANALYSIS

In this case, the parties have stipulated that the Employer failed to notify the Union at least fourteen days prior to changing the reporting time of a section of employes.  The parties also have agreed that this failure violated Article VIII, Section 2.c.a of the Local Memorandum of Understanding. They have disagreed vigorously with regard to the appropriate remedy for this violation.

The Union has argued that the Employer should be required to pay all affected employes an hour of out-of-schedule premium pay from the date of the change in reporting time until the effective settlement of this grievance.  According to the Union, such a result has been dictated by the parties' collective bargaining agreement.  The Union has relied on Article VIII, Section 2.c.a.  That clause provides:

> Changes in Reporting Time
>
> 1.   When permanent changes in the reporting time of entire units, sections, or tours are contemplated by management, Albuquerque Local APWU shall be consulted 14 days prior to implementation.
>
> 2.   Duty assignments changed in starting time by more than one (1) hour shall be reposted for bid. (See, Joint Exhibit No. 2(E)).

Additionally, Article 19 of the parties' agreement has given effect to those parts of Handbooks and Manuals relating to wages, hours, or working conditions.  Thus, the agreement of the parties has incorporated Section 434.6 of the Employee and Labor Relations Manual.  Section 434.611 states:

> 'Out-of-schedule' premium is paid to an eligible full-time bargaining unit employee for time worked outside of, and instead of, the employee's regularly

9

scheduled work day or work week when the employe
is working on a temporary schedule at the request
of management, provided that notice of the temporary
schedule change is given to the employe by Wednesday
of the preceding service week.  (See, Joint Exhibit
No. 3).

The Union represents all bargaining unit members in this
case.  Accordingly, the Union has reasoned that, by failing to
provide notice to the Union, management violated the rights
of all individuals affected by the change in reporting time.
The Union has noted that the Employee and Labor Relations
Manual includes a provision for out-of-schedule premium for
employes who work outside of and instead of their regular
work days.  It is the position of the Union that the employes
whose schedules were changed without proper Union notifica-
tion  effectively worked "out-of-schedule."  Consequently,
it is the belief of the Union that out-of-schedule pay is an
appropriate remedy for management's violation of the rights
of its employes.

The Union, however, failed to be persuasive with this
theory on several bases.  First, the Union failed adequately
to distinguish between rights of the Union and rights of indi-
vidual employes.  Were the Union's theory of the case to be
accepted, the Employer could satisfy its obligation to notify
the Union of an upcoming change in a section's reporting
time simply by giving notice to all individual bargaining
unit members fourteen days in advance.  The Union and indi-
vidual employes, however, are not synonymous.  Article VIII,
Section 2.c.a gives only the Union a right to such notifica-
tion.  Section 434.6 of the Employee and Labor Relations

10

Manual has provided out-of-schedule pay to individual employes only in specified circumstances. This provision does not require out-of-schedule pay in this case when only the Union's rights have been violated.

It is arguable that Section 434.6 of the Employee and Labor Relations Manual would apply if management had abridged the rights not only of the Union but also of specific employes as well. The arbitrator, however, failed to receive evidence that showed this to be the case. At one point in the arbitration hearing, Mr. Garcia, president of the Albuquerque APWU Local in 1982, testified that he knew of two employes who had not been notified of the scheduled change. At the same time, the Union stated in its opening statement that all affected clerks had received appropriate notification of their transfers. Additionally, in his own testimony, Mr. Garcia stated that all employes were notified of the impending schedule change. The point is that the evidence failed adequately to support a finding that management did not give individual employes the notice to which they enjoyed a contractual entitlement.

Nor did the Employer violate rights of individual employes under Article VIII, Section 2.c.a.2 of the Local Memorandum of Understanding. It is undisputed in the case that the Employer did not change the starting times of employes by more than one hour. Consequently, management had no obligation to repost duty assignments for those employes.

Circumstances under which Section 434.6 of the Employee

11

and Labor Relations Manual calls for out-of-schedule pay for employes failed to be established in this case.  The requirements of the section are clear.  It provides that an employe may receive out-of-schedule pay only when he or she actually works substituted hours at the request of management, provided the employe has received timely notification of the temporary schedule change.  In this case, affected employes did not work out-of-schedule hours.  Rather, management made a permanent change in their starting time.  Once that change had been accomplished, the employes worked their regular shift.

Section 434.6 of the Employee and Labor Relations Manual provides out-of-schedule pay only for full-time regular employes.  The Union's proposed remedy made no differentiation between part-time flexible employes and full-time regular employes who may have been affected by the change in reporting time which occurred on April 17, 1982.  Consequently, the remedy requested by the Union failed to flow directly from the requirements of Section 434.6 of the Employee and Labor Relations Manual.  The point is that the Union failed to show its proposed remedy is required by any specific term of the collective bargaining agreement or the Employee and Labor Relations Manual.

The Union has also argued that awarding out-of-schedule pay is within an arbitrator's authority.  It is the contention of the Union that the Employer knowingly and repeatedly has violated Article VIII, Section 2.c.a of the Local Memorandum of Understanding.  It is the position of the Union

12

that an award of out-of-schedule pay to all employes affected
by the change in reporting time would serve to deter the
Employer from an improper practice and to make management
realize that it must adhere to provisions of the parties'
agreement.

It is recognized that arbitrators possess reasonably
broad power to fashion an effective remedy.  As the U.S.
Supreme Court has stated:

> When an arbitrator is commissioned to interpret
> and apply the collective bargaining agreement,
> he is to bring his informed judgment to bear
> in order to reach a fair solution of the prob-
> lem.  This is especially true when it comes
> to formulating remedy.  There the need is for
> flexibility in meeting a wide variety of situa-
> tions.  The draftsman may never have thought
> of what specific remedy should be awarded to
> meet a particular contingency.  (See, United
> Steelworkers of America v. Enterprise Wheel and
> Car Corp., 363 U.S. 593 (1960)).

In fashioning remedies, however, arbitrators generally
have adhered to the principle that damages should correspond
to the harm suffered.  A deeply rooted principle of measuring
contract damages is that such damages must be based on the
injured party's expectation.  (See, Fuller and Perdue, "The
Reliance Interest in Contract Damages," 46 Yale L.J. 52
(1936)).  The expectation interest of the party in contract
cases generally has been measured by the actual worth that
performance of the agreement would have had for the individual,
and in this case the Union has not demonstrated that any
employe was harmed.  The weight of the evidence makes it
reasonable to conclude that all affected employes received
timely notice.  Moreover, even if one accepted the Union's

13

theory of the case, only full time bargaining unit members would receive out-of-schedule pay, and an award to all employes, including part-time flexible employes, would not conform to the administrative regulation.

It is recognized that some arbitrators have awarded punitive damages when a party's violation of an agreement has been constant and repeated or malicious.  That approach, however, has not been consistent with the common law which has taught that, no matter how reprehensible a breach, punitive damages which were in excess of an injured party's lost expectation generally have not been awarded for a breach of contract.  (See, Judge A. White, Inc., v. Metropolitan Merchandise Mart, 107 A.2d 892 (1954); Den v. Den, 222 A.2d 647 (1966); and White v. Venkowski, 155 N.W.2d 74 (1967)).  As the U.S. Supreme Court has taught, "if the contract is broken, the measure of damages generally is the same, whatever the cause of the breach."  (See, Globe Refining Company v. Landa Cotton Oil Company, 190 U.S. 540, 544 (1903)).

Even if one accepted the teaching of some arbitrators that punitive damages should be awarded when a party's violation has been malicious and persistent, the principle would not be applicable in this particular case.  Mr. Garcia testified that management's failure to notify the Union of upcoming schedule changes had happened too often to be ignored and that further research would bring to light similar violations.  The arbitrator, however, has received evidence only with regard to one violation of Article VIII.  Nor has the

14

arbitrator received any evidence to demonstrate malice on the Employer's part.  In other words, no circumstances showed a basis for awarding punitive damages even if that arbitral principle were followed.

On the other hand, the Union established a violation by management which must be addressed.  The Employer argued that the Local Memorandum of Understanding might be invalid because it was inconsistent with the rest of the Agreement.  The employer contended that Section 434.611 of the Employee and Labor Relations Manual, included in the parties' agreement pursuant to Article 19, gives individual employes a right to notification of schedule changes.  The Memorandum of Understanding gives a similar right to the Union.  The Employer argued that this fact might constitute an inconsistency between terms of the Local Memorandum of Understanding and the remainder of the agreement.

The Employer, however, failed to establish any inconsistency in the provisions that provide the Union and individual employes separate notification rights.  The Employer is obligated to adhere to terms of the Local Memorandum of Understanding.  While no retroactive remedy is appropriate in this case at this time, it is reasonable to require the Employer to cease and desist from any further actions which would violate Article VIII, Section 2.c.a of the parties' Memorandum of Understanding.

AWARD

Having carefully considered all evidence submitted by
the parties concerning this matter, the arbitrator concludes
that the Employer violated Article VIII, Section 2.c.a of the
Local Memorandum of Understanding when it failed to give the
Union fourteen days of notice of an impending change in the
reporting time of an entire section.  Because evidence sub-
mitted by the parties demonstrated only a single violation
of this provision in 1982, no retroactive remedy has been
deemed appropriate.  The Employer, however, must cease and
desist from any further failure to provide the Union with
timely notification of such changes.  The arbitrator shall
retain jurisdiction of this matter for ninety days from the
date of the report in order to resolve any problems resulting
from the remedy in the award.  It is so ordered and awarded.

Respectfully submitted,

Carlton J. Snow
Professor of Law

Date:

**RECEIVED**

SEP 1 1 1987

16

Grievance and Arbitr...
Labor Relations Departm...

# EXHIBIT C

# REGULAR ARBITRATION PANEL

-------------------------------------------------------x

**In the Matter of the Arbitration**

    **between**

**American Postal Workers Union, AFL-CIO**

    **and**

**UNITED STATES POSTAL SERVICE**

-------------------------------------------------------x

**Grievant: Class Action**

**Post Office: San Juan, P.R.**

**Case No.: A98C1AC99270389–991315**

**BEFORE:**   **Irene Donna Thomas, Arbitrator**

**APPEARANCES:**

For the United States Postal Service: Sandra Moya, Labor Relations Specialist
585 Avendia F. D. Roosevelt, San Juan, P.R.  00936-9401

Witnesses:   n/a

For the APWU: Carlos I. Rodriguez, National Business Agent
Reparto Metropolitan Shopping Center, Suite 205
Avenida Americo Miranda, Rio Piedras, P.R.  00921

Witnesses:   n/a

Place of hearing: San Juan, P.R.

Date of hearing: September 22, 2000

Date of award: November 8, 2000

Relevant Contract Provisions: Article 11

Contract Year: 1998 - 2000

## AWARD SUMMARY

**The grievance is denied.  The union has not shouldered its burden of proving that a bona fide "past practice" existed with respect to the working of holiday schedules and even if the employer did violate the national agreement, the union's requested "punitive damages" are improper.**

_____
Irene Donna Thomas, Arbitrator

## INTRODUCTION

Pursuant to the arbitration procedures between the parties, the undersigned was selected to hear and decide the contract dispute described herein and to render a final and binding Opinion and Award. This proceeding involves a claim that the employer violated the national agreement when it asked for volunteers to work on a holiday and subsequently changed the starting and ending times. The dispute being unresolved was submitted by the Union to arbitration.

A one day hearing was held before this arbitrator on September 22, 2000 at the General Mail Facility in San Juan, P.R. The evidence adduced and the positions and arguments set forth at the hearing have been fully considered in preparation and issuance of this Opinion and its accompanying Award. The parties were afforded ample opportunity to present evidence and testimony germane to their position.

## ISSUE

The parties agreed that the issue to be decided is whether the postal service violated the collective bargaining agreement in the way they posted the holiday schedule for September 6, 1999. If so, what shall the remedy be?

## BACKGROUND OF THE CASE

The basic facts of this case are not in dispute. On or about August 1999, management asked for volunteers to work on the Labor Day holiday. Several employees volunteered. On Monday, August 30, 1999, the employer posted the holiday schedule which stated: "The following employees will report to work on Labor Day Holiday on Monday, September 6, 1999 at 08:00." The union complained that the Tour 2 employees who volunteered to work

*Class Action; A98C1AC99270389–991315*
*San Juan, P.R.*                                   2

the holiday were not told of the change of reporting time from their regular schedule to 08:00 A." As a remedy, the union requested that (1) "employees working on holidays shall report as their regular schedule; and (2) "pay 50% premium for each hour work on September 6, 1999 to each employee that worked on Labor Day holiday, 9/6/99."

## DISCUSSION AND ANALYSIS

With respect to holiday schedules, Article 11 of the national agreement provides that "The Employer will determine the number and categories of employees needed for holiday work and a schedule shall be posted as of the Tuesday preceding the service week in which the holiday falls." Article 11.6.A. After careful consideration of the record evidence, I conclude that this grievance must be denied.

I note that the union argued to the Step 2 designee that the employer had failed to provide the holiday lists for the prior year as requested. In the absence of an argument to the contrary by the employer, I find that the employer violated the national agreement and federal law. The union is entitled to an inference in its favor. But, this inference is insufficient to require a finding in its favor.

The language of Article 11.6.A does not limit the employer to posting holiday schedules in accord with an employees present schedule. In its papers, the union provided no argument to suggest that the employer was so limited. In a letter dated September 27, 1999 to the Step 2 designee, the Shop Steward wrote that: "But as per our conversation during our Step 2 meeting, you acknowledge that its been a practice for years to let employees work their holidays on their regular work schedule." However, this does not support the conclusion that the employer and the union had implicitly adopted a "past practice" as known in the labor

*Class Action; A98C1AC99270389–991315*
*San Juan, P.R.*                                      3

arena.  At the arbitration hearing, the union, who bears the burden of proof, simply did not provide evidence to show that a legitimate past practice was accepted between the parties. Thus, there is no contract violation.

Arguably, the union's position may be supported by the fact that employees in a "bid" position, who work on the holiday must be scheduled to work according to their regular work schedule.  But, as this argument was not advanced by the union in the prior proceedings, and, therefore, the employer was not given an opportunity to oppose it.  Even if it were, under the circumstances of this case, the grievance would be denied in any event.  The union's requested remedy is punitive in nature and thus, must be dismissed.  Accordingly,

AWARD

The grievance is denied.  The union has not shouldered its burden of proving that a bona fide "past practice" existed with respect to the working of holiday schedules and even if the employer did violate the national agreement, the union's requested "punitive damages" are improper.

Dated:          New York, New York
                November 8, 2000


Irene Donna Thomas, Arbitrator



*Class Action; A98CIAC99270389-991315*
*San Juan, P.R.*                          4

# EXHIBIT D



## Regular Arbitration Panel

| | | | |
|---|---|---|---|
| **In the Matter of Arbitration** | § | | |
| **Between** | § | **Grievant:** | **Class Action** |
| | § | | |
| **United States Postal Service** | § | **Post Office:** | **Tulsa, Ok** |
| | § | | |
| **And** | § | **USPS Case:** | **G11N-4G-C 15003323** |
| | § | | |
| **National Association of Letter Carriers, AFL-CIO** | § | **NALC Case:** | **1358140645** |

**Before:  Paul Chapdelaine**

**Appearances:**

| | |
|---|---|
| For the Postal Service: | **LeTrecca Wilson** |
| For the Union: | **Sandra Emerson** |
| **Place of Hearing** | **Tulsa, OK** |
| **Date of Hearing:** | **March 24, 2015** |
| **Briefs Received** | **April 8, 2015** |
| **Date of Award:** | **April 28, 2015** |
| **Relevant Provisions** | **Articles 15 and 19** |
| **Contract Year** | **2010 - 2015** |
| **Type of Grievance:** | **Territory Adjustment** |

### Summary of Award

To award the Union's requested monetary remedy in the instant case would be improper under the specific terms of the National Agreement and would exceed this Arbitrator's authority.  If the parties wish to vest its selected arbitrators with the authority to award monetary remedies for contract infractions, that authority must be established through the negotiating process and not through arbitration.  Therefore, notwithstanding the vigorous and skilled arguments advanced by the Union in this case, I find insufficient evidence on the record to sustain the Union's request for monetary damages

Accordingly, the grievance is denied in its entirety.

**Paul Chapdelaine**
**Arbitrator**
**April 28, 2015**

- 1 -

## Issue

The issue to be decided in this arbitration is limited to determining the appropriate remedy to be applied, if any, for Management's failure to complete selected territory adjustments on Tulsa Jenkins Station Routes as directed in the Step B Decisions dated October 1, 2014 and December 9, 2014.

## Background

The Step B Team had first resolved this grievance in their decision dated October 1, 2014. In that decision, it was determined that Management had violated the National Agreement by failing to adjust route 3625 in accordance with the M-39 Handbook. In its detailed decision, the Step B Team ruled as follows:

> **DECISION:** The DRT mutually agrees to **RESOLVE** this grievance by determining management violated the National Agreement. The representative street time selected for city route 3625 will be increased twenty-four minutes (0:24) from 6:08 to 6:32. **A territorial adjustment will be implemented as soon as is practical after receipt of this decision if no other adjustments have been made to this route after May 31, 2014.** (Emphasis added)

The representative street time selected for city route 3625 was subsequently adjusted as directed by Step B decision. However, when the territorial adjustment had not been implemented by Management, the Union submitted the instant appeal dated November 3, 2014 to compel Management to comply with the territorial adjustment as previously directed by the Step B Decision. The Union also requested that the Step B Team address the subject of the appropriate remedy.

The Step B Team reviewed the appeal and agreed that Management had not yet complied with the subject territorial adjustment. However, the Step B Decision stopped short of ordering a remedy in pertinent part as follows:

> **ISSUE:**
>
> Did Management violate Article 15 of the National Agreement by failing to comply with Dispute Resolution Team decisions (14-400, 14-399, 14-44-2 and 14-431)? If so, what is the appropriate remedy?
>
> **DECISION:**
>
> The Dispute Resolution Team has decided to resolve this grievance in part and impasse in part.

**Resolve:**

The Dispute Resolution Team agrees Management violated Article 15 of the National Agreement when they failed to implement territory adjustments on routes 3642, 3603, 3624 and 3625 in accordance within the parameters set forth in the Step B Decisions. Management is reminded that compliance with Step B Decisions is not optional.

**Impasse:**

The Dispute Resolution Team agrees the only remaining issue in this impasse is that of remedy for the Article 15.3 violation. The NALC National Business Agent may appeal this grievance to arbitration within fourteen (14) days after receipt of this joint report. The Step B Team has considered all arguments and evidence in the case file and any of this material may be cited in the event of arbitration.

**EXPLANATION:**

DRT decisions 14-400, 14-399, 14-401, 14-402 and 14-431 ruled that a violation of Handbook 39 was substantiated and territory adjustments were to be executed no later than October 4, 2014. The territory adjustments have not been made by Management.

The Formal Step A parties agreed to the following undisputed facts:

- Territory on Routes 3642, 3603, 3624 and 3625 had not been adjusted.
- 3626 was abolished.
- 3632 is an auxiliary route approximately 4 ½ hours.
- No PS Form 2608.
- City Delivery Route Alternative Adjustment process was signed on 9-23-14.
- The last two DRT decisions on the route adjustment were not received until 10-6-14 grievance 14-389 and 14-397.

**DRT - RESOLVE:**

After careful consideration of all evidence and arguments presented in the grievance file, the Step B team agrees to resolve this grievance in part.

While there were several decisions in which Management failed to comply, the Step B team will only refer to one such decision in this forum to minimize repetition as each contained similar language. In the resolution of DRT #14-400 (GATS 011N-4G-C 14192610, Local #1358-14-0386) which was rendered on August 26, 2014, the Step B team agreed to the following language (page 10):

> The Dispute Resolution Team has decided to resolve this grievance. A violation of §242 of Handbook M-39 was substantiated when Management failed to include auxiliary street assistance documented on the 8 week Carrier Time Card Analysis and also when they reduced the street time selected from PS Form 1840B. The street time selected for city route 3603 will be increased thirty-four minutes (0:34). **Territory adjustments necessary to execute this decision should be implemented as soon as possible but no later than Saturday, October 4, 2014.** Emphasis added)

The above language is clear and unambiguous when it states "Territory adjustments necessary to execute this decision should be implemented as soon as possible but, no later than Saturday, October 4, 2014." The file is devoid any evidence Management acted with

any degree of immediacy.   The first communication related to the aforementioned adjustments was an email dated October 2, 2014, from Area Manager of Labor Relations to the National Business Agent which stated (page 83):

> The attached decision needs to go into effect on 10/4/14.   With the Route Adjustment MOU being signed on 9/23 does this change anything? Wouldn't it be better if the NALC selected this entire zone for evaluation under the MOU on 11/3/14?
>
> Either way is fine by me. I just need to know what to tell the district.

The NBA replied on October 6, 2014, with the following (page 83):

> I have spoken with the powers in DC and they said the adjustments should go ahead and take place. Thanks...

It is undisputed that the adjustments have not taken place as of the date the instant grievance was appealed.   The only changes that have occurred so far have been to the base street time associated with the routes in question.   Clearly, this is not what was intended when the Step B team rendered their decisions.   Additionally, with the exception of DRT grievances 14-389 and 14-397, each of the other decisions was rendered and dispensed to the applicable parties in late August giving local Management enough time to implement adjustments by the October 4, 2014 deadline.   The Step B team notes that DRT cases 14-389 and 14-397 were not specifically addressed in the Union's issue statement.

Management's Formal Step A representative is well aware of the time necessary to implement adjustments and contended (page 87):

> The route adjustment process takes 3-5 weeks to process.  This includes moving the territory, working on new line of travel, time for AMS to process the adjustment and set up the effective date...

Given that Management is aware of the time needed to implement adjustments, the Step B team was disappointed that they delayed implementation.   The first four decisions were rendered in August giving Management five weeks to enact territory adjustments. According to Management's own contentions, any delay would have made the October 4th implementation date unobtainable.

Additionally, the CDRAA agreement was not signed until September 23, 2014 and would only be applicable in this case had the parties agreed to utilize it.  In this case, the email from the Southern Area to the NBA's office established that said parties agreed the adjustments should take place as ordered in the aforementioned Step B Decisions.

Article 15.3.A of the National Agreement provides:

> A. The parties expect that good faith observance, by their respective representatives, of the principles and procedures set forth above will result in resolution of substantially all grievances initiated hereunder at the lowest possible step and recognize their obligation to achieve that end.  At each step of the process the parties are required to jointly review the Joint Contract Administration Manual (JCAM).

The Step B team refers to M-1517 written by current Postmaster General Patrick Donahoe

which states, in part:

> Compliance with arbitration awards and grievance settlements is not optional. No
> manager or supervisor has the authority to ignore or override an arbitrator's award
> or a signed grievance settlement. Steps to comply with arbitration awards and
> grievance settlements should be taken in a timely manner to avoid the perception of
> non-compliance, and those steps should be documented.

In closing, Step B team agrees Management violated Article 15 of the National Agreement
when they failed to implement territory adjustments on routes 3642, 3603, 3624 and 2625 in
accordance within the parameters set forth in the Step B Decisions.   Management is
reminded that compliance with Step B Decisions is not optional.

With this, the Step B team considers this portion of the grievance resolved.

**IMPASSE:**

As previously stated, **the only remaining issue is that of remedy for the Article 15
violation**. (emphasis added)

When Management again failed to comply with the designated territory adjustment provided in
the Step B Decision dated December 9, 2014, the matter was advanced to arbitration for final and
binding resolution regarding the sole issue of the appropriate remedy to be assessed. During the
arbitration hearing conducted on March 24, 2015, the appeal was fully and fairly represented by
the National Association of Letter Carriers, AFL-CIO ("Union"). Both the Service and the
Union presented documentary evidence and sworn testimony in support of their respective
positions. At the conclusion of the hearing the Union presented an oral closing argument in
support of the Union's position, while the Service elected to submit a post-hearing brief. Upon
receipt of said brief from the Service on April 8, 2015, the record was closed.

## Position of the Union

The Union made the following assertions:

- The Step B Team had reviewed the Union's grievance and determined that the Service
  had violated Article 15 of the National Agreement when territory adjustments had not
  been made.
- The Step B Decision directed that route adjustments should be completed by October 4,
  2014.
- Although the street time had been adjusted for the subject routes, the territory
  adjustments had not been made by the October 4, 2014 deadline.
- Territory adjustments have still not been completed as directed by the Step B Decision.
- Compliance with Step B Decisions is mandatory and Management has failed to comply
  with the subject Step B decision.

In view of the above, the Union insisted that the affected city carriers should be paid $10 per day
from October 4, 2014 until the territory adjustments have been completed for the affected routes.

## Position of the Service

The Service made the following assertions:

- Management's failure to implement the Step B Decision was caused by a number of complicating factors.
- Although the Union contended that the failure to implement the Step B Decision was malicious and willful, no such determination was found by the Step B Team.
- The street time adjustments had been made to the effective routes prior to October 16, 2014. However, the territory adjustments were delayed by similar pending Step B Decisions on other grievances, the 2014 holiday season and the new CDRAAP route adjustment process.
- The Union has provided no evidence that any carrier suffered harm as a result of Management's failure to make the subject territory adjustments.
- Granting the Union's request for $10 per day to each affected carrier would constitute punitive damages; which is specifically prohibited under the terms of the National Agreement.

In view of the above, the Service urged that the Union's request for a $10 per day payment to each affected carrier during the subject period should be denied in its entirety.

## Discussion

As previously discussed, the Step B Team has already resolved the dispute concerning the merits of the case. Therefore, this award will address the Union's requested remedy only.

During the arbitration hearing, the Tulsa NALC Branch Vice President, Gary Butts testified that he had filed the subject appeal on October 16, 2014 when Management failed to comply with the Step B Decision dated October 1, 2014. He also testified that his requested remedy of a monetary payment of $10 per day to each affected carrier was not intended to punish Management. According to Mr. Butts, Tulsa Management has a history of non-compliance with the requirements of Article 8, and he stated his belief that an order to cease and desist in this case was insufficient to resolve the problem. At the same time, he acknowledged that he would not have filed his appeal if management had shown a good-faith attempt to resolve the issue.

During cross examination, Mr. Butts acknowledged that Management had adjusted the route times as directed by the Step B decision and that the only remaining task is to complete the territory adjustments for the affected routes. He also acknowledged that he had not submitted any evidence to support a claim that Management had previously violated Article 15 of the National Agreement. In addition, he acknowledged that there was no evidence to establish that any Tulsa carrier had been required to work compulsory overtime as a result of Management's failure to adjust the affected territories.

Tulsa Manager of Customer Service Operations, Jeff Callison testified that he has responsibility over the Operations Support department; which is responsible for territory adjustments. Mr. Callison described in detail the difficult process of making territory adjustments and he stated that the adjustments were further complicated by the new City Delivery Route Alternative Adjustment Process dated September 23, 2014 for calendar years 2014-2015 ("CDRAAP").

Mr. Callison pointed out that the CDRAAP is a negotiated Memorandum of Understanding between the Postal Service and the Union ("MOU") and that once he had received the new CDRAAP, he was required to comply with its terms. According to Mr. Callison, he had received the CDRAAP at the end of September 2014, but he had not yet received the last of the related Step B Decisions until after that date.[1] He also stated that if he had received all of the related Step B Decisions before he received the new CDRAAP, he would have immediately complied with the Step B Decisions and made the requisite adjustments.

Examination of the subject MOU reveals that the parties had clearly stated their intent regarding the subject of adjustments as follows:

> No adjustments will be performed to city routes that include casing and delivering of mail during the life of this agreement other than through the process outlined herein.[2]

During his testimony, Mr. Callison stated persuasively that he had no malicious intent when he did not carry out the territory adjustments as directed in the subject Step B Decision. He also stated that he was not aware of any other Article 15 violations in Tulsa, and that to his knowledge, no carrier had been harmed as a result of the delay in making the subject territory adjustments. In addition, he stated that the subject territory adjustments have now been completed and would go into effect in early April 2014.

In view of the above, the evidence supports a finding that the Service made a good-faith effort to comply with the Step B Decision. In addition, I have found no evidence to establish that Management had repeatedly and deliberately violated Article 15, or that the failure to implement the subject Step B Decision was willful or malicious.

During the arbitration hearing, the Union pointed to the provisions of JCAM page 41-17 and argued vigorously that those provisions supported its contention that a compensatory remedy is appropriate in the instant case. JCAM page 41-17 states in pertinent part as follows:

> In circumstances where the violation is egregious or deliberate or after local management has received previous instructional resolutions on the same issue and it appears that a

---

[1] The Step D Decision dated November 3, 2014 reflects the parties agreement that "The last two DRT decisions on the route adjustment were not received until 10-6-14 - grievance 14-389 and 14-397".

[2] The CDRAAP contained no provision for a variance to accommodate a prior Step B Decision.

> "cease and desist" remedy is not sufficient to ensure future contract compliance, **the parties may wish to consider a further, appropriate compensatory remedy** to the injured party to emphasize the commitment of the parties to contract compliance. In these circumstances, care should be exercised to ensure that the remedy is corrective and not punitive, providing a full explanation of the basis of the remedy. (Emphasis added)

However, closer examination of the subject provision reveals that the above compensatory remedy refers to a situation where it is established that a Part Time Flexible ("PTF") or City Carrier Assistant ("CCA") has been denied a preference for an opt on a qualifying vacancy in violation of Article 41.2.B.4. However, it makes no reference to a compensatory remedy for a violation of Article 15, or any other provision of the National Agreement other than Article 41; other than what "**the parties may wish to consider a further, appropriate compensatory remedy**".

The Union submitted a number of previous arbitration decisions in support of its argument that a compensatory award is appropriate in this case. In *USPS/NALC Case NumberF06N-4F-C 12231043, Louise B. Wolitz (March 2011),* the Arbitrator ordered a compensatory award for repeated violations of the National Agreement at the Redondo Beach Post Office. In her award, the Arbitrator had this to say:

> The Redondo Beach Post Office has a long history of failing to comply with settlement decisions. Joint Exhibit 2, **pages** 54 - 165 reflect the immense amount of prior violations of failing to comply and denial of information. The Service has, on numerous occasions, been ordered to cease and desist and pay compensatory remedies to no avail.

As the Arbitrator made clear, the Redondo Beach Post Office had repeatedly failed to comply with settlement decisions and denied the Union information necessary to process the grievance. She also made it clear that those parties had previously ordered compensatory remedies to no avail. As previously discussed, no evidence was submitted in the instant case to show that the Tulsa Post Office had repeatedly violated Article 15 or repeatedly failed to comply with settlement decisions. Thus, the Wolitz award has no application to the instant case.

The Union also submitted *USPS/NALC Case Number G98N-4G-C 01250215, Kathy Eisenmenger (January 2005)* in which the Arbitrator explained her reasons for granting a monetary award this way:

> The primary goal in determining remedial relief in a labor grievance is to make the employees whole; i.e., to put them in the place they would have been in but for the contractual violations. The application of the make-whole principle is to return the carriers of the Lynbrook Station to the *status quo* immediately prior to the effectuation of the July 2001 route adjustments. However, **given the circumstances that three (3) and one-half years and intervening circumstances have occurred since the grieved route**

adjustments, it simply is not feasible to order such relief. Some routes have experienced growth and an intervening route adjustment in 2002 involved further changes to the routes that was left unidentified in the record before me. (Emphasis added)

However, given the strong *prima facie* evidence that at least half of the routes were overburdened as a result of the July 2001 adjustments and the numerous violations of Handbook M-39 that led to that result, a new route count inspection and subsequent route adjustments are hereby ordered for the routes assigned to the Lynbrook Station. The Postal Service is to initiate the route count inspection process contained in Handbook M-39 within no less than twenty (20) calendar days from receipt of this Award and to effect route adjustments that are in full compliance with the handbook's provisions. The new route adjustments to be made in 2005 are not to be given retroactive effect.

**I also find that the violations of Handbook M-39 were intentional. I base this conclusion on the methodology employed by the Postal Service's subject-matter expert, Mr. Scarber, when he failed to consider all the factors pertaining to the routes and instead focused predominately on isolated days of carrier performance where low street time was demonstrated.** While the carriers were presumably paid appropriately for the overtime they may have been assigned, harm to the carriers occurred in other ways, as addressed above. An order to conduct a new route count inspection and to effectuate route adjustments to cure currently overburdened routes does not address fully the harm caused by intentional violations of Handbook M-39 or the Postal Service's apparent reluctance to correct evidently overburdened routes. (Emphasis added)

As the Arbitrator pointed out in the above decision, the number of factors listed below influenced her decision to grant a monetary award:

1. Three (3) and one-half years and intervening circumstances have occurred since the grieved route adjustments, it simply is not feasible to order such relief;
2. The strong *prima facie* evidence that at least half of the routes were overburdened as a result of the July 2001 adjustments and the numerous violations of Handbook M-39 that led to that result;
3. The violations of Handbook M-39 were intentional.

No evidence was submitted in the instant case to establish that a single one of those circumstances exists in the instant case. Therefore, I find that the Eisenmenger award also has no application to the instant case.

The Union also submitted the following cases in support of its position:

- *USPS/NALC Case Number W8N-5K-C 13829, William Eaton (January 1983)*
- *USPS/NALC Case Number NC-S 5426, Howard Gamser (April 19, 1983)*
- *USPS/NALC Case Number W1N-5G-C 24783, William Eaton (November 1984)*
- *USPS/NALC Case Numbers H4N-NA-C -21 and H4C-NA-C-27, George Bowles (June 1986)*
- *USPS/NALC Case Number W7C-5E-C 18702, William Eaton (May 1990)*

I have carefully reviewed each of these cases and I find that none of them have direct application to the instant case.

The Service provided a the following arbitration awards in support of its position that monetary damages are not warranted:

- *USPS/NALC Case Number NC-E-11359, Benjamin Aaron (January 1994)* "National"
- *USPS/NALC Case Number H7C-NA-C 36 [Et Al], Richard Mittenthal (January 1994)*
- *USPS/NALC Case Number F94N-4F-C 98094984, Carlton Snow (May 2001)*
- *USPS/NALC Case Number C98N-4C-C 02078480 Jonathan Klein (March 2002)*
- *USPS/NALC Case Number A01N-4A 05062073, Harry Gudenberg (October 2006)*
- *USPS/NALC Case Number C06N-4C-C 08148260 (July 2008)*
- *USPS/NALC Case Number E06N-4E-C 08177058, Robert Steinberg (September 2008)*
- *USPS/NALC Case Number G11N-4G-C 13209161, Michael McReynolds (June 2014)*
- *USPS/NALC Case Number B06N-4B-C 09247054, Eileen Cenci (November 2010)*

A careful review of these awards reveals that in each of those cases, arbitrators have repeatedly declined to award monetary damages to the Union for contract violations.

Finally, in *USPS/NALC Case Number G11N-4G-C 13327680, Paul Chapdelaine (March 2014)* this Arbitrator ruled on a similar monetary remedy request for a violation of the National Agreement concerning a bid delay. In that award this Arbitrator opined:

> The Union in the instant case argued that "cease and desist" is not a sufficient remedy and insisted that a monetary award is necessary in order to reprimand the Service and emphasize to them that such violations will not be tolerated in the future. Management argued vigorously that the Grievant did not suffer any lost wages or benefits due to Management's failure to post the bid within the time limits provided by the labor agreement.

> Notwithstanding the Union's vigorous argument for punitive damages, Article 15.5.A.6 of the National Agreement restricts the arbitrator's authority as follows:

> All decisions of an arbitrator will be final and binding. **All decisions of arbitrators shall be limited to the terms and provisions of this Agreement, and in no event may the terms and provisions of this Agreement be altered, amended, or modified by an arbitrator.** (Emphasis added)

> In Addition, in Article 41 of the JCAM, the parties made their understanding clear that remedies are not intended to be punitive as follows:

> In circumstances where the violation is egregious or deliberate or after local management has received previous instructional resolutions on the same issue and it appears that a "cease and desist" remedy is not sufficient to insure future contract compliance, **the parties may wish to consider a further, appropriate compensatory remedy to the injured party to emphasize the commitment of the parties to contract compliance.**

In these circumstances, care should be exercised to insure that the remedy is corrective and not punitive, providing a full explanation of the basis of the remedy. (Emphasis added)

While the JCAM is clear that "the parties" may wish to consider a compensatory remedy, there is no indication that the parties wished to allow an arbitrator to make such an award.

The Union argued that previous Step B Decisions have awarded monetary payments in previous decisions and that those decisions established a precedent that should be followed in the instant case. While it may be true that monetary payments had been awarded in some previous Step B Decisions, there was no evidence submitted to establish that the facts and circumstances in those decisions are the same or similar to those in the instant case. In addition, the Union was unable to point to any provision of the National Agreement that provides for the awarding of punitive damages by an arbitrator.

While it is true that Management violated the provisions of Article 41 in the instant case, no evidence or testimony was submitted to establish that the violation was deliberate or malicious. Also, in view of the hundreds of postings at the Fort Worth complex over the years referenced by the submitted prior Step B Decisions, it is reasonable to assume that occasional errors are bound to occur. If the parties wish to establish monetary penalties for specific contract infractions, such penalties must be established through the negotiating process and not through arbitration.

The same principle applies to the instant case. To award the Union's requested monetary remedy in the instant case would be improper under the specific terms of the National Agreement and would exceed this Arbitrator's authority.

It is understandable that the Union may feel frustrated by Management's failure to promptly follow the Step B Team's Decision. However, if the parties wish to vest their selected arbitrators with the authority to award monetary remedies for such contract infractions, that authority must be established through the negotiating process and not through arbitration.

### Findings

Notwithstanding the vigorous and skilled arguments advanced by the Union in this case, I find insufficient evidence on the record to sustain the Union's request for monetary damages

### Award

The grievance is denied in its entirety.

EXHIBIT E

**REGULAR ARBITRATION PANEL**

| | |
|---|---|
| In the Matter of the Arbitration )<br><br>  ) <br> ) <br> between  ) <br> ) <br> **UNITED STATES POSTAL SERVICE**  ) <br> ) <br> and  ) <br> ) <br> **NATIONAL ASSOCIATION OF LETTER**  ) <br> **CARRIERS**  ) <br>  ) | **AWARD**<br><br>**Grievant:   Class**<br>**Post Office: Government Mail Facility**<br><br>**Case No.:        K16N 4K C 18442097**<br>**NALC No.:     142CA15200**<br>**DRT No.:       13 446486** |

**Before:  Jacquelin F. Drucker, Esq., Arbitrator**

**Appearances:**

For the NALC:      Walter Brummage, Local Business Agent
                            Vada Preston, National Business Agent
                            Sean Anderson, Letter Carrier
                            James Bowie, Letter Carrier
                            Angelo Brown, Letter Carrier
                            Gary Harris, Letter Carrier
                            Frank Young, Letter Carrier
                            Alton Branson, Formal Step A Representative

For the Postal Service:   Swillie Ross, Postal Service Advocate
                            Tiffany Tyson, Manager

| | |
|---|---|
| **Date of Hearing:** | November 14, 2019 |
| Record Closed: | December 18, 2019 |
| **Place of Hearing:** | 3300 V Street NE<br>Washington, DC 20018 |
| **Date of Award:** | February 24, 2020 |
| **Relevant Contract Provision(s):** | Article 15, et al. |
| **Contract Year:** | 2016- 2019 |
| **Type of Grievance:** | Contract |

### AWARD SUMMARY

The parties stipulated at Step B that the Postal Service breached the National Agreement, the M-39, the M-41, ELM Sections 811 and 833 and the EL-809 by failing to provide Letter Carriers relocated from Chillum Place to the Government Mails Facility with casing equipment. The question in arbitration, therefore, is solely that of remedy. The Union sought a monetary remedy based on a lump-sum award to the Branch and a $25.00 payment for each day that the Letter Carriers have worked and continue to work without proper casing equipment. The Arbitrator finds, however, that the financial remedy has not been shown to be compensatory in nature or warranted in this instance. The Union relies upon precedent that is based upon repeated failures of management to abide by arbitration awards or settlements. That is not the case here, as this is the first instance in which this matter has been adjudicated. Accordingly, in the absence of specific contractual terms or repeated or egregious failure to comply with an award or settlement, the remedy for breaches such as this is limited to traditional contractual relief. The Arbitrator thus directs Management to cease and desist from this violation and to take immediate steps to ensure that proper casing equipment is made available for all Letter Carriers assigned to this facility.

Jacquelin F. Drucker, Esq.

## I.   STATEMENT OF THE CASE

The instant grievance relates to the remedy for a grievance that was sustained as to the merits at Step B, where the parties agreed that the Postal Service violated the National Agreement and various manuals in failing to provide adequate casing equipment to Letter Carriers who had been relocated to the Government Mails Facility at 3300 V Street NE, Washington, DC, following the destruction by fire of the Chillum Annex Post Office. The hearing of this matter was held on November 14, 2019, at the Government Mails Facility. At hearing, the parties were ably represented and were given a full and fair opportunity to present evidence, examine and cross examine witnesses, and make arguments. All witnesses were sequestered and testified under oath. In the course of the hearing, it was agreed that the Arbitrator would visit the Letter Carriers' casing area in the facility. During such visit, the Arbitrator was accompanied by the advocates and representatives of each party. Only limited commentary was permitted, in keeping with the need to control the privacy and the formal structure of the taking of testimony. After the taking of evidence, including the visual observation of the site, was concluded, the advocates agreed to present written closing arguments. The submissions of both parties were

timely received, whereupon the record was closed. The Arbitrator's office forwarded exchange copies by U.S. Mail. In reaching the conclusions and Award set forth herein, the Arbitrator has given full and careful consideration to all arguments posed, all evidence of record, and all citations, including the many awards, settlements, policies, law, and contract provisions provided by both parties.

## II.    ISSUE

The parties agree that the issue to be decided by the Arbitrator is limited to a determination of the remedy in this case. The Postal Service has stipulated that, as stated in the Step B Decision, "management violated the NA, M-39, M-41, ELM sections 811, 833 and EL-809 by not providing carriers with casing equipment." Accordingly, the only question posed in this arbitration proceeding is, as also stated in the Step B Decision: "What is the appropriate remedy?"

## III.   FACTS AND ANALYSIS

The parties have agreed that a breach occurred, and there is little dispute as to the basic relevant facts leading up to that situation. By way of background, it is noted that on May 10, 2018, the Chillum Annex Post Office in Washington, D.C. was destroyed by a fire that had originated in an adjacent building. As the result of the fire, the Letter Carriers assigned to the Chillum Post Office were relocated to the Government Mails Facility, 3300 V Street NE, Washington D.C. In keeping with the United State Postal Service's nationally revered and storied commitment, the Letter Carriers resumed delivery of mail the following day.

As an initial matter, the Arbitrator notes that the Union asserts that Management is precluded from presenting any arguments or evidence regarding its positions on remedy, as it offered none during Step A of the grievance process. Everything Management presented at hearing, contends the Union, is new argument and thus must be barred. More precisely, the Union argues that Management offered nothing in the lower steps of the grievance procedure to rebut the evidence offered regarding the alleged harm suffered by the Letter Carriers resulting from the relocation

and, specifically, working without proper cases for more than a year while temporarily based at the Government Mails Facility.

The Union asserted and the testimony and observation confirmed that the Letter Carriers continue to work, predominately, without access to the cases that are essential to efficient and effective preparation of their route. A number of the affected Letter Carriers were prepared to testify at hearing, but, ultimately, the relevant points were established through the testimony of five individuals and written statements provided by many others. All Letter Carriers who testified agreed that, in the immediate aftermath of the fire and relocation, operations were hectic and Letter Carriers were everywhere, but their was an air of teamwork as they tried to find locations and ways to put their mail together on the heels of the emergency. Notable is the degree to which each Letter Carrier conveyed dedication to the work and concern for accurate completion of their routes. Through their testimony, however, it became clear that, many months after the relocation, they remained without the fundamental equipment needed to prepare their routes in efficient, effective, and ergonomically sound ways. In fact, several took issue with the use of the term "casing" for this step, as they lacked the one piece of equipment that would enable them to complete that task: the case.

Letter Carrier Gary Harris testified that, months after the fire, he and his colleague still had to sit at low tables, sorting and routing mail on these small tables and even using APCs, in an area with insufficient room to sort. They had no case labels and no edit books. This continued, he said, for at least seven months after the relocation. Eventually, Management brought in a few cases for their use, but, he said, even then, not everyone got a case, as there was not sufficient room. Mr. Harris testified that he was continually having to bend to pick up five or six pounds of mail, and, as there was no way to achieve leverage and he is very tall, he was straining his back. Letter Carriers who had to use APCs for casing also had to bend in unhealthful ways. Mr. Harris had expressed his frustration to management, he said, but he was told that there is mail to go out and that he had to get it done. The lack of proper equipment led, he estimated, to an additional hour and one-half to the time necessary for sorting his route.

Letter Carrier James Bowie recalled his experience in casing mail using tubs or just sorting on the floor. Like Mr. Harris, Mr. Bowie testified that, when cases were installed, there were too few and the Letter Carriers did not have sufficient time to complete casing before the next shift arrived and needed to take over the case, changing the labels. The Letter Carriers then would have to take down the mail and move it to an APC to complete the casing. Using the APC for casing, Mr. Bowie said, was awkward and he would have to steady it and rotate it using his foot.

Letter Carrier Angelo Brown bid out of this assignment not long before the hearing. He noted that he loved his route and had been on it for a long time, and the facility was conveniently located near his home. Yet when nothing happened even after having been told many times by Management that they would be getting cases, it eventually wore him down, Mr. Brown said, and he transferred. Until his transfer, he would find himself sorting mail at a table and even on his knees, on the floor.

Letter Carrier Sean Anderson also found himself "casing" mail on the floor, and he noted that mail was being scattered everywhere. He acknowledged that some cases were brought in eventually, in the summer of 2019. These, however, were unstable when in use, he said. Also, he, too, noted that when the next shift arrived, it would be necessary to gather the mail and depart so that the labels on the case could be flipped. Mr. Anderson noted that the situation was causing delays in the delivery of mail, noting that several Postal Service residential customers on his route knew what days to expect certain pieces of mail and became concerned when that mail was delayed.

The Union took steps to encourage Management to correct the situation. Vada Preston, the National Business Agent, pursued meetings with District management in an effort to resolve the lack of casing equipment for these workers. He received assurances that the problem would be rectified and that the needed casing equipment would be brought in. He also was aware that available, unused casing equipment existed elsewhere, and he thus offered suggestions as to where and how Management might secure the urgently needed equipment, but to no avail.

After the situation had not improved over the course of five months and many efforts by the Union to impress upon Management the need to provide proper equipment, the instant grievance was commenced in August 2018 by Alton Branson. Mr. Branson and Tiffany Tyson, Manager, met at Formal Step A on August 8, 2018, and they agreed that their discussions should be declared an impasse and that the grievance should be moved to Step B. The Union in these lower stages sought a monetary remedy, as it does here, arguing that Management's breach had been willful and deliberate and, therefore egregious, and that a monetary remedy was necessary to ensure compliance with the contract. In that regard, the Union has sought and seeks in this forum an award in which each Letter Carrier will be paid $25.00 per calendar day from the time of the grievance until Management provides casing equipment for all Letter Carriers. The Union also seeks a lump-sum payment of $5,000 to be awarded to Branch 142 "as a compensatory remedy seeking contract compliance."

The grievance moved to Step B, where the parties were able to agree, on the merits, that Management had breached the National Agreement and had ignored multiple provisions of various handbooks when it failed to provide appropriate equipment for the Letter Carriers. The parties at Step B could not achieve agreement, however, as to the remedy. Thus, that is the issue posed in this forum.

There is no question from the evidence of record that the conditions the Letter Carriers have tolerated and endured are unacceptable. Merely observing one of the Union's witnesses demonstrating how he had to sort mail, spreading it out while crouched on the floor, makes that clear. Management thus is to be credited for acknowledging the breaches created by this situation. It also is clear, and Management concedes, that an essential element of the remedy for this grievance is a cease and desist order requiring the Postal Service to promptly rectify these breaches, which continued as of the day of hearing.

The questionable element of remedy sought by the Union, and the stumbling block to resolution at Step B, is the Union's assertion that the remedy should include a monetary award to the Letter Carriers for each day without equipment and a lump sum payment to the Union. The Union cites the provisions of the JCAM, page 41-17, that address relief beyond a cease and desist order when

a violation is egregious or deliberate or where local management has received previous instructional resolutions on the same issue and it appears that a cease and desist remedy is insufficient to ensure future contract compliance. That provision of the JCAM has no relevance here, as it relates to breaches of the bidding process and seniority issues under Article 41 of the National Agreement. Moreover, that the parties chose to specify an instance in which more than a cease and desist order is warranted makes it apparent that such exceptions to the general rule of relief through cease-and-desist orders do not exist under other provisions of the contract applicable here.

Nonetheless, even if that concept articulated in the JCAM applied substantively in this case, the elements set forth to support relief beyond basic contractual remedies are not present in this record. The breach in this case is serious, in that its reach is far-- it affects the security of the mail, the safety of the Letter Carriers, the speed of their work, and the effectiveness of delivery operations – and Management was repeatedly made aware of the problem and yet took only meager steps to address it. The effects upon the Letter Carriers unsurprisingly have been profound. Yet, accepting for purposes of argument that some breaches may rise to a level of egregiousness that would warrant the extraordinary consideration of monetary relief when no fiscal harm has been shown, the Arbitrator must conclude that, while this breach is serious and at best indicative of a lack of adequate concern, a showing of egregiousness is not seen here.

The customary remedy for breach of contract is the make-whole standard, which means a return to the *status quo ante* or fulfillment of the standard that has not been met. In this case, that remedy is achieved through a cease and desist order, as no financial loss or measurable compensable harm has been shown. The Union, however, anticipates non-compliance because, the Union argues, Management has demonstrated its lack of adherence to the contract. That argument, however, mixed failure to adhere to the contract with failure to adhere to a settlement or award. Breach in the first instance is not the same as non-compliance with an ordered or agreed remedy. The Union relies heavily on National Level awards and Postal Service communications relating to the obligation of Management to abide by arbitration awards and settlements. But this is a case of first impression as to this facility and there is neither a settlement nor an award with which Management has failed to comply. It is not a case in which

there have been prior awards or settlements to which Management was bound but disregarded, thereby triggering the potential for a more powerful remedy.

In fact, the Union in its brief argues, "The fact that the union had to file this grievance in the first place highlights the futility of us agreeing to 'instructional' or 'cease and desist' language that would be ignored like previous settlements and the underlying contract language. The union already expected management to comply with the clear contract language, and in good faith agreed on numerous occasions to simply instruct management to comply. The time has come to provide a remedy that will give the union what it bargained for – contract compliance." The flaw in the Union's argument is that it equates the assertion of a grievance or other allegation of a breach with the obligation to comply with a remedy resulting from the *finding* of breach.

Management contends that the imposition of a monetary award would be punitive in nature, noting, correctly, that punitive damages are uncommon in labor arbitration. The Union argues that the remedy it seeks is not punitive in nature, but, as there is no relationship shown between either financial aspect of the remedy sought and any compensatory factor, a monetary award under these circumstances begins to function in a punitive manner. As noted by Arbitrator Carlton Snow in *American Postal Workers Union and United States Postal Service (Albuquerque, NM)*, Case No. WIC 5F C 4734 (Snow, September 1987), even though some arbitrators have awarded punitive damages when a party's violation has been constant, repeated or malicious, that approach "has not been consistent with the common law which has taught that, no matter how reprehensible a breach, punitive damages which were in excess of an injured party's lost expectation generally have not been awarded for a breach of contract."

The Union contends that the remedy sought is not punitive, but much of its argument is based upon contentions that Management in the past has failed to abide by other, wholly unrelated settlements or awards at other facilities. The body of precedent relating to those situations is not persuasive here, for there is no related prior holding or settlement with which Management is alleged not to have complied. The Union in part is arguing that Management's failure to abide by the contract (a failure that was not determined until Step B) should warrant an extraordinary remedy because Management should have abided by the contract in the first place. Any contract

breach presents a situation in which the contract should have been – but was not – followed. Thus, if a monetary penalty is imposed for any breach, the very nature of remedy is changed and departs from the conventional concepts of compensatory remedies and damages.

For all of the reasons stated, the Arbitrator finds that neither aspect of the monetary remedy sought by the Union is appropriate under the National Agreement. As indicated in the Award which follows, the cease and desist order is the appropriate remedial action.

## AWARD

The parties stipulated at Step B that the Postal Service breached the National Agreement, the M-39, the M-41, ELM Sections 811 and 833 and the EL-809 by failing to provide Letter Carriers relocated from Chillum Place to the Government Mails Facility with casing equipment. The question in arbitration, therefore, is solely that of remedy. The Union sought a monetary remedy based on a lump-sum award to the Branch and a $25.00 payment for each day that the Letter Carriers have worked and continue to work without proper casing equipment. The Arbitrator finds, however, that the financial remedy has not been shown to be compensatory in nature or warranted in this instance. The Union relies upon precedent that is based upon repeated failures of management to abide by arbitration awards or settlements. That is not the case here, as this is the first instance in which this matter has been adjudicated. Accordingly, in the absence of specific contractual terms or repeated or egregious failure to comply, the remedy for breaches such as this is limited to traditional contractual relief. The Arbitrator thus directs Management to cease and desist from this violation and to take immediate steps to ensure that proper casing equipment is made available for all Letter Carriers assigned to this facility.

February 24, 2020

Jacquelin F. Drucker, Esq.

EXHIBIT F

#13823

# IN THE MATTER OF THE ARBITRATION

### between

| | | |
|---|---|---|
| UNITED STATES POSTAL SERVICE | ) | Case No. H1N-1J-C 23247 |
| | ) | |
| and | ) | |
| | ) | |
| NATIONAL ASSOCIATION OF LETTER | ) | **RECEIVED** |
| CARRIERS | ) | |

-------------------------------------------------------  AUG 1 1 1987

Grievance and Arbitration Division
Labor Relations Department

Before
Neil N. Bernstein,
Arbitrator

-----------------------------------------------------------------

### APPEARING

FOR THE SERVICE:      James G. Merrill,
                      Director, Human Resources
                      San Jose Division
                      1750 Lundy Avenue
                      San Jose, California 95101-9994

FOR THE UNION:        Keith E. Secular, Esq.
                      Cohen, Weiss & Simon
                      330 West 42nd Street
                      New York, New York 10036

-----------------------------------------------------------------

OPINION OF THE ARBITRATOR

The parties have agreed that the only issue to be resolved
in this proceeding is the following:

Whether management may permanently transfer an employee
who sustained an injury on duty and who is performing
limited duty to another craft on an involuntary basis?

Upon resolution of that issue, the case is to be remanded to the
regional level for further proceedings on whatever issues will be
remaining in the grievance itself.

I

The relevant facts in the particular grievance were
stipulated to by the parties at the arbitration hearing.  The
Grievant, Marisa Puppolo, was hired as a fulltime regular letter
carrier in New Haven, Connecticut, in September 1979.  In
February 1980, she suffered an on-the-job injury to her knee that
prevented her from performing the duties of her position.
Thereafter until August 1983, she worked a variety of limited
duty tasks at the New Haven Post Office within the letter carrier
craft and within normal daytime working hours.

The instant grievance arose on August 1, 1983, when the

2

Service informed her that, effective August 6, she was being reassigned to the clerk craft as a Distribution Clerk and that she would be working as a clerk from 5:30 p.m. until 2:00 a.m. with Tuesday and Wednesday as her non-scheduled days.

The Union, after an unsatisfactory Step 1 meeting, filed the instant grievance on Ms. Puppolo's behalf on August 10, 1983, asserting that her transfer violated the National Agreement in several respects.  The grievance has been processed through the fourth step in the parties' disputes resolution procedure without a voluntary resolution.  Thereafter, the Union appealed the case to National arbitration on the single issue set out above.

II

Since at least 1974, the Service has been subject to the Federal Employees Compensation Act (5 USC 8101 et seq.). That statute provides compensation for employees who are disabled as a result of on-the-job injuries or employment-related illnesses. Such employees receive continuation of their pay for 45 days and a portion of their wages thereafter for the period of their disability; those compensation payments are assessed against the budgets of the agencies who had employed them.

The Office of Personnel Management is empowered by the FECA to issue regulations governing the administration of the statute.

3

One of its regulations, 5 CFR 353.306, specifically deals with the treatment of employees who have partially recovered from their injuries, but not sufficiently to enable them to return to their regular positions. The regulation directs the agency involved to make "every effort" to restore such an employee to some form of "limited duty".

The Postal Service has endeavored over the years to comply with the directive set out above.  In 1979, the Union filed a grievance challenging certain of its efforts on the ground that they constituted "punitive practices."  The Service, with the concurrence of this and all other affected unions, promulgated a regulation resolving that grievance, which regulation was incorporated into the Employee and Labor Relations Manual as Section 546.14.  The mandate of that regulation is one of the questions to be resolved in this proceeding.

Section 546.14 has previously been the subject of a National arbitration involving the Service and the American Postal Workers Union, in case H1C-4K-C 17373.  That case concerned a letter carrier who suffered a compensable injury that was determined would permanently prevent him from performing carrier work.  The Service then offered the carrier a limited duty job as a full-time regular Distribution Clerk, and informed him that if he refused to accept a permanent reassignment to that clerical craft position, management would "so advise the Office of Workers

4

Compensation for action deemed warranted".  The carrier accepted the position and transferred to the clerk craft.  The APWU then demanded that the vacancy created in the carrier work complement by his reassignment be posted for bid by employees in the clerk craft, pursuant to Article 13, Section 5 of the National Agreement.  Management refused, and the case eventually was heard by National Arbitrator Richard Mittenthal.

Mittenthal rejected the Union's claim.  He held that Article 13 applied only to Article 13 reassignments, which occur when an employee makes a "voluntary request" and the transfer is to a "light duty assignment" established through "local negotiations". He concluded that the transfer in question was made pursuant to Part 540 of the ELM and that such transfers are not covered in any way by Article 13.  He also found that the transfer involved in that case was "voluntary", in spite of the fact that it was made only after the Service advised that it would inform the Office of Workers Compensation of any refusal, because that statement merely informed the carrier of the action that the regulations required the Service to take.

III

The Union argues first of all that transfers between crafts can only take place if they are explicitly authorized by some provision of the National Agreement.  The particular reassignment

5

involved in this case is not authorized by any provision,
including the provisions of the manuals and handbooks that are
incorporated into the Agreement by Article 19.

Secondly, the Union asserts that this reassignment is not
only not authorized by Part 540, but it is inconsistent with that
Part of the ELM, because it cuts off all future opportunity for
the Grievant to work in her craft, if suitable work ever becomes
available at a future date.  Moreover, it creates many
significant disadvantages for the Grievant, such as loss of her
craft seniority.

Third, the Union asserts that the action in question
constitutes an amendment to Section 546.14, which can only be
effected through the utilization of the procedures set out in
Article 19, Section 2.  Those procedures were not followed in
this case.

Finally, the Union argues that Arbitrator Mittenthal's
decision in Case 17373 did not dispose of this dispute, because
the facts of the two cases are materially different.

IV

The Service argues first of all that the instant grievance
is not arbitrable.  It claims that there is no contractual

6

provision in dispute and that the parties have previously agreed that management had the right to reassign an employee with a compensable injury from one craft to another.  In addition, it asserts that its right to do so has been affirmed by several arbitration awards, including Mr. Mittenthal's.

On the merits, the Service maintains that it has the absolute right to make such involuntary transfers.  Its right to do so is "ingrained" in the Management Rights provision of the National Agreement, which is Article 3.  In addition, Section 546.14 does not talk only of temporary assignments to limited duty work in other crafts, but it also covers permanent assignments, which would involve transferring the employee to another craft.  In addition, it claims, such a transfer is not irrevocable, and if the employee ever recovers, he or she can request reassignment to the original craft.

Finally, the Service contends that leaving an employee in a craft for which he or she cannot perform the work is inefficient, because another employee can not be assigned to the injured employee's bid duty assignment on a permanent basis while the employee remains attached to that craft.

The Service also points out that there were 348 permanent reassignments in the last year from one craft to another, and that this is the only case which challenges its right to make

7

such reassignments.

V

The relevant language of Section 546.14 of ELM is the following:

.141 <u>Current Employees.</u>  When an employee has partially overcome a compensable disability, the USPS must make every effort toward assigning the employee to limited duty consistent with the employee's medically defined work limitation tolerances.... In assigning such limited duty, the USPS should minimize any adverse or disruptive impact on the employee.  The following considerations must be made in effecting such limited duty assignments:

a.  To the extent that there is adequate work available within the employee's work limitation tolerances; within the employee's craft; in the work facility to which the employee is regularly assigned; and during the hours when the employee regularly works; that work shall constitute the limited duty to which the employee is assigned.

b.  If adequate duties are not available within

8

the employee's work limitation tolerances in the craft
and work facility to which the employee is regularly
assigned, within the employee's regular hours of duty,
other work may be assigned within that facility.

* * * * *

VI

The Arbitrator concludes that the Service violated the
National Agreement by involuntarily assigning the Grievant, an
employee disabled by a compensable injury, from one craft to
another.  The case should be remanded to the regional level for
further proceedings consistent with that finding.

Thus conclusion is derived from the following
considerations:

A

First of all, the grievance is clearly arbitrable.  The only
question that can properly be considered in an arbitration is
whether the action taken by the Service violated that National
Agreement in any way. The fact that there is not a specific
provision which explicitly prohibits involuntary transfers across
craft lines is of no significance, if such a prohibition can be

9

found in the agreement by implication or construction.

In addition, Arbitrator Mittenthal's decision, although it is important to the resolution of this proceeding in a number of respects, did not determine that the Service had the power to make involuntary reassignments across craft lines.  To the contrary:  the Union involved in that case, APWU, presented the contention that the transfer of the carrier involved had been an involuntary one, because he had been warned that the Office of Workers Compensation would be notified if he did not agree to take the job (the significance of that argument to the issues before Mittenthal is not clear to this Arbitrator).  Mittenthal rejected that contention and explicitly held that the carrier had not been coerced to take the assignment. Thus, the case was decided as a voluntary transfer under Part 540 of the ELM.

Further, the present National Arbitrator is not bound in any way by awards issued by regional arbitrators on this issue.  The whole purpose of the national arbitration scheme is to establish a level of definitive rulings on contract interpretation questions of general applicability. National decisions bind the regional arbitrations, and not the reverse.

Finally, the Step 4 settlement cited by the Service that supports its contention is of even less value, especially since the Union was able to produce a comparable settlement of a

10

different dispute that supported its contrary contention.  It is
precisely that kind of confusing and conflicting interpretations
that establish the need for the national arbitration cases.

B

Turning now to the merits, the Arbitrator notes that the
Service throughout this proceeding has taken two separate, and
relatively conflicting, positions.  First of all, it has
contended at various times that it has the inherent management
right, as incorporated in Article 3, to make reassignments of
employees across craft lines because there is no prohibition of
same in any explicit term of the agreement. If that argument were
accepted, the only limitation on the Service's power to make such
reassignments would be the general prohibition against arbitrary
and capricious actions. At other times, however, the Service has
taken the position that it derives its power to permanently
reassign partially recovered employees with work-related injuries
from the language of Section 546.14, quoted above.  The
Arbitrator can find no merit in either of these contentions.

The argument that the Service has the general power to make
any permanent reassignments across craft lines that are neither
arbitrary or capricious is totally inconsistent with the language
in Article 12, Sections 4 and 5, which set out a very precisely
regulated and limited power in the Service to make such

11

reassignments under very specific circumstances.  Moreover, the last sentence of Section 12.4A directly states,

> "Reassignments will be made in accordance with this Section and the provisions of Section 5 below."

This language, and indeed both sections, would be totally superfluous if the Service had a general power to make such reassignments that it could exercise whenever the precise criteria of Article 12 could not be satisfied.  Moreover, the only provision in the National Agreement that appears to allow for permanent reassignments is Article 13, which had been conclusively construed by Arbitrator Mittenthal to be available only for voluntary reassignments initiated by the employee involved.

Consequently, the Arbitrator holds that the Service is empowered by the Agreement itself, only to make the involuntary reassignments across craft lines that satisfy the criteria set out in Article 12.

C

This leaves only the Service's argument that Section 546.141 of the ELM empowers it to make involuntary craft transfers of partially disabled employees who are permanently unable to meet

12

the requirements of their craft.  If that power were found in this section, it could lead to a second interesting issue as to whether the section is void under Article 19 because it "conflicts with this Agreement".  Happily, that issue need not be resolved in the present case.

The Service finds its power to make such involuntary reassignments in the language of the section empowering it to "assign the employee to limited duty" consistent with his or her medical tolerances, within or without the employee's craft.  The Service contends that this language gives it the right to permanently assign an injured employee to such work and that such a permanent reassignment would be a reassignment across craft lines.

The Arbitrator holds that this interpretation of the provision is barred by the specific mandate in the section that the Service "should minimize any adverse or disruptive impact on the employee".  The Arbitrator agrees with the Union that this mandate creates an obligation on the Service that is a continuing duty for the entire period of the employee's disability.  The Service is contending that there should be a point in time at which it has the right to "wash its hands" of a particular injured employee and move him out of his craft and into another one for the remainder of his career.  Perhaps it would be sound policy to have such a provision in the section, but there is no

13

language to that effect in that section at this time.  Section 546.14 must be read to impose a continuing duty on the Service to always try and find limited duty work for injured employees in their respective crafts, facilities and working hours.  The fact that such duty might not be available at any point in time does not mean that it will never become available, because there are many changes that can take place.  Therefore, the Service must be prepared to modify a limited duty assignment outside of the employee's craft, facility or hours, when work within those conditions becomes available.

The Service protests that such a holding would be "inefficient" because it would prevent awarding the employee's bid duty assignment to anyone else on a permanent basis as long as the employee remains assigned to the same craft.  The Arbitrator questions first of all whether this argument is factually correct, because the applicable statute and regulations obligate the Service only to hold the employee's position open for one year. After that date, it would appear that the duty assignment could be awarded to another, but that the employee's position in the craft complement would have to retained and never filled by anyone else.  However, even if the Service's contention is correct, the same situation would occur where the employee was permanently unable to perform the duties of his or her bid assignment, but could handle limited duty that was available in the craft.  The Service has agreed to accept the resulting

14

inconvenience in that situation, and there is no valid reason why the circumstances should be different just because the limited duty is only available in a different craft.  Finally, even if the Service could operate more efficiently if it could "wash its hands" of partially disabled employees, its inefficiency must be balanced against the adverse consequences to the employees that would flow from the deprivation of their total craft seniority.

Thus, the most reasonable construction of Section 546.14 is that it empowers the Service to assign partially recovered employees to limited duty outside their craft on an "indefinite" basis under the criteria set out in the regulation, but that it does not have the power to remove them against their will from future consideration for whatever craft work becomes available at a later date.

This is not to say that the Service's hands are tied in this situation.  It can continue to make such duty assignments for as long as the needs of the particular installation justify it.  In addition, it can offer a permanent transfer to the employee involved and point out to him or her the advantages of accepting the reassignment (right to bid on better jobs or vacation schedules, etc.) and it can inform the employee, as was done in the case before Arbitrator Mittenthal, that the Office of Workers Compensation will be notified if the employee turns the transfer down.  But the Service does not have the power to make an

15

involuntary permanent reassignment across craft lines if the
employee decides to take his or her chances and refuse a
voluntary transfer.

### VI

For these reasons, the Arbitrator concludes that the Service
violated the collective bargaining agreement by involuntarily
transferring the Grievant from carrier complement to the clerk
complement.  This is not to say the assignment of clerical work
to her on a different tour was proper or improper, or that any
other action taken with respect to her employment was correct or
incorrect.  Those questions are to be determined in a suitable
forum at the regional level.

### THE AWARD

The Arbitrator finds that management did violate the
provisions of the National Agreement when it involuntarily
permanently assigned the grievant from the letter carrier craft
to the clerk craft based on her medical condition.

16

The case is remanded for further proceedings in accord with
this holding.

NEIL N. BERNSTEIN,
Arbitrator

August 7, 1987

RECEIVED

AUG 1 1 1987

Grievance and Arbitration Division
Labor Relations Department

17

# EXHIBIT G

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### In the Matter of the National Arbitration Between

| | | |
|---|---|---|
| **UNITED STATES POSTAL SERVICE** | ) | |
| | ) | |
| **and** | ) | **Case No. Q11N-4Q-C 14032224)** |
| **NATIONAL ASSOCIATION OF LETTER** | ) | |
| **CARRIERS, AFL-CIO** | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Before:**     Dennis R. Nolan, Arbitrator

**Appearances:**

>    **For the USPS:**     Lucia R. Miras, Counsel, Washington, DC

>    **For the NALC:**     Peter DeChiara, Cohen, Weiss and Simon LLP, New York, NY

**Place of Hearing:**     Washington, D.C.

**Date of Hearing:**     January 29, 2015

**Date of Award:**     June 29, 2015

**Relevant Contract Provision(s):**     Article 19; Handbook M-39

**Contract Year:**     2011-2016

**Type of Grievance:**     Contract Interpretation

**Award Summary:**     Section 126.3 of Handbook M-39 does not "directly relate" to wages, hours, or working conditions and is therefore not incorporated into the Agreement by Article 19. For that reason, Section 126.3 does not create rights enforceable by bargaining unit employees through the grievance procedure. The grievance is denied.

*Dennis R. Nolan*

_____

Dennis R. Nolan, Arbitrator

2

**OPINION**

## I.     Statement of the Case

The NALC filed a local level class action grievance in Florida in May of 2013 to remedy an alleged violation of Section 126.3 of the M-39 Handbook.  The parties could not resolve the dispute in the grievance process, so the Union demanded arbitration.  On March 10, 2014, the Postal Service decided that the grievance raised an interpretive issue within the meaning of Article 15.  That eventually led to this national level arbitration.

The arbitration hearing took place in Washington, DC on January 29, 2015.  Both parties appeared and had full opportunity to testify, to examine and cross-examine witnesses, and to present all pertinent evidence.  Both parties filed lengthy post-hearing briefs, supplemented by statements about an arbitration decision issued after they submitted their briefs.

## II.    Statement of the Facts

This case began two years ago in Florida when Local 599 filed a grievance alleging that the Postal Service violated the Agreement by not following Section 126.3 of Handbook M-39.  The specific complaint was that Management did not schedule known replacements for known vacancies in advance, as Section 126.3 directs.  While the grievance was headed toward regular arbitration, Management asserted on March 10, 2014 that it posed an "interpretive issue within the meaning of Article 15 of the 2011 National Agreement."  That diverted the grievance from regular arbitration and to national arbitration.

In Management's phrasing, the interpretive issue was whether Section 126.3 created a contractual obligation to schedule employees on overtime to cover "known vacancies" when completing the weekly schedule.  That phrasing actually includes two distinct issues.  One is whether Section 126.3 creates *any* contractual obligation subject to the grievance procedure.  The other, if Section 126.3 does create some obligation, is whether it requires the use of overtime.

The key to the contractual obligation question is Article 19 of the Agreement.  Article 19 states that parts of handbooks "that directly relate to wages, hours or working conditions" of bargaining unit employees "shall contain nothing that conflicts with this Agreement."  Although Article 19 does not state it specifically, a reasonable interpretation is that handbook provisions that *do* directly relate to bargaining unit employees' wages and hours are binding and may be enforced through the grievance procedure.

Because the sole issue in this case is contractual, there are no serious factual disputes.  The testimony was therefore quite limited.  The sole Union witness, Vice President Lew Drass, talked mainly about the impact of scheduling on employees and also stated the Union's position that advance scheduling does not necessarily require the use of overtime.

3

The Postal Service's main witness was Kevin Rachel, formerly Manager of Collective Bargaining and Labor Arbitration and now retired.  He worked with Article 19 often n the 1990s and had created a binder of reference materials for his successors, which was introduced at the hearing as Tab 4.  That compilation provides certain bargaining history about the section.  He also discussed several arbitration awards addressing the issues involved in this case.

The other Management witness was Rick Helser, a City Delivery Specialist.  He testified about how he used Form 3997 and other documents in his work.  The new delivery operating system, DOIS, uses three forms that collectively replicate Form 3997.

## III.    The Issue

The Agency defines the issue this way:  Does Section 126.3 of Handbook M-39, Management of Delivery Services, create a contractual obligation for management to schedule in advance individual employees on overtime to cover "known vacancies" when completing the weekly schedule?

The Union agrees that one issue is whether Section 126.3 creates a contractual obligation. It disagrees with the Postal Service over whether that section, even if contractually binding, would require assignment on overtime.

These two versions are essentially the same.  Both parties understand that the key question is whether Section 126.3 creates a contractual obligation enforceable under the negotiated grievance procedure.  If so, both agree that the next question is just what that obligation is.

## IV.    Pertinent Authorities

### 2011-2016 AGREEMENT

### ARTICLE 19
### HANDBOOKS AND MANUALS

Those parts of all handbooks, manuals and published regulations of the Postal Service, that directly relate to wages, hours or working conditions, as they apply to employees covered by this Agreement, shall contain nothing that conflicts with this Agreement, and shall be continued in effect except that the Employer shall have the right to make changes that are not inconsistent with this Agreement and that are fair, reasonable, and equitable. . . .

### M-39 Handbook

## 111.1   General

4

All delivery service managers are responsible for developing and maintaining their units at a high degree of efficiency and for assuring that USPS standards are maintained.  Through these broad guidelines, plus skill, knowledge, and experience, delivery service managers can be aware of whether subordinate managers and delivery employees are achieving USPS goals of service to the public.  Emphasis is placed upon the constant need for close coordination between mail processing and delivery managers so the most practical and cost effective work methods possible can be implemented.

126.3   Complete PS Form 3997, *Unit Daily Record*, as per instructions on the form or electronic equivalent from a nationally approved computer system that provides equivalent information.  (See Exhibit 126.3.)  Prepare PS Form 3997 several days in advance.  Since scheduled absences and scheduled replacements are known, add only the unscheduled absences and their unscheduled replacements.  [Form 3997, *Unit Daily Record*, immediately follows Section 126.3 in the Handbook.]

## V.     The Union's Position

The Union's position is quite simple.  It argues that Section 126.3 imposes a contractual obligation because it directly relates to bargaining unit employees' wages and hours.  Because the section regulates scheduling, it obviously relates to employees' hours.  That is what several regional arbitrators have held.  The cases relied on by the Postal Service to show that Section 126.3 is not binding do not support its position.  One arbitrator merely said that Section 126.3 does not require the scheduling of overtime, which the Union does not dispute.  Another held that Management could not be required to assign Transitional Employees in advance for specific post offices.

Section 126.3 obliges Management to schedule known replacements for vacancies that are known in advance.  The section directs Management to complete Form 3997 several days in advance; because "scheduled absences and scheduled replacements are known," the manager need only add the unscheduled absences and their replacements.  That is true both for the paper Form 3997 and for its "electronic equivalent."  Management's objections to that interpretation lack merit.  It does not matter whether From 3997 is called a Unit Daily Record.  Nor does it matter that the section does not directly relate to other negotiated provisions; the test under Article 19 is whether it relates to employees' hours.

Management cited several arbitration awards interpreting Section 126.3 but none of them help its case.  Several regional awards, on the other hand, do establish that  Section 126.3 creates enforceable rights under Article 19.

While an award of overtime may be an appropriate remedy in some cases, Management may be able to avoid overtime by scheduling as the replacement an unassigned regular, a full-time or part-time flexible, or a city carrier assistant.  At other times such as choice vacation periods, overtime may be the only way to schedule replacements.

5

## VI.    The Postal Service's Position

The Postal Service's initial point is that the M-39 Handbook is not incorporated into the Agreement by Article 19 because the relevant parts do not "directly relate" to wages, hours, or working conditions.  As Arbitrator Mittenthal pointed out in Case H4C-NA-C 81 (June 20, 1990), regulations that are only "indirectly related" to wages or hours "cannot violate Article 19."  Merely having "a potential effect" on employee behavior is not enough to bring a regulation under Article 19.

Section 126.3 is merely an instruction from management to managers on how to schedule employees.  It does not provide bargaining unit employees a right to have any type of employee scheduled in advance for a known vacancy.  Article 8 and the Joint Contract Administration Manual (JCAM) govern scheduling; neither mentions Section 126.3 or the Form 3997 addressed in that section.  As previous arbitrators have held, an internal management document that is not distributed to employees does not create enforceable rights under Article 19.

Form 3997 is a record of work, not a schedule.  The instructions on the back of the form direct supervisors to "record" the total work hours by route.  The form is not complete until the end of the day or even the next morning.  Supervisors *may* use that form as a planning but are not required to do so.  They do not share the form with employees.  Similarly, DOIS, the "electronic equivalent" of Form 3997 is not a schedule.  Portions of the information included on form 3997 appear on three DOIS reports.  They too are internal management documents that carriers do not see.

Even if Section 126.3 were enforceable, it does not require what the Union seeks.  All that section does is direct supervisors to record their scheduling; it does not require an advance schedule as the Union now seeks.  In the 50 years of its existence, Section 126.3 was never intended or understood to have the meaning the Union now gives it.  Moreover, supervisors have the authority to schedule replacements as needed, so even creating a Form 3997 in advance would not guarantee that the designated employees will actually be put on the Weekly Schedule.

## VII.    Discussion

The critical preliminary question in this case is whether Section 126.3 creates enforceable rights under Article 19 of the Agreement.  According to Article 19 and the main arbitrable interpretations, parts of handbooks that "directly relate" to the wages, hours, or working conditions of bargaining unit employees may "contain nothing that conflicts with" the Agreement and "shall be continued in effect," subject only to management's right to make "fair, reasonable, and equitable" changes that are consistent with the Agreement.

On that much everyone agrees.  They differ on whether that section "directly" relates to the covered topics.  If it does, it binds the Postal Service for the purposes of this grievance.  The next step would be to determine just what the section requires — whether, in effect, Section 126.3 and Form 3997 oblige management to schedule employees in advance so that they are entitled to certain

work, or whether the purpose is just to create a record of actual assignments. If it does not "directly" relate to bargaining unit employees' wages, hours, and working conditions, however, the inquiry is at an end: Section 126.3 would not bind the Postal Services for the purposes of this grievance. Because the grievance relies entirely on the Union's interpretation of that section, the grievance would therefore have to be denied. Any "indirect" effect on wages or hours is irrelevant to the issue in this case.

## A.    Arbitral Precedent

Answering that question requires a brief review of the main arbitral precedents. The first case relied on by the Postal Service, Arbitrator Richard Mittenthal's 1990 decision in an APWU grievance, H4C-NA-C 81, mainly emphasized Article 19's use of the term "direct." He distinguished direct relationships from those that are indirect or unrelated. Importantly, he also stated that the subject matter of the regulation, not its effect, determines whether Article 19 applies.

The second case on which the Postal Service relies is Arbitrator Howard Gamser's 1982 decision in another APWU grievance, H8C-NA-C 61. The main importance of that decision is the arbitrator's distinction between internal management documents that instruct managers about how to carry out their jobs and thus do not directly affect employee rights, and other documents that change existing employee rights or create new requirements.

The tricky part, of course, is to determine which is which. On that point, the Postal Service points to a third decision, my 2002 award in an NALC case, Q98N-4Q-C01090839. I noted there that the publication at issue was distributed to employees and included instructions to them about obtaining FMLA rights. It was not, therefore, simply an internal management communication intended only to direct managers.

Applying the Gamser distinction to a different document, Arbitrator Shyam Das found in an a 2009 APWU case, Q94T-4Q-C 9809959, that a bulletin to managers about when employees should perform preventive maintenance tasks and how long that should take did not directly relate to wages or hours and thus was outside the scope of Article 19.

Finally, on June 15 the Postal Service submitted a recent decision by Arbitrator Stephen Goldberg in an APWU case, Q06C-4Q-C 10033773. The Postal Service had rescinded Handbook AS-707 F and replaced it with Publication 156. Both dealt with contract postal units. Arbitrator Goldberg agreed with the Postal Service that the parts of Handbook AS-707 F that "provide guidance to managers, and do not establish rules that employees must follow, nor impact existing employee rights or benefits, do not 'directly relate to wages, hours or working conditions'" and thus do not fall within Article 19. He reached that conclusion in part because there was no evidence that there was no evidence he handbook was ever intended to protect the Union's claims to work.

The Union responded the next day. It pointed out that the handbook in Arbitrator Goldberg's case really had nothing to do with wages, hours, or working conditions. Moreover, one of the

7

arbitrator's reasons for his decision was that the APWU had not participated in drafting the handbook in question.  That, it asserts, is irrelevant to the instant case because the only question at issue is whether Section 126.3 directly relates to hours or working conditions; how the section was drafted makes no different.

While the Union undoubtedly would have preferred different emphases, it does not challenge any of those decisions.  Instead, it primarily relies on several regional awards that, in contrast to the national awards cited by the Postal Service, specifically addressed Section 126.3.[1]  The difficulty with relying on regional awards in a national level interpretive case like this is that regional level arbitrators lack authority to interpret the national Agreement and manuals.  While regional arbitrators do not always restrain themselves from doing so, the limitation on their powers means at the least that their interpretations carry less weight.  Nevertheless, for whatever help they may offer, I review the cited regional and summarize some of the holdings here.

Arbitrator Jonathan Klein held in C01N-4C0C 05149941 (2006) that Section 126.3 unambiguously required Form 3997 to be prepared several days in advance, and that included scheduled absences and replacements.  He directed management to "cease and desist" from failing to schedule known vacancies in advance.  Critically, though, he did not first interpret Article 19 to determine whether Section 126.3 was actually included in the Agreement by virtue of Article 19.  In effect, what he said was that *if* the Section were binding by virtue of Article 19, he interpreted that section to require advance scheduling for known vacancies.

Arbitrator Marilyn Zuckerman reached a similar conclusion in Case B06N-4B-C 10205734 (2010). Relying in part on Arbitrator Klein's decision, she held that the application of Section 126.3 to the facts of her case was "non-interpretive and no different than what arbitrators on the regular panel do day-in and day-out."   Like Arbitrator Klein, she held that Section 126.3 required management to complete Form 3997 and to schedule a carrier in advance for a known vacancy.  And again like Arbitrator Klein, she did not address the preliminary interpretive question of whether Section 126.3 directly related to wages or hours.

The same is true of the other regional cases submitted by the Union with its brief.  In Case K06N-4K-C 12299507 (2013), Arbitrator Mark Rosen directed management to comply with Section 126.3 but did not first decide whether Article 19 incorporated that section.  In Case B06N-4B-C

---

[1]The one national level case on which it relied was Case B94N-4B-C 97105300 (Stephen Briggs 2002). Although his case involved a different section, he noted that "The parties agree" that M-39 and M-41 directly related to wages, hours, or working conditions and therefore fell under Article 19.  His brief statement about that agreement provides no explanation, nor does it quote any specific statements about the Postal Service's concession.  That lack of explanation makes it impossible to determine whether the Postal Service was talking only about the portions of M-39 at issue in that case or whether it was making a definitive statement that *all* portions of two large handbooks "directly related" to wages and hours.

It seems highly unlikely that in a case focusing on one narrow point the Postal Service actually intended to concede that *every other* portion of the two handbooks was also subject to Article 19.  For lack of clearer evidence, I do not find that Arbitrator Briggs's statement controlling here.

8

10406986 (2011), Arbitrator Anthony Ross found that management was obliged to schedule carriers in advance on Form 3997, even though he denied the grievance in that instance. NALC Exhibit 15 is particularly interesting because of its contrast with Arbitrator Mittenthal's award discussed above. Arbitrator Mittenthal held that the subject matter of the regulation, not its effect, determined whether the regulation directly related to wages or hours. Arbitrator Donald E. Olson, Jr., in Case F01N-4F-C 06017920 (2006) turned that principle on its head. Even after quoting Arbitrator Mittenthal, Arbitrator Olson held that Section 126.3 fell under Article 19 in that case precisely because management's scheduling decisions had a direct *impact* on employee hours and working conditions.

I have reviewed these decisions at length because both parties placed a great deal of weight on them. Here is where they leave us on the initial question of whether Section 126.3 creates binding rights under Article 19.

- First, the national level awards, which of course are the only ones with precedental effect on this case, agree that a handbook provision comes under Article 19 only if it "directly" relates to wages, hours, or working conditions.

- Second, According to Arbitrator Mittenthal, whose interpretation has not been challenged by any later national award, the key factor in determining whether there is a direct relation is the *subject matter* of the regulation, not merely whether it has an *effect* on working conditions.

- Third, according to Arbitrator Gamser, a management communication directing other managers how to their jobs is not within Article 19 if it does not change any rights granted in the Agreement.

- Fourth, as demonstrated in my 2002 award and in Arbitrator Das's 2009 award, one strong indicator of whether a regulation is intended to create enforceable rights is whether the document was distributed to employees. In my case, management distributed the publication to employees. I therefore found that it was intended to create enforceable rights and thus fell under Article 19. In Arbitrator Das's case, the bulletin was addressed only to managers and merely told them how to perform their own jobs; it therefore did not come under Article 19. Similarly, Arbitrator Goldberg's case involved parts of a handbook that "provide[d] guidance to managers," and neither created rules for employees nor affected existing employee rights and benefits. As a result, it was not directly related to wages, hours, or working conditions.

- Finally, the regional decisions generally hold that *if* Article 19 incorporates Section 126.3, that section then requires management to complete Form 3997 as a scheduling tool. Because the regional arbitrators lack authority to interpret the national Agreement, however, their interpretation of Section 126.3 does not come into play unless Article 19 actually incorporates that section.

9

**B.      Analysis**

After carefully considering the text of Section 126.3, the evidence about its history and use, the cited arbitral precedent, and the parties' arguments, I find that the section is not incorporated into the Agreement by means of Article 19.

The basis for any grievance must be found in the Agreement itself.  In addition to the words of the Agreement, however, Article 19 provides for the incorporation of certain provisions from Postal Service handbooks and other communications.  Article 19 defines the incorporated provisions as those that "directly relate to wages, hours or working conditions" of bargaining unit employees.  The most important word in that sentence is "directly."  Were that word not in Article 19, then every handbook provision that "relates to" working conditions, however remotely or indirectly, would be enforceable through the grievance procedure.  Because it is there, however, Article 19 covers only those provisions with a very close relationship to the listed subjects.

In determining whether a provision directly relates to wages or hours, the most important factor, as Arbitrator Mittenthal pointed out, is the subject matter.  Virtually everything that a manager does affects employees in some way or another.  If simply having an effect on employees were the test, then virtually every handbook would be incorporated in the Agreement.  The subject matter, then, must itself *directly* relate to wages, hours or working conditions.

Applying Arbitrator Mittenthal's test to Section 126.3, I find that the Union did not prove that Section 126.3 *directly* related to wages or hours.  The subject matter of that section is an instruction to supervisors to complete a particular form, described as a "Unit Daily Record," several days in advance.  Using that form does not assign or guarantee employees any hours.  To be sure, using that form might award hours to some employees, but that concerns the form's effect, not its purpose.  Even that limited effect would only be a byproduct of using the form to control scheduling, not its purpose.

Applying Arbitrator Gamser's test, I find that Section 126.3 does not change any rights granted in the Agreement.  It simply tells managers how to perform their own jobs.  It neither limits nor expands existing employee rights.  It thus did not directly relate to employee hours.

Applying the test used by Arbitrators Das and Goldberg, I find that Section 126.3 was directed and published to managers rather than to bargaining unit employees.  In Arbitrator Goldberg's words, it provided guidance to managers and neither created new rules for employees or changed existing ones.  Again, the relationship to employee hours is at most indirect.

As in other contractual cases, the Union bears the burden of proof.  Here, that requires the Union to show the *direct* relationship between the provision at issue and employee hours.  It failed to do so; the grievance must therefore be denied.

10

**AWARD**

The grievance is denied.

*Dennis R. Nolan*

_____

**Dennis R. Nolan, Arbitrator**

**June 29, 2015**

**Date**

# EXHIBIT H

# NATIONAL ARBITRATION
## CASE  NO. E95R-4E-D 01027978

In the Matter of the Arbitration Between

UNITED STATES POSTAL SERVICE

   - and -

NATIONAL RURAL LETTER  CARRIER'S
ASSOCIATION

Subject:- "Review and
Concurrence for Discipline"

Article 16.6

Dana Edward Eischen, National Arbitrator

<u>Appearances</u>

For the NRLCA:          Peer & Gan, LLP
                              by
                      Dennis D. Clark, Esq.
                      Michael Gan, Esq., of Counsel

For the U.S.P.S.:       John W. Dockins, Esq.
                      William Daigneault, Lab. Rel. Specialist

<u>Also Present</u>

<u>For the NRLCA</u>                     <u>For the U.S.P.S.</u>

Gus Baffa, President
Randy Anderson, Dir. Labor Relations

Olie Turner, Postmaster
Robert Horsdig, Lab. Rel. Spec.
John Ingram, Lab. Rel. Spec.
Jim Hellquist, Lab. Rel. Spec.
Charles Baker, Lab. Rel. Spec.
Frank Keenan, Lab. Rel. Spec. (ret.)
Marty Rothbaum, Lab. Rel. Spec.
Roy Shirkey, Lab. Rel. Spec.


RECEIVED
DEC 10 2002
COLLECTIVE BARGAINING AND ARBITRATION
LABOR RELATIONS

2

## PROCEEDINGS

Article 15, Section 5 of the National Agreement between the United States Postal Service ("USPS" or "Employer") and the National Rural Letter Carrier's Association ("NRLCA" or "Association") provides for two-tier grievance arbitration: Article 15.5.C "National Arbitration" of "certified cases involving national interpretations" and/or "other cases which the parties agree have substantial significance"; and, Article 15.5.D "area arbitration" of "removal cases and contract cases not involving national issues". In December 2001, these Parties designated me to serve as their National Arbitrator, to hear and decide unresolved national level interpretive grievances filed at Step 4, in accordance with Article 15, Section 3.D of the National Agreement.

The record before the National Arbitrator in this case presents a fundamental conflict between the NRLCA and the United States Postal Service concerning the proper interpretation of the "review and concurrence" provision contained in Article 16, Section 6 of their National Agreement. It is not disputed that this review and concurrence language has been a fertile source of controversy over the last thirty (30) years, resulting in scores of decisions by area arbitrators interpreting and applying its provisions. The ostensible vehicle for bringing certain generic issue(s) concerning the interpretation and application of Article 16.6 to this National Arbitration, at this time, was a grievance concerning the removal of rural carrier Ms. Julie DeWitt, from the Buhl, Idaho post office. However, the DeWitt grievance, *per se,* is not before the National Arbitrator for decision in this proceeding.

The Grievant in that case was issued a Notice of Removal dated October 6, 2000, for allegedly driving unsafely and failing to immediately report an accident. As a defense, the NRLCA asserted that there was improper review and concurrence as required by Article 16.6. The Postal

3

Service disagreed with the NRLCA's interpretation of Article 16.6 and the Association declared the issue to be interpretive.

After the Association referred the instant case to Step 4 of the parties' grievance procedure, the Postal Service referred to Step 4 a number of other removal grievances, which had been denied at Step 3 and were pending area arbitration. The Postal Service determined that each of those cases raised Article 16.6 issues likely be impacted by the national interpretive decision on the issues raised herein. [The record is not entirely clear whether the number of related cases held in abeyance is sixteen (16) or twenty-one (21). It is noted that Attachment H to the NRLCA post-hearing brief is a list of relevant information about sixteen (16) such cases. Each entry contains the name of the Grievant, the location where he or she was employed, the NRLCA case number, the Postal Service case number, subject of the grievance, date of the Step 3 denial, date the case was appealed to area arbitration, date (if any) the case had been scheduled for area arbitration, and the date when the case was referred to Step 4 by the Postal Service (if known).]

Some of these cases apparently involve grievances concerning both an emergency suspension and the subsequent removal of the Grievant, which were consolidated during the grievance procedure. Like the DeWitt case, these related cases have also been held at Step 4, awaiting the resolution of the national interpretive issues presented in this case. The Parties agree that these cases (some of which were appealed to area arbitration as far back as 2000) should be processed in area arbitration as expeditiously as possible. To that end, at the hearing in this case, the parties stipulated that the National Arbitrator should also decide in this proceeding "the issue of what to do with the pending Step 4 cases that have similar issues in them."

4

The broad, general interpretive issues concerning the "review and concurrence" provision of Article 16.6, as presented in the Step 4 appeal and answer, are decided herein, without reference to the specifics of the DeWitt case. Further, no opinion is expressed or implied by this National Arbitrator concerning the facts or merits of that specific grievance nor concerning the facts and merits of the other related cases which are also pending hearing in area arbitrations; held in abeyance by the Parties, pending the outcome of the national interpretation issue(s) appealed to Step 4 by the Union in the instant case, pursuant to Article 15, Section 3.D of the National Agreement.

A National Arbitration hearing was held at Washington, D.C., on June 4, 2002, at which both Parties were represented by Counsel and afforded full opportunity to present documentary evidence, testimony subject to cross-examination and oral argument. A transcribed certified stenographic record was made and the proceedings were closed with the filing and exchange of briefs and reply briefs. The Parties graciously granted an extension of the contractual time limits for rendition of the Opinion and Award.

## PERTINENT NATIONAL AGREEMENT PROVISIONS

### ARTICLE 15
### GRIEVANCE AND ARBITRATION PROCEDURE

**Section 1. General Policy**

Grievances which are filed pursuant to this Article are to be processed and adjudicated based on the principle of resolving such grievances at the lowest possible level in an expeditious manner, insuring that all facts and issues are identified and considered by both parties. In the event that a grievance is processed beyond Step 1, both parties are responsible to insure all facts, issues and documentation are provided to the appropriate union and management officials at the next higher level of the grievance procedure. The parties further agree that at any step in the grievance procedure, the Union representative shall have full authority to settle or withdraw the grievance in whole or in part. The Employer representative, likewise, shall have full authority to grant, settle or deny the grievance in whole or in part.

**Section 2. Definition**

A grievance is defined as a dispute, difference, disagreement or complaint between the parties related to wages, hours, and conditions of employment. A grievance shall include, but is not limited to, the

5

complaint of an employee or of the Union which involves the interpretation, application of, or compliance with the provisions of this Agreement.

* * *

## Section 4. Grievance Procedure-General

### A. Observance of Principles and Procedures

The parties expect that good faith observance, by their respective representatives, of the principles and procedures set forth above will result in settlement or withdrawal of substantially all grievances initiated hereunder at the lowest possible Step and recognize their obligation to achieve that end.

### B. Failure to Meet Time Limits

The failure of the employee or the Union at Step 1, or the Union thereafter, to meet the prescribed time limits of the Steps of this procedure, including arbitration, shall be considered as a waiver of the grievance.

### C. Failure to Schedule Meetings

Failure by the Employer to schedule a meeting or render a decision in any of the Steps of this procedure within the time herein provided (including mutually agreed to extension periods) shall be deemed to move the grievance to the next Step of the grievance-arbitration procedure.

### D. National Level Grievance

It is agreed that in the event of a dispute between the Union and the Employer as to the interpretation of this Agreement, such dispute may be initiated as a grievance at the Step 4 level by the President of the Union. Such a grievance shall be initiated in writing and must specify in detail the facts giving rise to the dispute, the precise interpretive issues to be decided and the contention of the Union. Thereafter the parties shall meet at Step 4 within thirty (30) days in an effort to define the precise issues involved, develop all necessary facts, and reach agreement. Should they fail to agree, then, within fifteen (15) days of such meeting, each party shall provide the other with a statement in writing of its understanding of the issues involved, and the facts giving rise to such issues. In the event the parties have failed to reach agreement within sixty (60) days of the initiation of the grievance at Step 4, the Union then may appeal it to arbitration, within thirty (30) days thereafter.

* * *

## Section 5. Arbitration

### A. General

A request for arbitration must be submitted within the time limit for appeal as specified for the appropriate Step. The National President of the Union must give written authorization of approval to the Employer at the national level before the request for arbitration is submitted.

Grievances referred to arbitration will be placed on a pending arbitration list. Except for discharge cases, the Union will have sixty (60) days from the date of such referral to certify the case to be scheduled for arbitration at the earliest possible date. Cases which are not certified for arbitration within the sixty (60) day period shall be considered waived and removed from the pending arbitration list. Discharge cases referred to arbitration shall be placed on a separate pending arbitration list. The Union will have fifteen (15) days from the date of such referral to certify the case to be scheduled for arbitration at the earliest possible date. Cases which are not certified for arbitration within the fifteen

6

(15) day period shall be considered waived and removed from the pending arbitration list. If there are other certified disciplinary cases related to the employee's removal grievance, these cases shall be scheduled for hearing along with the removal cases.

The case with the lowest docket number pending before a panel will be scheduled to be heard first. However, the parties may mutually agree to assign such cases for hearing out of numerical sequence in order to fill a vacated hearing date, or to lessen the amount of the arbitrator's travel time and expense or for other valid reasons. Arbitration hearings shall be held during working hours. Employee witnesses shall be on Employer time when appearing at the hearing provided the time spent as a witness is part of the employee's regular working hours.

Any dispute as to arbitrability may be submitted and determined by the arbitrator. The arbitrator's determination shall be final and binding. The arbitrator shall render his award within thirty (30) days of the close of the hearing, or if briefs are submitted, within thirty (30) days of the receipt of such briefs on cases which do not involve interpretation of the Agreement, or are not of a technical or policy making nature. On all other cases, the award shall be rendered within thirty (30) days if possible. All decisions of the arbitrator shall be limited to the terms and provisions of this Agreement and in no event may the terms and provisions of this Agreement be altered, amended or modified by the arbitrator. Unless otherwise provided in this Article, all costs, fees and expenses charged by an arbitrator will be borne by the party whose position is not sustained by the arbitrator. In those cases of compromise where neither party's position is clearly sustained, the arbitrator shall be responsible for assessing costs on an equitable basis.

**B. Selection of Panels**

National and Area Arbitration Panels are established as set forth below:

The members of these panels will be selected in accordance with the procedure set forth below and will serve for the term of this Agreement and shall continue to serve for six (6) months thereafter unless the parties otherwise mutually agree. To assure the expeditious processing of grievances, the parties by agreement may increase the size of these panels at any time. Should vacancies occur, or additional members be required on the National or Area panels, such vacancies shall be filled by mutual agreement. In the event the parties cannot agree on individuals to serve on these panels, or to fill any vacancies which may exist, a list of five (5) arbitrators will be supplied by the American Arbitration Association for each selection to be made. The parties shall then proceed by alternately striking names from the list until only one individual remains. Such individual shall be selected to remain on the panel.

**C. National Arbitration**

Effective August 3, 1996, a National Panel of not more than three (3) arbitrators will be established to hear certified cases involving national interpretations or other cases which the parties agree have substantial significance. Arbitrators on the National Panel will be assigned to hear cases on a rotating basis. Member(s) of the Area Panel may by mutual agreement be member(s) of the National Panel.

Prior to the scheduled hearing each party to the dispute may separately submit to the arbitrator who has been assigned the case, and to the other party to the dispute, a statement setting forth the following:

    a. the facts relevant to the grievance;
    b. the issue in the case;
    c. the position(s) or contention(s) of the party submitting the statement.

7

The parties may by mutual agreement submit a joint statement to the arbitrator. A stenographic record will be taken if requested by either party to the dispute. In such case, the cost of such record shall be borne by the requesting party. The other party, upon request, will be furnished a copy of the record, in which case the cost of such record shall be borne equally by both parties to the dispute.

## D. Area Arbitration

A geographically balanced Area Panel of arbitrators is established to hear removal cases and contract cases not involving national issues.

Normally, a stenographic record shall not be taken at these hearings, nor post hearing briefs filed. However, either party may make exception to this policy. The case with the lowest docket number pending before a panel will be scheduled to be heard first. However, the parties may mutually agree to assign such cases for hearing out of numerical sequence in order to fill a vacated hearing date, or to lessen the amount of the arbitrator's travel time and expense or for other valid reasons.

## ARTICLE 16
## DISCIPLINE PROCEDURE

### Section 1. Statement of Principle

In the administration of this Article, a basic principle shall be that discipline should be corrective in nature, rather than punitive. No employee may be disciplined or discharged except for just cause such as, but not limited to, insubordination, pilferage, intoxication (drugs or alcohol), incompetence, failure to perform work as requested, violation of the terms of this Agreement, or failure to observe safety rules and regulations. Any such discipline or discharge shall be subject to the grievance-arbitration procedure provided for in this Agreement, which could result in reinstatement and restitution, including back pay.

For minor offenses by an employee, management has a responsibility to discuss such matters with the employee. Discussions of this type shall be held in private between the employee and the supervisor. Such discussions are not considered discipline and are not grievable.

Following such discussions, there is no prohibition against the supervisor and/or the employee making a personal notation of the date and subject matter for their own personal record(s). However, no notation or other information pertaining to such discussion shall be included in the employee's personnel folder. While such discussions may not be cited as an element of a prior adverse record in any subsequent disciplinary action against an employee, they may be, where relevant and timely, relied upon to establish that employees have been made aware of their obligations and responsibilities.

### Section 2. Letter of Warning

A letter of warning is a disciplinary notice in writing, identified as an official disciplinary letter of warning which shall include explanation of a deficiency or misconduct to be corrected.

### Section 3. Suspension of 14 Days or Less

In the case of discipline involving suspensions of fourteen (14) days or less, the employee against whom disciplinary action is sought to be initiated shall be served with a written notice of the charges against the employee and shall be further informed that the employee will be suspended after two (2) working days during which two-day period the employee shall remain on the job or on the clock (in pay status) at the option of the Employer. For the term of the 1995 Agreement, the notice period shall be increased to ten (10) calendar days and if the employee initiates a grievance during that period, the

8

suspension will not be served until disposition of the grievance or issuance of the Step 2 decision, whichever comes first

## Section 4. Suspension of More Than 14 Days or Discharge

In the case of suspension of more than fourteen (14) days or of discharge, any employee shall, unless otherwise provided herein, be entitled to an advance written notice of the charges against the employee and shall remain either on the job or on the clock at the option of the Employer for a period of thirty (30) days. Thereafter, the employee shall remain on the rolls (non-pay status) until disposition of the employee's case has been had either by settlement with the Union or through exhaustion of the grievance-arbitration procedure.

When there is reasonable cause to believe an employee is guilty of a crime for which a sentence of imprisonment can be imposed, the advance notice requirement shall not apply and such an employee may be immediately removed from a pay status.

## Section 5. Emergency Procedure

An employee may be immediately placed on an off-duty status (without pay) by the Employer, but remain on the rolls where the allegation involves intoxication (use of drugs or alcohol), pilferage, or failure to observe safety rules and regulations, or in cases where retaining the employee on duty may result in damage to U.S. Postal Service property, loss of mail or funds, or where the employee may be injurious to self or others. The employee shall remain on the rolls (non-pay status) until disposition of the case has been had. If it is proposed to suspend such an employee for more than fourteen (14) days or discharge the employee, the emergency action taken under this section may be made the subject of a separate grievance.

## Section 6. Review of Discipline

**In no case may a suspension or discharge be imposed upon an employee unless the proposed disciplinary action has first been reviewed and concurred in by a higher authority. Such concurrence shall be in writing.** (Emphasis added)

In associate post offices of twenty (20) or less employees, or where there is no higher level supervisor than the supervisor who proposes to initiate suspension or discharge, the proposed disciplinary action shall first be reviewed and concurred in by a higher authority outside such installation or post office before any proposed disciplinary action is taken.

* * * * *

## ISSUES

The Parties did not formulate a joint submission to arbitration nor did either Party elect to file individual pre-hearing statements of relevant facts, issues and contentions, as suggested by Article 15, Section 5.C. At the arbitration hearing, the Parties submitted differing articulations of the interpretive issues presented for determination in this matter. Before setting forth those respective statements of issues, however, it is instructive to review the process leading to the certification of this case to National Arbitration under Article 15.5.C.

The dispute concerning the proper interpretation of Article 16.6, now under consideration, crystallized during Step 3 discussions of the Dewitt discharge area grievance (E95R-4E-D 01027978). In that context, by letter dated May 11, 2001, Mr. Baffa submitted the matter to Step 4 in accordance with Article 15.4.D and requested national arbitration, as follows:

> The purpose of this letter is to appeal the subject-named grievance to Step 4. The union is appealing the above referenced case from Area Arbitration to Step 4 because the union believes it contains nationally interpretive issues.
>
> This appeal letter does not constitute a waiver by this Union of any issue or violation as it relates to this grievance; it is for the sole purpose of bringing this grievance to a Step 4 hearing.
>
> Please schedule this grievance for an early discussion.

The attached written grievance submitted to national handling at Step 4 by Mr. Baffa read as follows:

> The NRLCA position and interpretation of Article 16, Section 6, which many Area Arbitrators continue to conclude, if the facts of the particular case permit, that Article 16.6 of the National Agreement is violated if:
>
> 1) There is a "command decision" from above;
>
> 2) There is a joint decision to impose a suspension or discharge;
>
> 3) There is a failure of either the initiating or review and concurring official to make an independent substantive review of the evidence prior to the imposition of a suspension or discharge;

10

4) There is no evidence of written review and concurrence prior to the imposition of a suspension or discharge;

5) There is no showing of harm.

In recent Step 3 decisions, the USPS designee refers to the Association's position on review and concurrence as a "total bastardization of Article 16, Section 6." The Association strongly disagrees with the USPS designee's characterization as expressed in this and other Step 3 decisions involving Article 16.6. The Association's position is grounded in the language of Article 16.6 and the many arbitration awards between the Association and the LISPS. Based on the above referenced Step 3 decisions, is it the position and interpretation of the USPS that Article 16.6, as agreed to in the 1995-99 National Agreement and Extension, bars the Association from citing as violations of Article 16.6 the following:

1) "Command decisions" from above;

2) Joint decisions;

3) Failure of either the initiating or review and concurring official to make an independent substantive review of the evidence, prior to the imposition of a suspension or discharge;

4) No evidence of written review and concurrence prior to the imposition of a suspension or discharge.

Following Step 4 discussions of these Article 16.6 national interpretive issues between USPS Labor Relations Specialist William Daigneault and NRLCA Director of Labor Relations Randy Anderson, Mr. Daigneault denied the national interpretive grievance at Step 4, by letter of September 27, 2001, as follows:

Re: E95R-4E-D 01027978  J. DeWitt Buhl, ID 83316-9998

On several occasions, the most recent being September 14, 2001, I discussed with the Union the above-captioned grievance at the fourth step of our contractual grievance procedure.

The issue in this grievance concerns the interpretation of Article 16.6 of the National Agreement concerning review and concurrence of discipline.

It is the Union's position that a violation of Article 16.6, Review of Discipline has occurred in the following situations:

1. There is a command decision from higher authority that instructs the issuance of a suspension or discharge.

2. The decision by the in initiating official to suspend or discharge is reached jointly with the review and concurring official and was not an independent decision by the initiating official.

3. The initiating official or reviewing official failed to complete an independent substantive review of the evidence prior to the imposition of the suspension or discharge.

11

4. There is no evidence of written review and concurrence prior to the imposition of the suspension or discharge.

It is the Union's position that a showing of harmful error in relation to review and concurrence is not required to sustain the Union's grievance on the discipline. The Union also contends that their position is "grounded in the language of Article 16.6 and the many arbitration awards between the USPS and NRLCA."

It is the position of the Postal Service that Article 16.6 restricts a supervisor, manager or postmaster from imposing a suspension or discharge upon an employee in the rural carrier bargaining unit without review and concurrence by a higher authority. It protects carriers from a new, inexperienced supervisor that intends to suspend or remove the carrier without just cause. It provides for a higher authority to review the situation (either review of paperwork, discussion with proposing official or general knowledge of the situation giving rise to the charges) to determine whether, on the surface, it appears that the action being proposed is appropriate.. It requires that the higher authority document his/her concurrence with the action being proposed in writing.

Article 16.6 does not require that the concurring official conduct an independent investigation. It does not prohibit the concurring official from having previous knowledge of the charges, discussing the charges with the proposing official, being involved in the investigation with the proposing official or providing advice. It does not restrict management from having more than one concurring official.

In the case at hand, the Union alleges Management violated Article 16.6 claiming the review and concurrence was nothing more than a "rubber stamp." The Union contends that the review and concurrence official did not review anything except the proposing official's request for discipline.

It is Management's position that the concurring officials in the case at hand went above and beyond the requirements of Article 16.6. While the contract only requires review a nd concurrence by one higher authority, several managers in higher authority reviewed the evidence submitted by the proposing official in this case. All the managers agreed the action being proposed was appropriate.

In the absence of any contractual violation, this grievance is denied. Time limits were extended by mutual consent.

At the arbitration hearing in this matter, each Party submitted its own specific statement of national interpretive issues regarding violations and compliance with Article 16.6, upon which it seeks a decision in this case. Additionally, they submitted by joint stipulation two other "issues of national significance", regarding appropriate remedies for proven violations of Article 16.6 and post-National Arbitration administration of the pending area arbitration cases, now held in abeyance. Rather than rewording the issues advanced by the Parties into some form of synthesized issues, I will address in this Opinion and Award the following joint and several interpretive concerns expressed by the Parties, respectively, in their Step 4 correspondence and at the arbitration hearing, viz.:

12

1) Is Article 16.6 <u>Review of Discipline</u> of the Extension to the 1995-1999 USFS-NRLCA National Agreement violated if:

    a)  The lower level supervisor consults, discusses, communicates with or jointly confers with the higher reviewing authority before deciding to propose discipline;

    b)  There is a "command decision" from higher authority to impose a suspension or discharge;

    c)  There is a joint decision by the initiating and reviewing officials to impose a suspension or discharge;

    d)  The higher level authority does not conduct an independent investigation and relies upon the record submitted by the supervisor when reviewing and concurring with the proposed discipline;

    e)  There is a failure of either the initiating or reviewing official to make an independent substantive review of the evidence prior to the imposition of a suspension or discharge;

    f)  There is no evidence of written review and concurrence prior to the imposition of a suspension or discharge.

2) Does a proven violation of Article 16.6 automatically sustain the grievance and overturn any discipline, absent a showing of "actual harm", *i.e.*, "that the reviewing official would not have concurred with the proposing official and that the discipline would not have been issued in the first instance".

3) What should be done next with those pending Step 4 cases which have been held in abeyance for area arbitration, awaiting the outcome of this National Arbitration case?

13

# POSITIONS OF THE PARTIES

The following statements of position have been edited from the respective posthearing briefs and reply briefs.

## NRLCA

It is the Association's position that Article 16.6 requires two separate independent judgments on discipline -- the first by the initiating official who proposes discipline, and the second by a higher authority who reviews and concurs in that discipline before it is imposed. It is the Association's position that such requirement is violated : (1) when the initiating official does not possess the freedom to make his own independent determination on discipline free of command from higher authority, (2) when the initiating and concurring officials jointly make one decision, or (3) when the concurring official does not meaningfully review the record before concurring in the proposed discipline. In each such instance, there have not been two separate independent judgments on discipline, and the rural carrier who is facing the potential loss of his livelihood has been deprived of the due process protection -- the essential "check and balance" -- that Article 16.6 is intended to provide.

Compliance with Article 16.6 is required in every case before a suspension or discharge can be imposed. Failure by the Postal Service to comply with Article 16.6's dictates is fatal to the disciplinary action  Consequently, the appropriate remedy for such violation is reinstatement with full back pay, without consideration of the underlying merits of the disciplinary action.  The Postal Service apparently contends that a "harmless error" rule should apply to Article 16.6 violations -- that the disciplinary action should stand notwithstanding such violation if it can be shown that the same action would have been taken even if Article 16.6 had been complied with.  The Postal Service is wrong. Article 16.6 says nothing about a "harmful error" requirement but it does say that "in no case" may discipline be imposed without compliance with Article 16.6's due process requirements. In addition, the Postal Service also offers the totally insupportable notion that in the case of a proven Article 16.6 violation, the aggrieved employee is not to be reinstated to his job but merely to receive backpay from the date of his removal to the date of a Step 2 decision in the grievance process.  As in the case of Article 16.6's due process requirement -- two separate independent judgments on discipline -- the arbitral remedy for a violation of Article 16.6 -- reinstatement with full backpay -- has been incorporated into the parties' agreement. The universal arbitral remedy of reinstatement, and the almost universal arbitral remedy of full backpay, has never been addressed by the Postal Service in collective bargaining negotiations.

The language of Article 16.6 has been in the parties' agreements for more than 30 years. The language has been interpreted consistently by area arbitrators throughout this period. The Postal Service has never sought to renegotiate that language to undo any of the interpretations of those arbitrators, and this National Arbitrator should not do now for the Postal Service what it has failed to seek or achieve at the bargaining table.

## USPS

Because the language at issue is so clear and unambiguous there is no need to search any further.  If the NRLCA wants to impose more stringent standards and criteria of review then they should negotiate such changes at the bargaining table.  To pretend that such criteria are present in the long standing

14

language of Article 16.6 is to ignore the plain meaning of the language itself. Absent any special meaning assigned by the parties to the words "review" and "concur", the Arbitrator is bound by the language of the bargain as expressed in Article 16.6. A careful reading of Article 16.6 reveals that the language does not call for overturning a removal action but states that "In no case may a suspension or discharge be imposed upon an employee unless the proposed disciplinary action has *first* been reviewed and concurred in by a higher authority". (Emphasis added) Therefore, where a violation of Article 16.6 is found to have taken place the only appropriate remedy is to place the employee back into a pay status until review and concurrence takes place. Once review and concurrence takes place the discipline may then be imposed.

In summary, the ability to issue and impose discipline is an exclusive management right expressly incorporated into the Collective Bargaining Agreement at Article 3. Article 16.6 merely requires a procedure that two management officials concur before a suspension or discharge is imposed. It does not in any way alter the exclusive discretion that management has in issuing or imposing suspensions and removals. There is no violation of Article 16.6 if the proposing official consults, discusses, communicates with or jointly confers with the reviewing official before deciding to propose discipline. There is no violation of Article 16.6 if the reviewing official does not conduct an independent investigation and relies on the record submitted by the proposing official. As long as the reviewing official can articulate that a review has occurred and concurrence was given in writing, the Postal Service has met its obligation under Article 16.6. The standard of review required by Article 16.6 is simply and only that each of the management officials is satisfied that suspension or discharge be imposed.

Because the "review and concur" requirement does not factor into the "just cause" determination, any potential remedy should not disturb the final analysis regarding "just cause" in any particular case. Furthermore, any procedural defect of noncompliance with Article 16.6 will have been cured at Step 2 of the grievance procedure because a higher authority will have reviewed the file and issued a written concurrence in the form of a Step 2 denial. Even if a violation of Article 16.6 can be proven, the NRLCA still must demonstrate in each individual case how the grievant has been harmed.   A violation of Article 16.6 does not automatically sustain the grievance, but rather the Association has the burden of showing that a harmful error has occurred. At the most, the appropriate remedy would be to delay imposition of the discipline until such written concurrence has occurred. Finally, all pending Step 4 grievances in which the NRLCA alleges a violation of Article 16.6 should be remanded to Step 3 for application of the award in this case.

15

## OPINION OF THE NATIONAL ARBITRATOR

### Bargaining History, Arbitral Authority and Mutual Intent

Certification of the instant case to Article 15.5.C National Arbitration marks the first occasion for a definitive resolution of the national interpretive issues presented, *supra*. However, the contract language under analysis in this case has been part of the collectively negotiated contracts between these parties for some thirty (30) years. Thus, a certain valuable perspective is gained by considering the bargaining history and administrative practice thereunder; especially since this very language has been so frequently interpreted and applied in final and binding decisions by scores of arbitrators in Article 15.5.D area arbitration of removal cases.

Turning first to bargaining history, the language which now appears as Article 16.6 of the current USPS/NRLCA National Agreement is essentially unchanged, dating from the 1971-73 Joint Collective Bargaining Agreement. Following passage of the Postal Reorganization Act of 1970, the major craft unions representing postal employees bargained jointly with the Postal Service and entered into a joint collective bargaining agreement covering all crafts. Those unions covered by the first agreement included the NRLCA, as well as the APWU (then known as the United Federation of Postal Clerks), the NALC, the Mail Handlers (and three others which have since been absorbed by the mentioned unions).

Article 16, Section 5 of that seminal agreement provided:

> SECTION 5. REVIEW OF DISCIPLINE. In no case may a supervisor impose suspension or discharge upon an employee unless the proposed disciplinary action by the supervisor has first been reviewed and concurred in by the installation head or his designee.
>
> In associate post offices of twenty (20) or less employees, or where there is no higher level supervisor than the supervisor who proposes to initiate suspension or discharge, the proposed disciplinary action shall first be reviewed and concurred in by a higher authority outside such installation or post office before any proposed disciplinary action is taken.

16

Over the intervening years, these unions have sometimes bargained in coalitions of differing combinations and sometimes negotiated separate contracts with the Postal Service, but the review and concur language has remained virtually constant throughout.

As for the NRLCA/Postal Service contracts, since the original language of Article 16.6 was adopted by the Parties in the 1971-73 joint Collective Bargaining Agreement, the language was re-adopted unchanged in the successive agreements negotiated in 1973, 1975, 1978, 1981, 1984, 1988, 1990, and 1993. In 1995, the NRLCA and the Postal Service amended the language of the first paragraph of Article 16.6 to provide as follows: (Emphasis in original, to denominate the changes.)

> In no case may a suspension or discharge be imposed upon an employee unless the proposed disciplinary action has first been reviewed and concurred in by a higher authority. Such concurrence shall be in writing.

It is noted that the NRLCA and the Postal Service jointly prepare and publish an "Analysis of Changes" following renegotiation of their agreements. The 1995 Analysis stated with respect to the above changes in Article 16.6:

> The first change clarifies the parties' position that discipline may be imposed by a manager other than the rural carrier's supervisor. The second change makes it clear that the concurring official need not be the installation head, provided the official is a higher authority, *i.e.*, a higher organizational level or higher grade level. The third change requires that there be written evidence of such review and concurrence.

My focus in this case remains the language of Article 16.6 of the current Agreement, in a national interpretive context; with due regard for bargaining and arbitral history concerning the interpretation and application of that language since 1971, to the extent such evidence assists in determining the mutual intent of the contracting parties. In that connection, from the inception of the first collective bargaining agreement in 1971 to date, a period spanning some 30 years and 11 separately negotiated agreements, the NRLCA and the Postal Service have permitted area arbitrators to interpret and apply the provisions of Article 16.6, without resort to National Arbitration. Indeed,

17

over the last three decades, area arbitration decisions construing and applying the review and concur language of Article 16.6 have been stacking up like cordwood. [Parenthetically, area arbitrators in cases involving the other crafts likewise have consistently interpreted the meaning of the review and concurrence provision in the same manner].

It is worth re-emphasizing that, notwithstanding the Postal Service's ostensible opposition to the interpretation and application of that language rendered by virtually all of the area arbitrators in these Article 15.5.D removal cases, the substance of the "review and concur" language has been repeatedly re-adopted by the Parties, without material change, in every successive National Agreement since 1971-73. In short, during more than three decades of living with this language as interpreted and applied by the area arbitrators, with a remarkable degree of consistency, in nearly 100 decisions. In all that time, neither Party ever exercised its right to renegotiate the controlling language of Article 16.6. Nor, prior to the instant case, did either Party deem it necessary to submit the review and concurrence language of Article 16.6 for definitive interpretation in Article 15.5.C National Arbitration, as a certified "national interpretive issue".

The Postal Service quite properly points out that, under the two-tier arbitration system adopted by these Parties, National Arbitration decisions govern in matters of national interpretations and the area arbitration decisions therefore are not authoritative precedent in this case. But just because National Arbitration decisions pre-empt area decisions in certified cases of national interpretation does not mean that thirty (30) years' worth of arbitration decisions by scores of prominent arbitrators, consistently construing and applying the language of Article 16.6 in area arbitration cases, are irrelevant, immaterial or unpersuasive in this National Arbitration case.

18

This National Arbitrator has the power and authority, as the contractual "Court of Last Resort", to interpret Article 16.6 in a manner other than as consistently and uniformly interpreted by scores of distinguished area arbitrators. It is manifest that Article 15.5.C area arbitration decisions are not *res judicata, stare decisis*, or in any sense dispositive, in Article 15.5.D National Arbitration. My responsibility to function as the designated National Arbitrator is not fulfilled simply by taking an opinion poll of area arbitrators.

But, in the absence of a National Arbitration decision interpreting a particular provision of the National Agreement, area arbitrators are regularly called upon to interpret and apply the various provisions of that Agreement, including Article 16.6. Area arbitrators have interpreted and applied Article 16.6 for more than 20 years in scores of cases, because the Association and the Postal Service have permitted them to do so and there is no contractual prohibition on them doing so. Of course, the interpretation of Article 16.6 in this National Arbitration case will govern and apply in all future area arbitrations, because National Arbitration under the Agreement represents a ruling by the Parties' designated "Supreme Court". On the other hand, in this particular case, most of those area arbitration decisions do in fact comport with my own interpretation of the language at issue in this case, based upon my independent analysis of the record before me. In short, the great majority of those area arbitration decisions are correct and as the National Arbitrator I reach essentially the same conclusions concerning the meaning of the language of Article 16.6.

Area arbitration may not be the "Supreme Court" under the parties' Agreement, but it most certainly is the "Court of Appeals" and area arbitration decisions are as "final and binding" as National Arbitration awards. If either party disagrees with an interpretation of the Agreement made by one or more area arbitrators, it can initiate a national interpretive grievance at Step 4 and take it

19

on to national arbitration, to obtain a "Supreme Court" ruling. Unless and until that occurs, however, the area arbitration decisions construing and applying Article 16.6 represented the "law" of the Parties. More importantly, in my considered judgement, those accumulated decisions also constitute persuasive evidence of the mutual intent of the contracting Parties.

Those area arbitrations have laid on a persuasive interpretive gloss to Article 16.6 over a period of thirty(30) years, during which the Parties jointly re-negotiated the controlling National Agreement eleven (11) times, without even seeking, let alone achieving, any significant modification of the language of Article 16.6.  When, as here, the area arbitration awards uniformly interpret a contract provision over a long period, and neither party seeks national arbitration or change in the contract language, but rather continually re-adopts the critical contract language time and time again in collective bargaining, it may well be concluded that the area arbitral interpretation has been incorporated into the Agreement.  Elkouri & Elkouri, How Arbitration Works (5th edition) (BNA 1997), states the governing principle of incorporation or adoption, at page 615:

> [I]f the agreement is renegotiated without materially changing a provision that has been interpreted by arbitration, the parties may be held to have adopted the award as a part of the contract. Indeed, the binding force of an award may even be strengthened by such renegotiation without change.

The Postal Service may be technically correct, as a matter of logic, that incorporation/re-adoption theory should not be dispositive, because none of the myriad arbitration decisions construing and applying Article 16.6 was in the National Arbitration forum.  However, to argue that the adoption theory should not even be considered seems to me an elevation of form over substance in this particular factual record.  In my considered judgement, the arbitral gloss applied by the area arbitrators has in fact and in practice been largely accepted by both Parties and is reflective of their

20

mutual understanding and intent concerning the interpretation and application of Article 16.6 in removal cases.

### Issues No. 1(a)-1(f): Article 16.6 Violation/Compliance

When the rhetorical excesses of ardent advocacy are stripped away, I do not perceive any meaningful disagreement between these Parties with the fundamental proposition that Article 16.6. requires two separate and independent managerial judgments, each based on substantive review of the record evidence, before a suspension or discharge disciplinary action may be imposed on an employee: the first by the initiating official who proposes discipline, and the second by a higher authority who must review and concur in the proposed discipline before it is imposed upon the employee.

It necessarily follows that the requirement of two separate and independent judgements, constitutes the very heart and core of Article 16.6, is violated when the reviewing/concurring official "commands" or "dictates" the disciplinary action to the proposing official, when the higher authority merely "rubber-stamps" the disciplinary action proposed by the employee's supervisor and/or when the sequential steps of a separate and independent supervisory initiation, followed by a separate and independent higher authority review/concurrence, are merged into a single consolidated joint decision by the two managers to suspend or discharge the employee.

Just as the area arbitration decisions rendered by a long line of prominent arbitrators have consistently held, I now hold that a violation of Article 16.6 occurs whenever: (1) the initiating official is deprived of freedom to make his own independent determination to discipline by a "command decision" dictated from higher authority to suspend or discharge; (2) the initiating and reviewing/concurring officials jointly make one consolidated disciplinary action decision, or (3) the

21

higher authority does not review the record and consider all of the available evidence before concurring in the supervisor's proposed discipline. In each such instance, because there have not been two separate and independent judgments on discipline, the employee is deprived of the essential due process check and balance protection that Article 16.6 is intended to provide.

However, so long as the *sine qua non* of Article 16.6, separateness and and independence of judgement in a two-stage process, is not violated by "command" decisions, joint decisions and/or "rubber-stamping", Article 16.6 does not bar the lower level supervisor from consulting, discussing, communicating with or jointly conferring with the higher reviewing authority before deciding to propose discipline. Indeed, it is common, and in many ways commendable and conducive to fulfillment of the intent of Article 16.6, for the lower level authority to communicate with higher management and discuss policies, options, and other factors to be considered, before determining whether, and to what extent, to propose suspension or discharge of an employee. In short, so long as the initiating official retains independence of judgment and is not commanded by higher authority to issue the discipline, such communications for advice and counsel between the initiating official and a higher authority are to be encouraged rather than chilled or prohibited. The determining factor under Article 16.6 is not whether the officer in charge seeks advice and counsel outside his office but whether, once having obtained such information, the initiating official acts independently or surrenders that independence completely to the person from whom he has sought such advice. In the former case, Article 16.6 is not violated but, in the latter case, Article 16.6 is violated.

By the same token, it is not *per se* a violation of Article 16.6 when the higher level authority relies in the reviewing/concurring step upon the record considered by the lower level official in proposing the discipline. The higher authority is not required by Article 16.6 to make an

22

"independent investigation". In my judgement, the requirements of Article 16.6 are met when the higher authority makes a substantive review of and bases the decision to concur on the record developed below.

Contrary to the position advanced by the Postal Service in this case, however, that process of review and concurrence contemplated by Article 16.6 is not a ministerial formality or a mere technical "laying on of hands" by the reviewing/concurring official. The requirement of a separate and independent second step of review and concurrence by the higher authority is not met by just a declaration of agreement with the first step supervisor's proposed disciplinary action. Compliance with Article 16.6 requires a substantive review of the matter by the higher authority in light of all the current information and the higher authority's concurrence with imposition of the disciplinary action proposed by the supervisor. Since the 1995 amendments, Article 16.6 specifies that this statement of concurrence by the higher authority must be set forth in writing.

Issue No. 1, *supra*, presents a subset of six (6) specific interrogatories concerning Article 16.6 compliance and violation, submitted by the Parties for determination in National Arbitration. Based on all of the foregoing, I conclude that Issues 1(a), and 1(d) are answered in the negative and Issues 1(b), 1(c), 1(e) and 1(f) are answered in the affirmative.

23

## Issue No. 2- - The Remedy for Proven Violations of Article 16.6

The operative language of Article 16.6 provides (emphasis added):

> **In no case** may a suspension or discharge be imposed upon an employee **unless** the proposed disciplinary action **has first** been reviewed and concurred in by a higher authority.

This language clearly and unambiguously mandates that compliance with the two-step, two-stage process set forth in Article 16.6 is a condition precedent to the imposition of a removal or suspension. Accordingly, I concur without equivocation with those many area arbitrators who have concluded that the substantive violations of Article 16.6 set forth in Issues 1(b), 1(c) and 1(e) invalidate the disciplinary action. Because these are substantive violations which effectively deny an employee the due process rights granted by Article 16.6, persuasive proof of such fatal violations requires arbitral reversal of the improperly imposed suspension or discharge, without consideration of the underlying merits of the disciplinary action, *i.e.*, reinstatement with "make whole" damages.

In my considered judgement, those relatively few area arbitration decisions which have engrafted onto the condition precedent language of Article 16.6 an additional requirement of proof of "actual harm", notwithstanding persuasive proof of a "command decision", a "joint decision" or that the reviewing/concurring official merely "rubber-stamped" the proposed disciplinary action, are just plain wrong. Under different contract language, arbitrators might properly overlook procedural defects in administration of discipline which do not unduly compromise the rights of an employee whose suspension or discharge is otherwise justified on the record. However, the precise terminology of Article 16.6 precludes recourse to that "harmless error" argument. If this plain language of Article 16.6 occasionally produces a manifestly unfair result, as undoubtedly it has in some cases, the proper recourse is renegotiation at the bargaining table, not arbitral legislation of "actual harm" or "harmless error" rules which are at odds with the express wording of Article 16.6.

24

The only *caveat* I would add concerns the procedural violation described in Issue 1(f), *i.e.*, failure of the Postal Service to produce evidence that the higher authority's concurrence was reduced to writing, as required by the 1995 amendment to Article 16.6. Such a failure to express concurrence in written form clearly is a procedural violation of Article 16.6, for which an arbitral remedy might well be appropriate. But it is not so clear that such a violation, standing alone, would invalidate the disciplinary action and require reversal and reinstatement in every case.

The record in this matter is insufficiently developed to make an informed judgement concerning bargaining history and mutual intent regarding the 1995 amendment. The facts and circumstances of each particular case determine whether a procedural failure to concur in writing adversely impacted substantive Article 16.6 rights of an individual suspended or discharged employee. For these reasons, I refrain from making a definitive generic ruling on that single remedial aspect of the submitted issues at this time. Area arbitrators remain free to exercise their own best judgement as to whether, in the facts and circumstances of the individual case, an Issue 1(f) type of violation requires reversal of the disciplinary action or some other remedy. For Issue 1(b), 1(c) and 1(e) violations, however, Article 16.6 requires reversal of the disciplinary action and reinstatement with remedial "make-whole" damages.

25

## AWARD OF THE NATIONAL ARBITRATOR
## CASE NO. E95R-4E-D 01027978

Having been designated National Arbitrator in accordance with Article 15, Section 5.C of the National Agreement between the above-named parties, and having been duly sworn and having duly heard the proofs and allegations of the parties, I hereby AWARD as follows:

### ISSUE NO.1

Article 16.6 <u>Review of Discipline</u> of the Extension to the 1995-1999 USPS-NRLCA National Agreement:

> a) Is not violated if the lower level supervisor consults, discusses, communicates with or jointly confers with the higher reviewing authority before deciding to propose discipline;

> b) Is violated if there is a "command decision" from higher authority to impose a suspension or discharge;

> c) Is violated if there is a joint decision by the initiating and reviewing officials to impose a suspension or discharge;

> d) Is not violated if the higher level authority does not conduct an independent investigation and relies upon the record submitted by the supervisor when reviewing and concurring with the proposed discipline;

> e) Is violated if there is a failure of either the initiating or reviewing official to make an independent substantive review of the evidence prior to the imposition of a suspension or discharge;

> f) Is violated if there is no evidence of written review and concurrence prior to the imposition of a suspension or discharge.

### ISSUE No. 2

(a) Proven violations of Article 16.6 as set forth in Issues 1 (b), 1(c) or 1(e) are fatal. Such substantive violation invalidate the disciplinary action and require a remedy of reinstatement with "make-whole" damages.

(b) Whether a violation of Article 16.6 as set forth in Issue 1(f) is fatal, invalidates the disciplinary action and requires a remedy of reinstatement with "make-whole" damages is for the area arbitrator to determine based on the facts and circumstances if the individual case.

**ISSUE No. 3**

Case No. E95R-4E-D 01027978 and all other similar cases held in abeyance at Step 4, pending this National Arbitration interpretation of Article 16.6, are remanded to area arbitration, for priority scheduling consistent with Article 15, Section 5.A of the National Agreement.

Jurisdiction is retained for the sole purpose of resolving any disputes which may arise between the Parties regarding the meaning, application or implementation of this National Arbitration Award.



Dana Edward Eischen

Signed at Spencer, New York on December 3, 2002

STATE OF NEW YORK    }
COUNTY OF TOMPKINS   } SS:

On this 3rd day of December, 2002, I, DANA E. EISCHEN, upon my oath as National Arbitrator, do hereby affirm and certify, pursuant to Section 7507 of the Civil Practice Law and Rules of the State of New York, that I have executed and issued the foregoing instrument and I acknowledge that it is my Opinion and Award in Case No. E95R-4E-D 01027978.



RECEIVED
DEC 10 2002
COLLECTIVE BARGAINING AND ARBITRATION
LABOR RELATIONS

EXHIBIT I

NATIONAL ARBITRATION PANEL

```
_____
                          )
In the Matter of Arbitration )
                          )
         between           )
                          )
UNITED STATES POSTAL SERVICE )
                          )
          and             )    Case Nos.:   H7V-1K-C 31669
                          )                 H7V-3S-C 40533
AMERICAN POSTAL WORKERS UNION )             H7V-1K-C 37022
                          )                 HOV-3E-C 3100
          and             )                 H7V-1N-C 33344
                          )
   NATIONAL ASSOCIATION OF  )
 LETTER CARRIERS (Intervenor) )
                          )
          and             )
                          )
NATIONAL POSTAL MAIL HANDLERS )
    UNION (Intervenor)     )
_____ )
```

BEFORE:              Professor Carlton J. Snow

APPEARANCES:         For the U.S. Postal Service:
                       Mr. Kevin B. Rachel

                     For the American Postal Workers Union:
                       Mr. Lee W. Jackson

                     For the National Association of
                     Letter Carriers:
                       Mr. Keith E. Secular

                     For the National Postal Mail
                     Handlers Union:
                       Mr. Bruce R. Lerner

PLACE OF HEARING:    Washington, D. C.

DATE OF HEARING:     March 15, 1994

POST-HEARING BRIEFS: May 11, 1994

AWARD

Having carefully considered all evidence submitted by the parties concerning this matter, the arbitrator concludes that the grievance is procedurally arbitrable and that national level arbitration is an appropriate forum for resolving the grievance on the merits.  A national level arbitrator has jurisdiction to proceed to the merits of the case.  It is so ordered and awarded.

DATE: 8-5-94

Carlton J. Snow
Professor of Law

```
IN THE MATTER OF ARBITRATION )
                             )
           BETWEEN           )
                             )
UNITED STATES POSTAL SERVICE )
                             )
            AND              )
                             )         ANALYSIS AND AWARD
AMERICAN POSTAL WORKERS UNION )
                             )
            AND              )            Carlton J. Snow
                             )             Arbitrator
    NATIONAL ASSOCIATION OF  )
   LETTER CARRIERS (Intervenor) )
                             )
            AND              )
                             )
NATIONAL POSTAL MAIL HANDLERS )
      UNION (Intervenor)     )
   (Case Nos.:  H7V-1K-C 31669 )
                H7V-3S-C 40533 )
                H7V-1K-C 37022 )
                HOV-3E-C 3100  )
                H7V-1N-C 33344 )
```

I.   <u>INTRODUCTION</u>

   This matter came for hearing pursuant to a collective
bargaining agreement between the parties effective from
November 21, 1990 through November 20, 1994.  A hearing
occurred on March 15, 1994 in a conference room of U.S. Postal
Service Headquarters located at 475 L'Enfant Plaza S.W. in
Washington, D.C.  Mr. Kevin B. Rachel, Labor Relations
Representative, represented the United States Postal Service.
Mr. Lee W. Jackson of the O'Donnel, Schwartz & Anderson law
firm in Washington, D.C., represented the American Postal
Workers Union.  Mr. Keith E. Secular of the Cohen, Weiss &
Simon law firm in New York, N.Y. represented the National

Association of Letter Carriers.  Mr. Bruce R. Lerner of the
Bredhoff & Kaiser law firm in Washington, D.C.  represented
the National Postal Mail Handlers Union.

The hearing proceeded in an orderly manner.  There was
a full opportunity for the parties to submit evidence, to
examine and cross-examine witnesses, and to argue the matter.
All witnesses testified under oath as administered by the
arbitrator.  The advocates fully and fairly represented their
respective parties.  Ms. Oveda Hancock of Aaron Reporting
Services, Inc. reported the proceeding for the parties and
submitted a transcript of 86 pages.

There were no challenges to the substantive arbitrability
of the dispute, but the American Postal Workers Union main-
tained that the dispute is not procedurally arbitrable.  The
National Association of Letter Carriers and the National
Postal Mail Handlers Union intervened in the case.  They sub-
mitted post-hearing briefs in support of the Employer's con-
tention that the dispute is procedurally arbitrable at the
national level.  The arbitrator officially closed the hearing
on May 11, 1994 after receipt of the final post-hearing
briefs in the matter.

2

II.  STATEMENT OF THE ISSUE

The American Postal Workers Union framed the issue on the merits as follows:

> Whether the Employer violated terms of the collective bargaining agreement between it and the American Postal Workers Union by issuing to employes OF-346 licenses endorsed for motor vehicles which the employes' position does not require them to drive?

The Employer framed the issue on the merits as follows:

> Whether the Postal Service violated its collective bargaining agreement with the American Postal Workers Union by allowing bargaining unit employes, who hold positions for which the national position description does not explicitly refer to such driving duties, to have an OF-346 license?

The issues before the arbitrator is as follows:

> (1)  Is the grievance procedurally arbitrable? If not, what is an appropriate remedy?

> (2)  Did the Employer violate the collective bargaining agreement with the American Postal Workers Union by issuing an OF-346 license to bargaining unit employes who hold jobs for which the position description does not require driving duties?  If so, what is an appropriate remedy?

3

III.   RELEVANT CONTRACTUAL PROVISIONS

ARTICLE 15   GRIEVANCE-ARBITRATION PROCEDURE

Section 4.   Arbitration

A.   General Provisions

9.   In any arbitration proceeding in which a Union feels that its interests may be affected, it shall be entitled to intervene and participate in such arbitration proceeding, but it shall be required to share the cost of such arbitration equally with any or all other Union parties to such proceeding. Any dispute as to arbitrability may be submitted to the arbitrator and be determined by such arbitrator. The arbitrator's determination shall be final and binding.

D.   National Level Arbitration

1.   Only cases involving interpretive issues under this Agreement or supplements thereto of general application will be arbitrated at the National level.

IV.   STATEMENT OF FACTS

In this dispute, the American Postal Workers Union challenged the procedural arbitrability of the grievance and contended that the grievance does not raise an interpretive issue of general application, as required by Article 15.4.D.1 of the parties' collective bargaining agreement. The procedural question in dispute between the parties cannot be resolved without reference to the merits of the dispute. Such

4

background information will provide a useful context for understanding the nature of the dispute between the parties. Because, however, the arbitration hearing was bifurcated, none of the parties has presented testimonial evidence on the merits of the dispute.  But five grievance documents involving the five cases at issue in the proceeding have been admitted into the record.  (See, APWU Exhibit Nos. 1-5).

The American Postal Workers Union filed the five grievances at issue in the case.  The grievances in each of these disputes arose when the Employer, at its various locations, issued an OF-346 driver's license to bargaining unit employes with endorsements for vehicles which position descriptions of those employes did not require them to drive.  In each instance, the American Postal Workers Union challenged management's decision to issue the license  in question.  The OF-346 license includes certain endorsements which authorize a person holding the license to drive certain vehicles.

An employe is not authorized to drive a Postal Service vehicle without an OF-346 license with a specific endorsement for a particular type of vehicle.  The American Postal Workers Union maintained that the parties' collective bargaining agreement and provisions of handbooks and manuals prevent the Employer from issuing OF-346 licenses with endorsements to drive certain vehicles to employes  whose job description does not require them to drive those same vehicles.  According to the American Postal Workers Union, if operation of a particular type of vehicle is not contained within the official job

description of a job classification (such as, "Mail Handler"
or "Letter Carrier"), the Employer may not change or add to
the qualification standards. The American Postal Workers
Union argued that issuing such licenses to employes outside
the Motor Vehicle Craft allowed individuals to perform Motor
Vehicle Craft work in violation of the parties' National
Agreement, specifically, Articles 1, 19, 39, Handbook EL-827,
or the Postal Operations Manual, and Postal Manual EL-201
and EL-203.

It is the belief of the Employer that there are no con-
tractual restrictions on its issuance of OF-346 licenses and
that, under Article 3 of the parties' agreement, management
has discretion to issue OF-346 licenses for any vehicle to
any employe. According to the Employer, Article 3 of the
parties' collective bargaining agreement grants it an exclu-
sive right to assign employes and to determine methods, means,
and personnel to conduct efficient operations of the enter-
prise. The Employer asserts that no craft has exclusive
jurisdiction over the operation of any vehicle. The Employer
argued that language of Handbook EL-827 regarding the surren-
der of OF-346 licenses is intended to insure that such
licenses are surrendered when they are no longer necessary.
According to the Employer, its regulations require that an
employe have an OF-346 license for the type of vehicle driven,
even if the employe only occasionally drives a vehicle. The
Employer argued that determining whether any driving is

6

required as a part of a duty assignment is strictly a managerial function.

Each of the five grievances proceeded to Step 3 of the parties' grievance-arbitration procedure.  In its Step 3 decision, the Employer initially took the position that each case did not present an "interpretive issue of general application" and that each case, therefore, was not appropriate for national level arbitration.  (See, APWU Exhibit Nos. 1-5). In each of the five cases, however, the Employer later referred the grievance to Step 4 of the parties' grievance-arbitration procedure, contending that the grievances presented an interpretive issue of general application.  The American Postal Workers Union consistently has taken the position that the grievances at issue do not raise an interpretive issue of general application.

At the national level arbitration hearing, the American Postal Workers Union restated its position that the dispute is not procedurally arbitrable because it does not involve an interpretiuve issue under the agreement between the parties.

The merits of the dispute involve five separate grievances.  Four of the grievances arose during the term of the 1990-94 collective bargaining agreement between the parties. One of the grievances arose during the 1987-90 agreement. Only Case No. H7V-1K-C 31699 from Manchester, New Hampshire arose during the term of the 1987-90 collective bargaining

7

agreement. The American Postal Workers Union, however, argued that there has been no change in the parties' agreement which materially affects its position with regard to this dispute. (See, APWU Post-hearing Brief, 3).

In deference to an acknowledged practice of the parties and without objection from any party, the arbitrator honored the request of the American Postal Workers Union to bifurcate the issue of arbitrability from the merits of the case. Accordingly, the arbitrator adjourned the hearing after a presentation of evidence and argument from the parties that related solely to the issue of procedural arbitrability. The single issue before the arbitrator at this juncture, therefore, is whether or not the dispute is procedurally arbitrable.

V.   POSITION OF THE PARTIES

A.   The American Postal Workers Union

The American Postal Workers Union maintains that the dispute is not procedurally arbitrable because it fails to raise an interpretive issue of general application, as required by the grievance-arbitration procedure in the parties' agreement. It is the position of the American Postal Workers Union that Article 15.4.V.1 prevents the arbitrator from hearing the dispute on its merits at the national level. The contractual provision states:

8

Only cases involving interpretive issues under
this Agreement or supplements thereto of general
application will be arbitrated at the National
level. (See, Joint Exhibit No. 1, p. 69).

It is the position of the American Postal Workers Union
that there is no interpretive issue in this case because
there allegedly is no legitimate undecided dispute about the
meaning to be attached to specific language in the National
Agreement. According to the American Postal Workers Union,
the parties must attach different meanings to the same con-
tractual language in order for an interpretive issue to be
present at the national level. On the merits, the American
Postal Workers Union maintains that the Employer violated the
parties' agreement, including Articles 19 and 39 as well as a
number of Postal Service handbooks and manuals. The viola-
tion allegedly occurred when management issued OF-346 licenses
to bargaining unit members with endorsements for vehicles
which job descriptions of those employes did not require them
to drive. According to the American Postal Workers Union:

[The Employer does not] take issue with [its] inter-
pretation of the cited provisions of the National
Agreement or of the cited provisions of the Hand-
books and Manuals. Instead, Postal Service [takes]
the position that Article 3 of the National Agreement
gives it the exclusive right to assign employees
and to decide who should receive OF-346 licenses
with endorsements to drive particular vehicles.
(See, APWU's Post-hearing Brief, 10).

The American Postal Workers Union asserts the Employer
is not arguing that provisions of the National Agreement at
issue here have a meaning other than the one ascribed to
them by the APWU. The American Postal Workers Union maintains

9

that the Employer disputes the application of those provisions to facts presented by the five disputed grievances. The American Postal Workers Union contends that, in order to resolve the dispute on its merits, the arbitrator is not required to choose between competing meanings for the same contractual language but, rather, is required to decide whether certain contractual language (together with Handbook and Manual provisions) should be applied to facts presented by the underlying grievance. It is the belief of the American Postal Workers Union that resolving the merits of the grievance at the national level will disrupt a delicately balanced system of arbitration constructed by the parties over a period of many years.

It is also the position of the American Postal Workers Union that the Employer, in its Step 3 decision in each of the five grievances, cast the issue presented by the merits of the dispute as one not involving an interpretive issue of general application. According to the American Postal Workers Union, the Employer now is engaged in forum shopping by referring these grievances to national level arbitration because three regional level arbitration awards have been decided in favor of the American Postal Workers Union's position on the merits of the underlying grievance. The APWU contends that the Employer should be bound by its earlier assertion that these grievances do not present an interpretive issue of general application.

The American Postal Workers Union also argued that the

merits of the grievances do not present an  interpretive
issue of general application because the issue has been
decided at the regional level in the Union's favor on three
separate occasions.  According to the American Postal Workers
Union, an issue must be legitimate and undecided in order to
raise an interpretive issue for national level arbitration.
Such allegedly are not the facts in this case.

Finally, a close scrutiny of the facts in this case
allegedly shows that there is no interpretive issue of general
application at stake in the dispute.  According to the American
Postal Workers Union:

> What the facts of this case show is that over a
> period of about five years, five cases have ap-
> peared at the national level involving the same
> issue on the merits.  Clearly, the existence of
> five cases over a period of four or five years
> does not show that there is a widespread confu-
> sion nationally over the meaning of any particu-
> lar provision of the collective bargaining
> agreement.  Thus, no issue of 'general applica-
> tion' is presented.  (See, APWU's Post-hearing
> Brief, 12-13).

Since the dispute allegedly is not appropriate for national
level arbitration, the American Postal Workers Union argues
that the five grievances should be remanded to regional arbi-
tration for a solution at that level.

11

B.   <u>The Employer</u>

The Employer contends that the dispute is procedurally arbitrable.  It is the position of the Employer that there is a legitimate conflict about the meaning to be attached to specific language in the agreement and, that, therefore, the dispute raises an interpretive issue of general application. On the merits, the Employer maintains that it fundamentally disagreed with the meaning and result which the American Postal Workers Union seeks to derive from its interpretation of the postal handbooks and manuals  provisions incorporated into the National Agreement pursuant to Article 19.  The Employer maintains that the argument of the American Postal Workers Union to the effect that various position  descriptions limit work which employes may perform is a misinterpretation of those provisions.  According to the Employer, the various position descriptions provide a general statement of duties of the position and exist  for the purpose of assigning an appropriate rate of pay.  It is the belief of the Employer that the American Postal Workers Union has interpreted Section 444 of the EL-827, as well as Section 142 of the EL-303.

According to the Employer, the present dispute involves an interpretive issue because neither party has attempted to resolve the dispute by referencing the factual circumstances underlying the grievances at issue.  Rather, both parties have relied on provisions of the National Agreement as well

12

as provisions of handbooks and manuals incorporated by Article
19 into the parties' agreement.  Accordingly, the Employer
concludes that the dispute involves conflicts regarding the
meaning to be attached to language in the parties' agreement
and that, therefore, it raises an interpretive issue.  That
issue is one of general application, according to the Employer,
because its resolution has the potential to affect the assign-
ment of driving duties in many of its operations.

### C.   The National Association of Letter Carriers

The National Association of Letter Carriers agrees with
the Employer that the present dispute raises an interpretive
issue of general application and, therefore, is procedurally
arbitrable at the national level.  According to the National
Association of Letter Carriers, grievances advanced by the
American Postal Workers Union rest on an interpretation of
numerous provisions of national handbooks and manuals incor-
porated into the National Agreement by Article 19; and it is
the belief of the NALC that the interpretation of the American
Postal Workers Union is at odds with the Employer's inter-
pretation of those provisions and Article 3 of the parties'
agreement.  The National Association of Letter Carriers,
therefore, concludes that this dispute involves a conflict
over the appropriate meaning to be attributed to specific

13

language in the parties' agreement, and such a dispute
allegedly cannot be resolved without resort to general prin-
ciples of contract interpretation.  Thus, the dispute involves
an interpretative issue, in the opinion of the National
Association of Letter Carriers.

It is also the position of the National Association of
Letter Carriers that merely because similar grievances have
been arbitrated at the regional level does not remove the
dispute from the jurisdiction of an arbitrator at the national
level.  The National Association of Letter Carriers contends
that regional arbitrators themselves have recognized the
interpretive nature of the dispute before them.  Because
regional arbitration awards are not binding at the national
level and national level arbitration awards are binding at
the regional level, the National Association of Letter Carriers
argues that the present dispute is a legitimate, undecided
conflict involving the meaning of specific language in the
agreement.

The National Association of Letter Carriers also argued
that, in at least one of the underlying grievances, the
American Postal Workers Union advanced an interpretation of
Article 7.2 in the National Agreement that Arbitrator Garrett
specifically rejected in Case No. AW-NAP-5753.  Accordingly,
it is the position of the NALC that this dispute involves a
"fundamental question as to the meaning of a national arbi-
tral precedent."  (See, NALC's Post-hearing Brief, 5-6).

14

D.   The National Postal Mail Handlers Union

It is the position of the National Postal Mail Handlers Union that the present dispute is procedurally arbitrable at the national level.  According to the National Postal Mail Handlers Union,

> The argument and the testimony introduced by the APWU and the USPS during the . . . hearing clearly demonstrates that the parties to these consolidated cases dispute not only the meaning of the APWU/USPS collective bargaining agreement (including Articles 3 and 39), but also the meaning of various provisions found in handbooks, manuals, and published regulations of the Postal Service (including Section 444 of EL-827. . . ; Section 142 of EL-303 . . . ; and Chapter 7 of the Postal Operations Manual.  (See, NPMHU's Post-hearing Brief, p. 2).

According to the National Postal Mail Handlers Union, the present dispute involves a conflict between the parties regarding the meaning to be attached to specific contractual language and, as such, is a dispute that involves an interpretive issue.

The National Postal Mail Handlers Union also contends that the interpretive issue presented by this case is of general application.  The Union asserts that the fact that the same issue has arisen in at least five grievances from various localities as well as that the American Postal Workers Union has submitted regional awards in at least three other cases that are factually parallel demonstrate  that the issue presented is one of sufficient general application to meet requirements of procedural arbitrability under Article 15.4.D.1 of the parties' agreement.

15

VI. <u>ANALYSIS</u>

    A.    <u>A Narrowed Dispute</u>

The parties agreed to bifurcate the merits of the dispute from the issue of procedural arbitrability. Accordingly, the issue before the arbitrator is a narrow one. The question to be resolved is whether or not the grievance is procedurally arbitrable at the national level. Article 15.4.A(9) mirrors the teaching of the U.S. Supreme Court that issues of procedural arbitrability involve primarily contract interpretation and should be resolved by an arbitrator. (See, <u>John Wiley & Sons v. Livingston</u>, 376 U.S. 543 (1964)). As the parties have agreed:

> Any dispute as to arbitrability may be submitted to the arbitrator and be determined by such arbitrator. The arbitrator's determination shall be final and binding. (See, Joint Exhibit No. 1, p. 66).

It is appropriate for an arbitrator to resolve issues of procedural arbitrability not only because such disputes routinely implicate principles of contract interpretation but also because procedural issues often are intertwined with the underlying merit of the dispute. The parties in this case have maintained a long collective bargaining relationship, and they have negotiated a sophisticated grievance-arbitration procedure with several tiers of arbitration, including national level arbitration, regional arbitration, and expedited arbitration. It is the substantive issue raised by a grievant which determines the appropriate forum.

16

Regular regional arbitration cases typically involve removals or suspensions for more than fourteen days. Cases involving a sanction of fourteen days or less without interpretive overtones may be appropriate for expedited arbitration. The parties have agreed that certain cases may be resolved by either regular regional arbitration or expedited arbitration. They have designed their grievance-arbitration procedure, however, to restrict the jurisdiction of national level arbitration proceedings to cases involving interpretive issues of general application. They expressly have consigned ultimate interpretive authority to national level arbitration. They implicitly concluded that debate about national issues should occur in a national level proceeding because such a setting encourages more dispassionate investigation among leaders in the organization who have access to the most complete data and systematic analysis. Ultimate authority, of course, resides with the parties at the bargaining table, but the parties designed a system that left the final work in determining fundamental interpretive issues of general application to national arbitrators, unless modified at the bargaining table.

Article 15.4.D.1 which requires only cases involving interpretive issues of general application to be arbitrated at the national level restricts an arbitrator's jurisdiction at the national level. In order to test the procedural arbitrability of a dispute at the national level, an arbitrator must determine that it presents an "interpretive issue under

17

this agreement or supplement thereto of general application
. . . ." (See, Joint Exhibit No. 1, p. 69).  Such an assess-
ment cannot be made in a vacuum and requires some review of
facts in the case.

The American Postal Workers Union argued the Employer
has conceded that the present dispute does not involve an
interpretive issue of general application.  Management alleg-
edly did so in its Step 3 decision for each of the five
underlying grievances.  According to the American Postal
Workers Union, the Employer now should be bound by its earlier
determination that the present dispute is not procedurally
arbitrable at the national level.  A contrary conclusion
allegedly would allow the Employer to engage in "forum shop-
ping" by referring disputes that have been settled at the
regional level, such as the present dispute, to national level
arbitration.  It, however, is clear from previous national
level arbitration decisions that a party may change its
position on the issue of procedural arbitrability at the
arbitration hearing if that party now believes that an inter-
pretive issue is involved.  (See, e.g., Case Nos. H4C-4A-C 7931;
H4C-4C-C 13068; H4C-4K-C 33596; H4C-3C-C 4857; and H7N-1A-C 25966).

18

## B.    APPLICATION OF THE CONTRACTUAL TEST

As previously has been stated:

> An 'interpretive issue' exists when there is a
> reasonable conflict about the meaning to be
> attributed to the symbols of expression used by
> the other party.  That is, an 'interpretive issue'
> exists when there is a legitimate dispute about
> the meaning of language contained in the contract.
> (See, Case No. H4C-3W-C 28547, p. 22).

An interpretive issue must be distinguished from an issue

involving only an application of specific language in the

agreement to a particular set of facts.  Parties may agree

on the meaning of specific language in an agreement and, yet,

dispute the effect of that meaning in a particular case.

For instance, the parties agreed in a case before Arbitrator

Mittenthal that the labor contract authorized an arbitrator to

award interest on a monetary award as a result of the employer's

post-award conduct.  The parties, however, disagreed about

whether interest should be awarded under the facts of that

particular case.

Arbitrator Mittenthal determined that the grievance did

not present an interpretive issue under the National Agree-

ment because both parties agreed the labor contract allowed

an arbitrator to award interest based on the employer's post-

award conduct.  Whether an arbitrator should or should not

award interest on the basis of the Employer's post-award con-

duct constituted an individual case and did not involve an

interpretation of language in the parties' agreement.  It,

therefore, did not present an interpretive issue.  As

19

Arbitrator Mittenthal stated:

> The Union apparently [thought] that the Postal
> Service was asserting, as a contractual principle,
> that an arbitrator could never award interest on
> a money award because of management's post-award
> conduct.  At the arbitration hearing, it quickly
> became evident that this was not the Postal Ser-
> vice's position.  Interest, in other words, might
> in appropriate circumstances be awarded on account
> of post-award conduct.  That being so, there was
> no longer an interpretive issue under the National
> Agreement before this national arbitrator.  (See,
> Employer's Exhibit No. 5, p. 2).

Drawing a distinction between an interpretive issue and an

issue involving only an application of language in the parties'

agreement, the meaning of which is undisputed, can be most

difficult.  Ultimately, the issue cannot be resolved without

a thorough examination of the nature of the dispute on its

merits.  To determine whether the grievance in this particular

matter presents an interpretive issue, it is necessary to

review some aspects of the merits of the case.

###     C.    A Review of Some of the Facts

Applying the working definition of an "interpretive

issue" leads to a conclusion that the present dispute involves

an interpretive question.  Grievance documents from the five

consolidated grievances show that the parties disagreed about

the proper interpretation of provisions in their National

Agreement and handbooks and manuals.  Handbooks and manuals

have been incorporated into the parties' agreement pursuant

20

to Article 19.  It states:

> Those parts of all handbooks, manuals, and pub-
> lished regulations of the Postal Service, that
> directly relate to wages, hours or working condi-
> tions, as they apply to employees covered by this
> Agreement, shall contain nothing that conflicts
> with this Agreement and shall be continued in
> effect. . . .  (See, Joint Exhibit No. 2, p. 99).

The American Postal Workers Union offered the following

assessment of the merits of the case:

> Both the National Agreement, together with cited
> provisions of the Postal Service Handbooks and
> Manuals, forbid the Postal Service to issue OF-346
> licenses with endorsements to drive certain
> vehicles to employees whose job descriptions do
> not require them to drive those same vehicles.
> In circumstances where employees' job descriptions
> do not require them to drive a certain vehicle
> but those employees do in fact possess an OF-346
> license to drive that vehicle, the Postal Service
> must require that employee to surrender the OF-346
> license with the endorsement for vehicles not
> required by his job descriptions.  (See, APWU's
> Post-hearing Brief, 4-5).

In support of its position on the merits of the case, the

American Postal Workers Union relied on Articles 1; 19; and

39 of the National Agreement; EL and R Manuals, Section 2.1

and 231.2; Postal Manual EL-201; Postal Manual EL-303 with

special reference to Sections 142, 150, 151, and 153; Postal

Operations Manual Sections 714, 721, and 722; Postal Handbook

EL-827, Sections 444, 120(J), and Chapter 8.  (See, APWU's

Post-hearing Brief, 6).

Not surprisingly, the Employer saw the merits differ-

ently.  According to the Employer:

> APWU seeks the establishment of a strict, nation-
> ally-applicable rule that would prevent management
> from permitting certain employees to drive certain

types of vehicles.  The APWU derives as the source
for this rule Handbook and Manual provisions incor-
porated in the contract pursuant to Article 19.
The Postal Service vigorously disagrees with the
APWU's claim that these Handbooks and Manuals can
be conferred with the meaning which the APWU gives
them.  Rather, the Postal Service asserts that no
such rule exists, and that pursuant to its Hand-
books and Manuals, it is fully entitled to permit
letter carriers and mail handlers to carry the
authorization to drive any postal vehicle.  (See,
Employer's Post-hearing Brief, 15).

In its Step 4 decision, the Employer again asserted its

authority to issue licenses to a broader array of workers

than the APWU believed permissible.  At Step 4, the Employer

characterized its position as follows:

Management has the discretion to issue OF-346s to
any employee to drive any vehicle.  There are no
contractual restrictions on the issuance of OF-346s.
Article 3 grants management the exclusive right
to assign employees and to determine the method,
means and personnel to conduct operations.  (See,
APWU's Exhibit No. 1).

In concluding that the grievance before the arbitrator

is not procedurally arbitrable, the American Postal Workers

Union argued that:

The Postal Service did not, at Step 4 or earlier
in the grievance procedure in these cases, take
issue with the APWU's interpretation of the cited
provisions of the National Agreement or of the
cited portions of the Handbooks and Manuals.  In-
stead, the Postal Service took the position that
Article 3 of the National Agreement gives it the
exclusive right to assign employees and to decide
who should receive OF-346 licenses with endorse-
ments to drive particular vehicles.

The Postal Service has not taken the position that
the terms of the EL and R Manual, the Postal Oper-
ations Manual, the EL-201 Manual, the EL-303
Manual, or Article 1 or 19 of the National Agree-
ment have a meaning other than the one ascribed
to them by the APWU.  Rather, the Postal service

22

seems to dispute, whether these provisions, saying
what they do, shall be applied  to  the facts of
the situations presented by the five arbitration
cases at Bar.  Thus, with regard to the merits of
the issue presented by the five cases at Bar, the
Arbitrator is not required to choose between com-
peting meanings with the same contract  language,
but  rather is required to decide whether certain
contract language, together with  Handbook  and
Manual provisions, should be applied to the facts
presented.  (See, APWU's Post-hearing Brief, 10-11).

Such an argument failed to be persuasive.  The parties

are in vigorous disagreement about the meaning to be attri-

buted to language in their agreement.  The American Postal

Workers Union argued that cited provisions of handbooks and

manuals as well as Article 1 of the parties' agreement

restricted the Employer's issuance of OF-346 licenses to

employes whose job descriptions do not contain driving

requirements or duties.  The Employer maintained with equal

vigor that those same provisions do not restrict its issuance

of OF-346 licenses to any employe.  In other words, the dis-

pute between the parties cannot be resolved without inter-

preting the meaning of language in the collective bargaining

agreement, including language in handbooks and manuals.  Such

a dispute calls out for an authoritative contract interpretation

and the compact between the parties has  named a national level

arbitrator  as  the  one who should determine the meaning of

the agreement in a dispute of this sort.

It is important to distinguish the central issue on the

merits in this dispute from an issue involving an application,

rather than an interpretation, of provisions in the parties'

National Agreement.  The Employer has not argued in this case
that employes at issue held bid positions for which job
descriptions included driving requirements.  Neither has the
American Postal Workers Union argued that the Employer impro-
perly added driving duties to job descriptions and, as a
result, improperly issued an employe an OF-346 license.
Rather, the parties are in disagreement over whether the
Employer's issuance of OF-346 licenses is limited in any
manner by provision of the agreement cited by the American
Postal Workers Union.

The American Postal Workers Union argued that the pre-
sent dispute involves only a factual determination regarding
whether the Employer issued OF-346 licenses to employes who
hold positions for which the job descriptions do not include
driving requirements.  In arguing that the merits of the dis-
pute involve only those factual inquiries, the American Postal
Workers Union relied on its own interpretation of relevant
language in handbooks and manuals.  In other words, if the
language means what the Union says it means, then the griev-
ances present only factual inquiries.  The Employer, however,
does not agree that the language in the handbooks and manuals
means what the American Postal Workers Union says it means.
Rather, the Employer argued that there are no contractual
provisions which restrict the issuance of OF-346 licenses to
any employe, regardless of the individual's position descrip-
tion.  Thus, the interpretive issue in this case is "whether"

24

the Employer's issuance of OF-346 licenses to employes is restricted by language in the parties' agreement.

On the merits, the present dispute involves an interpretive issue because its resolution depends on whose interpretation of the language in the parties' agreement is correct. Resolution of that issue depends on the parties' intended meaning at the time they agreed to provisions of the labor contract at issue in this case. Whose meaning should prevail must be determined by using standard principles of contract interpretation. Because there is a legitimate dispute about reasonable expectations of the parties and about whose meaning should prevail, the dispute involves an interpretive issue appropriate for resolution at the national level.

Further support for this conclusion is found in three regional arbitration decisions involving the same issue on the merits as the dispute presently before the arbitrator. (See, APWU's Exhibit Nos. 6, 7, and 8). In each of those regional cases, an arbitrator applied principles of contract interpretation to resolve disputes about the intended meaning of language in the parties' agreement. For example, one arbitrator concluded that

> The parties' inability to reach a resolution on this issue appears to be a result of their conflicting interpretations of the language contained in the relevant Handbooks and Manuals. In the instant grievance it may be that the language in each Handbook was as clear and definite as the Parties intended it to be when originally constructed. However, the result is a lack of clarity when the contract is construed as a whole because there is an absence of harmony when its various parts are brought together.

25

> In the instant grievance the determination has
> been reached through the application of arbitral
> standards regarding the interpretation of contract
> language and the principle which demands that
> clear and specific contract language must be given
> precedence over language that is general or ambiguous.
> (See, APWU's Exhibit No. 6, p. 12, emphasis added).

The paties have decided that, under their system, interpretive

issues of general applicability may be heard by a national

arbitrator.  The conclusion of the regional arbitrators must

be overlaid with the definition of an "interpretive issue."

As previously has been determined,

> An 'interpretive issue' exists when there is a legi-
> timate dispute about the meaning of (the expecta-
> tions of parties to an agreement), and standard
> rules of contract interpretation must be applied
> in order to clarify the competing definitions of
> 'meaning' within the parties' agreement.  (See,
> APWU's Exhibit No. 17, p. 23).

Three regional arbitrators resolved the merits of the

present dispute by ascertaining the meaning of the parties'

agreement through applying general rules of contract inter-

pretation.  Their decisions support a conclusion that the

merits of the present dispute involve  an interpretive issue

appropriate for resolution by a national arbitrator.  This

result is consistent with the parties' grievance procedure

which has been designed to produce uniformity of interpreta-

tion and to encourage dispassionate investigation by indivi-

duals with a coherent understanding of operations on a

national level.

The American Postal Workers Union also has argued that

the present dispute is not procedurally arbitrable because

the merits of the case already have been resolved in its favor by three regional level arbitration decisions.  Since an interpretive issue must involve an undecided issue between the parties, it allegedly would violate the parties' agreement to permit national level arbitration of an issue that already has been thrice decided.  It is clear from the design of the parties' grievance-arbitration procedure that the parties have not intended to bind a national level arbitrator by a regional arbitration award.  It is an important source of guidance, and the reasoning in such decisions generally deserves respect and study.  The common law of the industry with respect to these parties, however, is that they deliberately have designed a precedential system with regard to the impact of national level arbitration decisions in regional level arbitration proceedings.

D.   An Issue of General Applicability

The American Postal Workers Union argued that the present dispute is not procedurally arbitrable because the Employer failed to prove the existence of a widespread organizational problem, that is, the dispute allegedly did  not involve an issue of general application.  As the American Postal Workers Union described it:

27

> What the facts in this situation show is that over
> a period of about five years, five cases have ap-
> peared at the National level involving the same
> issue on the merits.  Clearly, the existence of
> five cases over a period of four or five years
> does not show that there is a widespread confusion
> nationally over the meaning of any particular pro-
> vision of the Collective Bargaining Agreement. Thus,
> no issue of 'general application' is presented.
> (See, APWU's Post-hearing Brief, 12-15).

It is clear from the evidence that the dispute in this case

has arisen periodically.  Nor can the merits of the dispute

be resolved without interpreting several provisions of hand-

books and manuals that are of general application.  This is

sufficient to meet the threshold requirement  of the parties'

agreement to overcome a challenge to the procedural arbitra-

bility of an interpretive issue at the national level.

AWARD

Having carefully considered all evidence submitted
by the parties concerning this matter, the arbitrator con-
cludes that the grievance is procedurally arbitrable and
that national level arbitration is an appropriate forum
for resolving the grievance on the merits.  A national level
arbitrator has jurisdiction to proceed to the merits of
the case.  It is so ordered and awarded.

Respectfully submitted,

Carlton J. Snow
Professor of Law

Date: 8-5-94

29

# EXHIBIT J

# USPS-NALC JCAM

2014

## Joint
## Contract
## Administration
## Manual

United States Postal Service
and
National Association
of Letter Carriers, AFL-CIO







**Appeal to Step B.** If the grievance is not resolved at Formal Step A, the union may appeal it to Step B within 7 calendar days of the Formal Step A decision date (unless the parties agree to an extension of time for appeal).

**15.2**
**Formal Step A (g)**

(g) Additions and corrections to the Formal Step A record may be submitted by the Union with the Step B appeal letter within the time frame for initiating the Step B appeal with a copy to the management Formal Step A official. Any such statement must be included in the file as part of the grievance record in the case.

**Additions and Corrections.** The union may submit written additions and corrections to the Formal Step A record with the Step B appeal within the time limit for filing an appeal to Step B. The filing of any corrections or additions does not extend the time limits for filing the appeal to Step B. At the same time, a copy of the additions and cor-rections must be sent to the management Formal Step A official. Management may respond by sending additional information to the Step B team which is directly related to the union's additions and corrections provided that it is received prior to the Step B decision. At the same time, a copy must be sent to the union Formal Step A representative. Any statement of additions and corrections must be included in the file as part of the grievance record in the case. A steward is entitled to time on-the-clock to write the Union's state-ment of corrections and additions (Step 4, A8-S-0309, December 7, 1979, M-01145).

**15.2**
**Step B (a)**

**Step B**

(a) Any appeal from an unresolved case in Formal Step A shall be in writing to the Step B team at the appropriate Step B office, with a copy to the Formal Step A representatives, and will include a copy of the Joint Step A Grievance Form, and shall specify the reasons for the appeal.

**Step B—Dispute Resolution Teams.** The Step B teams each consist of two Step B representatives—one appointed by the NALC and the other by the Postal Service. Appeals of unresolved cases at Formal Step A are made in writing to the Step B Dispute Resolution Team. The parties at the national level have agreed any arguments and facts brought forth at either Informal or Formal Step A and properly included in the PS Form 8190/case file are incorporated in the Step B decision, and any of this material may be cited in the event of arbitration.

**15.2**
**Step B (b)**

(b) The Step B team will review the appeal and issue a joint report of the decision and any supporting findings within fourteen (14) days of receipt of the appeal at Step B unless the parties mutually agree to extend the fourteen (14) day period. The Step B team will give priority consideration to discussion and decision of removal cases. It is the

responsibility of the Step B team to ensure that the facts and con-
tentions of grievances are fully developed and considered, and resolve
grievances jointly. The Step B team may 1) resolve the grievance 2)
declare an impasse 3) hold the grievance pending resolution of a repre-
sentative case or national interpretive case or 4) remand the grievance
with specific instructions. In any case where the Step B team mutually
concludes that relevant facts or contentions were not developed ade-
quately in Formal Step A, they have authority to return the grievance to
the Formal Step A level for full development of all facts and further
consideration at that level. If the grievance is remanded, the parties'
representatives at Formal Step A shall meet within seven (7) days after
the grievance is returned to Formal Step A. Thereafter, the time limits
and procedures applicable to Formal Step A grievances shall apply.

**15.2
Step B (c)**

(c) The written Step B joint report shall state the reasons in detail and shall
include a statement of any additional facts and contentions not previ-
ously set forth in the record of the grievance as appealed from Formal
Step A. The Step B team will attach a list of all documents included in
the file.

**Review.** The Step B representatives work together in pairs and attempt to
resolve grievances jointly. Both Step B representatives are responsible
for ensuring that the facts and contentions of grievances are fully devel-
oped. The Step B representatives may restate or change a grievance's
issue statement as appropriate. The Step B teams must give priority to
considering and deciding removal cases.

**Step B Decision.** The Dispute Resolution Team must make a decision
within fourteen calendar days after receipt of the appeal from Formal
Step A, unless this time limit is mutually extended. The written Step B
decision must state the reasons for the decision in detail and include a
statement of any additional facts or contentions not set forth in the griev-
ance as appealed from Formal Step A. The Step B team must attach to
the decision a list of all documents included in the file.

A Step B decision establishes precedent only in the installation from
which the grievance arose. For this purpose, precedent means that the
decision is relied upon in dealing with subsequent similar cases to avoid
the repetition of disputes on similar issues that have been previously
decided in that installation.

**Step B Decision Types.** In deciding a grievance the team chooses among
four options. It may:

- **Resolve** the grievance,

- **Impasse** the grievance if the team cannot resolve it,

- **Remand** the grievance to the Formal Step A parties with specific
instructions, or

- **Hold** the decision pending resolution of a representative case or
national interpretive case.

# EXHIBIT K

**MEMORANDUM OF AGREEMENT
BETWEEN THE
UNITED STATES POSTAL SERVICE
AND THE
NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO**

**Re: Article 15 – Dispute Resolution Procedure Task Force**

Pursuant to the Memorandum of Understanding, Re: Article 15 – Dispute Resolution Procedure Task Force, the parties agree to implement the following policy change.

The national parties have agreed that Step B teams are prohibited from citing/quoting regular panel arbitration awards in any decision, unless the award is from the installation where the grievance arose and is relevant to the subject matter at issue.

This policy is effective immediately and shall continue until such time as the national parties mutually agree otherwise.

_____
Alan S. Moore
Manager, Labor Relations
Policies & Programs
U.S. Postal Service

_____
Lew Drass
Vice President
National Association of Letter
Carriers, AFL-CIO

Date  7-10-18